IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------ x
:
IBRAHIM OSMAN IBRAHIM
IDRIS,                                                        :

                Petitioner,                :

                       *v.*                      :    Civil Action No. 05-CV-01555 (JR)

GEORGE W. BUSH, *et al.*,                                     :

                Respondents.               :
------------------------------------------------------------ x

**PETITIONER'S MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
PROHIBITING RESPONDENTS FROM REMOVING PETITIONER IDRIS FROM
GUANTÁNAMO OR, IN THE ALTERNATIVE, TO PROVIDE COUNSEL FOR
PETITIONER AND THE COURT WITH THIRTY DAYS'
<u>NOTICE OF ANY INTENDED REMOVAL OF PETITIONER FROM GUANTÁNAMO</u>**

       Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioner Ibrahim Osman Ibrahim Idris ("Petitioner Idris") respectfully submits this Memorandum in support of his application for the immediate issuance of a temporary restraining order and preliminary injunction prohibiting Respondents ("Respondents" or "Government") from removing Petitioner Idris from Guantánamo Bay Naval Base ("Guantánamo") other than releasing him from detention within the United States or, in the alternative, requiring Respondents to provide the Court and counsel for Petitioner Idris with at least thirty days' notice of any intended removal of Petitioner Idris from Guantánamo other than releasing him from detention within the United States.

22006279v6

The relief sought by Petitioner Idris is both reasonable and warranted. He is a Sudanese national detained by Pakistani authorities and now caught in an international maelstrom. For nearly four years, he has languished in a Guantánamo prison – half-way around the world from his home. Petitioner Idris seeks to be released from foreign captivity, but at the same time – because he has been branded an "enemy combatant" by Respondents – he could be exposed to significant risk to his safety depending upon the circumstances of his release. The designation as an "enemy combatant," yet to be reviewed by an independent tribunal, renders Petitioner Idris a potential target for abuse, persecution and violence in many parts of the world. The threat to his safety is not confined to lawless mobs or vigilantes, but perhaps he is at greatest risk from foreign governments that even Respondents acknowledge engage in torture and other affronts to basic human rights. Moreover, there have been news reports that in some cases, Respondents have transferred detainees to the custody of foreign government precisely because those governments countenance torture as an interrogation tool .

Respondents have refused to stipulate that, during the pendency of this proceeding, they will not transfer him to the custody of foreign governments where Petitioner faces substantial risk of violence. To the contrary, Respondents not only have acknowledged that they have transferred other Guantánamo detainees to the custody of foreign governments that are known to practice torture, but also that they intend to transfer more detainees to those foreign governments.

Based on the very real risk, indeed likelihood, that Petitioner may be transferred to the custody of a foreign government – as the result of Respondents' unilateral and unreviewed determination that he is an "enemy," and Respondents' unilateral and unreviewed decision to dispatch him to prison somewhere else in the world – Petitioner asks only that Respondents be

restrained from doing so until the Court has heard his petition, or at a minimum, that Respondents be required to provide advance notice of their intention to transfer him.

The relief sought by Petitioner Idris would neither unfairly prejudice the Government nor unduly impair the Government's ability to discharge its responsibilities. To the contrary, the relief sought would simply maintain the status quo – or merely require the Government to provide thirty days notice prior to seeking to alter the status quo – to enable the Court to address the merits of Petitioner Idris' pending petition for habeas corpus without being deprived of subject matter jurisdiction by a transfer. Moreover, a temporary restraining order and preliminary injunction would allow Petitioner to challenge the legality of his transfer to a country where he may face inhumane detention, torture, violence, or death. The relief that Petitioner Idris seeks is identical to that previously ordered by courts in this district on essentially identical allegations. *See, e.g., Al Daini v. Bush,* 05-CV-634 (RWR) (D.D.C. Jun. 6, 2005); *El Banna v. Bush,* 04-CV-1144 (RWR) (D.D.C. Apr. 8, 2004); *Al-Oshan v. Bush,* 05-CV-0520 (RMU) (D.D.C. Mar. 31, 2005); *Al-Joudi v. Bush,* 05-cv-00301 (GK) (Feb. 9, 2005); *Salahi v. Bush,* 05-CV-0569 (JR) (imposing a stay precluding the rendition and repatriation of detained petitioners).

