# EXHIBIT 1

To the Motion For Temporary Restraining Order
and Preliminary Injunction Prohibiting Respondents
From Removing Petitioner Idris From Guantanamo

On Behalf of Petitioner,

## IBRAHIM OSMAN IBRAHIM IDRIS

1 of 1 DOCUMENT

Copyright 2005 The New York Times Company
The New York Times

**March** 11, 2005 Friday
Correction Appended
Late Edition - Final

**SECTION:** Section A; Column 6; Foreign Desk; THE REACH OF WAR: GUANTANAMO; Pg. 1

**LENGTH:** 1493 words

**HEADLINE: PENTAGON SEEKS** TO SHIFT INMATES FROM CUBA BASE

**BYLINE:** By DOUGLAS JEHL; Neil A. Lewis and Tim Golden contributed reporting for this article.

**DATELINE:** WASHINGTON, March 10

**BODY:**

   The Pentagon is seeking to enlist help from the State Department and other agencies in a plan to cut by more than half the population at its detention facility in Guantanamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials.

   The transfers would be similar to the renditions, or transfers of captives to other countries, carried out by the Central Intelligence Agency, but are subject to stricter approval within the government, and face potential opposition from the C.I.A. as well as the State and Justice Departments, the officials said.

   Administration officials say those agencies have resisted some previous handovers, out of concern that transferring the prisoners to foreign governments could harm American security or subject the prisoners to mistreatment.

   A Feb. 5 memorandum from Defense Secretary Donald H. Rumsfeld calls for broader interagency support for the plan, starting with efforts to work out a significant transfer of prisoners to Afghanistan, the officials said. The proposal is part of a Pentagon effort to cut a Guantanamo population that stands at about 540 detainees by releasing some outright and by transferring others for continued detention elsewhere.

   The proposal comes as the Bush administration reviews the future of the naval base at Guantanamo as a detention center, after court decisions and shifts in public opinion have raised legal and political questions about the use of the facility.

   The White House first embraced using Guantanamo as a holding place for terrorism suspects taken in Afghanistan, in part because the base was seen as beyond the jurisdiction of United States law. But recent court rulings have held that prisoners there may challenge their detentions in federal court.

   Indeed, the Pentagon has halted, for the last six months, the flow of new terrorism suspects into the prison, Defense Department officials said. In January, a senior American official said in an interview that most prisoners at Guantanamo no longer had any intelligence value and were not being regularly interrogated.

   The proposed transfers would represent a major acceleration of Pentagon efforts that have transferred 65 prisoners from Guantanamo to foreign countries. The population at Guantanamo includes more than 100 prisoners each from Afghanistan, Saudi Arabia and Yemen, a senior administration official said, and the United States might need to provide money or other logistical support to make possible a large-scale transfer to any of those nations.

   Defense Department officials said that the adverse court rulings had contributed to their determination to reduce the population at Guantanamo, in part by persuading other countries to bear some of the burden of detaining terrorism suspects.

   Under the administration's approach, the State Department is responsible for negotiating agreements in which

PENTAGON SEEKS TO SHIFT INMATES FROM CUBA BASE The New York Times March

receiving countries agree "to detain, investigate, and/or prosecute" the prisoners and to treat them humanely.

"Our top choice would be to win the war on terrorism and declare an end to it and repatriate everybody," a senior Defense Department official said in an interview. "The next best solution would be to work with the home governments of the detainees in order to get them to take the necessary steps to mitigate the threat these individuals pose."

The official, who spoke on condition of anonymity, said that future transfers into Guantanamo remained a "possibility," but made clear that the court decisions and the burdens of detaining prisoners at the American facility had made it seem less attractive to administration policymakers than before.

"It's fair to say that the calculus now is different than it was before, because the legal landscape has changed and those are factors that might be considered," a senior Defense Department official said.

In addition to working to transfer prisoners to their home countries, either to face charges there or simply to be kept in detention, officials also hope to shed dozens of prisoners whose cases are being studied by special review boards.

Those three–member military boards began working in earnest in January to determine which prisoners are no longer a threat, have no information of value and may be released outright.

At its peak, the population at Guantanamo exceeded 750 prisoners. But the last time prisoners were transferred there was on Sept. 22, 2004, when a group of 10 was transferred from Afghanistan. The United States has already dispatched 211 Guantanamo prisoners, releasing the majority of them. Sixty–five have been transferred to the custody of other counties, including 29 to Pakistan, 5 to Morocco, 7 to France, 7 to Russia, and 4 to Saudi Arabia.

The administration's policy of detaining suspected terrorists at Guantanamo has relied on declarations that the detainees are unlawful "enemy combatants," based on assertions that they did not serve in a conventional army, and thus did not qualify for the protections listed in the Geneva Conventions.

Administration lawyers argued successfully in lower federal courts that United States laws, including access to the courts, did not apply because Guantanamo is part of Cuba.

But last June, the Supreme Court ruled that United States law applied to Guantanamo and that prisoners there could challenge their detentions in federal courts.

In August, a federal district judge ruled that the Geneva Conventions apply to Guantanamo prisoners and that the special military commissions to try war crimes were unconstitutional. The government's appeal of that ruling is scheduled to be heard next month.

Even as it moves to reduce the population at Guantanamo, the Pentagon has asked Congress for another $41 million in supplemental financing for construction there, including $36 million for a new, more modern prison and $5 million for a new perimeter fence.

The purpose, Defense Department officials said, was to provide a secure, humane detention facility for a remnant of the current population who are expected to remain there for the foreseeable future.

As many as 200 of those now at Guantanamo will most likely remain there indefinitely, the officials said, on grounds that they are too dangerous to be turned over to other nations or would probably face mistreatment if returned to those nations.

Each of the roughly 540 prisoners at Guantanamo have gone before a three–member military board, to have their status as enemy combatants reviewed. A final review has been completed in 487 cases; of those, all but 22 were found to have been properly classified, a status leaving them subject to possible war crimes charges.

Unlike the Pentagon, the C.I.A. was authorized by President Bush after the Sept. 11 attacks to transfer prisoners from one foreign country to another without case-by-case approval from other government departments. Former intelligence officials said that the C.I.A. has carried out 100 to 150 such transfers, known as renditions, since Sept. 11.

By contrast, the transfers carried out by the Pentagon are subject to strict rules requiring interagency approval. Officials said that the transfers do not constitute renditions under the Pentagon's definition, because the governments that accept the prisoners are not expected to carry out the will of the United States.

Indeed, officials have been concerned that transfer of some detainees could threaten American security because they

PENTAGON SEEKS TO SHIFT INMATES FROM CUBA BASE The New York Times March

might escape from foreign prisons or the foreign governments might free them.

The White House has said its policy prohibits the transfer of prisoners to other nations if it is likely they will be tortured, and administration officials said the interagency review is intended in part to enforce that standard. Transfers have been approved by the State Department to countries including Saudi Arabia and Pakistan, identified in the department's own human rights reports as nations where the use of torture in prisons is common.

Administration officials said that American diplomats in those countries were responsible for monitoring agreements to make sure prisoners were not mistreated. The senior Defense Department official said that the difficulty of "gaining effective and credible assurances" that prisoners would not be mistreated had been "a cause of some delay in releasing or transferring some detainees we have at Guantanamo."

It is possible that Guantanamo inmates could petition a federal court to stop a transfer to a country where they did not want to be sent. But there is little if any precedent to suggest how the courts would rule.

