# EXHIBIT 1

Amended Petition for Issuance of a Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

Westlaw.

PL 107-40, 2001 SJRes 23

Page 1

PL 107-40, September 18, 2001, 115 Stat 224
(Cite as: 115 Stat 224)

UNITED STATES PUBLIC LAWS
107th Congress - First Session
Convening January, 2001

Copr. © West Group 2001. No Claim to Orig. U.S. Govt.Works

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed

PL 107-40 (SJRes 23)
September 18, 2001
AUTHORIZATION FOR USE OF MILITARY FORCE

Joint Resolution To authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States.

Whereas, on September 11, 2001, acts of treacherous violence were committed against the United States and its citizens; and

Whereas, such acts render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad; and

Whereas, in light of the threat to the national security and foreign policy of the United States posed by these grave acts of violence; and

Whereas, such acts continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States; and

Whereas, the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States: Now, therefore, be it

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 50 USCA § 1541 NOTE >>

SECTION 1. SHORT TITLE.

This joint resolution may be cited as the "Authorization for Use of Military Force".

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PL 107-40, 2001 SJRes 23

Page 2

**PL 107-40**, September 18, 2001, 115 Stat 224
**(Cite as: 115 Stat 224)**

<< 50 USCA § 1541 NOTE >>

SEC. 2. AUTHORIZATION FOR USE OF UNITED STATES ARMED FORCES.

(a) IN GENERAL.--That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

(b) War Powers Resolution Requirements--

(1) SPECIFIC STATUTORY AUTHORIZATION.--Consistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.

*225 (2) APPLICABILITY OF OTHER REQUIREMENTS.--Nothing in this resolution supercedes any requirement of the War Powers Resolution.

Approved September 18, 2001.

**PL 107-40**, 2001 SJRes 23

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Amended Petition for Issuance of a Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

Westlaw.

66 FR 57833                                                              Page 1

66 FR 57833, 2001 WL 34773797 (Pres.)

**(Cite as: 66 FR 57833)**

Notice

Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism

November 13, 2001

*57833 By the authority vested in me as President and as Commander in Chief of the Armed Forces of the United States by the Constitution and the laws of the United States of America, including the Authorization for Use of Military Force Joint Resolution (Public Law 107-40, 115 Stat. 224) and sections 821 and 836 of title 10, United States Code, it is hereby ordered as follows:

Section 1. Findings.

 (a) International terrorists, including members of al Qaida, have carried out attacks on United States diplomatic and military personnel and facilities abroad and on citizens and property within the United States on a scale that has created a state of armed conflict that requires the use of the United States Armed Forces.

 (b) In light of grave acts of terrorism and threats of terrorism, including the terrorist attacks on September 11, 2001, on the headquarters of the United States Department of Defense in the national capital region, on the World Trade Center in New York, and on civilian aircraft such as in Pennsylvania, I proclaimed a national emergency on September 14, 2001 (Proc. 7463, Declaration of National Emergency by Reason of Certain Terrorist Attacks).

 (c) Individuals acting alone and in concert involved in international terrorism possess both the capability and the intention to undertake further terrorist attacks against the United States that, if not detected and prevented, will cause mass deaths, mass injuries, and massive destruction of property, and may place at risk the continuity of the operations of the United States Government.

 (d) The ability of the United States to protect the United States and its citizens, and to help its allies and other cooperating nations protect their nations and their citizens, from such further terrorist attacks depends in significant part upon using the United States Armed Forces to identify terrorists and those who support them, to disrupt their activities, and to eliminate their ability to conduct or support such attacks.

 (e) To protect the United States and its citizens, and for the effective conduct of military operations and prevention of terrorist attacks, it is necessary for individuals subject to this order pursuant to section 2 hereof to be detained, and, when tried, to be tried for violations of the laws of war and other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 FR 57833          Page 2

66 FR 57833, 2001 WL 34773797 (Pres.)

**(Cite as: 66 FR 57833)**

applicable laws by military tribunals.

