# EXHIBIT 6

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

**Previous**

# UNITED STATES OF AMERICA
# Human dignity denied
# Torture and accountability in the 'war on terror'
~~

*A report based on Amnesty International's 12-point Program for the Prevention of Torture by Agents of the State*

### Summary

*Then [the guard] brought a box of food and he made me stand on it, and he started punishing me. Then a tall black soldier came and put electrical wires on my fingers and toes and on my penis, and I had a bag over my head. Then he was saying 'which switch is on for electricity?' Iraqi detainee, Abu Ghraib prison, 16 January 2004(1)*

The image of New York's Twin Towers struck by hijacked airliners on 11 September 2001 has become an icon of a crime against humanity. It is tragic that the response to the atrocities of that day has resulted in its own iconography of torture, cruelty and degradation. A photograph of a naked young man captured in Afghanistan, blindfolded, handcuffed and shackled, and bound with duct tape to a stretcher. Pictures of hooded detainees strapped to the floor of military aircraft for transfer from Afghanistan to the other side of the world. Photographs of caged detainees in the United States (US) Naval Base in Cuba, kneeling before soldiers, shackled, handcuffed, masked and blindfolded. Television images of orange-clad shackled detainees shuffling to interrogations, or being wheeled there on mobile stretchers. A hooded Iraqi detainee sitting on the sand, surrounded by barbed wire, clutching his four-year-old son.(2) And the photos from Abu Ghraib – a detainee, hooded, balanced on a box, arms outstretched, wires dangling from his hands with electric torture threatened; a naked man cowering in terror against the bars of a cell as soldiers threaten him with snarling dogs; and soldiers smiling, apparently confident of their impunity, over detainees forced into sexually humiliating poses. The United States of America (USA), and the world, will be haunted by these and other images for years to come, icons of a government's failure to put human rights at its heart.

The struggle against torture and ill-treatment by agents of the state requires absolute commitment and constant vigilance. It requires stringent adherence to safeguards. It demands a policy of zero tolerance. The US government has manifestly failed in this regard. At best, it set the conditions for torture and cruel, inhuman or degrading treatment by lowering safeguards and failing to respond adequately to allegations of abuse raised by Amnesty International and others from early in the "war on terror". At worst, it has authorized interrogation techniques which flouted the country's international obligation to reject torture and ill-treatment under any circumstances and at all times.

The US administration has said that it is "strongly committed" to working with non-governmental organizations "to improve compliance with international human rights standards."(3) President George W. Bush has recently said that the USA "support[s] the work of non-governmental organizations to end torture and assist the victims".(4) With this in mind, Amnesty International seeks to provide a framework in this report by which there can be a full accounting for any torture or cruel, inhuman or degrading treatment by US agents, and to prevent future violations of international law and standards.

Part One gives an overview, describing how the US administration has fallen into an historically familiar pattern of abuse to respond to the "new paradigm" it says has been set by the atrocities of 11 September 2001. The war mentality the government has adopted has not been matched with a commitment to the laws of war, and it has discarded fundamental human rights principles along the way. While there are undoubtedly complex challenges and threats in the current situation, the simple fact is that the USA has stepped onto a well-trodden path of violating basic rights in the name of national security or "military necessity".

Throughout history, torture has often occurred against those considered as "the other", and a second section of Part One traces the thread of dehumanization of detainees in US custody from Afghanistan to Abu Ghraib. A third section in Part One outlines the unequivocal and non-derogable international legal prohibition on torture and cruel, inhuman and degrading treatment. The final section stresses that respect for human rights is the route to security, as the US government itself claims, not the obstacle to security, as appears to be the administration's true belief if its detention and interrogation policies are the yardstick.

Part Two is entitled Agenda for Action, and begins with a reiteration of Amnesty International's call for a full commission of inquiry into all US "war on terror" detention and interrogation practices and policies. While the organization welcomes the recent official investigations that have taken place, it believes that a more comprehensive and genuinely independent inquiry is needed to ensure full accountability and non-repetition of abuse. This commission of experts must have all the necessary powers to carry out such an investigation.

The remainder of Part Two is structured around Amnesty International's *12-point Program for the Prevention of Torture by*

*Agents of the State.* The organization has been working against torture for more than three decades. In addition to its daily efforts against this most tenacious and pervasive of human rights violations, it has conducted three worldwide campaigns for the abolition of torture, launched in 1972, 1984 and 2000. The 12-Point Program that forms the basis of this report was adopted for the most recent of these campaigns and reflects Amnesty International's key findings on how best to prevent torture.

Under each of the 12 Points, Amnesty International illustrates how the USA has failed to meet basic human rights safeguards, thus opening the door to torture and ill-treatment. Detailed recommendations are given under each Point, with the compilation of more than 60 recommendations provided at the end of the report.

Point 1 of the 12-Point Program is "Condemn Torture". In other words, the highest authorities of every country should demonstrate their total opposition to torture and other cruel, inhuman or degrading treatment or punishment. They should condemn torture and ill-treatment unreservedly whenever they occur. They should make clear to all members of the police, military and other security forces that torture and ill-treatment will never be tolerated.

The report recalls the US administration's repeated claims that it is committed to what it calls the "non-negotiable demands of human dignity", and that it is leading the global struggle against torture. A government's condemnation of torture and other ill-treatment must mean what it says, however. The US administration's condemnation has been paper thin, as shown by the series of government memorandums that have come into the public domain since the Abu Ghraib scandal broke. These documents suggest that far from ensuring that the "war on terror" would be conducted without resort to human rights violations, the administration was discussing ways in which its agents might avoid the international prohibition on torture and cruel, inhuman or degrading treatment. During this time, the government's voice was notable by its absence in the public debate in the USA since 11 September 2001 about whether torture is ever an acceptable response to "terrorism". Such silence may also betray a less than absolute opposition to torture and ill-treatment.

In June 2004, in one of several statements by senior United Nations (UN) officials responding to the US "torture memos", Secretary General Kofi Annan emphasized the absolute prohibition on torture and other cruel, inhuman or degrading treatment. He stressed that the prohibition is binding on all states, "in all territories under their jurisdiction or control", and in times of war as well as peace. He added: "Nor is torture permissible when it is called something else. Euphemisms cannot be used to bypass legal obligations."(5)

There is a tendency, not least amongst the US military, to euphemize aspects of war and violence. Killed and maimed civilians become "collateral damage"; torture and cruel, inhuman or degrading treatment become "stress and duress" techniques; and "disappeared" prisoners become "ghost detainees". Euphemizing human rights violations threatens to promote tolerance of them. In similar vein, there has been a noticeable reluctance among senior members of the US administration to call what happened in Abu Ghraib torture, preferring the term "abuse". Members of an administration that has discussed how to push the boundaries of acceptable interrogation techniques and of how agents could avoid criminal liability for torture might display a particular reticence to call torture by its name.

This reticence, however, is also symptomatic of a tendency by the USA – notwithstanding its pivotal role in the adoption of the Universal Declaration of Human Rights and subsequent international human rights instruments – to reject for itself the standards it so often says it expects of others. The human rights violations which the US government has been so reluctant to call torture when committed by its own agents are annually described as such by the State Department when they occur in other countries. While the State Department reports are positive contributions to the global struggle for human rights, double standards have greatly undermined the credibility of the USA's global discourse on human rights.

The USA's "war on terror" policies show that the prohibition against torture and ill-treatment is not "non-negotiable" as far as the administration is concerned. This is what must change. If a government genuinely opposes torture and ill-treatment, it must act accordingly. From this simple proposition, all 11 other points of the *12-point Program for the Prevention of Torture by Agents of the State* follow.

Impunity allows torture and ill-treatment to thrive. All allegations must be thoroughly investigated, including all deaths in custody (Point 6). Perpetrators of such human rights violations must be brought to justice, preferably in ordinary civilian courts rather than military tribunals as an emerging international consensus now recognizes (Point 7). At the same time, the necessary safeguards must be put and kept in place to prevent any recurrence of torture and ill-treatment. Secret detention must end immediately (Point 3). So too must the use of incommunicado detention, with lawyers, doctors, relatives, and independent monitors granted immediate and continuing access to and information about detainees, and with detainees brought before a judicial authority as soon as possible after arrest (Point 2). There must be a clear delineation between powers of interrogation and detention, with detention conditions fully meeting international standards. Vulnerable detainees, including children and women, should receive particular protections demanded by international law (Point 4). Coerced statements must not be admitted in any trials. Military commissions set up to try "war on terror" detainees, with the power to admit such statements, must be abandoned (Point 8).

Any victims of torture or ill-treatment are entitled to reparations, including compensation for the families of anyone who died as a result of such treatment in custody (Point 10). Training of anyone who comes into contact with detainees is essential, and must include relevant cultural awareness education as well as training in the international prohibition of

torture and ill-treatment (Point 9). The numerous conditions the USA attached to its ratifications of international treaties prohibiting torture and other cruel, inhuman or degrading treatment should be withdrawn. It should ratify those treaties and protocols it has not yet ratified (Point 11). In accordance with international human rights law, international security cooperation must rule out the transfer of detainees in conditions or to places where they are at risk of torture or other cruel, inhuman or degrading treatment or punishment (Point 12). US laws must be amended, or reinterpreted, to reflect fully the absolute prohibition on torture and ill-treatment in international law and allow no loopholes, in peacetime, in war, and in the "war on terror," or for anyone, from the foot soldier to the President (Point 5).

On 11 September 2001, President Bush said that "America was targeted for attack because we're the brightest beacon for freedom and opportunity in the world. And no one will keep that light from shining."(6) Three years later, the catalogue of human rights violations alleged or known to have been committed by US agents in the "war on terror" tells a different story. Amnesty International urges the US government to adopt a fundamental change in direction and to ensure that all its policies and practices fully comply with international law. The core message of this report is that the prevention of torture and cruel, inhuman or degrading treatment is primarily a matter of political will.

---

**A brief chronology**

11 September 2001 – four US commercial airliners are hijacked. Two are crashed into the World Trade Center in New York, one into the Pentagon and one into a field in Pennsylvania. Almost 3,000 people are killed in this crime against humanity.

7 October 2001 – the USA leads military action against the Taleban government and members of the *al-Qa'ida* network in Afghanistan.

10/11 January 2002 – the first detainees are transferred from Afghanistan to the US Naval Base in Guantánamo Bay, Cuba, in conditions that amount to cruel, inhuman or degrading treatment.

7 February 2002 – the White House announces its decision that the Geneva Conventions do not apply to *al-Qa'ida* suspects captured in Afghanistan, and that neither they nor Taleban members would be eligible for prisoner of war status.

June 2002 – Hamid Karzai appointed as President of interim Afghanistan administration. US forces continue to carry out military operations and detentions in Afghanistan to this day.

20 March 2003 – US-led Coalition forces attack Iraq. On 1 May 2003, President Bush announces that the main combat operations in Iraq are over. A major insurgency against the occupation develops.

28 April 2004 – photographs of torture and ill-treatment of Iraqi detainees by US soldiers in Abu Ghraib prison outside Baghdad are broadcast by CBS News and subsequently around the world.

22 June 2004 – the US administration releases several previously secret memorandums discussing "war on terror" detention and interrogation options "to set the record straight" following leaks.

28 June 2004 – the US Supreme Court rules that the US courts have jurisdiction over the Guantánamo detainees, hundreds of whom have already been held for more than two years without any judicial review, charge, trial or access to legal counsel or relatives.

2001-2004 – The US military has taken more than 50,000 people into custody during its military operations in Afghanistan and Iraq. In Afghanistan, the US has operated some 25 detention facilities, and in Iraq another 17. More than 750 people have been held in Guantánamo. The Pentagon states that 202 have been released or transferred, leaving "approximately 549" in the base by 22 September 2004. An unknown number of detainees have been held in undisclosed locations by the USA or transferred to the custody of other countries.

---

## Part One: Overview

### I. A familiar path to torture

*Apologists for torture generally concentrate on the classical argument of expediency: the authorities are obliged to defeat terrorists or insurgents who have put innocent lives at risk and who endanger both civil society and the state itself... The accumulated evidence also gives a clear picture of the 'preconditions' for torture... Incommunicado detention, secret detention and 'disappearance' increase the latitude of security agents over the lives and well-being of people in custody.*
Amnesty International, *Torture in the Eighties*, 1984

The torture and ill-treatment of Iraqi detainees by US agents in Abu Ghraib prison was – due to a failure of human rights leadership at the highest levels of government – sadly predictable.

"It is a recurring theme in history", said a senior United Kingdom (UK) judge in a criticism of US "war on terror" detentions, "that in times of war, armed conflict, or perceived national danger, even liberal democracies adopt measures infringing human rights in ways that are wholly disproportionate to the crisis".(7) Certainly, a glimpse at the history of torture in the 20th century was enough to ring alarm bells following the crime against humanity that was committed in the USA on 11 September 2001. The situation contained some classic ingredients that would demand principled leadership if human rights were not to suffer in the wake of such an atrocity. In the mix was an elusive, ill-defined and demonized enemy; shortcomings in intelligence-gathering; an official interpretation of the situation as new, unique and requiring special measures; and an apocalyptic picture painted by government of a stark moral choice between "good and evil" faced by society and wider "civilization".