On November 9, 2005, Petitioner's counsel contacted Respondents' counsel and requested that Respondents stipulate that Respondents would not remove Petitioner from Guantánamo, other than to release him in the United States, or in the alternative, first provide Petitioner's counsel at least 30 days advance notice of a planned move. On November 10, Respondent's counsel flatly refused the request, and refused even to consider some form of alternative relief.

3

## STATEMENT OF FACTS

Petitioner Idris is a Sudanese citizen who is being detained as an "enemy combatant" at Guantánamo. As explained in his letter to the Court, dated February 12, 2005 and received by the Court on August 2, 2005, and accepted as a *pro se habeas* petition (the "*pro se* Petition"), as well as in the Petition for Issuance of a Writ of Habeas Corpus (the "Petition") dated August 30, 2005, filed in the proceeding with docket number 05-cv-01725, Petitioner Idris denies being an "enemy combatant" and contends that he is being detained in violation of the Constitution, treaties, and laws of the United States. Counsel for Petitioner Idris only recently received security clearance necessary to visit Guantánamo and have requested an opportunity to meet with Petitioner Idris.

According to the *pro se* Petition, Petitioner Idris has been detained at Guantánamo since January 2002. According to several news reports, the United States has secretly moved detainees and others suspected of terrorist crimes from Guantánamo to foreign countries for interrogation and/or detention without complying with extradition or other legal process. This practice, known as "rendition," "irregular rendition" or "extraordinary rendition," is reportedly used to facilitate interrogation by subjecting detainees to torture and other practices that are proscribed by United States law and regulations.

Petitioner Idris has reason to fear that, without due process of law, he will be transferred into the custody of a foreign government and may face illegal detention and inhumane interrogations and conditions of detention. News reports indicate that the United States Government has been planning "to cut by more than half the population at its detention facility in Guantánamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in

4

Saudi Arabia, Afghanistan and Yemen, according to senior administration officials." Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba,* N.Y. Times, Mar. 11, 2005 (attached as Exhibit 1). The Government recently reached an agreement to transfer 110 detainees to Afghanistan for further detention, and negotiations on similar arrangements are progressing with Saudi Arabia. Neil A. Lewis, *Guantánamo Detention Site Is Being Transformed, U.S. Says,* N.Y. Times, Aug. 6, 2005, at A8 (attached as Exhibit 2). In requiring notice prior to any transfer of detainees, another court in this district noted that Respondents have not denied press reports detailing Respondents' plans "to accelerate the transfer of Guantánamo detainees to other sovereigns and other locations." *Abdullah v. Bush,* 05-CV-0023 (RWR), Mem. Order dated Apr. 8, 2005, at 4.

According to reports by American and foreign news organizations, including the *Washington Post* and the *Los Angeles Times*, the United States government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques. According to an article in the *New Yorker*, the "rendition" process was originally "a program aimed at a small, discrete set of suspects – people against whom there were outstanding foreign arrest warrants," but after September 11 came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture*, New Yorker, Feb. 14, 2005, at ¶ 7 (attached as Exhibit 3). According to the *Washington Post*,

> Since Sept. 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been

5

> taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *US. Behind Secret Transfer of Terror Suspects*, Wash. Post, Mar. 11, 2002, at A1 (attached as Exhibit 4). Some of the countries to which detainees have been brought are known to practice torture. *See, e.g.*, Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over For Torture*, L.A. Times, Jan. 13, 2005, at A1 ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners.") (attached as Exhibit 5).