In November, a lawyer for Mamdouh Habib, a prisoner who claimed he had been tortured in Egypt before being transferred to Guantanamo, asked a federal district court to stop the Bush administration from returning him to Egypt. Before the court ruled, he was sent to Australia in January and freed.

**URL:** http://www.nytimes.com

**CORRECTION–DATE:** March 15, 2005

**CORRECTION:**

A front-page article on Friday about the Pentagon's efforts to send prisoners to other countries from Guantanamo Bay, Cuba, referred incompletely to legal proceedings in a recent case involving Mamdouh Habib, who had asked the Federal District Court in Washington to prohibit the government from sending him to Egypt. In November, a judge denied Mr. Habib's request but gave him permission to renew it if the government ordered his transfer there, and required the government to give advance notice of any such transfer. Mr. Habib was later sent instead to Australia, where he was released.

**GRAPHIC:** Photo: Defense Secretary Donald H. Rumsfeld is said to have sought broader support from other governmental agencies for transfers of detainees. (Photo by Doug Mills/The New York Times)(pg. A10)Chart: "Transferred From Guantnamo"While roughly 540 detainees are still being held by the American military at Guantnamo Bay, Cuba, 211 detainees have left. Of those 211, 146 have been released, and 65 have been transferred to other countries for further detention or for prosecution.Detainees transferred from Guantamo to other countriesTo Pakistan: 29Britain: 9France: 7Russia: 7Morocco:5Saudi Arabia: 4Australia, Kuwait, Spain and Sweden: 1 each(Source by Department of Defense)(pg. A10)

**LOAD–DATE:** March 11, 2005

# EXHIBIT 2

To the Motion For Temporary Restraining Order
and Preliminary Injunction Prohibiting Respondents
From Removing Petitioner Idris From Guantanamo

On Behalf of Petitioner,

## IBRAHIM OSMAN IBRAHIM IDRIS

1 of 1 DOCUMENT

Copyright 2005 The New York Times Company
The New York Times

**August** 6, 2005 Saturday
Late Edition - Final

**SECTION:** Section A; Column 1; National Desk; Pg. 8

**LENGTH:** 826 words

**HEADLINE: Guantanamo** Detention Site Is Being Transformed, U.S. Says

**BYLINE:** By NEIL A. LEWIS

**DATELINE:** WASHINGTON, Aug. 5

**BODY:**

In a few years, Pentagon officials say, the detention center at Guantanamo Bay, Cuba, will have undergone a radical transformation.

The sprawling detention site known as Camp Delta, with its watchtowers, double-wide trailers housing rows of steel cells and interrogation rooms will be mostly demolished.

Instead, a sharply reduced inmate population of those the military considers the most hard-core will inhabit two nearby hard-walled modern prisons. The newest of those, which is still under construction, is modeled on a modern county jail in Michigan and is designed to counter international criticism of Guantanamo as inhumane and, to some, a symbol of American arrogance.

The first step in changing the character of Guantanamo, officials say, is to relocate many of the 520 detainees. As part of that effort, Defense and State Department officials said this week that they had reached agreement with Afghanistan to transfer 110 Afghan detainees to their home country. Eventually, the population will be reduced to 320, the capacity of the permanent prison buildings.

Under the agreement, the United States will help the Afghan government build new prisons and train correction personnel; in return, the Afghan government has pledged to ensure that the transferred prisoners are not freed to fight against the United States or allied governments.

"We know that there will be a number of individuals that cannot be released because of a high degree of certainty they would return to the battlefield," Bryan Whitman, a senior Pentagon spokesman, said on Friday. "We're looking for ways to share that responsibility with our coalition partners," he said.

The agreement with Afghanistan is the first such understanding. The Defense and State Departments are also negotiating to move many inmates to Saudi Arabia and Yemen, but officials who spoke on the condition of anonymity because it involved diplomatic negotiations said those talks had not yet progressed to the same stage as those in Afghanistan.

Mr. Whitman said the Afghan agreement also covered 350 Afghan prisoners now being held by American forces at a detention center at the Bagram air base in Afghanistan.

The United States has transferred more than 200 Guantanamo prisoners to their home countries, some of whom were then released and some of whom were reimprisoned. The new transfers to Afghanistan, Yemen and Saudi Arabia would be explicitly for those countries to take over the detention and not release any individuals immediately.

Mr. Whitman said that Afghan government officials would have the authority to release any of those prisoners eventually, but that they had agreed "to take necessary steps under Afghanistan law to prevent any of these individuals from returning to the battlefield."

Guantanamo Detention Site Is Being Transformed, U.S. Says The New York T

Amnesty International, a group that presses human rights concerns on behalf of prisoners throughout the world, sharply criticized the Pentagon's plans to transfer custody of many detainees to Afghanistan.

The group said on Friday that the detainees might face torture and other human rights abuses at the hands of the Afghan government.

"No government should force people to return to a country where they may be at risk of human rights abuses," said Sharon Critoph, an Amnesty International official.

The State Department's annual reports "show serious human rights violations in all three of the countries to which it is planning to return detainees," Ms. Critoph said.

Some detainees are already housed in one of the new prisons at Guantanamo known as Camp Five, which has the capacity for 100 detainees. Camp Six, with a capacity of 220, is not yet complete.

Camp Six is modeled after the jail in Lenawee County, Mich., and unlike Camp Five and most of Camp Delta, the prisoners will, for the most part, sleep and eat in a communal setting.

Cmdr. Anne M.W. Reese, the construction chief for the Guantanamo command, said in a recent interview that the new prison would have "more compliance with the Geneva Conventions."

"It will have more concern for the quality of life" than Camp Delta, Commander Reese said.

The building, for example, will have its own medical and dental clinic, she said.

Under current American policy, the prisoners at Guantanamo can be held indefinitely without being charged with a crime, although that issue is being litigated in federal courts.

Commander Reese said the prison would comply with guidelines for American correctional facilities. Camp Delta, she said, was decaying beyond repair because of its exposure to the elements and because it was built on unstable coral.

Brig. Gen. Jay W. Hood, the commander of the Guantanamo detention operation, visited the Lenawee County Jail in January, county officials said.

Capt. Jack Welsh, the administrator of the Michigan jail, said it generally resembled dormitories. Convicts may only serve up to a year in the jail because it is a county facility, Captain Welsh said.

**URL:** http://www.nytimes.com

**LOAD–DATE:** August 6, 2005

# EXHIBIT 3

To the Motion For Temporary Restraining Order
and Preliminary Injunction Prohibiting Respondents
From Removing Petitioner Idris From Guantanamo

On Behalf of Petitioner,

## IBRAHIM OSMAN IBRAHIM IDRIS

# THE NEW YORKER
# FACT

ANNALS OF JUSTICE
## OUTSOURCING TORTURE
by JANE MAYER
The secret history of America's "extraordinary rendition" program.

Issue of 2005-02-14
Posted 2005-02-07

On January 27th, President Bush, in an interview with the *Times,* assured the world that "torture is never acceptable, nor do we hand over people to countries that do torture." Maher Arar, a Canadian engineer who was born in Syria, was surprised to learn of Bush's statement. Two and a half years ago, American officials, suspecting Arar of being a terrorist, apprehended him in New York and sent him back to Syria, where he endured months of brutal interrogation, including torture. When Arar describe his experience in a phone interview recently, he invoked an Arabic expression. The pain was so unbearable, he said, that "you forget the milk that you have been fed from the breast of your mother."