(f) Given the danger to the safety of the United States and the nature of international terrorism, and to the extent provided by and under this order, I find consistent with section 836 of title 10, United States Code, that it is not practicable to apply in military commissions under this order the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts.

(g) Having fully considered the magnitude of the potential deaths, injuries, and property destruction that would result from potential acts of terrorism against the United States, and the probability that such acts will occur, I have determined that an extraordinary emergency exists for national defense *57834 purposes, that this emergency constitutes an urgent and compelling government interest, and that issuance of this order is necessary to meet the emergency.

Sec. 2. Definition and Policy.

(a) The term "individual subject to this order" shall mean any individual who is not a United States citizen with respect to whom I determine from time to time in writing that:

(1) there is reason to believe that such individual, at the relevant times,

(i) is or was a member of the organization known as al Qaida;

(ii) has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

(iii) has knowingly harbored one or more individuals described in subparagraphs (i) or (ii) of subsection 2(a)(1) of this order; and

(2) it is in the interest of the United States that such individual be subject to this order.

(b) It is the policy of the United States that the Secretary of Defense shall take all necessary measures to ensure that any individual subject to this order is detained in accordance with section 3, and, if the individual is to be tried, that such individual is tried only in accordance with section 4.

(c) It is further the policy of the United States that any individual subject to this order who is not already under the control of the Secretary of Defense but who is under the control of any other officer or agent of the United States or any State shall, upon delivery of a copy of such written determination to such officer or agent, forthwith be placed under the control of the Secretary of Defense.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 FR 57833 Page 3

66 FR 57833, 2001 WL 34773797 (Pres.)

**(Cite as: 66 FR 57833)**

Sec. 3. Detention Authority of the Secretary of Defense. Any individual subject to this order shall be --

(a) detained at an appropriate location designated by the Secretary of Defense outside or within the United States;

(b) treated humanely, without any adverse distinction based on race, color, religion, gender, birth, wealth, or any similar criteria;

(c) afforded adequate food, drinking water, shelter, clothing, and medical treatment;

(d) allowed the free exercise of religion consistent with the requirements of such detention; and

(e) detained in accordance with such other conditions as the Secretary of Defense may prescribe.

Sec. 4. Authority of the Secretary of Defense Regarding Trials of Individuals Subject to this Order.

(a) Any individual subject to this order shall, when tried, be tried by military commission for any and all offenses triable by military commission that such individual is alleged to have committed, and may be punished in accordance with the penalties provided under applicable law, including life imprisonment or death.

(b) As a military function and in light of the findings in section 1, including subsection (f) thereof, the Secretary of Defense shall issue such orders and regulations, including orders for the appointment of one or more military commissions, as may be necessary to carry out subsection (a) of this section.

(c) Orders and regulations issued under subsection (b) of this section shall include, but not be limited to, rules for the conduct of the proceedings of military commissions, including pretrial, trial, and post-trial procedures, modes of proof, issuance of process, and qualifications of attorneys, which shall at a minimum provide for-- *57835

(1) military commissions to sit at any time and any place, consistent with such guidance regarding time and place as the Secretary of Defense may provide;

(2) a full and fair trial, with the military commission sitting as the triers of both fact and law;

(3) admission of such evidence as would, in the opinion of the presiding officer of the military commission (or instead, if any other member of the commission so requests at the time the presiding officer renders that opinion, the opinion of the commission rendered at that time by a majority of the commission), have probative value to a reasonable person;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 FR 57833                                                                                                  Page 4

66 FR 57833, 2001 WL 34773797 (Pres.)

**(Cite as: 66 FR 57833)**

(4) in a manner consistent with the protection of information classified or classifiable under Executive Order 12958 of April 17, 1995, as amended, or any successor Executive Order, protected by statute or rule from unauthorized disclosure, or otherwise protected by law, (A) the handling of, admission into evidence of, and access to materials and information, and (B) the conduct, closure of, and access to proceedings;

(5) conduct of the prosecution by one or more attorneys designated by the Secretary of Defense and conduct of the defense by attorneys for the individual subject to this order;

(6) conviction only upon the concurrence of two-thirds of the members of the commission present at the time of the vote, a majority being present;

(7) sentencing only upon the concurrence of two-thirds of the members of the commission present at the time of the vote, a majority being present; and

(8) submission of the record of the trial, including any conviction or sentence, for review and final decision by me or by the Secretary of Defense if so designated by me for that purpose.