Amnesty International wrote to President Bush on 25 September 2001 reiterating its condemnation of the appalling crime of two weeks earlier and its support for efforts to bring the perpetrators to justice in accordance with international human rights standards. The organization urged the President to lead his government "to take every necessary human rights precaution in the pursuit of justice, rather than revenge, for the victims of this terrible crime."(8) The organization regrets that part of the USA's response to the atrocities has been to allow another chapter in the history of torture and cruel, inhuman and degrading treatment to open. Earlier chapters in this history would have been instructive.(9)

In the late 1960s, for example, the Brazilian state faced social unrest as well as violence from small urban guerrilla groups. In the government's view, both economic development and national security were under threat. The authorities took a number of draconian measures, none of which was open to judicial review. The one that had the most direct bearing on the practice of torture was the suspension of the right of *habeas corpus* for anyone charged with crimes against national security.(10) From 1968 to 1973, widespread torture became a feature of the government's campaign against "permanent subversion". On the other side of the continent, the coup in Chile on 11 September 1973 was followed by gross human rights violations. The *Central Nacional de Informaciones* (CNI) was the agency most frequently cited as responsible for torture. People detained by, or handed over to, the CNI for interrogation were usually taken to secret detention centres where they could be held incommunicado for up to 20 days. It was during this period that torture was used to obtain information, "confessions", or collaboration. Torture thrives on secrecy.

Also in 1973, faced with a security problem in Northern Ireland, the British government passed emergency legislation. Not only did this relax the rules of evidence for the admissibility of confessions, it also allowed the police to hold those suspected of politically motivated crimes incommunicado for up to three days, raised to seven the following year. In 1976 and 1977 there was a marked increase in allegations of torture and ill-treatment, just as the government was pressing the police for confessions to use in court. A significant factor in the rapid decline in police standards was the failure of government ministers and senior police officers to intervene with interrogators, directly and forcefully, to make it clear that assault and illegal coercion would not be tolerated. The security forces may also have taken the extension of powers granted to them at the expense of the rights of detainees as a signal that the government authorities would tolerate violence towards and coercion of detainees. Torture rears its head when the legal barriers against it are lowered.

From 1987, torture in Israel was effectively legalized. This was made possible because the government and the judiciary, along with much of Israeli society, accepted that the methods of physical and psychological pressure used by the security services were a legitimate means to combat "terrorism". Palestinians, Lebanese and other non-Israeli nationals were seen as "acceptable" victims of torture – and the methods were seen as "acceptable". Torture feeds on discrimination and fear.

Thus the US administration can be seen to have fallen into a familiar pattern since 11 September 2001. Although President Bush said that "this new paradigm – ushered in not by us, but by terrorists – requires new thinking in the law of war," whatever "new thinking" has been done within the administration, the result has been old abuses.(11) They include the denial of *habeas corpus*; the use of incommunicado and secret detention; a pattern of official commentary on the presumed guilt of detainees; the sanctioning of harsh interrogation techniques in the pursuit of "intelligence"; the blurring of the lines between powers of detention and interrogation; the setting up of military commissions which could admit coerced evidence; and a selective approach to international human rights and humanitarian law obligations. All contributed to conditions ripe for torture and ill-treatment.

The photographs of torture and ill-treatment of detainees in Abu Ghraib prison did not come out of the blue, but followed numerous allegations of abuse in Afghanistan and Guantánamo Bay raised with the US authorities over the previous two years by the International Committee of the Red Cross (ICRC), Amnesty International and others. When it suited the US government's aims in its build up to the invasion of Iraq, the administration cited Amnesty International's reports on torture in that country.(12) When the alleged abuse involved US agents, its response was denial and disregard for the organization's concerns.

In April 2002, Amnesty International wrote to the administration about allegations of ill-treatment of people in US custody in Afghanistan. It never received a reply to its questions and concerns.(13) Ten months before the Abu Ghraib revelations, the organization raised cases of alleged abuses in Iraq by US forces, including the case of Khreisan Khalis Aballey. This 39-year-old man was arrested by the US military at his home in Iraq on 30 April 2003 with his elderly father. According to the allegations, during his interrogation he was made to stand or kneel facing a wall for a week, hooded, and handcuffed tightly with plastic strips. At the same time a bright light was placed next to his hood and distorted music was playing the whole time. During all this period he was deprived of sleep, though he may have been unconscious for some periods. He reported that at one time a US soldier stamped on his foot and as a result one of his toenails was torn off. When, after seven days he was told he was to be released and told he could sit, he said that his leg was the size of a football. He continued to be held for two more days, apparently to allow his health to improve, and was released on 9 May 2003. His father, who was released at the same time, was held in the cell beside his son, where he could hear his son's voice and his screams. Amnesty International did not receive a response to its concerns on this and other cases.(14)

According to the Fay report, one of the military investigations into Abu Ghraib, when the ICRC made allegations of torture or cruel, inhuman or degrading treatment by US forces in 2003 and 2004, "their allegations were not believed, nor were they adequately investigated".(15) Impunity is the friend of torture.

## A war mentality without commitment to the laws of war

Prior to 11 September 2001, the USA had "dealt with [terrorist] attacks as primarily a law enforcement matter".(16) This approach changed after the atrocities of that day. President Bush has said he decided that "we were going to war" the moment he heard that airliners had been crashed into the World Trade Center,(17) and early that afternoon he opened a video teleconference meeting with his principal advisers with the words "we're at war".(18) He has characterized the ensuing "war on terror" as a "monumental struggle of good versus evil".(19) The President has maintained this tone, including in speeches to military audiences in his role as Commander-in-Chief.(20)

A war mentality is dangerous for human rights when a government extends the war framework to cover areas that should appropriately be addressed by law enforcement measures, and even then claims that existing laws of war do not cover this "new paradigm". Amnesty International does not believe that the so-called "war on terror" mandates a new legal framework. The territories and the circumstances in which the confrontation with *al-Qa'ida* or others actually takes place determine the applicable legal regime, within the existing framework of international human rights and humanitarian law. The US administration's refusal to recognize this has fed its willingness to countenance the ill-treatment of detainees in the "war on terror".(21)

The global "war on terror" is described by US officials as a conflict of indeterminate but great length.(22) It is a "war" the end of which will presumably be determined, as has the fate of so many detainees, by executive decision. There will be no single event to signal its conclusion. President Bush declared one victory achieved on 1 May 2003 when, on the deck of an aircraft carrier off the coast of California, he announced that major combat operations in Iraq were over.(23) However, as the military itself has since pointed out, the US forces on the ground in Iraq "rapidly realized that the war had not ended. They were in a counter-insurgency operation with a complex, adaptive enemy that opposed the rule of law and ignored the Geneva Conventions".(24)

It is tragic that in the "war on terror", the USA has itself undermined the rule of law. Its selective disregard for the Geneva Conventions and international human rights law has contributed to torture and ill-treatment. The presidential decision that none of the detainees captured in the international armed conflict in Afghanistan would be eligible for prisoner of war status, and not to bring any such detainee before a "competent tribunal" to determine status as required by Article 5 of the Third Geneva Convention, contradicted the US Army's own doctrine.(25) The ICRC – the most authoritative body on the provisions of the Geneva Conventions – disagreed with the presidential decision.(26)

The decision to reject the applicability of the Geneva Conventions was in line with the many public messages sent by the administration that the "war on terror" would be waged according to new rules and that those captured during this global "war" could be treated differently. Detainees have even been categorized differently, only adding to the risk that they would be perceived by their guards or interrogators as deserving less than basic protections. Those taken into US custody have been variously classified, beyond previous US military doctrine, as "Enemy Combatant", "Under-privileged Enemy Combatant", "Security Internee", "Criminal Detainee", "Person Under US Forces Control", and "Low Level Enemy Combatant".(27) As the UN Special Rapporteur on torture recently pointed out, however, "although the status of detainees may remain unclear, there is no uncertainty as to the international obligations, standards and protections that apply to them, the prohibition of torture being applicable to all individuals without exception and discrimination, regardless of their legal status."(28) The ICRC stated in September 2004 that, based on its "decades of experience in visiting places of detention in vastly different, rapidly changing environments", the organization's consistent finding is that "only by determining and adhering to a clearly established legal framework does one prevent arbitrariness and abuse".(29)

The panel appointed in May 2004 by Secretary of Defense Donald Rumsfeld to review the Pentagon's detention operations (the Schlesinger Panel) pointed out that there was "a failure to plan for a major insurgency" in Iraq and "improvisation was the order of the day".(30) The Schlesinger and military inquiries have stressed that there was a serious under-resourcing of detention operations in Iraq which contributed to abuses. According to Schlesinger, in October 2003 Abu Ghraib, the largest of the US detention facilities in Iraq, had a detainee population of up to 7,000 and a guard force of about 90 personnel. A Schlesinger Panel member has said that the "extreme lack of resources [and] the policy failure at all levels to assure a clear and stable set of rules for treatment and interrogation further opened the door to abuse", adding that this situation was "compounded by inadequate training." (31) Clear policy and effective training become especially crucial at moments of high emotion and high pressure, which can be predicted to be part of any war – as soldiers react to their fellow colleagues being killed or wounded, and interrogators are put under pressure to gain intelligence about the enemy. There is surely responsibility at the highest levels of government – where the decision to go to war is taken – when there is a failure to plan for detention operations, or to ensure an appropriate response to evidence of torture by its troops.

The immediate response of President Bush and other officials to the torture photographs was to claim that the problem was restricted to Abu Ghraib and a few wayward soldiers. On 22 June 2004, after the leaking of earlier government memorandums relating to "war on terror" detention and interrogation options suggesting that torture and ill-treatment had been anticipated, the administration took the step of declassifying selected documents to "set the record straight". At a press briefing, the White House Counsel explained how after 11 September 2001, the US administration had had to ask questions such as "What is the legal status of individuals caught in this battle? How will they be treated? To what extent can those detained be questioned to attain information concerning possible future terrorist attacks? What are the rules?" He continued: "As we debated these questions, the President made clear that he was prepared to protect and defend the United States and its citizens, and he would do so vigorously, but as the documents we are releasing today show, that he

would do so in a manner consistent with our nation's values and applicable law, including our treaty obligations..."(32) It was the same White House Counsel who two and a half years earlier had drafted a memorandum to President Bush suggesting that determining that the Geneva Conventions did not apply to those captured in Afghanistan would free up US interrogators and make their prosecution for war crimes less likely. (33) That memorandum was not one released by the administration. Indeed, at the 22 June press conference, the White House Counsel made clear that the administration's release of its documents "should not be viewed as setting any kind of precedent". It has kept to this line. Of 23 additional documents requested by the Senate Judiciary Committee, only four had been provided by the administration by 13 October 2004.(34)

If one were to single out one sentence from one of the declassified memorandums that calls into question the administration's stated commitment to its international legal obligations, it might be the following: "Of course, our values as a Nation, values that we share with many nations in the world, call for us to treat detainees humanely, *including those who are not legally entitled to such treatment*" (emphasis added).

No detainee can fall outside the prohibition on torture or cruel, inhuman or degrading treatment. To suggest otherwise, as this line does, points to a serious gap in a government's understanding of international law and indicates that it views fundamental human rights as privileges that can be granted, and therefore taken away, by the state. The sentence in question – repeated aloud by the White House Counsel at the June 2004 press briefing with no apparent recognition of the disturbing message contained in it – was in a memorandum signed by President Bush on 7 February 2002, classified as secret for 10 years, and distributed to the main office-holders in his administration.(35) According to the White House Counsel, this document is the "most important" of those released by the administration.

The White House, which maintains that the USA is "steadfastly committed to upholding the Geneva Conventions",(36) has "categorically reject[ed] any connection" between the decision to reject the application of the Geneva Conventions to detainees in Afghanistan and Guantánamo and the torture committed in Abu Ghraib prison in Iraq.(37) Yet its selective disregard for the Geneva Conventions has been part of a policy which has at best sown confusion about interrogation rules among its armed forces, and at worst given a green light to torture or other cruel, inhuman or degrading treatment. Official investigations have concluded that versions of interrogation techniques developed for use against detainees in Afghanistan and Guantánamo, unprotected by the Geneva Conventions, later emerged in Iraq, where the Conventions were held by the US Government to apply.

It is clear that the decision to reject the protections of the Geneva Conventions in the "war on terror" outside Iraq has infected official thinking in the USA. Following the publication of the Schlesinger report, for example, the ICRC pointed out that it contained "a number of inaccurate assertions, conclusions and recommendations" on the role of the ICRC and about the laws of armed conflict. (38) For example, the Schlesinger report suggests that the Fourth Geneva Convention is "not sufficiently robust and adequate" for the detention of "terrorist" suspects, reminiscent of the memorandum drafted by the White House Counsel for President Bush in January 2002 which characterized provisions of the Geneva Conventions as "quaint", "undefined" and "obsolete".(39) Secretary of Defense Rumsfeld echoed this more recently when he said "Some will say, well… in my view it is mental torture to do something that is inconvenient in a certain way for a detainee. Like standing up for a long period or some other thing that someone else might say is not in an, way abusive or harmful. And there's no way to get everybody to agree to all that because when Geneva was prepared and agreed upon, it didn't go to that level of detail."(40)

In response to the findings of Secretary Rumsfeld's appointees on the Schlesinger Panel, the ICRC pointed out that the Fourth Geneva Convention allows internment for imperative security reasons, as well as prosecution, and does not prohibit interrogation. What it does prohibit – a prohibition apparently seen as an obstacle by the US administration – is inhumane treatment. The ICRC added that "the Panel's suggestion that because Geneva Convention IV would not be 'sufficiently robust' it could be waived by decision of individual State parties is a dangerous premise. To accept this argument would mean creating an exception that risks undermining all the humanitarian protections of the law."