Official government documents confirm transfers of detainees from Guantánamo to countries which are known to practice torture. *See, e.g.,* FBI memos dated February 23 and 29, 2004, March 11, 2004, and April 4 and 7, 2004, available at http://www.aclu.org/torturefoia/released/FBI_3928_3940.pdf (attached as Exhibit 6) (detailing transfers of detainees from Guantánamo to countries including Afghanistan, Russia, Pakistan, Turkey, and Iraq). The Government has admitted in court filings that the United States transfers detainees "to the control of other governments for investigation and possible prosecution and continued detention…Such governments can include the government of a detainee's home country, or a country other than a detainee's home country that may have law enforcement or prosecution interest in the detainee." *See* Declaration of Matthew C. Waxman, dated Mar. 8, 2005, ¶3, in *Al-Adahi v. Bush,* 05-cv-280 (GK) (attached as Exhibit 7). The Government has

6

admitted that, as of March 8, 2005, sixty-five detainees had been transferred from Guantánamo Bay to the control of their home governments for further detention. *See id.* at ¶ 4. Pursuant to Government policy, a detainee may be transferred to a country known to practice torture if the Government believes that the chances the transferee will be tortured are less than fifty percent. *See id.* at ¶ 6. Other courts in this district have taken the Government's policy and practices into consideration when granting requests for relief under nearly identical circumstances. *See, e.g., Abdullah,* 05-CV-0023 (RWR), Mem. Order dated Apr. 8, 2005 at 4; *Kurnaz v. Bush,* 04-cv-01135 (ESH), Order dated Apr. 12, 2005 at 4.

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to issue injunctions to protect its jurisdiction." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973). Further, this Court may issue a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure to preserve the *status quo* between the parties pending a final determination of the merits of the action. *See* 13 Moore's Federal Practice 3d, § 65.20 (2004) (stating that as preliminary injunctions are intended "to preserve the *status quo* between the parties pending a final determination of the merits of the action…a request for a preliminary injunction that seeks to store the *status quo* will ordinarily be granted.").

Each of the four factors to be weighed in awarding a temporary restraining order or preliminary injunction favors granting the requested relief: (1) Petitioner will suffer irreparable harm if the relief is denied; (2) there is a clear public interest in preventing the United States Government from rendering individuals to foreign countries where they may be subject to

7

detention and torture; (3) Petitioner is likely to succeed on the merits of his claims; and (4) no harm will be suffered by Respondents if the temporary restraining order or injunction is granted. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *see also Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921 (D.C. Cir. 1958). These four factors "interrelate on a sliding scale," so that "if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).

1. Petitioner Idris Faces A Significant Threat of Irreparable Harmed In The Absence Of A Preliminary Injunction.

Courts in this district have recognized "two obvious and substantial threats" in similar factual situations: 1) the deprivation of Petitioner's right to have his *habeas* claims considered by a unbiased tribunal, and 2) the potential harm from a transfer to a country where Petitioner may be tortured. *See, e.g., Al-Joudi v. Bush*, 05-cv-00301 (GK) (Feb. 9, 2005), Mem. Op. dated Apr. 4, 2005, at 8-9.

First, by transferring Petitioner Idris to another country, the Government would unilaterally deprive the Court of jurisdiction to consider and resolve Petitioner Idris' claims of unlawful detention. In the absence of the limited relief requested here, Petitioner Idris' claims, which invoke the fundamental concept of due process – including the elemental right to have a grievance heard by a tribunal – will be unilaterally defeated by the Government, the very party against whom due process violations have been alleged. *See Rumsfeld v. Padilla,* 124 S. Ct. 2711, 2722 (2004) ("District courts are limited to granting habeas relief within their respective jurisdictions." (internal quotations omitted)). Courts in this district have found that such

purposeful denial of due process, in and of itself, constitutes irreparable harm and warrants issuing an injunction requiring notice prior to transfer. *See Abdah v. Bush,* 04-CV-1254 (HHK) (RMC) (Mar. 12, 2005), Mem. Op. dated Mar. 29, 2005, at 7 (holding that transfer out of the Court's jurisdiction in itself "clearly satisfies the preliminary injunction standard" of irreparable harm).