Arar, a thirty-four-year-old graduate of McGill University whose family emigrated to Canada when he was a teen-ager, was arrested on September 26, 2002, at John F. Kennedy Airport. He was changing planes; he had been on vacation with his family in Tunisia, and was returning to Canada. Arar was detained because his name had been placed on the United States Watch List of terrorist suspects. He was held for the next thirteen days, as American officials questioned him about possible links to anoth suspected terrorist. Arar said that he barely knew the suspect, although he had worked with the man's brother. Arar, who was not formally charged, was placed in handcuffs and leg irons by plainclothes officials and transferred to an executive jet. The plane flew to Washington, continued to Portland, Maine, stopped in Rome, Italy, then landed in Amman, Jordan.

During the flight, Arar said, he heard the pilots and crew identify themselves in radio communications as members of "the Special Removal Unit." The Americans, he learned, planned to take him next to Syria. Having been told by his parents about the barbaric practices of the police in Syria, Arar begged crew members not to send him there, arguing that he would surely be tortured. His captors did not respond to his request; instead, they invited him to watch a spy thriller that was aired on board.

Ten hours after landing in Jordan, Arar said, he was driven to Syria, where interrogators, after a day of threats, "just began beating on me." They whipped his hands repeatedly with two-inch-thick electrical cables, and kept him in a windowless underground cell that he likened to a grave. "Not even animals could withstand it," he said. Although he initially tried to assert his innocence, he eventually confessed to anything his tormentors wanted him to say. "You just give up," he said. "You become like an animal."

A year later, in October, 2003, Arar was released without charges, after the Canadian government took up his cause. Imad Moustapha, the Syrian Ambassador in Washington, announced that his country had found no links between Arar and terrorism. Arar, it turned out, had been sent to Syria on orders from t U.S. government, under a secretive program known as "extraordinary rendition." This program had been devised as a means of extraditing terrorism suspects from one foreign state to another for interrogation and prosecution. Critics contend that the unstated purpose of such renditions is to subject the suspects to aggressive methods of persuasion that are illegal in America—including torture.

Arar is suing the U.S. government for his mistreatment. "They are outsourcing torture because they know it's illegal," he said. "Why, if they have suspicions, don't they question people within the

boundary of the law?"

Rendition was originally carried out on a limited basis, but after September 11th, when President Bush declared a global war on terrorism, the program expanded beyond recognition—becoming, according to a former C.I.A. official, "an abomination." What began as a program aimed at a small, discrete set of suspects—people against whom there were outstanding foreign arrest warrants—came to include a wide and ill-defined population that the Administration terms "illegal enemy combatants." Many of them have never been publicly charged with any crime. Scott Horton, an expert on international law who helped prepare a report on renditions issued by N.Y.U. Law School and the New York City Bar Association, estimates that a hundred and fifty people have been rendered since 2001. Representative Ed Markey, a Democrat from Massachusetts and a member of the Select Committee on Homeland Security, said that a more precise number was impossible to obtain. "I've asked people at the C.I.A. for numbers," he said. "They refuse to answer. All they will say is that they're in compliance with the law."

Although the full scope of the extraordinary-rendition program isn't known, several recent cases have come to light that may well violate U.S. law. In 1998, Congress passed legislation declaring that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."

The Bush Administration, however, has argued that the threat posed by stateless terrorists who draw no distinction between military and civilian targets is so dire that it requires tough new rules of engagement. This shift in perspective, labelled the New Paradigm in a memo written by Alberto Gonzales, then the White House counsel, "places a high premium on . . . the ability to quickly obtain information from captured terrorists and their sponsors in order to avoid further atrocities against American civilians," giving less weight to the rights of suspects. It also questions many international laws of war. Five days after Al Qaeda's attacks on the World Trade Center and the Pentagon, Vice-President Dick Cheney, reflecting the new outlook, argued, on "Meet the Press," that the government needed to "work through, sort of, the dark side." Cheney went on, "A lot of what needs to be done here will have to be done quietly, without any discussion, using sources and methods that are available to our intelligence agencies, if we're going to be successful. That's the world these folks operate in. And so it's going to be vital for us to use any means at our disposal, basically, to achieve our objective."

The extraordinary-rendition program bears little relation to the system of due process afforded suspects in crimes in America. Terrorism suspects in Europe, Africa, Asia, and the Middle East have often been abducted by hooded or masked American agents, then forced onto a Gulfstream V jet, like the one described by Arar. This jet, which has been registered to a series of dummy American corporations, such as Bayard Foreign Marketing, of Portland, Oregon, has clearance to land at U.S. military bases. Upon arriving in foreign countries, rendered suspects often vanish. Detainees are not provided with lawyers, and many families are not informed of their whereabouts.

The most common destinations for rendered suspects are Egypt, Morocco, Syria, and Jordan, all of which have been cited for human-rights violations by the State Department, and are known to torture suspects. To justify sending detainees to these countries, the Administration appears to be relying on a very fine reading of an imprecise clause in the United Nations Convention Against Torture (which the U.S. ratified in 1994), requiring "substantial grounds for believing" that a detainee will be tortured abroad. Martin Lederman, a lawyer who left the Justice Department's Office of Legal Counsel in 2002, after eight years, says, "The Convention only applies when you know a suspect is more likely than not to be tortured, but what if you kind of know? That's not

enough. So there are ways to get around it."

Administration officials declined to discuss the rendition program. But Rohan Gunaratna, a Sri
Lankan expert on terrorist interrogations who has consulted with several intelligence agencies,
argued that rough tactics "can save hundreds of lives." He said, "When you capture a terrorist, he
may know when the next operation will be staged, so it may be necessary to put a detainee under
physical or psychological pressure. I disagree with physical torture, but sometimes the threat of it
must be used."

Rendition is just one element of the Administration's New Paradigm. The C.I.A. itself is holding
dozens of "high value" terrorist suspects outside of the territorial jurisdiction of the U.S., in
addition to the estimated five hundred and fifty detainees in Guantánamo Bay, Cuba. The
Administration confirmed the identities of at least ten of these suspects to the 9/11 Commission—
including Khalid Sheikh Mohammed, a top Al Qaeda operative, and Ramzi bin al-Shibh, a chief
planner of the September 11th attacks—but refused to allow commission members to interview
the men, and would not say where they were being held. Reports have suggested that C.I.A.
prisons are being operated in Thailand, Qatar, and Afghanistan, among other countries. At the
request of the C.I.A., Secretary of Defense Donald Rumsfeld personally ordered that a prisoner in
Iraq be hidden from Red Cross officials for several months, and Army General Paul Kern told
Congress that the C.I.A. may have hidden up to a hundred detainees. The Geneva Conventions of
1949, which established norms on the treatment of soldiers and civilians captured in war, require
the prompt registration of detainees, so that their treatment can be monitored, but the
Administration argues that Al Qaeda members and supporters, who are not part of a state-
sponsored military, are not covered by the Conventions.

The Bush Administration's departure from international norms has been justified in intellectual
terms by élite lawyers like Gonzales, who is a graduate of Harvard Law School. Gonzales, the
new Attorney General, argued during his confirmation proceedings that the U.N. Convention
Against Torture's ban on "cruel, inhuman, and degrading treatment" of terrorist suspects does not
apply to American interrogations of foreigners overseas. Perhaps surprisingly, the fiercest internal
resistance to this thinking has come from people who have been directly involved in
interrogation, including veteran F.B.I. and C.I.A. agents. Their concerns are as much practical as
ideological. Years of experience in interrogation have led them to doubt the effectiveness of
physical coercion as a means of extracting reliable information. They also warn that the Bush
Administration, having taken so many prisoners outside the realm of the law, may not be able to
bring them back in. By holding detainees indefinitely, without counsel, without charges of
wrongdoing, and under circumstances that could, in legal parlance, "shock the conscience" of a
court, the Administration has jeopardized its chances of convicting hundreds of suspected
terrorists, or even of using them as witnesses in almost any court in the world.