Sec. 5. Obligation of Other Agencies to Assist the Secretary of Defense.

Departments, agencies, entities, and officers of the United States shall, to the maximum extent permitted by law, provide to the Secretary of Defense such assistance as he may request to implement this order.

Sec. 6. Additional Authorities of the Secretary of Defense.

(a) As a military function and in light of the findings in section 1, the Secretary of Defense shall issue such orders and regulations as may be necessary to carry out any of the provisions of this order.

(b) The Secretary of Defense may perform any of his functions or duties, and may exercise any of the powers provided to him under this order (other than under section 4(c)(8) hereof) in accordance with section 113(d) of title 10, United States Code.

Sec. 7. Relationship to Other Law and Forums.

(a) Nothing in this order shall be construed to--

(1) authorize the disclosure of state secrets to any person not otherwise authorized to have access to them;

(2) limit the authority of the President as Commander in Chief of the Armed Forces or the power of the President to grant reprieves and pardons; or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

66 FR 57833

Page 5

66 FR 57833, 2001 WL 34773797 (Pres.)

**(Cite as: 66 FR 57833)**

(3) limit the lawful authority of the Secretary of Defense, any military commander, or any other officer or agent of the United States or of any State to detain or try any person who is not an individual subject to this order.

(b) With respect to any individual subject to this order--

(1) military tribunals shall have exclusive jurisdiction with respect to offenses by the individual; and

(2) the individual shall not be privileged to seek any remedy or maintain any proceeding, directly or indirectly, or to have any such remedy or *57836 proceeding sought on the individual's behalf, in (i) any court of the United States, or any State thereof, (ii) any court of any foreign nation, or (iii) any international tribunal.

(c) This order is not intended to and does not create any right, benefit, or privilege, substantive or procedural, enforceable at law or equity by any party, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

(d) For purposes of this order, the term "State" includes any State, district, territory, or possession of the United States.

(e) I reserve the authority to direct the Secretary of Defense, at any time hereafter, to transfer to a governmental authority control of any individual subject to this order. Nothing in this order shall be construed to limit the authority of any such governmental authority to prosecute any individual for whom control is transferred.

Sec. 8. Publication.

This order shall be published in the Federal Register.

GEORGE W. BUSH

THE WHITE HOUSE,

November 13, 2001.

66 FR 57833, 2001 WL 34773797 (Pres.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

4/2/2005



# Press Release
# HR/4812

## UNITED NATIONS HUMAN RIGHTS EXPERTS EXPRESS CONTINUED CONCERN ABOUT SITUATION OF GUANTANAMO BAY DETAINEES

(Reissued as received.)

GENEVA, 4 February (UN Information Service) -- This statement was issued today by the following six United Nations human rights experts: Leïla Zerrougui, Chairperson-Rapporteur of the Working Group on Arbitrary Detention of the United Nations Commission on Human Rights; Stephen J. Toope, Chairperson-Rapporteur of the Working Group on Enforced or Involuntary Disappearances of the Commission; Manfred Nowak, the Commission's Special Rapporteur on torture; Paul Hunt, the Commission's Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health; Leandro Despouy, the Commission's Special Rapporteur on the independence of judges and lawyers, and Cherif Bassiouni, Independent Expert appointed by the Secretary-General on the situation of human rights in Afghanistan.