Echoing President Bush's central premise in the "war on terror" – that this is a "new paradigm" that "requires new thinking in the law of war" – the Schlesinger Panel recommended that:

> "The United States needs to redefine its approach to customary and treaty international humanitarian law, which must be adapted to the realities of the nature of conflict in the 21st Century. In doing so, the United States should emphasize the standard of reciprocity… The Panel believes the International Committee of the Red Cross, no less than the Defense Department, needs to adapt itself to the new realities of conflict…"

The ICRC responded that the organization indeed "continues to initiate or participate in debates about how the Geneva Conventions can best be applied in contemporary situations of armed conflict". It continued:

> "Nevertheless, a decision to deviate unilaterally from these universally established standards should not be taken lightly. To date, there has been little evidence presented that faithful application of existing law is an impediment in the pursuit of those who violate the same law. Moreover, the standard of reciprocity cannot apply to fundamental safeguards such as prohibition on torture without accepting the risk of destroying not

*only the principle of law, but also the very values on which it is built*". (41)

In similar vein, the most recent version (1992) of the US Army Intelligence Interrogation Field Manual (FM 34-52) states:

> "[The Geneva Conventions] *and US policy expressly prohibit acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment as a means of or aid to interrogation. Such illegal acts are not authorized and will not be condoned by the US Army. Acts in violation of these prohibitions are criminal acts punishable under the* [Uniform Code of Military Justice]... "*Revelation of use of torture by US personnel will bring discredit upon the US and its armed forces while undermining domestic and international support for the war effort. It also may place US and allied personnel in enemy hands at a greater risk of abuse by their captors. Conversely, knowing the enemy has abused US and allied* [prisoners of war] *does not justify using methods of interrogation specifically prohibited by the* [Geneva Conventions] *and US policy.*"

The Schlesinger Panel noted that the Legal Advisor to the Chairman of the Joint Chiefs of Staff and "many service lawyers" had been among those who, in late 2001 and early 2002, had been concerned that rejecting the Geneva Conventions would "undermine the United States military culture which is based on a strict adherence to the law of war". (42) Their fears, it seems, have been realized.

### Old arguments to justify torture: the concept of 'necessity'

In its first major report on torture three decades ago, Amnesty International wrote: "Those who consciously justify torture... rely essentially on the philosophic argument of a lesser evil for a greater good. They reinforce this with an appeal to the doctrine of necessity – the existential situation forces them to make a choice between two evils... The usual justification posits a situation where the 'good' people and the 'good' values are being threatened by persons who do not respect 'the rules of the game', but use ruthless, barbaric, and illegal means to achieve their 'evil' ends."(43)

The concept of "necessity" in relation to torture or ill-treatment has been raised in different ways by the US administration in the context of the "war on terror". Having taken the decision not to apply the Geneva Conventions to those held in Afghanistan and Guantánamo Bay – people whom he has described as "bad people" who "don't share the same values we share"(44) – President Bush sought to dispel concern about the treatment of detainees by saying that they would be treated "in a manner consistent with the principles of Geneva".(45) This has always been qualified, however, with a loophole for torture, namely the phrase "to the extent appropriate and consistent with military necessity".(46)

The legal concept of military necessity cannot lawfully be used to override the prohibition on torture. What happens, however, if a government willing to violate this principle perceives "military necessity" to require the torture or ill-treatment of a detainee, especially if it believes that there can be some detainees who "are not legally entitled to [humane] treatment"? One such detainee would appear to be Saudi national Mohammed al-Kahtani, held without charge or trial in Guantánamo on suspicion of being involved in the 11 September 2001 conspiracy and considered to be resistant to standard interrogation methods. An interrogation plan was approved for Mohammed al-Kahtani – described by Secretary Rumsfeld as "a very bad person"(47) – which "outlines the military necessity for doing this [harsh interrogation]".(48) This followed a request made on 11 October 2002 by military intelligence at Guantánamo for approval of techniques that went beyond normal army doctrine. Techniques including stress positions, sensory deprivation, hooding, stripping, and the use of dogs to inspire fear, were requested and were approved by Secretary Rumsfeld in December 2002 "as a matter of policy". Blanket approval was not given for other requested techniques such as death threats, exposure to cold weather or water, and inducing the perception of suffocation, but the Pentagon's General Counsel suggested that these were "legally available" and, according to a 15 January 2003 memorandum from Secretary Rumsfeld could be requested on a case-by-case basis, presumably if "military necessity" was considered to demand such techniques. (49) A 16 April 2003 memorandum signed by Secretary Rumsfeld, which is believed to remain in force, appears to allow for the possibility of these and any "additional interrogation techniques" to be requested on a case-by-case basis.(50)

The authorities have invoked "military necessity" to prevent the ICRC from meeting with certain detainees held in Guantánamo. In February 2002, following President Bush's decision to reject the application of the Geneva Conventions to those held in Guantánamo, the White House gave assurances that the ICRC would be able to visit all detainees in private. (51) According to leaked military documents, however, at a meeting with the Guantánamo authorities in October 2003, the ICRC raised the cases of four detainees who it had been unable to visit. It was informed by the camp commander that three of them were "off limits... due to military necessity".(52) Four months later, in a meeting on 2 February 2004, the ICRC was informed that it could still not see one of the detainees "because of military necessity".(53)

Under Article 143 of the Fourth Geneva Convention, ICRC visits to civilian internees may be denied "for reasons of imperative military necessity", but "only as an exceptional and temporary measure". In Iraq in January 2004, the US authorities invoked "military necessity" when they refused to grant the ICRC access to eight detainees held in Abu Ghraib. According to the Fay report, one of the eight detainees, a Syrian national, was at that time held in a tiny dark cell without windows, toilet or bedding. The use of "extended solitary confinement in dark and extremely small" cells was one of the torture techniques used under the government of Saddam Hussein that the USA cited in its build up to the invasion of Iraq. (54)

The inhumane treatment of this Syrian detainee, facilitated by the invocation of "military necessity", was not limited to solitary confinement in appalling conditions. Around 18 December 2003, he was abused and threatened with dogs. According to the military, there is a photograph of him kneeling on the floor with his hands tied behind his back, while an unmuzzled dog is snarling a few feet from his face. During an ICRC visit in mid-March 2004, the organization's delegates were again denied access to him, and eight other detainees, on the grounds of "military necessity". In January and March 2004, the ICRC questioned the "exceptional and temporary" nature of the denial of access. By the time of its March visit, the Syrian detainee had been under incommunicado interrogation for four months.(55)

Another variation on the concept of "necessity" in relation to torture arose in the now declassified government communications – including in an August 2002 Justice Department memorandum to the White House, and again in an April 2003 Pentagon report *on* "war on terror" interrogations. (56) Both contend that US agents accused of torture might evade criminal liability by arguing the defence of "necessity". For example, they state that "any harm that might occur during an interrogation would pale to insignificance compared to the harm avoided by preventing [a terrorist] attack". This crude "lesser evil" approach echoes the moral argument behind the "torture warrant" system proposed by Harvard law professor Alan Dershowitz – the idea that judges could approve torture for use against detainees believed to have information about future terrorist attacks, part of a public debate that the administration has failed to challenge (see Point 1.4).

The administration's previously secret memorandums discussed ways that US agents might escape criminal liability if accused of torture and explicitly argued that the President, as Commander-in-Chief of the armed forces, could authorize torture. In suggesting very narrow definitions of torture and that US agents could also get away with employing cruel, inhuman and degrading interrogation techniques, the memorandums took a deeply regressive approach to international standards, even as the administration continued to portray itself in public as leading the global struggle against torture. Its approach represents an attack on fundamental values enshrined in international law developed over the past half century or more. It directly contravenes the position of the international community of nations that:

> *"No State may permit or tolerate torture or other cruel, inhuman or degrading treatment or punishment. Exceptional circumstances such as a state of war or a threat of war, internal political instability or any other public emergency may not be invoked as a justification for torture or other cruel, inhuman or degrading treatment or punishment."*(57)

The administration claimed that the declassified documents "were circulated among lawyers and some Washington policymakers only", as if that makes their contents acceptable, and that they "never made it to the hands of soldiers in the field, nor to the President". (58) However, the administration's lack of a clear and consistent message that the *international* prohibition on torture and cruel, inhuman or degrading treatment would be strictly respected at all times and under all circumstances, opened the door to abuse.

Moreover, General Paul Kern, who oversaw the Fay investigation, has said that the debate on interrogation policies within official circles "found its way into the hard drives of the computers that we found in [Abu Ghraib] prison". He pointed out that "those policies were being debated while we were asking soldiers to conduct interrogations. And so they were seeking to find the limits of their authority." At the same time, the same soldiers were under pressure to produce intelligence. "We need to be crisp and clear in our delivery of orders to these people", the General concluded, "so that they know what the rules are".(59)

The White House Counsel said that President Bush "has given no order or directive that would immunize from prosecution anyone engaged in conduct that constitutes torture. All interrogation techniques actually authorized have been carefully vetted, are lawful, and do not constitute torture".(60) Yet the administration has sanctioned interrogation techniques that, even if each of them did not amount to torture in themselves, have done so in combination, and in any event constituted cruel, inhuman or degrading treatment equally prohibited under international human rights and humanitarian law. By their action as well as inaction, the government set a climate in which torture was more likely to occur. Even today's limited knowledge of the role of the administration suggests, at the very least, a significant degree of executive "acquiescence" – to use the language of Article 1 of the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (UN Convention against Torture) – in the torture and ill-treatment that has been alleged.

The memorandums have caused deep international concern, with senior UN officials seeing the need to reiterate the absolute prohibition on torture and ill-treatment. Referring to the US administration's documents, the UN High Commissioner for Human Rights has stressed: "There can be no doubt that the prohibition against torture and cruel, inhuman or degrading treatment or punishment is non-derogable under international law...Yet we find, remarkably, that questions continue to be raised about this clear dictate of international law, including at high levels of government".(61) The UN Special Rapporteur on torture has written:

> *"Legal arguments of necessity and self-defence, invoking domestic law have recently been put forward, aimed at providing a justification to exempt officials suspected of having committed or instigated acts of torture against suspected terrorists from criminal liability. The condoning of torture is per se a violation of*

*the prohibition on torture... A head of State, also in his or her capacity as commander-in-chief, should therefore not authorize his or her subordinates to use torture, nor to guarantee immunity to the authors, co-authors and accomplices to torture. The argument that public officials have used torture having been advised by lawyers and experts that their actions were permissible is not acceptable either. No special circumstance may be invoked to justify a violation of the prohibition on torture for any reason, including an order from a superior officer or a public authority.*

*"The Special Rapporteur has recently received information on certain methods that have been condoned and used to secure information from suspected terrorists. They notably include holding detainees in painful and/or stressful positions, depriving them of sleep or light for prolonged periods, exposing them to extremes of heat, cold, noise and light, hooding, depriving them of clothing, stripping detainees naked and threatening them with dogs. The jurisprudence of both international and regional human rights mechanisms is unanimous in stating that such methods violate the prohibition on torture and ill-treatment."(62)*

## Not just a few 'bad apples'

By September 2004, four months after the Abu Ghraib photographs came to light, the administration's theory that the problem was restricted to Abu Ghraib and a few aberrant soldiers had been debunked. Indeed, on 8 September 2004, eight retired US generals and admirals wrote to President Bush noting that "no fewer than a hundred criminal, military, and administrative inquiries have been launched into apparently improper or unlawful US practices related on detention and interrogation. Given the range of individuals and locations involved in these reports, it is simply no longer possible to view these allegations as a few instances of an isolated problem".(63) A day after this letter, the Senate Armed Services Committee was told that there might have been as many as 100 "disappearances" in US custody in Iraq, prisoners hidden from the ICRC at the behest of the Central Intelligence Agency (CIA).(64) At least one of these detainees died in custody, one of numerous deaths in US detention facilities in Iraq and Afghanistan since the "war on terror" began. The death in US custody in Gardez in Afghanistan in March 2003 of a young Afghan soldier, 18-year-old Jamal Naseer, allegedly after he and seven other detainees were tortured over a two-week period, has only come to light in recent weeks and raises further questions about the real extent of the abuses and the adequacy of official investigations into them (see Point 6.2).

On 25 August 2004, the Fay report revealed that 54 military intelligence, military police, medical personnel and civilian contractors had "some degree of responsibility or complicity in the abuses that occurred at Abu Ghraib", including seven soldiers already charged. (65) It found "failures of leadership..., failures to follow our own policy, doctrine and regulations", as well as confusion over which interrogation techniques were allowed in which theatre of operation.(66) On 24 August, the Chairman of the Schlesinger Panel, former Secretary of Defense James Schlesinger, had revealed that there had been approximately 300 recorded cases of alleged abuse in Afghanistan, Guantánamo and Iraq, "many of them beyond Abu Ghraib. So the abuses were not limited to a few individuals".(67) Another of the Schlesinger Panel members, former Secretary of Defense Harold Brown, has suggested that a degree of responsibility for "failure to provide adequate resources to support the custodial and intelligence requirements throughout the theater, and for the confusion about permissible interrogation techniques extend[s] all the way up the chain of command to include the Joint Chiefs of Staff and the Office of the Secretary of Defense". (68)

The Schlesinger Panel, however, was not critical of the interrogation techniques *per se*, just of the failure to prevent their transfer from Afghanistan and Guantánamo to Iraq. Chairman Schlesinger claimed: "In the conditions of today, aggressive interrogation would seem essential", and "what constitutes 'humane treatment' lies in the eye of the beholder".(69) Any tolerance for abusive techniques on the part of the investigative body with the widest remit of the reviews conducted since the Abu Ghraib scandal, and the one promoted by the government as the most independent of these investigations, is cause for serious concern.

It was also clear that on the question of accountability the Schlesinger Panel took a limited view. Former Secretary of Defense Harold Brown has suggested that in the case of high-level administration officials, punishment was not an option and that the matter of their accountability rests with the electorate at election time.(70) James Schlesinger suggested that the resignation of the Secretary of Defense "would be a boon to all of America's enemies" and that "his conduct with regard to [the issue of interrogation policy] has been exemplary".(71) The other panel members, retired General Charles Horner and former member of Congress, Tillie Fowler, agreed. This was consistent with the position Tillie Fowler had taken in an interview before the panel had begun its work, in which she had made it clear that Secretary Rumsfeld was not to be the focus of their review. Referring to the Abu Ghraib revelations, she was quoted as saying: "The Secretary is an honest, decent, honourable man, who'd never condone this type of activity. This was not a tone set by the Secretary."(72) Yet in December 2002 Secretary Rumsfeld authorized stripping, isolation, hooding, stress positions, sensory deprivation, and the use of dogs in interrogations. In November 2003, he in effect authorized a "disappearance" by ordering military officials in Iraq to keep a detainee off any prison register (see Point 3.1). In international human rights terms, his conduct, and that of the administration as a whole, has been far from exemplary. Indeed, he and the administration have authorized human rights violations.