Second, Petitioner Idris faces the very real risk of immeasurable and irreparable harm – from torture to possible death – if transferred to the custody of a foreign government. In another *habeas* proceeding brought by a Guantánamo detainee, another court in this district has issued a temporary restraining order and preliminary injunction regarding possible transfer based on claims of immediate, irreparable harm due to the possibility of torture after transfer because "the possibility of transfer to a country where [a detainee] might be tortured or indefinitely confined, …undeniably would constitute irreparable harm" and such a "threatened injury is not merely remote and speculative; it is a serious potential threat." *See, e.g., Al-Joudi,* Mem. Op. dated Apr. 4, 2005, at 8-9 (granting a temporary order and preliminary injunction restraining the Government from transferring petitioners without thirty days' notice).

Indeed, according to some accounts, Respondents have transferred detainees not simply in callous disregard of the risks of injury, but specifically to exploit the willingness of foreign governments to torture or otherwise mistreat persons in their custody. *See* Chanrasekaran & Finn, *US. Behind Secret Transfer of Terror Suspects*, Wash. Post, Mar. 11, 2002, at A1 (attached

22006279v6

as Exhibit 4).[1] In that regard, the risk is not whether Petitioner Idris will be mistreated by foreign governments, but rather the risk is whether Respondents will select Petitioner Idris for such transfer.

   2.   Public Policy Favors A Preliminary Injunction Restraining Respondents From Removing Petitioner From The Court's Jurisdiction, Or Requiring Advance Notice Before Doing So

Petitioner Idris has a right to petition for judicial review of the basis of his detention. *See Rasul v. Bush,* 124 S. Ct. 2686, 2698 (2004). The vindication of the right to petition for judicial review is important not only to Petitioner Idris, but indeed to the American public at large, which itself has a compelling interest in seeing that the right of an indigent Sudanese national is not only observed in form, but meaningful in fact. A court in this district has found that "the public interest undeniably is served by ensuring that Petitioners' constitutional rights can be adjudicated in an appropriate manner." *Al-Joudi,* Mem. Op. dated Apr. 4, 2005, at 14-15.

The American framework of governance rests on a fundamental balance of powers, both between the government and the people, as well as among the branches of government. This balance of power includes at its core the right of any federal prisoner – properly before the Court – to challenge meaningfully the basis on which he is being held prisoner by the executive branch. This right, to be meaningful, must exist independent of the executive branch's own interests; the right to petition the judiciary cannot turn on the executive branch's acquiescence. To allow the

---

[1] Respondents have denied that they transfer prisoners to the custody of foreign governments specifically to exploit the willingness of these other governments to use torture as an interrogation technique. However, the existence of credible reports of torture and the absence of any accountability are precisely the reason that the public's interest in entry of an injunction that would preserve the Court's jurisdiction and the Petitioner's safety are so vital.

executive branch to avoid altogether its obligation to respond to a petition for habeas relief, by transferring a prisoner to the custody of a foreign government that is likely to continue to hold the prisoner captive, and that may even exacerbate the conditions of confinement, would not simply jeopardize the right of a Sudanese indigent to invoke the power of the Great Writ, but would permit a dangerous drift in the balance of powers. That the executive branch has transferred prisoners specifically to foreign countries, in some instances neither the prisoner's home country nor the country where he was apprehended, but where the ruling power can be expected to continue to exercise custody over the prisoner under conditions considered inhumane here, and perhaps even affirmatively exploited these other government's allowance of physical abuse, is all the more reason to restrain such action until the petition has been resolved.

The public's interest in holding the executive branch to its obligation to answer the petition is especially compelling in this case, because the executive branch's actions have been conducted entirely behind closed doors. Respondents took custody of Petitioner Idris nearly four years ago, and since then have transferred him thousands of miles away from his home to a United States military facility, where he has been held virtually incommunicado. During this entire time, Respondents have refused to disclose the circumstances of his apprehension and the grounds for his apprehension and continued imprisonment; Respondents have refused to permit communication and access to Petitioner – indeed, Respondents refused even to voluntarily disclose that Petitioner Idris was in custody.[2] *See Names of the Detained in Guantanamo Bay,*

---

[2] Respondents in other instances have argued that detainees have access to send and receive correspondence, and are provided with writing instruments and a few pieces of paper a month. Petitioner's counsel are aware only of a single letter from Petitioner Idris: a

22006279v6

*Cuba,* Wash. Post, *available at* http://www.washingtonpost.com/wp-srv/nation/guantanamo_names.html (noting that the "Pentagon has declined to identify the detainees at Guantanamo Bay") (attached as Exhibit 8). The public has a substantial stake in maintaining the keystone in our relationship to government, namely that a prisoner, even an indigent alien, can call upon the executive branch to answer for its actions, taken in the name of the United States, to deprive a person of his liberty, as well as to defend its intention to deliver him to the custody of foreign governments.