"It's a big problem," Jamie Gorelick, a former deputy attorney general and a member of the 9/11
Commission, says. "In criminal justice, you either prosecute the suspects or let them go. But if
you've treated them in ways that won't *allow* you to prosecute them you're in this no man's land.
What do you do with these people?"

T he criminal prosecution of terrorist suspects has not been a priority for the Bush
Administration, which has focussed, rather, on preventing additional attacks. But some people
who have been fighting terrorism for many years are concerned about unintended consequences
of the Administration's radical legal measures. Among these critics is Michael Scheuer, a former
C.I.A. counter-terrorism expert who helped establish the practice of rendition. Scheuer left the
agency in 2004, and has written two acerbic critiques of the government's fight against Islamic
terrorism under the pseudonym Anonymous, the most recent of which, "Imperial Hubris," was a

Case 1:05-cv-01555-UNA   Document 14-3   Filed 11/11/2005   Page 24 of 24

best-seller.

Not long ago, Scheuer, who lives in northern Virginia, spoke openly for the first time about how he and several other top C.I.A. officials set up the program, in the mid-nineties. "It was begun in desperation, " he told me. At the time, he was the head of the C.I.A.'s Islamic-militant unit, whose job was to "detect, disrupt, and dismantle" terrorist operations. His unit spent much of 1996 studying how Al Qaeda operated; by the next year, Scheuer said, its mission was to try to capture bin Laden and his associates. He recalled, "We went to the White House"—which was then occupied by the Clinton Administration—"and they said, 'Do it.' " He added that Richard Clarke, who was in charge of counter-terrorism for the National Security Council, offered no advice. "He told me, 'Figure it out by yourselves,' " Scheuer said. (Clarke did not respond to a request for comment.)

Scheuer sought the counsel of Mary Jo White, the former U.S. Attorney for the Southern District of New York, who, along with a small group of F.B.I. agents, was pursuing the 1993 World Trade Center bombing case. In 1998, White's team obtained an indictment against bin Laden, authorizing U.S. agents to bring him and his associates to the United States to stand trial. From the start, though, the C.I.A. was wary of granting terrorism suspects the due process afforded by American law. The agency did not want to divulge secrets about its intelligence sources and methods, and American courts demand transparency. Even establishing the chain of custody of key evidence—such as a laptop computer—could easily pose a significant problem: foreign governments might refuse to testify in U.S. courts about how they had obtained the evidence, for fear of having their secret coöperation exposed. (Foreign governments often worried about retaliation from their own Muslim populations.) The C.I.A. also felt that other agencies sometimes stood in its way. In 1996, for example, the State Department stymied a joint effort by the C.I.A. and the F.B.I. to question one of bin Laden's cousins in America, because he had a diplomatic passport, which protects the holder from U.S. law enforcement. Describing the C.I.A.'s frustration, Scheuer said, "We were turning into voyeurs. We knew where these people were, but we couldn't capture them because we had nowhere to take them." The agency realized that "we had to come up with a third party."

The obvious choice, Scheuer said, was Egypt. The largest recipient of U.S. foreign aid after Israel, Egypt was a key strategic ally, and its secret police force, the Mukhabarat, had a reputation for brutality. Egypt had been frequently cited by the State Department for torture of prisoners. According to a 2002 report, detainees were "stripped and blindfolded; suspended from a ceiling or doorframe with feet just touching the floor; beaten with fists, whips, metal rods, or other objects; subjected to electrical shocks; and doused with cold water [and] sexually assaulted." Hosni Mubarak, Egypt's leader, who came to office in 1981, after President Anwar Sadat was assassinated by Islamist extremists, was determined to crack down on terrorism. His prime political enemies were radical Islamists, hundreds of whom had fled the country and joined Al Qaeda. Among these was Ayman al-Zawahiri, a physician from Cairo, who went to Afghanistan and eventually became bin Laden's deputy.

In 1995, Scheuer said, American agents proposed the rendition program to Egypt, making clear that it had the resources to track, capture, and transport terrorist suspects globally—including access to a small fleet of aircraft. Egypt embraced the idea. "What was clever was that some of the senior people in Al Qaeda were Egyptian," Scheuer said. "It served American purposes to get these people arrested, and Egyptian purposes to get these people back, where they could be interrogated." Technically, U.S. law requires the C.I.A. to seek "assurances" from foreign governments that rendered suspects won't be tortured. Scheuer told me that this was done, but he was "not sure" if any documents confirming the arrangement were signed.

A series of spectacular covert operations followed from this secret pact. On September 13, 1995,

U.S. agents helped kidnap Talaat Fouad Qassem, one of Egypt's most wanted terrorists, in Croatia. Qassem had fled to Europe after being linked by Egypt to the assassination of Sadat; he had been sentenced to death in absentia. Croatian police seized Qassem in Zagreb and handed him over to U.S. agents, who interrogated him aboard a ship cruising the Adriatic Sea and then took him back to Egypt. Once there, Qassem disappeared. There is no record that he was put on trial. Hossam el-Hamalawy, an Egyptian journalist who covers human-rights issues, said, "We believe he was executed."

A more elaborate operation was staged in Tirana, Albania, in the summer of 1998. According to the *Wall Street Journal*, the C.I.A. provided the Albanian intelligence service with equipment to wiretap the phones of suspected Muslim militants. Tapes of the conversations were translated into English, and U.S. agents discovered that they contained lengthy discussions with Zawahiri, bin Laden's deputy. The U.S. pressured Egypt for assistance; in June, Egypt issued an arrest warrant for Shawki Salama Attiya, one of the militants. Over the next few months, according to the *Journal,* Albanian security forces, working with U.S. agents, killed one suspect and captured Attiya and four others. These men were bound, blindfolded, and taken to an abandoned airbase, then flown by jet to Cairo for interrogation. Attiya later alleged that he suffered electrical shocks to his genitals, was hung from his limbs, and was kept in a cell in filthy water up to his knees. Two other suspects, who had been sentenced to death in absentia, were hanged.

On August 5, 1998, an Arab-language newspaper in London published a letter from the International Islamic Front for Jihad, in which it threatened retaliation against the U.S. for the Albanian operation—in a "language they will understand." Two days later, the U.S. Embassies in Kenya and Tanzania were blown up, killing two hundred and twenty-four people.

The U.S. began rendering terror suspects to other countries, but the most common destination remained Egypt. The partnership between the American and the Egyptian intelligence services was extraordinarily close: the Americans could give the Egyptian interrogators questions they wanted put to the detainees in the morning, Scheuer said, and get answers by the evening. The Americans asked to question suspects directly themselves, but, Scheuer said, the Egyptians refused. "We were never in the same room at the same time."

Scheuer claimed that "there was a legal process" undergirding these early renditions. Every suspect who was apprehended, he said, had been convicted in absentia. Before a suspect was captured, a dossier was prepared containing the equivalent of a rap sheet. The C.I.A.'s legal counsel signed off on every proposed operation. Scheuer said that this system prevented innocent people from being subjected to rendition. "Langley would never let us proceed unless there was substance," he said. Moreover, Scheuer emphasized, renditions were pursued out of expedience— "not out of thinking it was the best policy."