"In January 2005 the detention centre at the United States Naval Base in Guantánamo Bay entered into its fourth year of existence, and many of the inmates are completing their third year of virtually incommunicado detention, without legal assistance or information as to the expected duration of their detention, and in conditions of detention that, according to numerous observers, amount to inhuman and degrading treatment.

The Working Group on Arbitrary Detention, a group of experts appointed by the United Nations Commission on Human Rights to seek and receive information from governments and non-governmental organizations, and to report to the Commission on cases of detention inconsistent with international human rights standards, has been concerned about the situation at Guantánamo Bay since the establishment of the detention centre. Already on 22 January 2002, the then Chairman-Rapporteur of the Working Group, Louis Joinet, sent a letter to the Government of the United States of America seeking an invitation to visit the detention centre at the naval base in order to examine, on the spot, the legal aspects of detention. By a second letter sent on 25 October 2002, the Working Group requested that the United States Government provide responses to a series of factual and legal questions concerning the legal situation of the detainees in GuantánamoBay.

In June 2004, the Chairperson-Rapporteur of the Working Group on Arbitrary Detention, the Special Rapporteur on torture, the Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health, and the Special Rapporteur on the independence of judges and lawyers requested the United States, as well as Iraq and Afghanistan, to invite these experts to visit those persons detained on grounds of terrorism, including in Guantánamo Bay. While the United States Government -- the only Government to respond to date -- has not yet agreed to this request, it has indicated an interest in establishing a dialogue with the experts to consider the possibility of a visit.

The year 2004 saw a number of developments regarding the situation of the Guantánamo detainees. A number of detainees were released. The Supreme Court of the United States rejected the claim of the Government that it could deny access to habeas corpus proceedings to the GuantánamoBay detainees. A United States District Court ruled that it is for the judiciary and not for the executive power to establish whether the Third Geneva Convention applies to persons deprived

of their liberty during the hostilities in Afghanistan. The same court stated that the exclusion of the defendant from certain hearings and from access to evidence used against him was unlawful. In response to these judicial decisions, the United States established the Combatant Status Review Tribunals (CSRTs) and an Administrative Review Board (ARB), which will review, on an annual basis, whether an inmate continues to pose a threat to the United States or its allies, or whether there are other factors bearing upon the need for continued detention. As recently as 31 January 2005, a United States Federal District Court stated in a judgment concerning Guantánamo detainees that "Although this nation unquestionably must take strong action under the leadership of the commander in chief to protect itself against enormous and unprecedented threats, that necessity cannot negate the existence of the most basic fundamental rights for which the people of this country have fought and died for well over two hundred years."

These developments are, however, insufficient to dispel the serious concerns that the mandate holders continue to have with respect to the situation:

(a) Both the international armed conflict in Afghanistan and the war in Iraq have been over for more than 18 months now. The Third Geneva Convention, dealing with prisoners of war, mandates that any prisoner of war must be released "without delay after the end of hostilities". The legal basis for the continued detention of the GuantánamoBay inmates is therefore unclear. In any event, many of them were arrested in countries which were not parties to any armed conflict involving the United States of America;

(b) The lack of clarity concerning the legal basis on which the Guantánamo detainees are deprived of their freedom also means that both the detainees and their families are in a state of uncertainty regarding the remaining duration of the detention;

(c) The exact number and the names of the persons detained at GuantánamoBay continue to be unknown. This situation is extremely disconcerting and is conducive to the unacknowledged transfer of inmates to other, often secret, detention facilities, whether run by the United States or by other countries. This situation is of particular concern to the Working Group on Enforced or Involuntary Disappearances;

(d) Concerns have been voiced regarding the independence of both the Combatant Status Review Tribunals and the Administrative Review Board, and with respect to the fairness of the proceedings before them. In particular, most detainees do not have access to legal counsel, and much of the evidence on which the decision to detain them is based is not disclosed to them;

(e) The need to objectively assess the allegations of torture, and other cruel, inhuman or degrading treatment or punishment, particularly in relation to methods of interrogation of detainees, that have been brought to the attention of the Special Rapporteur on torture;