## II. Human dignity denied: torture or ill-treatment of the 'other'

*Make no mistake: every regime that tortures does so in the name of salvation, some superior goal, some promise of paradise. Call it communism, call it the free market, call it the free world, call it the national interest, call it fascism, call it the leader, call it civilisation, call it the service of God, call it the need for information; call it what you will, the cost of paradise, the promise of some sort of paradise... will always be hell for at least one person somewhere, sometime.*

Case 1:05-cv-01555-UNA    Document 15-3    Filed 11/11/2005    Page 11 of 25

Ariel Dorfman, Chilean writer, May 2004(73)

Moazzam Begg, a dual UK/Pakistan national, was abducted in January 2002 from Pakistan by US agents and taken to the US air force base in Bagram in Afghanistan where he claims to have been subjected to "pernicious threats of torture, actual vindictive torture and death threats – amongst other coercively employed interrogation techniques". He has alleged that he was interrogated "in an environment of generated fear, resonant with terrifying screams of fellow detainees facing similar methods. In this atmosphere of severe antipathy towards detainees was the compounded use of racially and religiously prejudicial taunts."(74)

On 7 October 2003, an Iraqi man, Amin Sa'id al-Sheikh, was arrested in Baghdad and taken to Abu Ghraib prison. The sworn statement he gave on 16 January 2004 to military investigators looking into allegations of abuse suggests that anti-Muslim sentiment was still running high among at least some US military personnel:

> "They stripped me naked, they asked me, 'Do you pray to Allah?' I said, 'Yes'. They said, 'Fuck you' and 'Fuck him'...One of them told me he would rape me. He drew a picture of a woman to my back and makes me stand in shameful position holding my buttocks. Someone else asked me, 'Do you believe in anything?' I said to him, 'I believe in Allah'. So he said, 'But I believe in torture and I will torture you.'... Then they handcuffed me and hung me to the bed. They ordered me to curse Islam and because they started to hit my broken leg, I cursed my religion. They ordered me to thank Jesus that I'm alive. And I did what they ordered me. This is against my belief."(75)

Throughout history, torture has often occurred against those considered the "other". The UN Committee against Torture has stated that "discrimination of any kind can create a climate in which torture and ill-treatment of the 'other' group subjected to intolerance and discriminatory treatment can more easily be accepted."(76) Even in regular internment facilities in Iraq, the ICRC noted a "widespread attitude of contempt" on the part of the US guards towards detainees. (77) The UN High Commissioner for Human Rights has reported that detainees in Iraq have even been humiliated upon release: "Among the examples given were that prisoners were released in the middle of the night, handcuffed, with Mickey Mouse drawn on their shirt…".(78)

Torture involves the dehumanization of the victim, the severing of all bonds of human sympathy between the torturer and the tortured. This process of dehumanization is made easier if the victim is from a despised social, political, religious or ethnic group. Discrimination paves the way for torture and ill-treatment by allowing the victim to be seen not as human but as an object, who can, therefore, be treated inhumanely.

Anti-Muslim sentiment increased in the USA in the wake of the atrocities of 11 September 2001. Amnesty International welcomed President Bush's early statements calling for citizens to respect Muslim and Middle Eastern members of their communities(79), but is concerned that the same message – that any form of retaliatory injustices would not be tolerated – does not appear to have been forcefully and directly transmitted to US law enforcement and military agencies. In November 2001, Amnesty International wrote to the US government raising allegations that immigration detainees arrested in the USA after 11 September were being subjected to more punitive conditions than before in some facilities, and that people of Muslim or Middle Eastern origin were being treated more harshly than other inmates. Reports included detainees being placed in solitary confinement and denied exercise; being required to wear full restraints, including leg-irons, during visits; being denied contact visits with families; being given an inadequate diet; and being denied personal possessions and copies of books in Arabic, including the Koran.(80) The subsequent Justice Department investigation confirmed such allegations, including of racial abuse of detainees.(81)

In its November 2001 memorandum, Amnesty International urged the US Government to stay fully committed to upholding principles of non-discrimination in the current challenging climate. It urged that "all precautions are taken to ensure that people are not arrested or detained or otherwise treated unfairly on grounds of their ethnic origin, race or religion."(82) The organization believes that the authorities have failed in this regard as they have taken the "war on terror" outside the US mainland. The absence of appropriate cultural training was part of the problem. The Fay report into Abu Ghraib found that "guard and interrogation personnel were not adequately trained or experienced and were certainly not well versed in the cultural understanding of the detainees".(83) Intelligence officers going to Guantánamo apparently had no cultural awareness training until at least a year after the detentions began.(84) One of Major General Antonio Taguba's recommendations following his investigation of US abuses in Iraq was that there should be an immediate deployment to Iraq of a mobile training team whose expertise should include "Arab cultural awareness".(85)

Colonel Henry Nelson, a US Air Force psychiatrist assigned to assist the Taguba investigation, concluded that among the factors contributing to the abuse was that soldiers sent to Iraq were immersed in Islamic culture for the first time and that "there is an association of Muslims with terrorism".(86) The US administration has played its part in this dangerous perception. The constant refrain of senior administration officials, including President Bush in his role as Commander-in-Chief of the armed forces, labelling detainees who have neither been charged with nor convicted of any offence as "terrorists", "killers", "dangerous", "the worst of a very bad lot", and "bad people", and holding them outside the protection of the law, always risked encouraging abuse.(87)

**From Afghanistan to Abu Ghraib, via Guantánamo**

Allegations of abuse by US forces in Afghanistan have been persistent. The Fay report confirmed that from December 2002 (there are also allegations of abuse from before then), "[US] interrogators in Afghanistan were removing clothing, isolating people for long periods of time, using stress positions, exploiting fear of dogs and implementing sleep and light deprivation."(88) The Schlesinger Panel noted that Special Operations Forces in Afghanistan had been implicated in "a range of abuses... similar in scope and magnitude to those found among conventional forces".(89) Amnesty International and others have raised allegations of abuse in Afghanistan with the US authorities, with little or no response.

Abdullah's arrest along with 33 others took place at 3am in a compound near Kandahar in Afghanistan on 18 March 2002. He told Amnesty International in October 2002 after his release that US forces broke down all the doors and took everybody outside. The detainees had their hands zip-tied behind their backs and were taken to Kandahar air base, where they were forced to lie on the gravel for several hours, their hands cuffed, now with metal handcuffs, behind their backs. Abdullah said that during this time he was kicked in the ribs and that he and all his fellow detainees were hooded and searched by dogs. They were subjected to forced shaving. He said that he was shaved of his entire facial and body hair by a woman. He was then put in a cage, under a tent, with about 14 others, including a boy of about 15. Some in the cage refused to eat because they did not want to have to use the toilet, a portable pot in the corner. Abdullah said that during interrogation, he was handcuffed, shackled and hooded, and that a female interrogator pulled and pushed him. He said that the cultural violations were the most traumatizing aspects of the treatment.

Two years later, an elderly Afghan man was arrested in his village by US marines in June 2004 and detained for three days. Noor Mohammad Lala alleged:

> "They told me to take off my shirt. I said 'How can I do that?' Then I told myself 'Take your shirt off.' When I took off my shirt, they told me to undo my belt. I found that very painful. I felt like I was having a nervous breakdown. In my entire life I'd never exposed myself. With respect, I have a bladder problem and I could not stop urinating. After that I was so humiliated I couldn't see for my pain. When they took off my trousers I had my eyes closed. I was totally disoriented, they stood me up in the container. When they stood me up like this, they took off all my clothes. I was completely naked, I'm not telling you a lie. They told me to look straight ahead, not to look around. While I was standing, I'm not lying to you, they kicked my feet apart with their boots and they were touching me. That's how it was I did not know what was going on. That's the sort of treatment I received. That's what they did. When I looked around there was only an interpreter, no one else. He told me to get dressed, my bottom was wet. I would not be a Muslim if I lied to you. When I put on my clothes, I rubbed it off. And this happened when I'm old, white-bearded with no teeth. And this outrage happened to me."(90)

Amnesty International has been told by the Afghanistan Independent Human Rights Commission of another elderly man who approached them after his release from US custody in 2004. At first he said that he was too ashamed to talk about it, but he later revealed that along with other detainees he had been stripped naked and kept in a container.

One of eight Afghan soldiers arrested by US Special Forces on 1 March 2003 has said that he and his fellow detainees were treated "like animals" when taken to the US base in Gardez. An investigation by the Crimes of War Project has revealed allegations by the detainees that they were subjected to torture and ill-treatment during their 17 days in custody, including repeated beatings, electric shocks and immersion in cold water. They were hooded and shackled during interrogations. One of the detainees, Jamal Naseer, died in custody (see Point 6.2).(91) Another Afghan national, Syed Nabi Siddiqi, has said that he was ill-treated during his 22-day detention in US custody in Gardez, Afghanistan, in July 2003. He says that he was blindfolded, kicked and beaten, and had his clothes removed:

> "Then they asked me which animals – they made the noise of goats, sheep, dogs, cows – I had had sexual activities with. They laughed at me. I said that such actions were against our Afghan and Islamic tradition, but they again asked me, 'Which kind of animals do you want to have sex with?' Then they...beat me with a stick from the back and kicked me. I still have pains in my back as a result."(92)

After Gardez, Syed Nabi Siddiqi said that he was flown to the US air base in Kandahar, where the ill-treatment continued, including when the soldiers "brought dogs close to us, they were biting at us". In a witness statement in 2004, former detainee Tarek Dergoul recalled his detention in Kandahar:

> "[I]n Kandahar I was hooded whilst being taken to interrogation and some of the time during interrogation. I was interrogated at least three or four times a week for up to seven or eight hours a day. Sometimes I was just left sitting in the interrogation tent with nothing, no food or toilet facilities. The guards in Kandahar regularly tore up the Qur'an and threw it. My body hair was shaved, including my pubic hair... After three months in Kandahar I was flown to Guantanamo Bay, Cuba, on 1 May 2002... I was stripped naked, given a full body search and pictures were taken of me naked."(93)

Tarek Dergoul states that he was again stripped and given another full body search on arrival in Guantánamo, despite the

fact that since leaving Kandahar he had been handcuffed, shackled and blindfolded the entire time. Swedish national Mehdi Ghezali has told Amnesty International that he and his fellow detainees were stripped, shaved of their facial and head hair and photographed before being transferred to Guantánamo. He says that they were also stripped and photographed on arrival in the naval base. He, like others, has described a punitive regime in Guantánamo that has shown little respect for human dignity. For example:

> "One prisoner had removed his ID-strap that the prisoners were forced to wear around their wrist. As punishment, the guards shackled both his hands and feet in his cell for more than 10 hours. During this time, the prisoner was not given any food and was not allowed to go to the toilet, although he had to. He could not hold himself. It was very degrading for him."(94)

Souvenir T-shirts, available for soldiers to purchase in the Navy Exchange shopping mall in Guantánamo perpetuate a view of "war on terror" detainees as less than human. One depicts a rat in a turban, orange jumpsuit and shackles, with the words *Guantanamo Bay: Taliban Lodge* around it. Another depicts six shackled rats in orange jumpsuits, surrounded by the caption *Al Qaeda six-pack – Guantanamo Bay, Cuba, Home of the sand rat*. Such "humour" takes on a different meaning when set against the experiences of real detainees. In a poem sent from his cell in Guantánamo to his brother in Kabul, Wazir Mohammed wrote, "I'm in a cage like an animal; No-one's asked me am I human or not".(95) Fellow detainee Sayed Abbasin told Amnesty International after his release in 2003 that the Guantánamo prison camp was "like a zoo". French detainee Nizar Sassi wrote of Guantánamo to his family: "If you want a definition of this place – you don't have the right to have rights".(96) The administration's position that the Guantánamo detainees – all foreign nationals – should be denied any opportunity to challenge the lawfulness of their detention led a US Supreme Court Justice to point out that US law at the Naval Base "even protect[s] the Cuban iguana".(97)

The first detainees to be taken to Guantánamo were not told where they were, and apparently thought they were "being taken to be shot", a situation exacerbated by the reddish colour of their jumpsuits, which "in their culture...is a sign that someone is about to be put to death".(98) The camp authorities considered whether to "continue not to tell them what is going on and keep them scared. ICRC says that they are very scared".(99) The authorities only agreed to consider telling the detainees where they were "after the first round of interrogations", an early sign of a blurring between detention conditions and interrogation techniques (see Point 4.1).(100)

In Iraq, foreign detainees were given wristbands marked "terrorist".(101) An Iraqi detainee has recalled how the US soldiers "used to beat up a prisoner who was from Syria and strip him all night. We heard him screaming all night".(102) It is not known if this was the Syrian national who was kept incommunicado "in a totally darkened cell measuring about 2 meters long and less than a meter across, devoid of any window, latrine or water tap, or bedding." On the door of the cell was the inscription "the Gollum" and a picture of this character from the film *Lord of the Rings*. (103) Other detainees were also reportedly given names of fictional non-human characters. According to a US Army reservist at Abu Ghraib, for example, there was a detainee with a deformed hand whom the US guards called "The Claw" and another with bulging eyes who was called "Froggy".(104) A US military lawyer later raised his concern about the use of nicknames chalked on cell doors by military guards in Abu Ghraib. He said that he was not aware of the torture and ill-treatment going on in the prison at the time he witnessed this nicknaming and so "I didn't recognize [its] significance".(105)

In Iraq, the allegations of abuse have not been restricted to Abu Ghraib. For example, three Iraqi nationals working for *Reuters* news agency have alleged that they were subjected to torture and cruel, inhuman or degrading treatment by US soldiers while held in military detention near Fallujah (see also Point 6.1). The three, Salem Ureibi, Ahmad Muhammad Hussein al-Badrani and Sattar Jabar al-Badrani, say they were held for three days in January 2004 and subjected to humiliation, religious taunts, sleep deprivation, hooding, kicking and beating, stress positions, loud music, forced physical exercises, and threats of transfer to Guantánamo.(106)

> "He asked me to pick up a shoe, took it and beat me on the face with it. Then he made me take the shoe in my mouth. He made me put my finger in my anus, then he made me smell my hand and put it in my nose, and keep the shoe in my mouth, with my other hand in the air. He told me I looked like an elephant. Every time I mentioned God they would beat me. The interrogators said they had found RPG launchers. I said: "I swear to God, no". Then they beat me".(107)

The UN High Commissioner for Human Rights has cited reports by Iraqis that during house searches by Coalition forces in Iraq, the conduct of soldiers has been "considered humiliating, for example, when they send women outside the house in their nightgowns, or when they show disrespect for the Koran, throwing it on the floor or tearing it apart."(108) Local civilians have made similar complaints of cultural disrespect by US forces in Afghanistan.