Respondents' concerns about national security have been protected, even at the expense of the public's traditionally paramount right of holding government accountable for its actions through public proceedings. But the public's interest in this and related proceedings have not been abated altogether, only held in abeyance in the interests of national security. This motion, however, which asks only that Respondents defend their professed unilateral right to transfer a prisoner to the custody of a foreign government even at the expense of the prisoner's physical safety, does not represent a risk to national security. In the absence of a preliminary injunction that preserves the Court's jurisdiction, as well as the physical safety of the Petitioner, the public's right to governmental accountability on a matter of global geopolitical importance will be subject to the discretion of the very persons whose actions are at issue.

---

February 12, 2005 letter to this Court that was not received until August 2, 2005. His letter to the Court suggests that Petitioner Idris, at least as of that date, had not been able to correspond with anyone else – and the fact that a letter to this Court took six months to deliver certainly does not inspire confidence that Petitioner Idris has been able to freely communicate with family in Sudan. Respondents do not permit telephone calls to detainees, and Petitioners' counsel are still waiting for Respondents to respond to their request to visit him.

12

22006279v6

### 3. Petitioner Idris Has Raised Serious, Substantial Issues Justifying Injunctive Relief

To justify his request for a temporary restraining order and a preliminary injunction, Petitioner Idris need not show "a mathematical probability of success," but rather only that the questions raised by his *habeas* claims are so "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 844 (D.C. Cir. 1977), *quoted in Al-Joudi,* Mem. Op. dated Apr. 4, 2005, at 11. Petitioner Idris' habeas claims clearly rise to this level of seriousness.

Petitioner Idris has properly invoked the jurisdiction of this Court in seeking *habeas* review of the legality of his detention at Guantánamo. *See Rasul*, 124 S. Ct. at 2698. Likewise, despite finding that "the mathematical probability of success is impossible to assess" with regard to habeas claims of those detained at Guantánamo, a court in this district has found that "there can be no doubt that the questions raised here are so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation." *Al-Joudi,* Mem. Op. dated Apr. 4, 2005, at 11-12 (internal citations omitted). Similarly, Judge Joyce Hens Green has ruled in eleven related cases that Guantánamo habeas petitioners have rights under the Due Process Clause of the Fifth Amendment. *See In re Guantánamo Detainee Cases,* 355 F. Supp. 2d 443, 463 (D.D.C. 2005), *certified for appeal at* 2005 U.S. Dist. LEXIS 5295 (D.D.C. Feb. 3, 2005). The substantial questions raised in this proceeding merit a preliminary injunction that would preserve the opportunity of the Court to resolve them.

In a proceeding brought by a Guantánamo detainee, another court in this district held that Federal Rule of Appellate Procedure 23(a), which requires that "pending review of a decision in a habeas corpus proceeding commenced before a court…the person having custody of the

13

prisoner must not transfer custody to another...'" applies to Guantánamo detainee habeas petitions. *Abdah,* Mem. Op. dated Mar. 29, 2005, at 8 (finding a clear likelihood of success in blocking a transfer made absent notice to the court). The court held not only that the Rule's "application here is consistent with both the text of the rule and its underlying purpose," but also that "Rule 23(a) acquires an even greater importance in the context of Petitioners' case," whereby transfer would "assuredly deprive the court of its jurisdiction." *Id.* at 9.