Since September 11th, as the number of renditions has grown, and hundreds of terrorist suspects have been deposited indefinitely in places like Guantánamo Bay, the shortcomings of this approach have become manifest. "Are we going to hold these people forever?" Scheuer asked. "The policymakers hadn't thought what to do with them, and what would happen when it was found out that we were turning them over to governments that the human-rights world reviled." Once a detainee's rights have been violated, he says, "you absolutely can't" reinstate him into the court system. "You can't kill him, either," he added. "All we've done is create a nightmare."

On a bleak winter day in Trenton, New Jersey, Dan Coleman, an ex-F.B.I. agent who retired last July, because of asthma, scoffed at the idea that a C.I.A. agent was now having compunctions about renditions. The C.I.A., Coleman said, liked rendition from the start. "They loved that these guys would just disappear off the books, and never be heard of again," he said. "They were proud

of it."

For ten years, Coleman worked closely with the C.I.A. on counter-terrorism cases, including the Embassy attacks in Kenya and Tanzania. His methodical style of detective work, in which interrogations were aimed at forging relationships with detainees, became unfashionable after September 11th, in part because the government was intent on extracting information as quickly as possible, in order to prevent future attacks. Yet the more patient approach used by Coleman and other agents had yielded major successes. In the Embassy-bombings case, they helped convict four Al Qaeda operatives on three hundred and two criminal counts; all four men pleaded guilty to serious terrorism charges. The confessions the F.B.I. agents elicited, and the trial itself, which ended in May, 2001, created an invaluable public record about Al Qaeda, including details about its funding mechanisms, its internal structure, and its intention to obtain weapons of mass destruction. (The political leadership in Washington, unfortunately, did not pay sufficient attention.)

Coleman is a political nonpartisan with a law-and-order mentality. His eldest son is a former Army Ranger who served in Afghanistan. Yet Coleman was troubled by the Bush Administration's New Paradigm. Torture, he said, "has become bureaucratized." Bad as the policy of rendition was before September 11th, Coleman said, "afterward, it really went out of control." He explained, "Now, instead of just sending people to third countries, we're holding them ourselves. We're taking people, and keeping them in our own custody in third countries. That's an enormous problem." Egypt, he pointed out, at least had an established legal system, however harsh. "There was a process there," Coleman said. "But what's our process? We have no method over there other than our laws—and we've decided to ignore them. What are we now, the Huns? If you don't talk to us, we'll kill you?"

From the beginning of the rendition program, Coleman said, there was no doubt that Egypt engaged in torture. He recalled the case of a suspect in the first World Trade Center bombing who fled to Egypt. The U.S. requested his return, and the Egyptians handed him over—wrapped head to toe in duct tape, like a mummy. (In another incident, an Egyptian with links to Al Qaeda who had coöperated with the U.S. government in a terrorism trial was picked up in Cairo and imprisoned by Egyptian authorities until U.S. diplomats secured his release. For days, he had been chained to a toilet, where guards had urinated on him.)

Under such circumstances, it might seem difficult for the U.S. government to legally justify dispatching suspects to Egypt. But Coleman said that since September 11th the C.I.A. "has seemed to think it's operating under different rules, that it has extralegal abilities outside the U.S." Agents, he said, have "told me that they have their own enormous office of general counsel that rarely tells them no. Whatever they do is all right. It all takes place overseas."

Coleman was angry that lawyers in Washington were redefining the parameters of counter-terrorism interrogations. "Have any of these guys ever tried to talk to someone who's been deprived of his clothes?" he asked. "He's going to be ashamed, and humiliated, and cold. He'll tell you anything you want to hear to get his clothes back. There's no value in it." Coleman said that he had learned to treat even the most despicable suspects as if there were "a personal relationship, even if you can't stand them." He said that many of the suspects he had interrogated expected to be tortured, and were stunned to learn that they had rights under the American system. Due process made detainees more compliant, not less, Coleman said. He had also found that a defendant's right to legal counsel was beneficial not only to suspects but also to law-enforcement officers. Defense lawyers frequently persuaded detainees to coöperate with prosecutors, in exchange for plea agreements. "The lawyers show these guys there's a way out," Coleman said. "It's human nature. People don't coöperate with you unless they have some reason to." He added, "Brutalization doesn't work. We know that. Besides, you lose your soul."

The Bush Administration's redefinition of the standards of interrogation took place almost entirely out of public view. One of the first officials to offer hints of the shift in approach was Cofer Black, who was then in charge of counter-terrorism at the C.I.A. On September 26, 2002, he addressed the House and Senate Intelligence Committees, and stated that the arrest and detention of terrorists was "a very highly classified area." He added, "All you need to know is that there was a 'before 9/11' and there was an 'after 9/11.' After 9/11, the gloves came off."

Laying the foundation for this shift was a now famous set of internal legal memos—some were leaked, others were made public by groups such as the N.Y.U. Center for Law and National Security. Most of these documents were generated by a small, hawkish group of politically appointed lawyers in the Justice Department's Office of Legal Counsel and in the office of Alberto Gonzales, the White House counsel. Chief among the authors was John C. Yoo, the deputy assistant attorney general at the time. (A Yale Law School graduate and a former clerk to Justice Clarence Thomas, Yoo now teaches law at Berkeley.) Taken together, the memos advised the President that he had almost unfettered latitude in his prosecution of the war on terror. For many years, Yoo was a member of the Federalist Society, a fellowship of conservative intellectuals who view international law with skepticism, and September 11th offered an opportunity for him and others in the Administration to put their political ideas into practice. A former lawyer in the State Department recalled the mood of the Administration: "The Twin Towers were still smoldering. The atmosphere was intense. The tone at the top was aggressive—and understandably so. The Commander-in-Chief had used the words 'dead or alive' and vowed to bring the terrorists to justice or bring justice to them. There was a fury."

Soon after September 11th, Yoo and other Administration lawyers began advising President Bush that he did not have to comply with the Geneva Conventions in handling detainees in the war on terror. The lawyers classified these detainees not as civilians or prisoners of war—two categories of individuals protected by the Conventions—but as "illegal enemy combatants." The rubric included not only Al Qaeda members and supporters but the entire Taliban, because, Yoo and other lawyers argued, the country was a "failed state." Eric Lewis, an expert in international law who represents several Guantánamo detainees, said, "The Administration's lawyers created a third category and cast them outside the law."

The State Department, determined to uphold the Geneva Conventions, fought against Bush's lawyers and lost. In a forty-page memo to Yoo, dated January 11, 2002 (which has not been publicly released), William Taft IV, the State Department legal adviser, argued that Yoo's analysis was "seriously flawed." Taft told Yoo that his contention that the President could disregard the Geneva Conventions was "untenable," "incorrect," and "confused." Taft disputed Yoo's argument that Afghanistan, as a "failed state," was not covered by the Conventions. "The official United States position before, during, and after the emergence of the Taliban was that Afghanistan constituted a state," he wrote. Taft also warned Yoo that if the U.S. took the war on terrorism outside the Geneva Conventions, not only could U.S. soldiers be denied the protections of the Conventions—and therefore be prosecuted for crimes, including murder—but President Bush could be accused of a "grave breach" by other countries, and be prosecuted for war crimes. Taft sent a copy of his memo to Gonzales, hoping that his dissent would reach the President. Within days, Yoo sent Taft a lengthy rebuttal.