(f) The conditions of detention, especially of those in solitary confinement, place the detainees at significant risk of psychiatric deterioration, possibly including the development of irreversible psychiatric symptoms;

(g) Most detainees do not know whether the United States Government intends to raise criminal charges against them or not. The procedural rules governing the Military Commissions set up to try those detainees who will face criminal charges raise misgivings similar to those voiced with regard to the Combatant Status Review Tribunals: doubts regarding the actual independence of the Commissions, and concerning the fairness in the respective positions (or "equality of position") between prosecution and defence, in particular with regard to access to evidence. Moreover, the mandate holders recall that where the conditions of detention are such as to subject a defendant to inhuman or degrading treatment, or to otherwise gravely weaken him physically and psychologically, equality is compromised and any imprisonment upon conviction tainted with arbitrariness.

In conclusion, the United Nations human rights experts, once more, confirm that the right and duty of all States to use all lawful means to protect their citizens against death and destruction brought about by terrorists must be exercised in conformity with international law; lest the whole cause of the international fight against terrorism be compromised."

# EXHIBIT 4

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

About the ICRC | ICRC activities | The ICRC worldwide | Focus | Humanitarian law | Info resources | News



**ICRC**



International humanitarian law and terrorism



Français Español عربي Português

MAKE A DONATION TO THE ICRC

[Search]

What's new | Contacts |

Home > News

30-11-2004 Press Release 04/70

Print this page

# The ICRC's work at Guantanamo Bay

Geneva (ICRC) - The International Committee of the Red Cross (ICRC) has been regularly visiting the US detention facility at Guantanamo Bay since early 2002 for the purpose of monitoring that persons held there are treated in accordance with applicable international laws and standards.

It also enables those detained at Guantanamo Bay to remain in contact with their families by means of Red Cross messages.

The contents of the ICRC's representations and reports are confidential and for the exclusive attention of the relevant detaining authorities. Therefore, in accordance with its usual policy, the organization will not publicly confirm or deny whether the quotations in the article entitled "Red Cross Finds Detainee Abuse in Guantanamo", which appeared in the *New York Times* of 30 November, reflect findings reported by the ICRC to the United States authorities regarding the conditions of detention and treatment of detainees at Guantanamo Bay.

The ICRC uses its exchanges with governments to make clear its concerns and recommendations regarding the situation in places of detention and to demand changes when necessary. Guantanamo Bay is no exception. The ICRC remains convinced that its policy of direct and confidential representations to the detaining authorities best serves the objective of ensuring that the detainees' treatment meets the standards set by international humanitarian law. This policy has made it possible for the ICRC to have repeated and regular access to those held at Guantanamo Bay and to speak with them in private.

The recent creation of the Office of Detainee Affairs in the US Department of Defense has provided a forum in which issues relating to Guantanamo Bay can be discussed in a more timely and systematic manner. Nevertheless, the ICRC remains concerned that significant problems regarding conditions and treatment at Guantanamo Bay have not yet been adequately addressed. The organization will pursue its discussions on these issues with the US authorities.

In 2003, the ICRC visited over 2,000 places of detention holding nearly 450,000 persons deprived of their freedom in about 80 countries. For thousands of those detainees, including many at Guantanamo Bay, visits by ICRC delegates constitute their only contact with the outside world.

**For further information, please contact:**
Antonella Notari, ICRC Geneva, tel. +41 22 730 2282 or +41 79 217 3280
Florian Westphal, ICRC Geneva, tel. +41 22 730 2930 or +41 79 217 3226
Amanda Williamson, ICRC Washington, tel. +1 202 431 6906
Roland Huguenin-Benjamin, ICRC London, tel. +44 7818 03 4932

**Other documents in this section:**
News

**In other sections:**
The ICRC worldwide\The Americas\United States
The ICRC worldwide\Asia and the Pacific\Afghanistan
ICRC Activities\Protection\Detention

Back to previous page

# EXHIBIT 5

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

About the ICRC | ICRC activities | The ICRC worldwide | Focus | Humanitarian law | Info resources | News



**ICRC**

**International humanitarian law and terrorism**



Français  Español  عربي  Português

MAKE A DONATION
TO THE ICRC



What's new | Contacts |

Home > The ICRC worldwide > The Americas > United States

26-07-2004 Operational update                                   Print this page

# US detention related to the events of 11 September 2001 and its aftermath - the role of the ICRC

The article explains the purpose of the ICRC visits and its procedures, and outlines its concerns, including the fate of people held at undisclosed locations.