Released detainees have described how, in the first weeks of the Guantánamo detentions from early January 2002, there was little official tolerance for the practice of Islam.(109) This was apparently improved under ICRC intervention.(110) The first commander of the Guantánamo prison camp was Brigadier General Rick Baccus. There was said to be tension between him and intelligence officials because he was seen as "soft" on the detainees by eventually distributing copies of the Koran, adjusting meal times for Ramadan, and allowing the ICRC to put up posters on the Geneva Conventions.(111)

He has since been quoted as saying: "I was mislabelled as someone who coddled detainees. In fact, what we were doing was our mission professionally".(112) He was relieved of his post in October 2002, and Secretary Rumsfeld reportedly gave military intelligence control of the Guantánamo detainee operations, including the guards.(113) Major General Geoffrey Miller was appointed as commander of Guantánamo detentions and assumed command on 4 November 2002. (114) According to three released detainees, the regime changed around this time:

> "[A] point came at which you could notice things changing. That appeared to be after General Miller around the end of 2002. That is when short-shackling started, loud music playing in interrogation, shaving beards and hair, putting people in cells naked, taking away people's 'comfort' items, the introduction of levels, moving people every two hours depriving them of sleep, the use of A/C air. Isolation was always there. 'Intel' blocks came in with General Miller. Before when people were put into isolation they would seem to stay for not more than a month. After he came, people would be kept there for months and months and months."(115)

Released Swedish detainee Mehdi Ghezali has described to Amnesty International the pain of "short shackling" in interrogations: "There was a ring attached to the floor. They chained your hands and feet to this ring. You had to sit chained with your arms between your legs from underneath. In this way, they could let you sit for hours". He has described harsh interrogations, including the manipulation of air conditioning to make interrogation rooms very cold or very hot. He said that during interrogations rap and heavy metal music was played loud, or sometimes loud un-tuned radio noise, which was "very unpleasant". (116) A recent report in the New York Times, based on interviews with people who have worked in Guantánamo, adds weight to such detainee allegations. It describes the debilitating effect on detainees of the alleged use of short-shackling, stripping, loud music, strobe lighting and temperature manipulation in prolonged interrogations.(117)

According to the military, the ICRC had "a serious concern with the treatment of the Koran" by military guards in Guantánamo, particularly in August 2003. Twenty detainees had told the ICRC that they had been forcibly shaved as punishment for "disturbances" that followed alleged disrespect towards the Koran. Major General Miller denied that the Koran had been deliberately disrespected or that anyone had been shaved as punishment.(118)

After some nine months of running the detention operation in Guantánamo, Major General Miller visited Iraq from 31 August to 9 September 2003 with a team of current and former Guantánamo personnel. His remit was to make recommendations on how to run the USA's detention operations in Iraq with a view to obtaining intelligence to counter the growing insurgency to the US-led occupation.(119) A central recommendation of his subsequent report was that the US authorities in Iraq should "[d]edicate and train a detention guard force subordinate to [military intelligence] that sets the conditions for the successful interrogation and exploitation of the internees/detainees" (see Point 4.1). The report asserted that "a significant improvement in actionable intelligence will be realized within thirty days".(120)

Brigadier General Janis Karpinski, who was in charge of Abu Ghraib prison before being suspended from duty after the torture evidence became public, has claimed that Major General Miller told her of his intention to "Gitmo-ize the confinement operation" in Iraq:(121)

> "He said at Guantánamo Bay we've learned that the prisoners have to earn every single thing they have.... He said they are like dogs, and if you allow them to believe at any point that they're more than a dog, then you've lost control of them. He said every time we remove them from a cell, there's two MPs that accompany them, they have ankle chains on, they have wrist chains on, and they have a belly chain on, and they are never moved outside of their cell unless they are under those conditions."(122)

Soon after Major General Miller's mission to Iraq, the ICRC found a regime in Abu Ghraib in which some detainees were being made "to earn" their right to humane treatment. The organization reported that during a visit to the prison in mid-October 2003 it witnessed the US practice of keeping detainees "completely naked in totally empty concrete cells and in total darkness". The organization reported that it was told by a military intelligence officer that this was "part of the process" – a process which the ICRC said "appeared to be a give-and-take policy whereby persons deprived of their liberty were 'drip-fed' with new items (clothing, bedding, hygiene articles, lit cell, etc.) in exchange for their 'co-operation'."(123)

**Interrogation techniques with a discriminatory resonance**
On 2 December 2002, a month after Major General Miller had begun his posting at Guantánamo Bay, Secretary Rumsfeld approved a number of interrogation techniques for use at the Naval Base, including hooding, sensory deprivation, isolation and stress positions.(124) Some of the techniques – such as forced shaving of facial and head hair, stripping, the use of dogs to inspire fear – although potentially humiliating, painful or frightening for anyone, can have particular resonance for Muslim detainees.(125)

After six weeks, Secretary Rumsfeld rescinded his authorization that such techniques could be used at the discretion of the Guantánamo authorities. In April 2003, he signed another memorandum, authorizing techniques which included isolation, environmental manipulation, and sleep adjustment. However, Secretary Rumsfeld reserved the right to authorize personally any "additional interrogation techniques". Attached to the memorandum were guidelines formulated by the

Pentagon Working Group and which included the reference, "it is important that interrogators be provided reasonable latitude to vary techniques depending on the detainee's culture...", a dangerous instruction if any religious intolerance, racism, or xenophobia was present within the military.

*Removal of religious items*
Secretary Rumsfeld approved the removal of religious items as an interrogation technique. On this question, the legal advice he received was that if these were US citizens, the removal of such materials would raise questions of constitutionality, but "such is not the case with [these] detainees", all foreign nationals.(126) The USA acknowledges that the use of this interrogation technique, known as "incentive or removal", may cause international tension because of disagreement over the USA's labelling of detainees as "enemy combatants" unprotected by provisions of the Geneva Conventions. The military authorities note of this technique, approved again by Secretary Rumsfeld in April 2003, that: "Other nations that believe that detainees are entitled to POW protections may consider that provision and retention of religious items (e.g., the Koran) are protected under international law".(127)

The US government itself criticizes such practices in other countries. For example in its human rights report on Syria in 2004, under the section on torture and other cruel, inhuman or degrading treatment, the US State Department noted: "Some former detainees reported that the Government prohibited reading materials, even the Koran, for political prisoners."(128) The US Army interrogation training manual, FM 34-52, lists various examples of mental torture. It includes: "Threatening or implying that other rights guaranteed by the [Geneva Conventions] will not be provided unless cooperation is forthcoming".

*Use of dogs*
The Fay report found that "interrogations at Abu Ghraib were also influenced by several documents that spoke of exploiting the Arab fear of dogs".(129) Major General George Fay has referred to a set of photographs from the prison depicting military intelligence personnel "encouraging" military police guards to "use the dogs to soften up a particular detainee who was a high-value detainee".(130)

The use of dogs to "induce stress" was one of the interrogation techniques authorized by Secretary Rumsfeld in December 2002 for use in Guantánamo Bay, and their use has been alleged in Afghanistan, and later in Iraq. The Fay report found that:

> "Abusing detainees with dogs started almost immediately after the dogs arrived at Abu Ghraib on 20 November 2003. By that date, abuses of detainees was [sic] already occurring and the addition of dogs was just one more abuse device. Dog teams were brought to Abu Ghraib as a result of recommendations from MG G Miller's assessment team from JTF-GTMO. MG G Miller recommended dogs as beneficial for detainee custody and control issues."

According to Colonel Thomas Pappas, who was in charge of interrogations at Abu Ghraib from 19 November 2003, Major General Miller told him that military working dogs were used at Guantánamo and that they were effective in setting the atmosphere for interrogations.(131) Major General Miller has denied this, claiming that he only said that dogs help to provide a controlled atmosphere in a detention facility.(132) What is beyond doubt is that the use of dogs "to induce stress" during interrogations in Guantánamo has been authorised by Secretary for Defence Rumsfeld. It seems that the technique may still be used if he personally authorizes it in any particular case. It is one of the techniques listed in the final report of the Pentagon Working Group, which recommended its use in "strategic interrogation facilities", including Guantánamo (see Point 1.2).

Interviewed for the Taguba investigation, a soldier from the 229th Military Police Company deployed to Abu Ghraib prison in Iraq recalled an incident involving a military intelligence (MI) officer and a military dog (K-9) handler:

> "The MI stated to the K-9 handler to allow the dog into the cell as a method of obtaining information. The dog would go into the cell for about a minute and then MI would call them out. I saw the dog during this strike the detainee. The detainee was bound and could not move, and the K-9 handler would allow the K-9 to approach within inches his face, and one time the dog bit the detainee's arm. When I saw the detainee later it appeared the detainee was bitten multiple times... During the time I was in the cell the detainee never resisted. The MI was calling the dog into the cell as a scare tactic to gather information."(133)

The Taguba report found that the "intentional abuse of detainees" in Abu Ghraib included "using military working dogs (without muzzles) to intimidate and frighten detainees, and in at least one case biting and severely injuring a detainee". On 16 January 2004, Amin Sa'id al-Sheikh, an Abu Ghraib detainee told military investigators that sometimes guards "hang me to the door and allow the dogs to bite me". (134) Another detainee, Ballendia, has said that he was taken from his cell during the night and sent into a hallway handcuffed: "They sent the dogs towards me. I was scared... The bite from the first dog caused me to have 12 stitches from the doctor of my left leg as a result I lost a lot of blood." (135) Another Iraqi detainee in Abu Ghraib recalled to military investigators: "I saw also in Room #5 they brought the dogs. [Guard X] brought the dogs and they bit [the detainee] in the right and left leg. He was from Iran and they started beating him up in the main

hallway of the prison". (136) The Fay report found allegations of a competition between two military dog-handlers to see if they could make detainees defecate out of fear of the dogs. One of the handlers allegedly revealed that they had already made some detainees urinate, "so they appeared to be raising the competition", according to the Fay report.

*Use of female interrogators*
Released Swedish detainee Mehdi Ghezali has alleged to Amnesty International that women were used to "degrade us and our faith".(137) Amnesty International has received other allegations that detainees in the Naval Base have been subjected to sexual humiliation targeted at their Muslim sensitivities. For example, a non-detainee source recently told the organization that during Ramadan in 2002, female military personnel attempted to sexually arouse detainees. In one case, it is alleged, the detainee broke down in distress when he was returned to his cell and prayed for forgiveness for having had sexual feelings.(138) In another case, it is alleged, a Yemeni detainee was subjected to sexual insults during interrogation, including repeated and graphic questions about whether his first sexual experience had been with a male relative. According to three UK detainees released from Guantánamo:

> *"We didn't hear anybody talking about being sexually humiliated or subjected to sexual provocation before General Miller came. After that we did. Although sexual provocation, molestation did not happen to us, we are sure that it happened to others... It was clear to us that this was happening to the people who'd been brought up most strictly as Muslims. It seemed to happen most to people in Camps 2 and 3, the 'intel' people, i.e. the people of most interest to the interrogators".(139)*

The Pentagon has acknowledged that, at least between December 2002 and January 2003, female interrogators were used in Guantánamo to "induce stress" in the male Muslim detainees.(140) However, according to the authorities, "the only incident of misbehaviour by an interrogator [at Guantánamo] was a female interrogator who went into the room to interrogate a detainee, took off her uniform blouse, had her T-shirt on, sat on the detainee's lap as part of her interrogation technique, and began to run her hands through his hair... She was suspended from duties for 30 days". (141)

In May 2004, in response to a question about the fact that the use of female guards can offend the religious or cultural sensitivities of male Muslim detainees, Porter Goss, then a member of the House of Representatives, reportedly responded: "My basic reaction to that was, 'Gee, you're breaking my heart, and maybe next time you start shooting at Americans, or blowing up Americans, you want to think about that'." Porter Goss also reportedly claimed that there "was no calculated effort" to have female military personnel in Guantánamo, contradicting the Pentagon's admission.(142) In August 2004, President Bush nominated Porter Goss to be the new Director of the CIA (following George Tenet's resignation). The Senate confirmed the nomination, and Porter Goss was sworn in as CIA Director on 24 September 2004.