Moreover, beyond the ultimate relief sought by Petitioner Idris -- that is, his release from detention -- Petitioner Idris is likely to prevail, following a hearing on the merits, on an application for a permanent injunction restraining Respondents from exercising unilateral and unfettered power to transfer him to any country -- and to the custody of any government -- they choose. The right to petition the Court for relief from unlawful conditions of detention, and for release from detention altogether, must also encompass the terms and conditions of transfer to the custody of a foreign government, especially in the context of Guantánamo detainees. Respondents in some instances have transferred detainees to the custody of cooperative foreign governments that, even the Government has acknowledged, condone the practice of torture and other affronts to the basic human rights of prisoners in their custody. It is not difficult to imagine possible transfers that would pose a risk of injury even greater than continued detention at Guantanamo – all of which has been occasioned by the Respondent's secretive determination to brand a detainee an "enemy" and imprison him at Guantánamo. The Court's authority to review and ameliorate conditions of detention that violate minimal standards must similarly comprehend the authority to ameliorate conditions of release that pose a significant threat to safety.

14

4.     The Requested Relief Will Not Burden Respondents

In contrast to the harm that Petitioner Idris stands to suffer from rendition to another country, Respondents, who have already held Petitioner Idris for nearly four years, are asked only to refrain from transferring him while his petition for habeas relief is before the Court or, in the alternative, to provide counsel and the Court with adequate notice of any intended removal of Petitioner Idris from Guantánamo.  The practical effect of the relief requested is to afford Petitioner Idris the opportunity, if necessary, of challenging a decision by Respondents to transfer him to a country where his safety would be at risk.  Respondents will suffer no conceivable prejudice from a preliminary injunction that does nothing more than preserve that opportunity of Petitioner Idris to challenge such an action, as well as Respondents' opportunity to seek to defeat his challenge.

## CONCLUSION

For the reasons discussed above, Petitioner Idris respectfully requests that this Court grant his motion for a temporary restraining order and preliminary injunction prohibiting Respondents from removing Petitioner Idris from Guantánamo other than releasing him from detention within the United States, or in the alternative, requiring Respondents to provide the Court and counsel for Petitioner Idris with at least thirty days notice of any intended removal of

22006279v6

Petitioner from Guantánamo other than releasing him from detention within the United States. Petitioner Idris requests a hearing on the instant motion to be scheduled as soon as the Court deems appropriate.

Dated: Washington, D.C.
      November 10, 2005

Respectfully submitted,

Counsel for Petitioner

/s/ John B. Missing
John B. Missing (Bar No. 425469)
Jennifer C. Argabright (Bar. No. 480763)
DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W. Ste 1100E
Washington, D.C. 20004-1169
Tel: (202) 383 8000
Fax: (202) 383 8118

Jeffrey I. Lang
Jennifer R. Cowan
Ellen A. Hochberg
Tatia L. Miller
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000
Fax: (212) 909-6386

*Of Counsel*
Barbara Olshansky
Gitanjali Gutierrez
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

## CERTIFICATE OF COUNSEL REQUIRED BY LCvR 65.1

Pursuant to Rule 65.1(a) of the Rules of the District of Columbia, counsel for Petitioner Idris hereby certifies to the Court that (1) counsel for Respondents, Andrew Warden, was notified by phone on November 9, 2005 that the instant motion would be filed shortly thereafter, and (2) copies of all pleadings and papers filed in the action to date or to be presented to the court at any hearing on the instant motion have been furnished to Mr. Warden. Petitioner Idris requests a hearing on the instant motion to be scheduled as soon as the Court deems appropriate.

Dated: November 10, 2005

Respectfully submitted,
Counsel for Petitioner:

/s/ John B. Missing
John B. Missing (Bar No. 425469)
Jennifer C. Argabright (Bar. No. 480763)
DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W. Ste 1100E
Washington, D.C. 20004-1169
Tel:  (202) 383 8000
Fax:  (202) 383 8118

Jeffrey I. Lang
Jennifer R. Cowan
Ellen A. Hochberg
Tatia L. Miller
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel:  (212) 909-6000
Fax:  (212) 909-6386

*Of Counsel*
Barbara Olshansky
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

22006279v6