Others in the Administration worried that the President's lawyers were wayward. "Lawyers have to be the voice of reason and sometimes have to put the brakes on, no matter how much the client wants to hear something else," the former State Department lawyer said. "Our job is to keep the train on the tracks. It's not to tell the President, 'Here are the ways to avoid the law.' " He went on, "There is no such thing as a non-covered person under the Geneva Conventions. It's

nonsense. The protocols cover fighters in everything from world wars to local rebellions." The lawyer said that Taft urged Yoo and Gonzales to warn President Bush that he would "be seen as a war criminal by the rest of the world," but Taft was ignored. This may be because President Bush had already made up his mind. According to top State Department officials, Bush decided to suspend the Geneva Conventions on January 8, 2002—three days before Taft sent his memo to Yoo.

The legal pronouncements from Washington about the status of detainees were painstakingly constructed to include numerous loopholes. For example, in February, 2002, President Bush issued a written directive stating that, even though he had determined that the Geneva Conventions did not apply to the war on terror, all detainees should be treated "humanely." A close reading of the directive, however, revealed that it referred only to military interrogators—not to C.I.A. officials. This exemption allowed the C.I.A. to continue using interrogation methods, including rendition, that stopped just short of torture. Further, an August, 2002, memo written largely by Yoo but signed by Assistant Attorney General Jay S. Bybee argued that torture required the intent to inflict suffering "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death." According to the *Times*, a secret memo issued by Administration lawyers authorized the C.I.A. to use novel interrogation methods—including "water-boarding," in which a suspect is bound and immersed in water until he nearly drowns. Dr. Allen Keller, the director of the Bellevue/N.Y.U. Program for Survivors of Torture, told me that he had treated a number of people who had been subjected to such forms of near-asphyxiation, and he argued that it was indeed torture. Some victims were still traumatized years later, he said. One patient couldn't take showers, and panicked when it rained. "The fear of being killed is a terrifying experience," he said.

The Administration's justification of the rough treatment of detainees appears to have passed down the chain of command. In late 2003, at Abu Ghraib prison, in Iraq, photographs were taken that documented prisoners being subjected to grotesque abuse by U.S. soldiers. After the scandal became public, the Justice Department revised the narrow definition of torture outlined in the Bybee memo, using language that more strongly prohibited physical abuse during interrogations. But the Administration has fought hard against legislative efforts to rein in the C.I.A. In the past few months, Republican leaders, at the White House's urging, have blocked two attempts in the Senate to ban the C.I.A. from using cruel and inhuman interrogation methods. An attempt in the House to outlaw extraordinary rendition, led by Representative Markey, also failed.

In a recent phone interview, Yoo was soft-spoken and resolute. "Why is it so hard for people to understand that there is a category of behavior not covered by the legal system?" he said. "What were pirates? They weren't fighting on behalf of any nation. What were slave traders? Historically, there were people so bad that they were not given protection of the laws. There were no specific provisions for their trial, or imprisonment. If you were an illegal combatant, you didn't deserve the protection of the laws of war." Yoo cited precedents for his position. "The Lincoln assassins were treated this way, too," he said. "They were tried in a military court, and executed." The point, he said, was that the Geneva Conventions' "simple binary classification of civilian or soldier isn't accurate."

Yoo also argued that the Constitution granted the President plenary powers to override the U.N. Convention Against Torture when he is acting in the nation's defense—a position that has drawn dissent from many scholars. As Yoo saw it, Congress doesn't have the power to "tie the President's hands in regard to torture as an interrogation technique." He continued, "It's the core of the Commander-in-Chief function. They can't prevent the President from ordering torture." If the President were to abuse his powers as Commander-in-Chief, Yoo said, the constitutional remedy was impeachment. He went on to suggest that President Bush's victory in the 2004 election, along with the relatively mild challenge to Gonzales mounted by the Democrats in

Congress, was "proof that the debate is over." He said, "The issue is dying out. The public has had its referendum."

A few months after September 11th, the U.S. gained custody of its first high-ranking Al Qaeda figure, Ibn al-Sheikh al-Libi. He had run bin Laden's terrorist training camp in Khalden, Afghanistan, and was detained in Pakistan. Zacarias Moussaoui, who was already in U.S. custody, and Richard Reid, the Shoe Bomber, had both spent time at the Khalden camp. At the F.B.I.'s field office in New York, Jack Cloonan, an officer who had worked for the agency since 1972, struggled to maintain control of the legal process in Afghanistan. C.I.A. and F.B.I. agents were vying to take possession of Libi. Cloonan, who worked with Dan Coleman on anti-terrorism cases for many years, said he felt that "neither the Moussaoui case nor the Reid case was a slam dunk." He became intent on securing Libi's testimony as a witness against them. He advised his F.B.I. colleagues in Afghanistan to question Libi respectfully, "and handle this like it was being done right here, in my office in New York." He recalled, "I remember talking on a secure line to them. I told them, 'Do yourself a favor, read the guy his rights. It may be old-fashioned, but this will come out if we don't. It may take ten years, but it will hurt you, and the bureau's reputation, if you don't. Have it stand as a shining example of what we feel is right.' "

Cloonan's F.B.I. colleagues advised Libi of his rights and took turns with C.I.A. agents in questioning him. After a few days, F.B.I. officials felt that they were developing a good rapport with him. The C.I.A. agents, however, felt that he was lying to them, and needed tougher interrogation.

To Cloonan's dismay, the C.I.A. reportedly rendered Libi to Egypt. He was seen boarding a plane in Afghanistan, restrained by handcuffs and ankle cuffs, his mouth covered by duct tape. Cloonan, who retired from the F.B.I. in 2002, said, "At least we got information in ways that wouldn't shock the conscience of the court. And no one will have to seek revenge for what I did." He added, "We need to show the world that we can lead, and not just by military might."

After Libi was taken to Egypt, the F.B.I. lost track of him. Yet he evidently played a crucial background role in Secretary of State Colin Powell's momentous address to the United Nations Security Council in February, 2003, which argued the case for a preëmptive war against Iraq. In his speech, Powell did not refer to Libi by name, but he announced to the world that "a senior terrorist operative" who "was responsible for one of Al Qaeda's training camps in Afghanistan" had told U.S. authorities that Saddam Hussein had offered to train two Al Qaeda operatives in the use of "chemical or biological weapons."

Last summer, *Newsweek* reported that Libi, who was eventually transferred from Egypt to Guantánamo Bay, was the source of the incendiary charge cited by Powell, and that he had recanted. By then, the first anniversary of the U.S. invasion of Iraq had passed and the 9/11 Commission had declared that there was no known evidence of a working relationship between Saddam and Al Qaeda. Dan Coleman was disgusted when he heard about Libi's false confession. "It was ridiculous for interrogators to think Libi would have known anything about Iraq," he said. "I could have told them that. He ran a training camp. He wouldn't have had anything to do with Iraq. Administration officials were always pushing us to come up with links, but there weren't any. The reason they got bad information is that they beat it out of him. You never get good information from someone that way."

Most authorities on interrogation, in and out of government, agree that torture and lesser forms of physical coercion succeed in producing confessions. The problem is that these confessions aren't necessarily true. Three of the Guantánamo detainees released by the U.S. to Great Britain last year, for example, had confessed that they had appeared in a blurry video, obtained by American

investigators, that documented a group of acolytes meeting with bin Laden in Afghanistan. As reported in the London *Observer*, British intelligence officials arrived at Guantánamo with evidence that the accused men had been living in England at the time the video was made. The detainees told British authorities that they had been coerced into making false confessions.