The terrible events of 11 September 2001 shocked the world including the ICRC, which immediately condemned the attacks on the United States (see **Press release, 11 September 2001**).

The ICRC recognises the significant challenge the United States and other countries face in defending their citizens against terrorist attacks. Nevertheless, there are serious divergences of opinion about the relevant laws which apply to the US government's response to terrorism. The ICRC is especially concerned about the fact that the US detains an unknown number of people outside any legal framework.

Many of those captured in the context of the so-called War on Terror are being held at US detention facilities in Bagram and Kandahar in Afghanistan and in Guantanamo Bay, Cuba. A small number of persons are furthermore detained in Charleston, USA. According to public statements by official US sources, a number of detainees are also being held incommunicado at undisclosed locations.

The ICRC has been visiting detainees in Bagram and Kandahar, Guantanamo Bay, and in Charleston. The ICRC has also repeatedly appealed to the American authorities for access to people detained in undisclosed locations.

---

### ICRC in Bagram, Afghanistan

The ICRC has been visiting detainees at the US-run Bagram military airbase since January 2002. Most of them are Afghans captured by the US-led coalition in Southern and Eastern Afghanistan. As of late June 2004, some 300 detainees were held at Bagram. In 2003, the ICRC facilitated the exchange of about 670 Red Cross Messages between detainees and their families.

### ICRC in Kandahar, Afghanistan

The ICRC visited the US detention facility in Kandahar from December 2001 when it opened until its closure in June 2002. It requested renewed access to the detention place in early June after it resumed its function as a recognised US facility to helped persons deprived of freedom. The first ICRC visit to Kandahar detention facility took place in late June 2004.

### ICRC in Guantanamo Bay, Cuba

The ICRC has been visiting detainees held at Guantanamo Bay, Cuba since January 2002. There are currently just under 600 detainees from roughly 40 countries speaking about 17 different languages. As of June 2004, the ICRC had facilitated the exchange of nearly 10,000 Red Cross messages between the detainees and their families.

---

## Aim of the visits

People held in connection with armed conflicts such as the war in Afghanistan fall under the regime of international humanitarian law (IHL), and should be treated accordingly. Those persons detained outside of a situation of armed conflict have rights enshrined in a number of other bodies of law such as **international human rights law** and relevant provisions of domestic law.

The ICRC's visits to Bagram, Kandahar and Guantanamo Bay are a continuation of the work the organisation had been carrying out in detention places in Afghanistan during the war in 2001.

The role of the ICRC, as an independent and neutral humanitarian organisation with a mandate conferred on it by States, is to regularly assess the conditions of detention, the treatment of detainees and respect of their fundamental judicial guarantees. The ICRC offers observations and makes recommendations for improvements - where appropriate - in the course of its ongoing dialogue with the US authorities. While the ICRC monitors the situation at Bagram, Kandahar and Guantanamo Bay, the responsibility for ensuring that persons held there are indeed treated in accordance with IHL and other applicable bodies of law lies with the US authorities.

## Why the ICRC?

The ICRC has been visiting people detained in connection with armed conflicts since 1915 when its delegates first negotiated access to tens of thousands of prisoners of war held during World War One. The ICRC's practice of visiting prisoners of war – combatants captured during an international armed conflict – was codified in the Geneva Conventions of 1949, to which 191 states are party. Common Article Three of the Four Geneva Conventions also gives the ICRC the right to request access to persons detained in non-international armed conflicts such as civil wars. Under the statute of the International Red Cross and Red Crescent Movement, the ICRC can moreover request access to persons detained in connection with situations of violence less intense than armed conflict.