*Forced nudity*
Another of the interrogation techniques Secretary Rumsfeld approved in December 2002 for use in Guantánamo was "removal of clothing". The legal advice which he received before this authorization was that stripping was permissible "so long as it is not done to punish or to cause harm, as there is a legitimate governmental objective to obtain information". (143) Forced stripping for the sake of "obtaining information" clearly constitutes at least degrading treatment, which is prohibited in all circumstances under international law. The Fay report into Abu Ghraib noted that "removal of clothing for both [military intelligence] and [military police] objectives was authorized, approved, and employed in Afghanistan and GTMO." (144)

While forced nudity of detainees is far from being a new technique, and can be humiliating to any detainee of any nationality or culture, it can be particularly shaming in Muslim culture. Two men who were in Bagram air base in 2002 before being transferred to Guantánamo alleged that they were forced to strip naked in the presence of female soldiers during medical examinations and showers. One of them, Parkhudin, who has alleged that his hands were chained to the ceiling for eight of the 10 days he spent in isolation in Bagram, said that the other acts of torture or ill-treatment "don't matter, but we are very angry about this (stripping)".(145) Another released prisoner said that female soldiers had watched male prisoners taking showers and undergoing intimate body searches at Bagram air base: "We don't know if it's medical or if they were very proud of themselves. But if it was medical, why were they taking our clothes off in front of the women? We are Afghans, not Americans."(146) Another Afghan man said after his release from US custody in Afghanistan on 19 April 2004 that he was photographed nude in detention: "I'm 50 years old, and no one has ever taken my clothes. It was a very hard moment for me. It was death for me".(147)

The Fay investigation found that in Abu Ghraib, "removal of clothing was employed routinely and with the belief that it was not abuse".(148) It found that "male detainees were naked in the presence of female Soldiers. Many of the Soldiers who witnessed the nakedness were told that this was an accepted practice. Under the circumstances, however, the nakedness was clearly degrading and humiliating." Military intelligence interrogators, the report said, "started directing nakedness at Abu Ghraib as early as 16 September 2003 to humiliate and break down detainees. MPs would also sometimes discipline detainees by taking away clothing and putting detainees in cells naked."

The Taguba report notes that the abuse of prisoners was not just committed by military police guards, but also by members of military intelligence. The report referred to the specific example that "on 24 November 2003, SPC Luciana Spencer, 205th MI Brigade, sought to degrade a detainee by having him strip and returned to cell naked". One of the

women soldiers charged in the Abu Ghraib crimes has explained her role: "Because I was a female and in the Muslim culture it's very embarrassing or humiliating to be naked in front of another female, especially if it's an American." (149) Another woman soldier has recalled that she was asked by a plainclothes US official in Abu Ghraib to be present when a male detainee was in the shower because "he'll feel more humiliated if there's a female present".(150)

The Fay report emphasized the link between what happened in Abu Ghraib and the operations in Afghanistan, Guantánamo and the wider "global war on terror" (GWOT):

> "The use of nudity as an interrogation technique or incentive to maintain the cooperation of detainees was not a technique developed at Abu Ghraib, but rather a technique which was imported and can be traced through Afghanistan and GTMO. As interrogation operations in Iraq began to take form, it was often the same personnel who had operated and deployed in other theaters and in support of GWOT, who were called upon to establish and conduct interrogation operations in Abu Ghraib… They simply carried forward the use of nudity into the Iraqi theater of operations. The use of clothing as an incentive (nudity) is significant in that it likely contributed to an escalating 'de-humanization' of the detainees and set the stage for additional and more severe abuses to occur."(151)

If the use of nudity contributed to an escalating dehumanization of detainees in Iraq, there is no reason to think that the same has not been the case elsewhere in the "war on terror".

**From stripping to sexual assault**

Forced nudity used to degrade and humiliate can easily be a prelude to more severe or wider torture or ill-treatment. On 17 January 2004 in Iraq, Mustafa, an Abu Ghraib detainee, told military investigators that he was stripped and kept naked for seven days, during which time the guards "were bringing a group of people to watch me naked." He alleged that another detainee was stripped and "they put wire up his ass and they started taking pictures of him".(152) On 20 January 2004, another Abu Ghraib detainee, Haidar, told investigators that he had been stripped, hooded, ordered to masturbate in front of a female US soldier, and piled up with five other naked detainees. He said that the soldiers were:

> "laughing, taking pictures, and they were stepping on our hands with their feet. And they started taking one after another and they wrote on our bodies in English. I don't know what they wrote, but they were taking pictures after that. Then, after that they forced us to walk like dogs on our hands and knees. And we had to bark like a dog and if we didn't do that, they start hitting us hard on our face and chest with no mercy. After that, they took us to our cells, took the mattresses out and dropped water on the floor and they made us sleep on our stomachs on the floor with the bags on our head and they took pictures of everything." (153)

Haidar was released without charge or trial in mid-April 2004. He recalled the torture and humiliation he said he had undergone. He said that when "the interpreter told us to strip. We told him: 'You are Egyptian, and you are a Muslim. You know that as Muslims we can't do that.' When we refused to take off our clothes, they beat us and tore our clothes off with a blade." The Pentagon Working Group report of April 2003 states that removal of clothing as an interrogation technique means: "Potential removal of all clothing; removal to be done by military police if not agreed to by the subject. Creating a feeling of helplessness and dependence".(154) In May 2004, Haidar said that the shame of what happened to him in custody is so deep that he felt that he could not move back to his old neighbourhood. (155)

The Taguba report found that the "sadistic, blatant and wanton criminal abuse" of detainees in Abu Ghraib included "forcing groups of male detainees to masturbate themselves while being photographed and videotaped; videotaping and photographing naked male and female detainees; writing 'I am a Rapest' (sic) on the leg of a detainee alleged to have forcibly raped a 15-year-old fellow detainee, and then photographing him naked; forcibly arranging detainees in various sexually explicit positions for photographing; forcing naked male detainees to wear women's underwear; a male MP guard having sex with a female detainee; and arranging naked male detainees in a pile and then jumping on them".(156)

The Fay report found, in Abu Ghraib, "an alleged rape committed by a US translator and observed by a female Soldier, and the alleged sexual assault of an unknown female".(157) An Abu Ghraib detainee has alleged that a fellow Iraqi detainee was sodomized with a phosphoric light, and that a child detainee was raped. There is reported to be a videotape, apparently made by US personnel, of Iraqi guards raping young boys.(158)

A male Abu Ghraib detainee made a statement on 21 January 2004 which included the following allegations:

> "And then the policeman was opening my legs, with a bag over my head, and he sat down between my legs on his knees and I was looking at him from under the bag and they wanted to do me because I saw him and he was opening his pants, so I started screaming loudly and the other police started hitting me with his feet on my neck and he put his feet on my head so I couldn't scream… And one of the police he put a part of his stick that he always carries inside my ass and I felt it going in about 2 centimetres, approximately. And I started screaming…"(159)

The Schlesinger report concluded that the torture and ill-treatment depicted in the Abu Ghraib photographs were the result of "freelance activities" on the part of a few personnel on the "night shift" at the prison.(160) At the same time, however, both the Schlesinger Panel and the Fay investigation found more widespread abuses not caught on film, and various prisoner statements indicate that the cruelty cut across shifts. For example Abu Ghraib detainee Nori gave a sworn statement to military investigators on 17 January 2004. His (translated) allegations included the following:

> *"And they treated us like animals, not humans. They kept doing this for a long time. No one showed us mercy. Nothing but cursing and beating. Then they started to write words on our buttocks, which we didn't know what it means. After that they left us for the **next two days** [emphasis added] naked with no clothes, with no mattresses, as if we were dogs."* (161)

Similarly, fellow detainee Thaar said that he was held in solitary confinement "for 67 days of suffering and little to eat". (162) On 18 January 2004, Abu Ghraib detainee Kasim gave military investigators a statement in which he recalled that:

> *"They stripped me of all my clothes, even my underwear. They gave me woman's underwear that was rose colour with flowers in it and the put the bag over my face. One of them whispered in my ear, 'today I am going to fuck you', and he said this in Arabic… And they forced me to wear this underwear all the time, for 51 days* [emphasis added]. *And most of the days I was wearing nothing else."*(163)

In August 2003, Secretary Rumsfeld allegedly approved the expansion of a secret operation – a "special-access program" (SAP) – originally for use against alleged *al-Qa'ida* detainees detained in the "war on terror", to prisoners incarcerated in Iraq in the growing insurgency there. The secret tactics, it is stated, allowed for sexual humiliation and physical coercion as interrogation tactics.(164) The Department of Defense issued a general denial of the detailed allegations, characterizing the report in which they first appeared as "outlandish, conspiratorial, and filled with error and anonymous conjecture".(165) The CIA also issued a three-sentence denial, saying that the allegations were "fundamentally wrong" and that there "was no DoD/CIA program to abuse and humiliate Iraqi prisoners".(166) Seymour Hersh, who reported the allegations, is standing by them.(167) He has alleged that the SAP is still active.(168)

The Fay report also concluded that "no policy, directive or doctrine directly or indirectly caused violent or sexual abuse." However, it also found that "the existence of confusing and inconsistent interrogation technique policies", including those for use in Afghanistan and Guantánamo, "contributed to the belief that additional interrogation techniques were condoned in order to gain intelligence". It found that "what started as nakedness and humiliation, stress and physical training (exercise)" – stripping and stress positions, for example, were techniques approved by the administration in Afghanistan and Guantánamo – "carried over into sexual and physical assaults by a small group of morally corrupt and unsupervised Soldiers and civilians".(169) Contrary to what it stated, therefore, the Fay report found at least an indirect link between policy and abuse.

Moreover, three months before Seymour Hersh's original allegations were made, the ICRC in Iraq complained to the US authorities. According to its leaked February 2004 report:

> *"In certain cases, such as in Abu Ghraib military intelligence section, methods of physical and psychological coercion used by the interrogators appeared to be part of the standard operating procedures by military personnel to obtain confessions and extract information. Several military intelligence officers confirmed to the ICRC that it was part of the military intelligence process to hold a person deprived of his liberty naked in a completely dark and empty cell for a prolonged period to use inhumane and degrading treatment, including physical and psychological coercion, against persons deprived of their liberty to secure their cooperation."*

The ICRC wrote that detainees suspected of security offences or deemed to have an intelligence value were at "high risk of being subjected to a variety of harsh treatments ranging from insults, threats and humiliations to both physical and psychological coercion, which in some cases was tantamount to torture". The techniques found by the ICRC included acts of physical force and sexual humiliation.(170) Asked whether he agreed with the ICRC's conclusion that "coercive practices such as holding prisoners naked for extended periods of time" were used "in a systematic way as part of the military intelligence process at Abu Ghraib", Major General Antonio Taguba replied that he did.(171)

In his May 2004 report, Seymour Hersh alleged that "the notion that Arabs are particularly vulnerable to sexual humiliation became a talking point among pro-war Washington conservatives in the months before the March, 2003 invasion of Iraq." (172) It is said that a book frequently cited in support of this notion was *The Arab Mind* by Raphael Patai, which includes a chapter on "The realm of sex".(173) On homosexuality in Arab culture, Patai wrote: "acceptance of the role of the passive homosexual is considered extremely degrading and shameful because it casts the man or youth into a submissive, feminine role", and on masturbation, "whoever masturbates… evinces [proves] his inability to perform the active sex act, and thus exposes himself to contempt".(174) A 2001 edition of the book contains a foreword by the director of Middle East Studies at the US Army John F. Kennedy Special Warfare Center and School at Fort Bragg, North Carolina, who states: "At the institution where I teach military affairs, 'The Arab Mind' forms the basis of my cultural instruction…

Over the past 12 years I have also briefed hundreds of military teams being deployed to the Middle East." (175) The JFK Special Warfare Center is responsible for the Army's special operations training and doctrine.

## The right to be treated with humanity

Respect for human dignity and freedom from discrimination are at the heart of international human rights and humanitarian law. For example, the "fundamental guarantees" of Article 75 of Additional Protocol 1 to the Geneva Conventions, recognized by the USA as reflecting customary international law, prohibit torture, indecent assault, and humiliating or degrading treatment of any kind, discrimination of any kind, including on the basis of colour, race, nationality and religion. (176) Article 75 expressly applies to military or civilian agents. Article 10.1 of the International Covenant on Civil and Political Rights (ICCPR) stipulates that "all persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person". According to the Human Rights Committee, this requirement is "a fundamental and universally applicable rule" and "a norm of general international law not subject to derogation". According to the Committee:

> "Article 10, paragraph 1, imposes on States parties a positive obligation towards persons who are particularly vulnerable because of their status as persons deprived of their liberty, and complements for them the ban on torture or cruel, inhuman or degrading treatment or punishment contained in article 7 of the Covenant. Thus, not only may persons deprived of their liberty not be subjected to treatment that is contrary to article 7…, but neither may they be subjected to any hardship or constraint other than that resulting from the deprivation of their liberty; respect for the dignity of such persons must be guaranteed under the same conditions as for that of free persons. Persons deprived of their liberty enjoy all the rights set forth in the Covenant, subject to the restrictions that are unavoidable in a closed environment."(177)

The USA has repeatedly declared its commitment to human dignity. Indeed, the National Security Strategy mentions this phrase no less than seven times in its 31 pages, and devotes an entire chapter to promising that the USA will "stand firmly for the non-negotiable demands of human dignity". In all three of his State of the Union addresses, as well as in his inaugural speech, President Bush asserted that the USA was founded upon and is dedicated to the cause of human dignity. It was a theme of his speech to the UN General Assembly on 21 September 2004. In a statement three months earlier to mark the UN International Day in Support of Victims of Torture, the President said that the "non-negotiable demands of human dignity must be protected without reference to race, gender, creed, or nationality. Freedom from torture is an inalienable human right, and we are committed to building a world where human rights are respected and protected by the rule of law."(178) The USA's detention and interrogation policies in the "war on terror" have left such words ringing hollow.