Craig Murray, the former British Ambassador to Uzbekistan, told me that "the U.S. accepts quite a lot of intelligence from the Uzbeks" that has been extracted from suspects who have been tortured. This information was, he said, "largely rubbish." He said he knew of "at least three" instances where the U.S. had rendered suspected militants from Afghanistan to Uzbekistan. Although Murray does not know the fate of the three men, he said, "They almost certainly would have been tortured." In Uzbekistan, he said, "partial boiling of a hand or an arm is quite common." He also knew of two cases in which prisoners had been boiled to death.

In 2002, Murray, concerned that America was complicit with such a regime, asked his deputy to discuss the problem with the C.I.A.'s station chief in Tashkent. He said that the station chief did not dispute that intelligence was being obtained under torture. But the C.I.A. did not consider this a problem. "There was no reason to think they were perturbed," Murray told me.

Scientific research on the efficacy of torture and rough interrogation is limited, because of the moral and legal impediments to experimentation. Tom Parker, a former officer for M.I.5, the British intelligence agency, who teaches at Yale, argued that, whether or not forceful interrogations yield accurate information from terrorist suspects, a larger problem is that many detainees "have nothing to tell." For many years, he said, British authorities subjected members of the Irish Republican Army to forceful interrogations, but, in the end, the government concluded that "detainees aren't valuable." A more effective strategy, Parker said, was "being creative" about human intelligence gathering, such as infiltration and eavesdropping. "The U.S. is doing what the British did in the nineteen-seventies, detaining people and violating their civil liberties," he said. "It did nothing but exacerbate the situation. Most of those interned went back to terrorism. You'll end up radicalizing the entire population."

Although the Administration has tried to keep the details of extraordinary renditions secret, several accounts have surfaced that reveal how the program operates. On December 18, 2001, at Stockholm's Bromma Airport, a half-dozen hooded security officials ushered two Egyptian asylum seekers, Muhammad Zery and Ahmed Agiza, into an empty office. They cut off the Egyptians' clothes with scissors, forcibly administered sedatives by suppository, swaddled them in diapers, and dressed them in orange jumpsuits. As was reported by "Kalla Fakta," a Swedish television news program, the suspects were blindfolded, placed in handcuffs and leg irons; according to a declassified Swedish government report, the men were then flown to Cairo on a U.S.-registered Gulfstream V jet. Swedish officials have claimed that they received assurances from the Egyptians that Zery and Agiza would be treated humanely. But both suspects have said, through lawyers and family members, that they were tortured with electrical charges to their genitals. (Zery said that he was also forced to lie on an electrified bed frame.) After spending two years in an Egyptian prison, Zery was released. Agiza, a physician who had once been an ally of Zawahiri but later renounced him and terrorism, was convicted on terrorism charges by Egypt's Supreme Military Court. He was sentenced to twenty-five years in prison.

Another case suggests that the Bush Administration is authorizing the rendition of suspects for whom it has little evidence of guilt. Mamdouh Habib, an Egyptian-born citizen of Australia, was apprehended in Pakistan in October, 2001. According to his wife, Habib, a radical Muslim with four children, was visiting the country to tour religious schools and determine if his family should move to Pakistan. A spokesman at the Pentagon has claimed that Habib—who has expressed support for Islamist causes—spent most of his trip in Afghanistan, and was "either supporting

hostile forces or on the battlefield fighting illegally against the U.S." Last month, after a three-year ordeal, Habib was released without charges.

Habib is one of a handful of people subjected to rendition who are being represented pro bono by human-rights lawyers. According to a recently unsealed document prepared by Joseph Margulies, a lawyer affiliated with the MacArthur Justice Center at the University of Chicago Law School, Habib said that he was first interrogated in Pakistan for three weeks, in part at a facility in Islamabad, where he said he was brutalized. Some of his interrogators, he claimed, spoke English with American accents. (Having lived in Australia for years, Habib is comfortable in English.) He was then placed in the custody of Americans, two of whom wore black short-sleeved shirts and had distinctive tattoos: one depicted an American flag attached to a flagpole shaped like a finger, the other a large cross. The Americans took him to an airfield, cut his clothes off with scissors, dressed him in a jumpsuit, covered his eyes with opaque goggles, and placed him aboard a private plane. He was flown to Egypt.

According to Margulies, Habib was held and interrogated for six months. "Never, to my knowledge, did he make an appearance in any court," Margulies told me. Margulies was also unaware of any evidence suggesting that the U.S. sought a promise from Egypt that Habib would not be tortured. For his part, Habib claimed to have been subjected to horrific conditions. He said that he was beaten frequently with blunt instruments, including an object that he likened to an electric "cattle prod." And he was told that if he didn't confess to belonging to Al Qaeda he would be anally raped by specially trained dogs. (Hossam el-Hamalawy said that Egyptian security forces train German shepherds for police work, and that other prisoners have also been threatened with rape by trained dogs, although he knows of no one who has been assaulted in this way.) Habib said that he was shackled and forced to stand in three torture chambers: one room was filled with water up to his chin, requiring him to stand on tiptoe for hours; another chamber, filled with water up to his knees, had a ceiling so low that he was forced into a prolonged, painful stoop; in the third, he stood in water up to his ankles, and within sight of an electric switch and a generator, which his jailers said would be used to electrocute him if he didn't confess. Habib's lawyer said that he submitted to his interrogators' demands and made multiple confessions, all of them false. (Egyptian authorities have described such allegations of torture as "mythology.")

After his imprisonment in Egypt, Habib said that he was returned to U.S. custody and was flown to Bagram Air Force Base, in Afghanistan, and then on to Guantánamo Bay, where he was detained until last month. On January 11th, a few days after the Washington *Post* published an article on Habib's case, the Pentagon, offering virtually no explanation, agreed to release him into the custody of the Australian government. "Habib was released because he was hopelessly embarrassing," Eric Freedman, a professor at Hofstra Law School, who has been involved in the detainees' legal defense, says. "It's a large crack in the wall in a house of cards that is midway through tumbling down." In a prepared statement, a Pentagon spokesman, Lieutenant Commander Flex Plexico, said there was "no evidence" that Habib "was tortured or abused" while he was in U.S. custody. He also said that Habib had received "Al Qaeda training," which included instruction in making false abuse allegations. Habib's claims, he suggested, "fit the standard operating procedure."

The U.S. government has not responded directly to Habib's charge that he was rendered to Egypt. However, several other men who were recently released from Guantánamo reported that Habib told them about it. Jamal al-Harith, a British detainee who was sent home to Manchester, England, last March, told me in a phone interview that at one point he had been placed in a cage across from Habib. "He said that he had been in Egypt for about six months, and they had injected him with drugs, and hung him from the ceiling, and beaten him very, very badly," Harith recalled. "He seemed to be in pain. He was haggard-looking. I never saw him walk. He always had to be held up."

    TI

Another piece of evidence that may support Habib's story is a set of flight logs documenting the travels of a white Gulfstream V jet—the plane that seems to have been used for renditions by the U.S. government. These logs show that on April 9, 2002, the jet left Dulles Airport, in Washington, and landed in Cairo. According to Habib's attorney, this was around the same time that Habib said he was released by the Egyptians in Cairo, and returned to U.S. custody. The flight logs were obtained by Stephen Grey, a British journalist who has written a number of stories on renditions for British publications, including the London *Sunday Times*. Grey's logs are incomplete, but they chronicle some three hundred flights over three years by the fourteen-seat jet, which was marked on its tail with the code N379P. (It was recently changed, to N8068V.) All the flights originated from Dulles Airport, and many of them landed at restricted U.S. military bases.