In 2003, the ICRC visited nearly 470,000 detainees, held in nearly 80 countries around the world. Of these, nearly 127,000 were individually registered and followed (see **Protecting prisoners and detainees in wartime**).

## Procedures

ICRC detention visits are usually carried out by a team of specialised delegates as well as interpreters and medical personnel when appropriate. The organisation follows the same standard working procedures wherever it visits detainees. These include:
- ICRC delegates insist on speaking in total privacy to each and every detainee held; delegates should be able to inspect all cells and other facilities.
- Visits should be carried out at a frequency of the ICRC's choice and for as long as people are held in detention.
- All detainees should have the opportunity to write to their families using the Red Cross message system and to receive Red Cross messages from their next of kin.
- Delegates conduct confidential discussions with the camp authorities before and after each visit to raise concerns and make recommendations where appropriate.
- The ICRC should be allowed to individually register the identities of detainees falling within its area of concern. This makes it possible to monitor the situation of each detainee throughout his or her period in detention.

## Dialogue with the US authorities

The ICRC regularly discusses its findings concerning Bagram, Kandahar and Guantanamo Bay with the

military authorities in the camps as well as with the appropriate US representatives in Kabul and Washington. While the ICRC has felt compelled to make some of its concerns public, notably regarding the legal status of the detainees, the primary channel for addressing issues related to detention remains its direct and confidential dialogue with the US authorities.

## Confidentiality. Why?

Wherever the ICRC visits places of detention, its findings and observations about the conditions of detention and the treatment of detainees are discussed directly and confidentially with the authorities in charge. Bagram, Kandahar and Guantanamo Bay are no exceptions. The ICRC's lack of public comment on the conditions of detention and the treatment of detainees must therefore not be interpreted to mean that it has no concerns.

Confidentiality is an important working tool for the ICRC in order to preserve the exclusively humanitarian and neutral nature of its work. The purpose of this policy is to ensure that the ICRC obtains and, importantly, maintains, access to tens of thousands of detainees around the world held in highly sensitive situations of armed conflict or other situations of violence.

The ICRC is also concerned that any information it divulges about its findings could easily be exploited for political gain.

## Red Cross messages

For most detainees in Bagram, Kandahar and Guantanamo Bay and their families, Red Cross messages are the only means of maintaining regular contact. As the feeling of isolation and uncertainty about their future has increased among the detainees, particularly in Bagram and Guantanamo Bay, these messages have become more and more valuable for them and their families. Red Cross messages are strictly intended for the exchange of personal and family news and are routinely censored by the US authorities. This corresponds to standard worldwide practice wherever the ICRC visits places of detention.

The Red Cross message service for detainees and their families is a major logistical exercise, involving a number of ICRC delegations worldwide, as well as national Red Cross and Red Crescent societies in the detainees' home countries. Every message is delivered by hand to the detainees and their families. The logistics involved and the censorship of the messages by authorities can unfortunately slow down the process.

## Juveniles at Guantanamo Bay

The ICRC believes that the US continues to detain two juveniles i.e. detainees under 18 years of age at Guantanamo Bay. International law recognises that juveniles in detention have special needs and must therefore be treated differently from adults.

## Military Commissions for Guantanamo Bay detainees

The US has publicly announced its plans to set up military commissions to try at least some of the detainees at Guantanamo Bay.

International Humanitarian Law provides for the prosecution of people suspected of having committed war crimes or any other criminal offence. It requires that the individuals concerned be afforded essential judicial guarantees. These include the presumption of innocence, the right to be tried by an impartial and independent tribunal, the right to qualified legal counsel and the exclusion of any evidence obtained as a result of torture or other cruel, inhuman or degrading treatment.