## III. Coercive interrogations and international law

> *Executive detention [may not] be justified by the naked interest in using unlawful procedures to extract information... For if this Nation is to remain true to the ideals symbolized by its flag, it must not wield the tools of tyrants even to resist an assault by the forces of tyranny.*
> Four US Supreme Court Justices, 28 June 2004(179)

Do the interrogation techniques suggested by the administration's declassified documents, or those actually approved and practiced by the USA in Guantánamo Bay, Afghanistan, Iraq and elsewhere constitute torture or cruel, inhuman or degrading treatment (ill-treatment) under international law? In fact, it does not matter whether particular practices are described as torture on the one hand or cruel, inhuman or degrading treatment on the other. All forms of torture and ill-treatment are strictly and equally prohibited in all circumstances. For instance, the International Covenant on Civil and Political Rights (ICCPR) prohibits both torture and ill-treatment even "[i]n time of public emergency which threatens the life of the nation."(180)

International humanitarian law, which covers international and non-international armed conflict, similarly prohibits not only torture but also any other ill-treatment. Thus, for instance, according to the Third Geneva Convention,

> "[N]o physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of any kind whatever. Prisoners of war who refuse to answer may not be threatened, insulted, or exposed to unpleasant or disadvantageous treatment of any kind."(181)

The Fourth Geneva Convention, which regulates the treatment of civilians under occupation or otherwise under the power of a party to a conflict similarly provides that "No physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties." (182)

Similarly stringent provisions apply to non-international armed conflicts. Article 3 common to all four Geneva Conventions and relating to armed conflicts not of an international character provides the following:

> "Persons taking no active part in the hostilities… shall in all circumstances be treated humanely… the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the

> *above-mentioned persons:...Violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture...Outrages upon personal dignity, in particular humiliating and degrading treatment..."(183)*

This prohibition exists "without distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria". In its August 2004 report on the attacks of 11 September 2001, the bi-partisan National Commission on Terrorist Attacks Upon the United States (also known as the 9-11 Commission) recommended that:

> *"The United States should engage its friends to develop a common coalition approach toward the detention and humane treatment of captured terrorists. New principles might draw upon Article 3 of the Geneva Conventions on the law of armed conflict. That article was specifically designed for those cases in which the usual laws of war did not apply. Its minimum standards are generally accepted throughout the world as customary international law."(184)*

The International Court of Justice has determined that the rules in common Article 3 "constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts; and they are rules which, in the Court's opinion, reflect what the Court in 1949 called 'elementary considerations of humanity'".(185) The International Criminal Tribunal for the former Yugoslavia (ICTY) reiterated that determination, adding that common Article 3 is "applicable to armed conflicts *in general*" (emphasis added). (186)

The duty of a state – *any* state – regarding its treatment of detainees – *any* detainees – under international law may be summed up in one short sentence: "*They shall at all times be humanely treated*".(187) It is here that the international community has created, through treaty and custom, an obligation that states can never renounce, and a line that must never be crossed.(188) The ICTY has emphasized that,

> *"The essence of the whole corpus of international humanitarian law as well as human rights law lies in the protection of the human dignity of every person, whatever his or her gender. The general principle of respect for human dignity is... the very raison d'être of international humanitarian law and human rights law; indeed in modern times it has become of such paramount importance as to permeate the whole body of international law. This principle is intended to shield human beings from outrages upon their personal dignity, whether such outrages are carried out by unlawfully attacking the body or by humiliating and debasing the honour, the self-respect or the mental well being of a person."(189)*

Nor is "humane treatment" or its corollary, the prohibition of torture and cruel, inhuman or degrading treatment or punishment, a vague notion open to all kind of interpretations, as the US administration's legal memorandums suggest. Some elements of humane treatment are spelt out in the treaties themselves. These include conditions of detention that "shall in no case be prejudicial to their health," "minimum cubic space," proper "bedding and blankets," "conditions of food and hygiene which will be sufficient to keep them in good health," "respect for their persons, their honour, their family rights, their religious convictions and practices, and their manners and customs," protection "against all acts of violence or threats thereof and against insults and public curiosity", and more.

In addition, UN bodies have adopted a series of instruments over the past half century specifying in detail the conditions under which detainees and prisoners must be held. These include the Standard Minimum Rules for the Treatment of Prisoners,(190) the Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, (191) and the Basic Principles for the Treatment of Prisoners.(192) UN and regional human rights monitoring bodies and courts have further clarified the contents of this legal requirement.

Not a single one of these treaties, instruments, human rights monitoring bodies, regional human rights courts, commissions and other international or regional bodies has ever condoned either acts of torture or any form of cruel, inhuman or degrading treatment or punishment in any circumstances.

Some US officials may contend that some of the interrogation methods outlined in the various government memorandums, or used in practice by US agents, if applied in isolation, for a short period or in mild form, may not cause "severe pain or suffering, whether physical or mental" as provided in most international definitions of torture. However, there is no doubt that interrogation methods such as "Using detainees individual phobias (such as fear of dogs) to induce stress," "Removal of clothing" or "The use of stress positions" constitute, at the very least, cruel, inhuman or degrading treatment and violate the right to be treated with humanity and with respect for the inherent dignity of the human person. Such interrogation methods cannot in any way be construed as "humane treatment" of detainees or as the absence of "any... form of coercion" as strictly and absolutely required by international law.

Curiously, the orders by Secretary for Defense Rumsfeld approving these and similarly humiliating or painful interrogation methods (whether as a matter of policy or "only" in individual cases subject to his approval) included also the instruction to "continue the humane treatment of detainees."(193) This indicates that the administration's non-legal notion of "humane treatment" has little to do with the international legal requirement of humane treatment and, unlike the latter, provides little

or no safeguards against physical and mental abuse of detainees. The US administration has explicitly stated that it does not consider itself bound by any international legal requirements regarding its treatment of "terrorist" suspects (see Point 5).

### Torture and ill-treatment as international crimes

Both torture and other forms of ill-treatment that are prohibited at all times and in all circumstances, such as "inhuman treatment" "cruel treatment" and "wilfully causing great suffering or serious injury to body or health," are "grave breaches" of the Geneva Conventions, that is, universally punishable crimes.(194) Similarly, they have been deemed war crimes and crimes against humanity under all *ad hoc* international criminal tribunals established so far. None of these tribunals has, to date, accepted any justifications for torture or other ill-treatment in any circumstances or found that torturing or otherwise ill-treating certain persons is not a crime. Torture and other ill-treatment are also war crimes and crimes against humanity under the Rome Statute of the International Criminal Court.(195)

International law not only allows states to bring to justice in their own courts persons suspected of having committed international crimes such as torture and ill-treatment, but in certain, notable instances *requires* them to do so. This is true even where the suspects are neither nationals nor residents of the state concerned, and the crime did not take place in its territory. Thus each of the 192 state parties to the Geneva Conventions, including the USA, is *required* to search for persons suspected of grave breaches and do one of the following: (1) bring such persons before its own courts, (2) extradite such persons to any state party willing to do so or (3) surrender such persons to an international criminal court with jurisdiction to try persons for these crimes. A similar duty exists under the UN Convention against Torture. In addition, states may exercise this principle – universal jurisdiction – as a matter of customary international law.

International crimes apply to those physically committing them, but also to those who order that they be committed, and to the superiors – both military and civilian – of perpetrators who tolerate or fail to act reasonably to prevent or repress the criminal acts. A Trial Chamber of the ICTY held that: "[t]he criminal responsibility of commanders for the unlawful conduct of their subordinates is a very well settled norm of customary and conventional international law."(196) This principle has been equally recognized in various judicial decisions since the Second World War, including cases decided by US judges, for example: in the cases of *Yamashita*,(197) *Von Leeb* (*German High Command Case*)(198) and *List* (*Hostages Case*), (199) as well as by further jurisprudence of the ICTY.

Criminal liability is not limited to soldiers – any "superior" is responsible for international crimes committed during activities that were within his or her "effective responsibility and control."(200) Nor does international law accept any limits as to how high the rank of civilian superiors who may be prosecuted is. The Rome Statute,

> "...shall apply equally to all persons without any distinction based on official capacity. In particular, official capacity as a Head of State or Government, a member of a Government or parliament, an elected representative or a government official shall in no case exempt a person from criminal responsibility under this Statute, nor shall it, in and of itself, constitute a ground for reduction of sentence."(201)

While the USA has rejected the ICC Statute (see Point 11.6), the statutes of both the ICTY and the International Criminal Tribunal for Rwanda, which the USA strongly supported, contain provisions with exactly the same effect.(202)

In the context of the USA's use of civilian interrogators, it is also important to note that international law provides that, in certain circumstances, even a crime committed by a single private individual – when he or she has acted as a *de facto* organ of the state – may generate individual criminal responsibility for the military commanders and those who effectively act as military commanders. The Appeals Chamber of the ICTY stated:

> "Other cases also prove that private individuals acting within the framework of, or in connection with, armed forces, or in collusion with State authorities may be regarded as de facto State organs. In these cases, it follows that the acts of such individuals are attributed to the State, as far as State responsibility is concerned, and may also generate individual criminal responsibility."(203)

### IV. Human rights: the route to security, not the obstacle to it

> *Allegations that the United States abused prisoners in its custody make it harder to build the diplomatic, political, and military alliances the government will need.*
> 9/11 Commission report, August 2004(204)

The USA and other countries face serious security threats, including those posed by groups determined to pursue their fight by abusing fundamental human rights without restraint. Governments have a duty to protect people's rights from such threats. In so doing, however, governments must not lose sight of other human rights and of their obligation to respect them. The UN High Commissioner for Human Rights has said:

> "Let us be clear: there is no doubt that States are obliged to protect their citizens from terrorist attacks. The most important human right is the right to life. States not only have the right, but also the duty to secure this

*right by putting in place effective measures to prevent and deter the commission of acts of terrorism...But counter-terrorism cannot be taken at any cost... Insisting on a human rights-based approach and a rule of law approach to countering terrorism is imperative... For even though it may be painted as an obstacle to efficient law enforcement, support for human rights and the rule of law actually works to improve human security...Ultimately, respect for the rule of law lessens the likelihood of social upheaval, creating greater stability both for a given society and its neighbours." (205)*

To flout the rule of law, to torture, to humiliate, is to undermine long-term security, even if there are perceived gains along the way. The brother of then Guantánamo detainee Wazir Mohammed told Amnesty International in Kabul in July 2003 that the USA's treatment of the prisoners "makes the reputation of the US bad amongst the people of Afghanistan". One of the alleged victims of the Abu Ghraib torture, asked after his release about the effect of his experience on his view of the occupation of Iraq, responded: "What would you do if I occupied your country, tortured people and violated all the laws of your country? Would you resist?"(206) In similar vein, a woman allegedly subjected to torture and cruel, inhuman and degrading treatment in US custody in Iraq has said that her ordeal has made her "hate [the Americans]".(207) The USA's tactics against the insurgency in Iraq drew the following response from a young Iraqi man in Fallujah: "For Fallujans it is a *shame* to have foreigners break down their doors. It is a *shame* for them to have foreigners stop and search their women. It is a *shame* for the foreigners to put a bag over their heads, to make a man lie on the ground with your shoe on his neck. This is a great *shame*, you understand? ...The Americans provoke the people. They don't respect the people."(208)

The US government itself has said that "states which demonstrate a high degree of respect for human rights are likeliest to contribute to international security and well-being".(209) In his address to the UN General Assembly on 21 September 2004, President Bush said that "the security of our world is found in the advancing rights of mankind".(210) The USA's National Strategy for Combating Terrorism stresses that creating a world in which principles based on human dignity, including the rule of law, "are embraced as standards, not exceptions, will be the best antidote to the spread of terrorism". (211)

The USA was one of the prime movers behind the adoption in 1948 of the Universal Declaration of Human Rights (UDHR). This visionary document, from which today's body of international human rights law and standards has developed, emerged in response to a time in which "disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind". It recognizes that respect for "the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world." The USA claims to remain committed to the principles of the Universal Declaration:

*"The protection of fundamental human rights was a foundation stone in the establishment of the United States over 200 years ago. Since then, a central goal of US foreign policy has been the promotion of respect for human rights, as embodied in the Universal Declaration of Human Rights. The United States understands that the existence of human rights helps secure the peace, deter aggression, promote the rule of law, combat crime and corruption, strengthen democracies, and prevent humanitarian crises."(212)*

Article 5 of the UDHR states: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment". Fifty-four years after that unequivocal statement was adopted by the international community, a memorandum was written in the US Justice Department advising on ways precisely to undermine this prohibition. The April 2003 report of the Pentagon Working Group noted that the UDHR "is not itself binding or enforceable against the United States". A legal memorandum recommending approval of interrogation techniques that the UN Committee against Torture has said violate the prohibition on torture or cruel, inhuman or degrading treatment, noted that this prohibition is contained in the Universal Declaration but added that "although international declarations may provide evidence of customary international law (which is considered binding on all nations even without a treaty), they are not enforceable by themselves". (213)

Yet, in his address to the UN General Assembly on 21 September 2004, President Bush proclaimed his country's commitment to the UDHR, adding that the rights enshrined in it "are advancing across the world" despite the belief of "the enemies of human rights" that the Universal Declaration and "every charter of liberty ever written are lies to be burned and destroyed and forgotten". In the past three years the US administration has itself discarded or eroded central tenets of the Universal Declaration and other international instruments.