Even if Habib is a terrorist aligned with Al Qaeda, as Pentagon officials have claimed, it seems unlikely that prosecutors would ever be able to build a strong case against him, given the treatment that he allegedly received in Egypt. John Radsan, a law professor at William Mitchell College of Law, in St. Paul, Minnesota, who worked in the general counsel's office of the C.I.A. until last year, said, "I don't think anyone's thought through what we do with these people."

Similar problems complicate the case of Khalid Sheikh Mohammed, who was captured in Pakistan in March, 2003. Mohammed has reportedly been "water-boarded" during interrogations. If so, Radsan said, "it would be almost impossible to take him into a criminal trial. Any evidence derived from his interrogation could be seen as fruit from the poisonous tree. I think the government is considering some sort of military tribunal somewhere down the line. But, even there, there are still constitutional requirements that you can't bring in involuntary confessions."

The trial of Zacarias Moussaoui, in Alexandria, Virginia—the only U.S. criminal trial of a suspect linked to the September 11th attacks—is stalled. It's been more than three years since Attorney General John Ashcroft called Moussaoui's indictment "a chronicle of evil." The case has been held up by Moussaoui's demand—and the Bush Administration's refusal—to let him call as witnesses Al Qaeda members held in government custody, including Ramzi bin al-Shibh and Khalid Sheikh Mohammed. (Bin al-Shibh is thought to have been tortured.) Government attorneys have argued that producing the witnesses would disrupt the interrogation process.

Similarly, German officials fear that they may be unable to convict any members of the Hamburg cell that is believed to have helped plan the September 11th attacks, on charges connected to the plot, in part because the U.S. government refuses to produce bin al-Shibh and Mohammed as witnesses. Last year, one of the Hamburg defendants, Mounir Motassadeq, became the first person to be convicted in the planning of the attacks, but his guilty verdict was overturned by an appeals court, which found the evidence against him too weak.

Motassadeq is on trial again, but, in accordance with German law, he is no longer being imprisoned. Although he is alleged to have overseen the payment of funds into the accounts of the September 11th hijackers—and to have been friendly with Mohamed Atta, who flew one of the planes that hit the Twin Towers—he walks freely to and from the courthouse each day. The U.S. has supplied the German court with edited summaries of testimony from Mohammed and bin al-Shibh. But Gerhard Strate, Motassadeq's defense lawyer, told me, "We are not satisfied with the summaries. If you want to find the truth, we need to know who has been interrogating them, and under what circumstances. We don't have any answers to this." The refusal by the U.S. to produce the witnesses in person, Strate said, "puts the court in a ridiculous position." He added, "I don't know why they won't produce the witnesses. The first thing you think is that the U.S. government has something to hide."

In fact, the Justice Department recently admitted that it had something to hide in relation to Maher Arar, the Canadian engineer. The government invoked the rarely used "state secrets privilege" in a motion to dismiss a lawsuit brought by Arar's lawyers against the U.S. government. To go forward in an open court, the government said, would jeopardize the "intelligence, foreign policy and national security interests of the United States." Barbara Olshansky, the assistant legal director of the Center for Constitutional Rights, which is representing Arar, said that government lawyers "are saying this case can't be tried, and the classified information on which they're basing this argument can't even be shared with the opposing lawyers. It's the height of arrogance—they think they can do anything they want in the name of the global war on terrorism."

Nadja Dizdarevic is a thirty-year-old mother of four who lives in Sarajevo. On October 21, 2001, her husband, Hadj Boudella, a Muslim of Algerian descent, and five other Algerians living in Bosnia were arrested after U.S. authorities tipped off the Bosnian government to an alleged plot by the group to blow up the American and British Embassies in Sarajevo. One of the suspects reportedly placed some seventy phone calls to the Al Qaeda leader Abu Zubaydah in the days after September 11th. Boudella and his wife, however, maintain that neither he nor several of the other defendants knew the man who had allegedly contacted Zubaydah. And an investigation by the Bosnian government turned up no confirmation that the calls to Zubaydah were made at all, according to the men's American lawyers, Rob Kirsch and Stephen Oleskey.

At the request of the U.S., the Bosnian government held all six men for three months, but was unable to substantiate any criminal charges against them. On January 17, 2002, the Bosnian Supreme Court ruled that they should be released. Instead, as the men left prison, they were handcuffed, forced to put on surgical masks with nose clips, covered in hoods, and herded into waiting unmarked cars by masked figures, some of whom appeared to be members of the Bosnian special forces. Boudella's wife had come to the prison to meet her husband, and she recalled that she recognized him, despite the hood, because he was wearing a new suit that she had brought him the day before. "I will never forget that night," she said. "It was snowing. I was screaming for someone to help." A crowd gathered, and tried to block the convoy, but it sped off. The suspects were taken to a military airbase and kept in a freezing hangar for hours; one member of the group later claimed that he saw one of the abductors remove his Bosnian uniform, revealing that he was in fact American. The U.S. government has neither confirmed nor denied its role in the operation.

Six days after the abduction, Boudella's wife received word that her husband and the other men had been sent to Guantánamo. One man in the group has alleged that two of his fingers were broken by U.S. soldiers. Little is publicly known about the welfare of the others.

Boudella's wife said that she was astounded that her husband could be seized without charge or trial, at home during peacetime and after his own government had exonerated him. The term "enemy combatant" perplexed her. "He is an enemy of whom?" she asked. "In combat where?" She said that her view of America had changed. "I have not changed my opinion about its people, but unfortunately I have changed my opinion about its respect for human rights," she said. "It is no longer the leader in the world. It has become the leader in the violation of human rights."

In October, Boudella attempted to plead his innocence before the Pentagon's Combatant Status Review Tribunal. The C.S.R.T. is the Pentagon's answer to the Supreme Court's ruling last year, over the Bush Administration's objections, that detainees in Guantánamo had a right to challenge their imprisonment. Boudella was not allowed to bring a lawyer to the proceeding. And the tribunal said that it was "unable to locate" a copy of the Bosnian Supreme Court's verdict freeing

him, which he had requested that it read. Transcripts show that Boudella stated, "I am against any terrorist acts," and asked, "How could I be part of an organization that I strongly believe has harmed my people?" The tribunal rejected his plea, as it has rejected three hundred and eighty-seven of the three hundred and ninety-three pleas it has heard. Upon learning this, Boudella's wife sent the following letter to her husband's American lawyers:

Dear Friends, I am so shocked by this information that it seems as if my blood froze in my veins, I can't breathe and I wish I was dead. I can't believe these things can happen, that they can come and take your husband away, overnight and without reason, destroy your family, ruin your dreams after three years of fight. . . . Please, tell me, what can I still do for him? . . . Is this decision final, what are the legal remedies? Help me to understand because, as far as I know the law, this is insane, contrary to all possible laws and human rights. Please help me, I don't want to lose him.

John Radsan, the former C.I.A. lawyer, offered a reply of sorts. "As a society, we haven't figured out what the rough rules are yet," he said. "There are hardly any rules for illegal enemy combatants. It's the law of the jungle. And right now we happen to be the strongest animal." ✦