The ICRC is closely following the development of the legal framework related to the military commissions.

It has communicated its preliminary comments and observations to the US authorities and seeks to be able to discuss the proposed proceedings with them before deciding whether or not to attend the military commission proceedings as an observer.

## Releases or transfers of detainees

The ICRC insists on interviewing in private any detainee about to be transferred out of Guantanamo Bay before his departure to allow him the opportunity to raise any possible fears of persecution should he be sent home or to a third country. The ICRC then relays the detainee's comments to the detaining authorities and makes appropriate recommendations as to how to proceed. This procedure is designed to ensure respect for the internationally recognised principle of non-refoulement which prohibits the transfer or return of a person to a country where he or she has reason to fear for his or her life, physical or mental integrity, or might be subject to other serious human rights violations.

The ICRC follows up on all cases of detainees transferred from Guantanamo Bay to third countries, particularly if they are subsequently rearrested and deprived of their liberty. The ICRC aims to visit these detainees in their new place of detention to ensure that their treatment and the conditions of detention are in conformity with international legal requirements.

The ICRC has regularly provided support to detainees released from Guantanamo Bay. Whenever needed, ICRC delegates are present during these releases and provide clothes and transport fares to enable the freed detainees to return to their families.

## ICRC concerns

For the ICRC, the question of the legal status of the persons detained by the US at Bagram, Guantanamo Bay or at so-called undisclosed locations, as well as the legal framework applicable to them remains unresolved *(see IHL and terrorism: questions and answers)*.

For many detainees at Guantanamo Bay more than two and a half years have passed since their arrest. The ICRC has always maintained that those detainees remaining in Guantanamo Bay should either be charged and tried, released, or be placed within a legal framework that governs their continued detention. On 28 June 2004, the United States Supreme Court ruled that 14 Guantanamo Bay detainees could file for writs of habeas corpus – that is, challenges to the legality of their detention – in US federal courts. This decision has opened the door for other detainees at Guantanamo Bay to challenge the legality of their detention in US courts. The ICRC is closely following developments in the wake of the Supreme Court decision.

The ICRC believes that the uncertainty about their fate has been a contributing factor to the mental and emotional health problems among the detainees at Guantanamo Bay observed by its delegates and reported by other sources.

The ICRC has had regular access to the persons detained at Bagram, but not immediately after their arrest. Initially detainees were only held for limited periods of time before being transferred to Guantanamo Bay or released. However, since mid-2003 many persons have been detained for longer periods at Bagram, in some cases for more than a year. Therefore, the ICRC is increasingly concerned by the fact that the US authorities have not resolved the questions of their legal status and of the applicable legal framework.

The ICRC's observations regarding certain aspects of the conditions of detention and treatment of detainees in Bagram and Guantanamo have not yet been adequately addressed.

The US authorities state that the detainees in Afghanistan and Guantanamo Bay are of important intelligence value. The Geneva Conventions do not preclude the interrogation of persons deprived of liberty. However, since the detainees, particularly in Guantanamo Bay, have been subjected to unusually long periods of interrogation, the ICRC closely monitors the impact this has on them. Any interrogation

has to be conducted in accordance with basic humanitarian standards.

Beyond Bagram, Kandahar and Guantanamo Bay, the ICRC is increasingly concerned about the fate of an unknown number of people captured as part of the so-called global war on terror and held in undisclosed locations. For the ICRC, obtaining information on these detainees and access to them is an important humanitarian priority and a logical continuation of its current detention work in Afghanistan and Guantanamo Bay. Dialogue continues with the US authorities to resolve this issue.

*To find out more about the ICRC's detention work in Iraq see* **operational update** *of 31 May 2004*

**Other documents in this section:**
**The ICRC worldwide > The Americas > United States**

**In other sections:**
**The ICRC worldwide\Asia and the Pacific\Afghanistan**
**ICRC Activities\Protection\Detention**

Back to previous page

**Copyright** © 2005 International Committee of the Red Cross

26-07-2004