For his own address to the UN General Assembly on 21 September 2004, the UN Secretary General chose the rule of law for his subject. Citing examples of gross human rights abuses by state and non-state actors from Uganda to Russia, from Israel to Palestine, and from Sudan to Iraq – including the torture of Iraqi prisoners by US forces – Kofi Annan said:

*"No cause, no grievance, however legitimate in itself, can begin to justify such acts. They put all of us to shame. Their prevalence reflects our collective failure to uphold the rule of law, and instil respect for it in our fellow men and women. We all have a duty to do whatever we can to restore that respect. To do so, we must start from the principle that no one is above the law, and no one should be denied its protection. Every nation that proclaims the rule of law at home must respect it abroad; and every nation that insists on it*

*abroad must enforce it at home."*

### Part Two: Agenda for action – Commission of inquiry and 12-Point Program
**An independent commission of inquiry is called for**

*I really doubt whether the Defense Department can investigate itself, because there's a possibility the Secretary himself authorized certain actions. This cries out for an outside commission to investigate.*

Retired US Army General, May 2004(214)

Amnesty International welcomes the official investigations and reviews that the US authorities have initiated and conducted – indeed the findings of such investigations are cited throughout this report. The information that has been made public has provided a wealth of information, insight and analysis.

Nevertheless, the organization believes that more is needed if full accountability is to be achieved and seen to be achieved – not least because none of the investigations has been comprehensive in scope and all have ultimately lacked genuine independence, most consisting of the military reviewing itself. It is clear that none has had the independence or reach necessary to adequately investigate the role of the Secretary of Defense or agencies, departments or individual office-holders outside the Pentagon, for example the Justice Department or the White House. The activities of the CIA and "other government agencies" in the "war on terror" remain shrouded in secrecy, and require a light to be shone on them by an independent inquiry.

In spite of the official reviews that have been initiated, there remain many unanswered questions about policies and practices still in operation. An investigation entirely independent of government, and with a willingness to take full cognizance of international law and standards, is needed. It must have the power to investigate the highest echelons of government. It must adopt more than just a "lessons-learned" approach, namely one that fully rejects impunity and facilitates full accountability.

The UN Special Rapporteur on torture has stated: "Independent entities are essential for investigating and prosecuting crimes committed by those responsible for law enforcement".(215) The Human Rights Committee has regularly criticized states parties to the International Covenant on Civil and Political Rights for inadequate investigations and called on them to set up independent bodies to investigate complaints of torture, ill-treatment and other abuses committed by agents of the state. (216) The same is true of the Committee against Torture. (217)

The "review" that has particularly been promoted as "independent" by the administration was conducted by the panel of four members appointed on 7 May 2004 by Secretary of Defense Rumsfeld to provide him with advice on the Department's detainee operations.(218) The Schlesinger Panel issued their report on 24 August 2004. The panel said that it had reviewed the following "completed investigations":
· *Joint Staff External Review of Intelligence Operations at Guantanamo Bay, Cuba.* 28 September 2002. This was a report by Brigadier General John Custer, acting commander of the US Army Intelligence Center at Fort Huachuca, following a visit to Guantánamo. One outcome of his visit was a new course at Fort Huachuca to train officers assigned to Guantánamo "on how to extract intelligence from Al Qaeda detainees". (219) The course began in late January 2003, more than a year after the first detainees arrived at Guantánamo. The Custer report was not made public.
· *Army Provost Marshal General assessment of detention and correction operations in Iraq* (Ryder report). This was a report, dated 5 November 2003, conducted by Major General Donald J. Ryder. Not made public, but leaked.
· *Joint Task Force Guantánamo assistance visit to Iraq to assess intelligence operations.* This was the report, dated 5 September 2003, produced by the then commander of Guantánamo Bay detentions, Major General Geoffrey Miller following his visit to Iraq in August and September 2003. Not made public, recently leaked.
· *Administrative Investigation under Army Regulation 15-6 (AR 15-6) regarding Abu Ghraib.* This is the administrative investigation of the 800th Military Police Brigade conducted by Major General Antonio Taguba, completed in late February 2004. This report was not intended for public release, but part of it was leaked to the media. The Taguba investigation did not interview any military personnel above the rank of brigade commander.
· *Army Inspector General assessment of doctrine and training for detention operations.* An "inspection" of US detainee operations in Afghanistan and Iraq, ordered on 10 February 2004, and conducted by Lieutenant General Paul Mikolashek. His report, dated 21 July 2004, described the abuses as "aberrations" committed by "a few individuals". Partially made public.
· *The Fay investigation of activities of military personnel at Abu Ghraib and related LTG Jones investigation under the direction of General Kern.* This review was initiated in April 2004 with Major General George Fay, deputy to the head of military intelligence, as the investigating officer. On 16 June 2004, General Paul Kern, Commanding General, US Army Materiel Command, was named as the "appointing authority" for the review, because Lieutenant General Ricardo Sanchez, head of US forces in Iraq, had excluded himself.(220) At General Kern's request, Lieutenant General Anthony Jones, Deputy Commanding General, US Army Training and Doctrine Command, was assigned responsibility for completing the review, with General Fay remaining on the review team.(221) The Fay report was issued on 25 August 2004. Parts remain classified. It found that abuses went beyond "the few", and implicated intelligence officials. It stressed that the "primary causes" of the "abuse" at Abu Ghraib was "misconduct (ranging from inhumane to sadistic) by a small group of morally corrupt soldiers and civilians, a lack of discipline on the part of the leaders and Soldiers of the 205th Military Intelligence Brigade, and a failure or lack of leadership by multiple echelons within CJTF-7".
· *Naval Inspector General's review of detention procedures at Guantanamo Bay, Cuba, and the Naval Consolidated Brig,*

*Charleston, South Carolina*. Vice Admiral Albert Church was directed in early May 2004 by Secretary Rumsfeld to conduct this review. On 12 May, Vice Admiral Church emphasized that this was a short review and neither an inspection nor an investigation. He described the review as a "snapshot of current existing conditions" which had found "no evidence of current abuse".(222) Not made public.

· *Naval Inspector General's review of Department of Defense worldwide interrogation operations*. Again, conducted by Vice Admiral Albert Church. Not completed by 19 October 2004.

· *Special inspection of detainee operations and facilities in the Combined Forces Command-Afghanistan*. 26 June 2004. Led by Brigadier General Chuck Jacoby, described as "a top-to-bottom review of all of our detention facilities" in Afghanistan "to make sure we're in complete compliance with our own standards".(223) The Schlesinger Panel reported that the Jacoby review of Special Operations Forces detention operations "found a range of abuses and causes similar in scope and magnitude to those found among conventional forces". It has not yet been made public. On 19 October 2004, the Commander of US forces in Afghanistan said that the report was "in a review process" in Washington, DC, and that when it was released, he would provide a media briefing on "the unclassified aspects of it".(224)

· *Administrative investigation of alleged detainee abuse by the Combined Joint Special Operations Task Force – Arabian Peninsula*. Conducted by Brigadier General Richard Formica into allegations of detainee abuse by Special Operations Forces in Iraq. However, the Schlesinger Panel said that it had not reviewed this "assessment". By 13 October 2004, the report had not been made public, and US Central Command was unable to provide Amnesty International with a date when it would be released.

· *Army Reserve Command Inspector General assessment of training and Reserve units regarding military intelligence and military police*. Beginning in March 2004, conducted by Colonel Beverly Ertman. Due for release in December 2004.

Notably, the CIA is absent from this list. The CIA did not cooperate with either the Schlesinger or Fay investigators, stating that it was carrying out its own investigation of the agency (see Point 3.2).

Some of the Schlesinger Panel's findings have been noted in the first part of this report. However, one of the Schlesinger report's core conclusions was that:

> "*the vast majority of detainees in Guantánamo, Afghanistan and Iraq were treated appropriately, and the great bulk of detention operations were conducted in compliance with US policy and directives... While any abuse is too much, we see signs that the Department of Defense is now on the path to dealing with the personal and professional failures and remedying the underlying causes of these abuses. We expect any potential future incidents of abuse will similarly be discovered and reported out of the same sense of honor and duty that characterized many of those who went out of their way to do so in most of these cases. The damage these incidents have done to US policy, to the image of the US among populations whose support we need in the Global War on Terror and to the morale of our armed forces, must not be repeated.*"

The report did not refer to the suffering of the detainees who were subjected to torture or other cruel, inhuman or degrading treatment, or to the distress of their families.

The UN Principles for the investigation of torture and other cruel, inhuman or degrading treatment, adopted by the General Assembly in 2000, state that where the "established investigative procedures are inadequate because of insufficient expertise or suspected bias, or because of the apparent existence of a pattern of abuse or for other substantial reasons, States shall ensure that investigations are undertaken through an independent commission of inquiry or similar procedure. Members of such a commission shall be chosen for their recognized impartiality, competence and independence as individuals. In particular, they shall be independent of any suspected perpetrators and the institutions or agencies they may serve. The commission shall have the authority to obtain all information necessary to the inquiry...".(225) The UN principles covering the investigation of deaths in custody state the same thing.(226)

Since 19 May 2004, Amnesty International has been calling for an impartial and independent commission of inquiry to be set up by the US Congress to conduct a thorough investigation into the USA's "war on terror" detention policies and practices worldwide.(227) Such a commission, composed of credible experts, could be appointed by Congress, but must be independent of government. It should have the necessary powers to be able to fully investigate all US "war on terror" detention policies, practices and facilities around the world, including in relation to the CIA and other agencies, and including in relation to all secret transfers ("renditions") of detainees between countries in which the USA has been involved (see Point 12). The commission should have subpoena powers, and unrestricted access to all classified information and to all agencies and levels of government. To ensure its effectiveness and the appearance of impartiality in the eyes of the world, the inquiry should seek the advice of international experts such as the UN Special Rapporteur on torture. Its findings should be made public.

As the UN Principles require, there are numerous reasons that call for such an approach. They include:
· A perceived or actual failure of previous investigations (see Point 6);
· Allegations suggesting a pattern of torture or cruel, inhuman or degrading treatment;
· Previously secret documents suggesting that at the highest levels of government there has been an official willingness to countenance torture if "military necessity" required it, as well as to authorize interrogation techniques that violate the prohibition on torture and other cruel, inhuman or degrading treatment. The resistance of the administration to releasing all

such documents;
· The highest office-holder in government is also Commander-in-Chief of the Armed Forces, a power which has been used to justify the government's detention policies, the response to the crimes of 11 September 2001 having been framed in terms of "war". A Supreme Court Justice has seen fit to offer a reminder, in the face of the executive's detention policies, that "the President is not Commander-in-Chief of the country, only of the military".(228) In this context, the commission of inquiry must be independent of the Pentagon and the rest of the "war" administration;
· Government officials, including the President and Secretary of Defense, have been perceived to prejudge the outcome of military investigations already initiated. The same office-holders throughout the "war on terror" have shown a disregard for the rights of detainees, including the presumption of innocence. There is enough reason to believe that they would disregard the right of detainees to have allegations of torture or ill-treatment properly investigated and those responsible brought to justice;
· The investigation must be entirely free from the influence of party politics;(229)
· The military authorities have stated that "there is no agreed-upon definition of abuse among all legal, investigating and oversight agencies" in the USA;(230)
· Any investigation must respect and comply with international standards. As a state party to the UN Convention against Torture the US is *obliged* to conduct "prompt and *impartial* investigation, wherever there is reasonable ground to believe that an act of torture has been committed in any territory under its jurisdiction" (Article 12, emphasis added). The US government in general has shown itself to be reluctant to apply international human rights law and standards to its own conduct, and remains ideologically opposed to the International Criminal Court. The members of any commission of inquiry should be prepared to apply the UN principles for the investigation of torture, and other international standards.

When the commission of inquiry concludes that conduct may have amounted to crimes under national or international law, the information gathered should be referred to the appropriate national authorities with a view to possible prosecution.

Any official who ordered, authorized, condoned or committed torture or cruel, inhuman or degrading treatment should be brought to justice as required by international law. As a matter of principle, across all countries, Amnesty International takes the position that justice is best served by prosecuting war crimes, crimes against humanity, and other grave violations of international law, such as torture, in independent and impartial civilian courts. There is a growing international consensus on this view (see Point 7).

Full accountability, covering the whole "war on terror", of persons at all levels of the chain of command, including officials in the administration, officers in the armed forces, CIA personnel and private contractors, with no hint of scapegoating of low-level soldiers and reservist officers, is crucial.

### Point 1 – Condemn torture
*The highest authorities of every country should demonstrate their total opposition to torture. They should condemn torture unreservedly whenever it occurs. They should make clear to all members of the police, military and other security forces that torture will never be tolerated.*

### 1.1 Words undone by deeds
*The United States is committed to the worldwide elimination of torture and we are leading this fight by example.*
President George W. Bush, 26 June 2003(231)

The USA ratified the UN Convention against Torture in October 1994. Five years later, in its initial report to the Committee against Torture, the US Government stressed that:

> "Torture is prohibited by law throughout the United States. It is categorically denounced as a matter of policy and as a tool of state authority. Every act constituting torture under the Convention constitutes a criminal offense under the law of the United States. No official of the government, federal, state or local, civilian or military, is authorized to commit or to instruct anyone else to commit torture. Nor may any official condone or tolerate torture in any form. No exceptional circumstances may be invoked as a justification of torture. US law contains no provision permitting otherwise prohibited acts of torture or other cruel, inhuman or degrading treatment or punishment to be employed on grounds of exigent circumstances (for example, during a "state of public emergency") or on orders from a superior officer or public authority, and the protective mechanisms of an independent judiciary are not subject to suspension." (232)

In November 2001, Amnesty International reminded the US Government of this statement and warned that "any withdrawal from such a clear affirmation of US policy in this area would send a grave signal to the international community about the USA's commitment to the respect and promotion of human rights. Any acceptance of torture in the United States risks eroding respect for the rule of law elsewhere. Furthermore, were the US Government to sanction even 'moderate physical pressure' on even a few detainees, it would almost inevitably lead to an expanded use, as Amnesty International has found in more than 40 years of documenting the use of torture."(233)

The USA's stated opposition to torture and ill-treatment has continued in public. On 26 June 2003, President Bush called on "all governments to join with the United States and the community of law-abiding nations in prohibiting, investigating, and prosecuting all acts of torture and in undertaking to prevent other cruel and unusual punishment."(234) On the eve of