President Bush's proclamation against torture, the General Counsel of the Department of Defense wrote to a US Senator concerned about allegations of torture and cruel, inhuman or degrading treatment against "war on terror" detainees. The Pentagon letter said that "we can assure you that it is the policy of the United States to comply with all of its legal obligations in its treatment of detainees, and in particular with legal obligations prohibiting torture. Its obligations include conducting interrogations in a manner that is consistent with the Convention against Torture".(235)

Taken at face value, these assurances might appear to meet the first point of Amnesty International's 12-Point program – that the highest officials of a country should make clear their opposition to torture and other cruel, inhuman or degrading treatment. Words alone can never be enough, however. Officials at all levels of government must *demonstrate* their total opposition to torture by what they do as well as what they say. The struggle against torture and ill-treatment by agents of the state requires absolute commitment and constant vigilance. It requires stringent adherence to safeguards. It demands a policy of zero tolerance.

This US administration has manifestly failed in this regard. Indeed the Pentagon's General Counsel gave his assurances just six months after Secretary of Defense Rumsfeld approved, for use at Guantánamo, a number of interrogation techniques which violated the USA's obligations under the UN Convention against Torture, and variations of which emerged not long afterwards in Abu Ghraib prison in occupied Iraq. The techniques included stress positions, sensory deprivation, isolation, hooding, stripping and the use of dogs to inspire fear. Similarly, President Bush's June 2003 proclamation of the USA's commitment to the eradication of torture came a matter of weeks after a Pentagon Working Group had produced a report, classified "secret" by the Secretary Rumsfeld until 2013, contending that as Commander-in-Chief of the armed forces the President was not bound by US and international law prohibiting torture and suggesting legal defences against criminal liability for any officials accused of torture.(236)

In July 2004, Guantánamo detainee Moazzam Begg wrote that he had been held in solitary confinement since 8 February 2003 – by October 2004 he had been in isolation for approximately 600 days.(237) He has been held in a reportedly windowless cell under 24-hour video surveillance. His isolation began almost a year to the day after the White House gave assurances that, despite President Bush's decision not to apply the Geneva Conventions to the Guantánamo detainees, they would "not be subjected to physical or mental abuse or cruel treatment".(238) The US administration's assurances must be treated with some scepticism.

### 1.2 The condemnation is paper thin – The 'torture memos'

*There can be no doubt that the prohibition against torture and cruel, inhuman or degrading treatment or punishment is non-derogable under international law...Yet we find, remarkably, that questions continue to be raised about this clear dictate of international law, including at high levels of government.*
UN High Commissioner for Human Rights, August 2004.(239)

It now seems that the US administration rejected provisions of the Geneva Conventions because it believed that the USA's treaty obligations might tie the hands of its interrogators. As the Geneva Conventions do not prohibit the interrogation of detainees, it would appear that the administration envisaged treatment that would potentially violate the prohibition on torture and ill-treatment. The ICRC itself has taken issue with the Schlesinger Panel's recent assertion that "If we were to follow the ICRC's interpretations, interrogation operations would not be allowed".(240) The organization responded:

> "The ICRC has never stated, suggested or intimated that interrogation of any detainee is prohibited, regardless of the detainee's status or lack of status under the Geneva Conventions. The ICRC has always recognized the right of States to take measures to address their security concerns. It has never called into question the right of the US to gather intelligence and conduct interrogations in furtherance of its security interests. Neither the Geneva Conventions, nor customary humanitarian law, prohibit intelligence gathering or interrogation. They do, however, require that detainees be treated humanely and their dignity as human beings protected. More specifically, the Geneva Conventions, customary humanitarian law and the Convention against Torture prohibit the use of torture and other forms of cruel, inhuman or degrading treatment. This absolute prohibition is also reflected in other international legal instruments and in most national laws." (241)

Nevertheless, two and a half years earlier, in a memorandum to President Bush, the White House Counsel advised that adherence to the Geneva Conventions would restrict the interrogation methods used by the USA in this "new kind of war" which "renders obsolete Geneva's strict limitations on questioning of enemy prisoners". The memorandum counselled that this "new type of warfare... requires a new approach to our actions towards captured terrorists".(242) Not applying the Geneva Conventions to certain prisoners, the memorandum said, "substantially reduces the threat of domestic criminal prosecution [of US agents] under the War Crimes Act".(243) He suggested that some of the language of the Geneva Conventions is "undefined", giving the example of the prohibition on "outrages upon personal dignity" and "inhuman treatment".(244) Given this, the memorandum continued, "it is difficult to predict with confidence what actions might be deemed to constitute violations".(245)

Although the memorandum stated that the USA would continue to treat detainees in accordance with international standards, it clearly anticipated that harsher treatment would occur. Subsequent official comments support this view. A

Pentagon official tellingly said in May 2004, for example, that "it's very different" treating detainees who are not subject to the Geneva Conventions to those who are.(246) Equally telling was Secretary Rumsfeld's (incorrect), assertion that official investigations into Abu Ghraib had not found "any abuse that was related to interrogations". He added that "The Iraq situation was always subject to the Geneva Convention. The President announced that, I announced it... Any abuse that took place was inconsistent with that."(247) His comment would appear to betray a view that interrogations of prisoners not protected by the Geneva Conventions can be abusive. This is somewhat reminiscent of President Bush's position, stated in his previously secret memorandum of 7 February 2002, suggesting that there can be detainees "who are not legally entitled to [humane] treatment".(248)

The White House Counsel's advice to President Bush was echoed by the US Attorney General, John Ashcroft. In a letter to the President, dated 1 February 2002, he wrote: "[A] Presidential determination against treaty applicability would provide the highest assurance that no court could subsequently entertain charges that American military officers, intelligence officials, or law enforcement officials violated Geneva Convention rules relating to field conduct, detention conduct or interrogation of detainees. The War Crimes Act of 1996 makes violation of parts of the Geneva Convention a crime in the United States".(249)

The theory that presidential power can be used to override treaty and national laws is a theme that runs through government communications following the attacks of 11 September 2001. A Justice Department memorandum, dated 22 January 2002 and made public by the government on 22 June 2004, concluded that "customary international law does not bind the President or the US Armed Forces in their decisions concerning the detention conditions of al Qaeda and Taliban prisoners".(250) The memorandum proposed "justified deviations from the Geneva Convention requirements". It pointed out that "some very well may argue that detention conditions [at Guantánamo] currently depart from Geneva III requirements". However, it suggested that "some deviations would not amount to a treaty violation" because, *inter alia*, they could be justified under the self-defence argument and "no treaty can override a nation's inherent right to self-defense".

In fact, international humanitarian law applies exactly when "nations" are exercising their right to self-defence. Its essence is encapsulated in a provision of a 1907 treaty which now reflects customary international law: "The right of belligerents to adopt means of injuring the enemy is not unlimited."(251)

Any rejection of this principle is an invitation to lawless wars. At the very least, Guantánamo detainees have been subjected to violations of their right to be treated with respect for their human dignity – transferred from Afghanistan and elsewhere in conditions of sensory deprivation and excessive restraint and held in some cases in small cells for more than two years without any legal process.

**An influential memorandum disowned today**
Another memorandum to the White House, dated 1 August 2002, also deserves scrutiny.(252) Written at the Justice Department reportedly in response to a CIA request for legal protections for its agents (see Point 3), the memorandum drew, *inter alia*, the following three erroneous conclusions: (1) that interrogators could cause a great deal of pain before crossing the threshold to torture. Specifically, it suggested that torture would only occur if the pain caused rose to the level "that would ordinarily be associated with a sufficiently serious physical condition or injury such as death, organ failure, or serious impairment of body functions"; (2) that even though US law makes it a criminal offence for anyone in an official position to commit or attempt to commit torture against a detainee outside the USA, and even though the USA has ratified treaties prohibiting torture, the US President's authority as Commander-in-Chief could override these laws – in other words if the President authorized torture, the agent who carried it out could not be prosecuted by the Justice Department.(253) Any attempt by Congress to interfere would be unconstitutional;(254) and (3) that, even if interrogators were prosecuted for torture, there were defences available to them by which they could escape criminal liability. "We conclude", the memorandum said, "that, under the current circumstances, necessity or self-defense may justify interrogation methods that might [amount to torture]".(255)

Almost two years after the August 2002 memorandum was produced and soon after it had been leaked to the media in June 2004, the administration attempted to distance itself from its contents, saying that parts of it would be rewritten.(256) Yet the memorandum had reportedly been vetted by numerous officials, including lawyers at the National Security Council, the White House, the Vice-President's office, as well as the Justice Department.(257) In 2003, its author, Jay S. Bybee, had been confirmed by the Senate as a federal judge after being nominated by President Bush to that position.(258) In hearings before the Senate Judiciary Committee in February 2003, nominee Bybee had declined to discuss any legal advice he had given to the administration, citing his obligation to maintain confidentiality.

As well as distancing itself from the August 2002 memorandum, the administration claims that the declassified documents "were circulated among lawyers and some Washington policymakers only" and "never made it to the hands of soldiers in the field, nor to the President".(259) This raises several questions. Firstly, given that the US administration has repeatedly justified its detention and interrogation policies as legitimate under the President's powers as Commander-in-Chief of the Armed Forces, the President should be expected to have known about the various memorandums written about his government's "war" policies on these issues. Secondly, the administration's belated distancing from the August 2002 memorandum should be set against the fact that other memorandums which have come into the public domain clearly formed the basis for government policy, for example President Bush's decision to reject the applicability of the Geneva

Conventions and the choice of Guantánamo Bay as a location to keep detainees out of the reach of the judiciary.(260)

Thirdly, despite being the subject of official public disdain in June 2004, much of the August 2002 memorandum is repeated in the April 2003 final report of the Pentagon's *Working Group on Detainee Interrogations in the Global War on Terrorism*. For example, the latter states that, "[i]n order to respect the President's inherent constitutional authority to manage a military campaign, [the US law prohibiting torture]...must be construed as inapplicable to interrogations undertaken pursuant to his Commander-in-Chief authority." Echoing the August 2002 memorandum, and its interpretation of the USA's reservation to Article 1.1 of the UN Convention against Torture (see Points 5.2 and 11.2), the report states that:

> "...even if the defendant knows that severe pain will result from his actions, if causing such harm is not his objective, he lacks the requisite specific intent [to be guilty of torture] even though the defendant did not act in good faith. Instead, a defendant is guilty of torture only if he acts with the express purpose of inflicting severe pain or suffering on a person within his custody or physical control."(261)

In a recent lecture, Professor Sir Nigel Rodley, formerly the UN Special Rapporteur on torture and currently a member of the Human Rights Committee, commented on this approach:

> "This cannot be and is not a true reading of the effect of the US reservation on the CAT. For, by this definition, no one could be guilty of the crime of torture... [the definition of torture in Article 1 of the UN Convention against Torture](262) requires that there be a purpose separate from the intention (purposes such as those of obtaining information or confessions). Since these must be the purposes, it can never be the objective simply to inflict severe pain or suffering – the severe pain or suffering can only be a means to the objective. So there can, therefore, never be the requisite specific intent. I do not for a moment believe that any other States Parties to the Convention would have accepted the understanding, had they believed this could be the effect. Indeed, such an interpretation is evidently incompatible with the international law requirement that treaties be interpreted 'in good faith'."(263)

The Pentagon Working Group report has not been disowned, and its recommendations were adopted by Secretary for Defense Rumsfeld, whose memorandum of 16 April 2003 does not rule out any interrogation method, as long as he authorizes it personally on a case-by-case basis.(264)

Fourthly, some of the contents of the August 2002 memorandum reflect what has happened on the ground. Noting that the UN Convention against Torture "reserves criminal penalties and the stigma attached to those penalties for torture alone", the memorandum emphasised that there is a "significant range of acts that though they might constitute cruel, inhuman, or degrading treatment or punishment fail to rise to the level of torture". Citing past abuses in Northern Ireland and Israel, and taking a highly regressive view of international standards and decisions (see Point 11.4), the memorandum said that these techniques include forced sitting, crouching and standing in painful positions, hooding, excessive tightening of handcuffs, subjection to noise, sleep deprivation and deprivation of food and drink. These techniques have all been alleged in the "war on terror", including in combination.(265)

In its August 2004 report, the Schlesinger Panel noted the Justice Department's memorandum. One of the Panel members left whether the document had influenced events on the ground as an open question. Whether the Department's position had "further contributed to an atmosphere of permissiveness in the field", he said, was "difficult to assess".(266)

### The Guantánamo memos

Among the dozen "Category I" and "Category II" techniques Secretary Rumsfeld authorized in December 2002, "as a matter of policy" for discretionary use at Guantánamo were the use of 20-hour interrogations, stress positions, isolation, sensory deprivation, using detainees' individual phobias (such as fear of dogs), hooding, "dietary adjustment", removal of clothing, forced shaving, removal of all "comfort items", and the use of "mild, non-injurious physical contact".(267) He has said that these techniques "were not torture", while making no mention on whether he thought they constitute cruel, inhuman or degrading treatment and equally prohibited under international law.(268)

In May 2004, a month before Secretary Rumsfeld's December 2002 memorandum was declassified by the administration, two former Guantánamo detainees wrote to the Senate Armed Services Committee:

> "Our interrogations in Guantánamo, too, were conducted with us chained to the floor for hours on end in circumstances so prolonged that it was practice to have plastic chairs for the interrogators that could be easily hosed off because prisoners would be forced to urinate during the course of them and were not allowed to go to the toilet. One practice that was introduced specifically under the regime of General Miller was "short shackling" where we were forced to squat without a chair with our hands chained between our legs and chained to the floor. If we fell over, the chains would cut into our hands. We would be left in this position for hours before an interrogation, during the interrogations (which could last as long as 12 hours), and sometimes for hours while the interrogators left the room. The air conditioning was turned up so high

*that within minutes we would be freezing. There was strobe lighting and loud music played that was itself a form of torture. Sometimes dogs were brought in to frighten us".* (269)

Meanwhile, the sort of techniques authorized by Secretary Rumsfeld for use at Guantánamo were being used in Afghanistan where interrogators were "removing clothing, isolating people for long periods of time, using stress positions, exploiting fear of dogs and implementing sleep and light deprivation."(270)

Including "mild, non-injurious physical contact", four so-called "Category III" techniques (in italics below) had been requested in October 2002 for use in Guantánamo against "the most uncooperative detainees".(271) The request noted that such techniques were used by "other US government agencies", a phrase usually used by the military to mean the CIA. The legal advice offered on these four Category III techniques struck a tone reminiscent of the August 2002 Justice Department memorandum:
· "*The use of scenarios designed to convince the detainee that death or severely painful consequences are imminent* is not illegal [because] there is a compelling governmental interest and it is not done intentionally to cause prolonged harm. However, caution should be utilized with this technique because the torture statute specifically mentions making death threats as an example of inflicting mental pain and suffering." No advice was offered on how this contradiction was to be resolved.
· "*Exposure to cold weather or water* is permissible with appropriate medical monitoring".
· "*The use of a wet towel to induce the misperception of suffocation* would also be permissible if not done with the specific intent to cause prolonged mental harm, and absent medical evidence that it would. Caution should be exercised with this method, as foreign courts have already advised about the potential mental harm that this method may cause."
· "The use of *mild non-injurious physical contact* with the detainee, such as pushing and poking, will technically constitute an assault under Article 128 [of the Uniform Code of Military Justice]".(272)

Despite making these limited *caveats*, the military lawyer recommended that all four Category III techniques be approved. Major General Michael Dunlavey, commander at Guantánamo (until Major General Miller assumed command on 4 November 2002) then forwarded the request, with his recommendation also that it be approved, to General James T. Hill, Commander, US Southern Command. Commander Hill wrote to the Chairman of the Joint Chiefs of Staff asking for Pentagon and Justice Department lawyers to review the Category III techniques. The Department of Defense's General Counsel wrote that "while all Category III techniques may be legally available, we believe that, as a matter of policy, a blanket approval of Category III techniques is not warranted at this time".(273) Amnesty International is seriously concerned that the chief lawyer for the Pentagon should consider that these techniques might be legal. This once again suggests an administration either ignorant or contemptuous of international law and standards. In June 2004, the General Counsel suggested that interrogation techniques such as stress positions and prolonged isolation did not violate the USA's international obligations *per se*, it was just a question of proper application: "Certainly, any one technique improperly applied could, you know, produce all sorts of undesirable consequences, including perhaps torture. But we – the United States is not permitted to go near that".(274)

Secretary Rumsfeld himself has apparently been willing to countenance such techniques. On 15 January 2003, he rescinded his 2 December 2002 authorization, saying that any use of the techniques should be approved by him on a case-by-case basis, including any technique in either Category II or III.(275) He set up a working group within the Department of Defense, chaired by the General Counsel of the Department of the Air Force, Mary Walker, "to assess the legal, policy, and operational issues relating to the interrogations of detainees held by the US Armed Forces in the war on terrorism".(276) The working group issued its report on 4 April 2003, and it was classified as secret for 10 years by Secretary Rumsfeld. A March 2003 draft of the report was leaked to the press after the allegations of abuse at Abu Ghraib became public, and subsequently the final version was made public by the administration at its press briefing on 22 June 2004 (see page 11).

**The Pentagon Working Group report**
The Working Group report lists 35 interrogation techniques. It recommended that the first 26 be "approved for use with unlawful combatants outside the United States". Eighteen of these appear in the most recent (September 1992) edition of the US Army's Field Manual on Intelligence Interrogation (FM 34-52).(277) The remainder thus go beyond standard US army interrogation doctrine. One comes from the May 1987 version of FM 34-52.(278) The remaining seven of the first 26 techniques are:
20) Hooding;
21) Mild physical contact;
22) Dietary manipulation;
23) Environmental manipulation (e.g. adjusting temperature);
24) Sleep adjustment; (279)
25) False flag (convincing the detainee that interrogators are from country other than the USA – see possible case example, Walid al-Qadasi, page 100);
26) Threaten to transfer to a 3rd country (where subject is likely to fear he would be tortured or killed).(280)

The Working Group recommends that the remaining nine of the 35 techniques it lists in the report "be approved for use with unlawful combatants outside the United States", but with "specific limitations". The restrictions include that the interrogations be conducted at "strategic interrogation facilities", including Guantánamo; that the detainee is believed to

have "critical intelligence"; that the detainee has been medically cleared for subjection to such techniques; and that the interrogators are specifically trained to use these methods. The nine techniques are:
27) Isolation;
28) Use of prolonged interrogations (e.g. 20 hours in a single day);
29) Forced grooming;
30) Prolonged standing;(281)
31) Sleep deprivation (not to exceed four days in succession);(282)
32) Physical training;
33) Face or stomach slap;
34) Removal of clothing;
35) Increasing anxiety by use of aversions (e.g. simple presence of dog).

The Pentagon Working Group also recommended that a procedure be established for requesting approval of any interrogation techniques additional to these 35.

On 16 April 2003, Secretary Rumsfeld authorized 24 of the techniques for use at Guantánamo Bay (1-19; 22-25; and 27 above). Additional techniques were not ruled out, but would have to be requested on a case-by-case basis. There is evidence which suggests that techniques such as stress positions and prolonged interrogations, authorized by Secretary Rumsfeld in December 2002, were continuing beyond the revocation of that authorization, and were being combined with techniques he authorized in April 2003, such as environmental manipulation. If accurate, these allegations would indicate that the Secretary of Defense was indeed approving such additional techniques on a case-by-case basis unless this authorization scheme was being bypassed.

For example, Parkhudin, an Afghan farmer who was detained at Guantánamo from February 2003 to March 2004, said that he had been shackled with a short chain during interrogation and that he had been questioned for up to 20 hours in uncomfortable positions, adding that "they made me stand in front of an air conditioner. The wind was very cold".(283) Released Swedish detainee Mehdi Ghezali told Amnesty International that he was subjected to sleep deprivation in April 2004, three months before he was released:

> "They kept doing it for about two weeks around 11 April 2004. The Americans took me to an interrogation that lasted 14-16 hours. Then they brought me back to my cell. Shortly thereafter, just as I was going to bed, the guards came and said that I was going to be moved to another cell. One hour later I was moved once more to another cell. I once saw how the guards treated an Australian prisoner in this way, by moving him from cell to cell and thus preventing him from getting any sleep. At the end, there was blood coming from both his nose and his ears. He was so tired."(284)

A recent report in the New York Times, based on non-detainee sources, adds further evidence:

> "The people who worked at the prison also described as common another procedure in which an inmate was awakened, subjected to an interrogation in a facility known as the Gold Building, then returned to a different cell. As soon as the guards determined the inmate had fallen into a deep sleep, he was awakened again for interrogation after which he would be returned to yet a different cell. This could happen five or six times during a night, they said. This procedure was described by those who participated as part of something called 'Operation Sandman'. Much of the harsh treatment described by the sources was said to have occurred as recently as the early months of this year. After the scandal about mistreatment of prisoners at the Abu Ghraib prison in Iraq became public in April, all harsh techniques were abruptly suspended, they said."(285)

A technique that is listed by the Pentagon Working Group, but was not authorized by Secretary Rumsfeld in either his December 2002 or April 2003 memorandum, is "threatening to transfer to a 3rd country that subject is likely to fear would subject him to torture and death".(286) Former Guantánamo detainee Tarek Dergoul, for example, has alleged that this happened to him. His testimony also brings to mind the emphasis that the Pentagon Working Group report placed on the importance of interrogators being "provided reasonable latitude to vary techniques depending on the detainee's culture", and its additional note that "techniques are usually used in combination":

> "Later the American interrogators did things that upset me. They threatened to send me to Morocco and Egypt where I would be tortured. They played US music very loud during interrogations. They brought pictures of naked women and dirty magazines and put them on the floor. One of the interrogators brought a cup holder for four cups with two coffees in the cup holder. He then deliberately placed the Qur'an on top of the coffee. He put his folder on the desk and then grabbed the Qur'an with his feet up on the table and read it like he was reading a magazine. He made jokes about the Qur'an... In later interrogations, I was kept in the interrogation room, chained to a ring in the floor, for at least six and sometimes as long as ten hours with no access to sanitary facilities. The interrogators left the room for hours at a time. I had to go to the toilet on the ground...During interrogation, if you moved from a sitting position or closed your eyes, they

*would take the chair away and make you bend your legs to sit cross-legged. They would then tighten the chain so there was no slack and you couldn't bend to the left or the right. This happened in very many interrogation sessions. I would get cramp and start screaming. The guards would swear at Muslims and curse Allah and the Prophet Mohammed. In interrogation sessions they used either the air conditioning unit or sometimes extreme heat to make you uncomfortable."(287)*

### The Afghanistan, Iraq and other unreleased memos
There are an unknown number of government documents that have not been released by the authorities, as well as an unknown number of decisions not put on paper.(288) For example, on 24 January 2003, the Commander of Joint Task Force-180 in Afghanistan forwarded to the Pentagon Working Group a list of interrogation techniques being used in Afghanistan.(289) Among the techniques listed was the use of nudity against detainees. The CJTF-180 memorandum "highlighted that deprivation of clothing had not historically been included in battlefield interrogations.(290) However, it went on to recommend clothing removal as an effective technique that could potentially raise objections as being degrading or inhumane, but for which no specific written legal prohibition existed."(291) As already noted, the Fay report into Abu Ghraib concluded that interrogators with experience in Afghanistan and Guantánamo, redeployed to Iraq, "simply carried forward the use of nudity into the Iraqi theater of operations" and that this "likely contributed to an escalating 'de-humanization' of the detainees and set the stage for additional and more severe abuses to occur."(292)

The Fay report's finding that interrogation techniques were "imported" (or, in the Schlesinger Panel's words, that they "migrated") to Iraq from Afghanistan and Guantánamo contrast to earlier Pentagon assurances that no interrogation techniques were "exported to Iraq" from the wider "war on terror".(293)

According to the Schlesinger review, the techniques listed in the CJTF-180 document of 24 January 2003 "were included in a Special Operations Forces (SOF) Standard Operating Procedures document published in February 2003". In Iraq, interrogation guidelines were initially drafted that were "a near copy of the Standard Operating Procedure (sic) created by SOF".(294) The officer who drafted these guidelines was Captain Carolyn A. Wood, officer in charge of the 519th Military Intelligence Battalion from Fort Bragg, North Carolina. The 519th military intelligence unit had served in Afghanistan and had "assisted in interrogations in support of SOF and was fully aware of their interrogation techniques".(295) Prior to its deployment to Iraq in August 2003, Captain Wood's unit "allegedly conducted the abusive interrogation practices in Bagram resulting in a Criminal Investigation Command (CID) homicide investigation."(296) Two detainees had died in Bagram in December 2002, showing signs of "blunt force" injuries (see Point 6.2).

In addition to Major General Miller's recommendations following his visit to Iraq from Guantánamo (see page 29), Colonel Marc Warren, the main US military lawyer in Iraq (Staff Judge Advocate), used the final report of the Pentagon Working Group in developing interrogation policy there. The Commander of the US forces in Iraq, Lieutenant General Ricardo Sanchez, signed a memorandum on 14 September 2003 "which contained elements of the approved Guantanamo policy and elements of the SOF policy" from Afghanistan. (297) It included the use of dogs, stress positions, sensory deprivation, yelling, loud music, light control, and sleep management as interrogation techniques.(298) The Schlesinger report pointed out that this meant that detainees in Iraq, where the US had decided to apply the Geneva Conventions, would be subject to interrogation policies developed for use against those not so protected – further evidence that the decision by President Bush to deny Geneva Conventions protection to detainees in Afghanistan and Guantánamo was taken to allow interrogators to adopt harsh techniques, as suggested by the White House Counsel's January 2002 memorandum to President Bush.(299) The 14 September 2003 memorandum has not been made public by the administration.

The 14 September 2003 memorandum was subsequently replaced by a memorandum signed by General Sanchez on 12 October 2003. On 16 October 2003, Captain Wood of the 519th Military Intelligence Battalion posted a list of interrogation techniques – entitled "interrogation rules of engagement" – on the wall of the Joint Interrogation and Debriefing Center at Abu Ghraib prison "as an aid for interrogators" and which "graphically portray[ed] the 12 October 2003 policy".(300) Confronted with this list of interrogation techniques during questioning in May 2004 by a Senate committee, Secretary Rumsfeld indicated that the Pentagon had approved such methods.(301)

The 12 October 2003 policy recently came into the public domain in the form of a Memorandum for Record, dated 27 January 2004.(302) This lists a number of interrogation techniques with blanket approval for use against "all detainees regardless of status".(303) It then lists techniques that could be used with the approval of General Sanchez. The policy stresses that this is "not an all-inclusive list", and adds, somewhat redundantly, that "at no time will detainees be treated inhumanely nor maliciously humiliated" (see also page 44):
· Change of scenery down;
· Dietary manipulation (minimum bread and water, monitored by medics);
· Environmental manipulation (i.e. reducing [air conditioning] in summer, lower heat in winter);
· Sleep adjustment;
· Isolation (for longer than 30 days);
· Presence of working dogs;
· Sleep management (for 72-hour time period maximum; monitored by medics);
· Sensory deprivation (for 72-hour time period maximum; monitored by medics);
· Stress positions (no one position for longer than 45 minutes, within a 4-hour time period).

The 12 October 2003 memorandum included text lifted from the Pentagon Working Group report, including: "interrogation approaches are designed to manipulate an internee's emotions and weaknesses...in close cooperation with the detaining units", and: "it is important that interrogators be provided reasonable latitude to vary approaches depending on the security internee's cultural background". Like the Pentagon Working Group report, the memorandum noted that interrogation techniques "are usually used in combination".(304) According to the Fay report, the 12 October memorandum,

> "...left certain issues for interpretation: namely, the responsibility for clothing detainees, the use of dogs in interrogation, and applicability of techniques to detainees who were not categorized as 'security detainees'. Furthermore, some military intelligence personnel executing their interrogation duties at Abu Ghraib had previously served as interrogators in other theaters of operation, primarily Afghanistan and GTMO. These prior interrogation experiences complicated understanding at the interrogator level. The extent of 'word of mouth' techniques that were passed to the interrogators in Abu Ghraib by assistance teams from Guantanamo, Fort Huachuca, or amongst themselves due to prior assignments is unclear and likely impossible to definitively determine... [T]he existence of confusing and inconsistent interrogation technique policies contributed to the belief that additional interrogation techniques were condoned in order to gain intelligence."(305)

On 30 November 2003, Colonel Pappas, commander of the 205th Military Intelligence Battalion which was handling the interrogations of detainees at Abu Ghraib, requested authorization for the harsher methods against a Syrian detainee who was proving resistant to interrogation. The Colonel's memorandum described the interrogation plan, which would begin with "Fear up Harsh", one of the techniques that could be used against any detainee without authorization:

> "Interrogators will at a maximum throw tables, chairs, invade his personal space and continuously yell at detainee. Interrogators will not physically touch or harm the detainee, will take all necessary precautions that all thrown objects are clear of the detainee and will not coerce the detainee in any way. If the detainee has not broken yet, interrogators will move into the segregation [isolation] phase of the approach... For the segregation phase of the approach, the MPs [military police] will put an empty sandbag onto the prisoners head before moving him out... During transportation, the Fear up Harsh approach will be continued... Upon arrival at site, MP guards will take him into custody. MP working dogs will be present and barking during this phase. Detainee will be strip searched by guards with the empty sandbag over his head... Detainee will be put on the adjusted sleep schedule for 72 hours. Interrogations will be conducted continuously during this 72-hour period. The approaches which will be used during this phase will include, fear up harsh, pride and ego down, silence and loud music. Stress positions will also be used... in order to intensify the approach. The approval for this approach is essential due to the information this detainee possesses... and could potentially save countless lives of American soldiers in the future".(306)

Amnesty International understands that the Syrian detainee in question was the detainee who was kept in prolonged incommunicado in solitary confinement in appalling conditions, without access to the ICRC (see page 16), on grounds of "military necessity" invoked by Colonel Pappas and Colonel Marc Warren.(307)

| WORDS | ACTIONS |
|---|---|
| Interrogation techniques listed by Pentagon Working Group, April 2003 (not exhaustive). Notes "techniques are usually used in combination". | Interrogation techniques, used "in a systematic way" against security detainees in Iraq, found by International Committee of the Red Cross and listed in report in February 2004 (not exhaustive). |
| Hooding<br>Prolonged interrogations<br>Environmental manipulation | Hooding, sometimes used in conjunction with beatings. Hooding could last for periods from a few hours to up to two to four consecutive days;<br>Exposure while hooded to loud noise or music, prolonged exposure while hooded to the sun at the hottest time of day; |
| Mild physical contact<br>Face slap / Stomach slap | Beatings with hard objects, slapping, punching, kicking; |
| Fear up harsh<br>Threat of transfer | Threats (of ill-treatment, reprisals against family members, imminent execution or transfer to Guantánamo); |
| Removal of clothing<br>Isolation<br>Sleep deprivation<br>Dietary manipulation<br>Prolonged standing | Being stripped naked for several days while held in solitary confinement in an empty and completely dark cell;<br>Being held in solitary confinement, combined with threats, insufficient sleep, food or water deprivation, minimal access to showers, denial of access to open air;<br>Being forced to remain for prolonged periods in stress positions; |

|  | Acts of humiliation such as being made to stand naked, with arms raised or with women's underwear over the head, for prolonged periods... |
|---|---|

Major General Miller, who in March 2004 was appointed to the post of Deputy Commander of Detainee Operations in Iraq, has stated that "the basics of the Geneva Convention – shelter, medical care, food – are never used as a manipulative tool."(308) Yet, the 12 October 2003 policy signed by Lieutenant General Sanchez, authorized interrogators to assume control over the "lighting, heating and configuration of the interrogation room, as well as the food, clothing, and shelter given to the security detainee" (as in the now outdated 1987 FM 34-52, see footnote 278). The Fay report noted that abuses such as "exposure to cold and heat or denial of food and water", including "detainees being left naked in their cells during severe cold weather without blankets", occurred at Abu Ghraib. It found that some of these abuses were directed by military intelligence and some were committed solely by military police guards.(309)

The "torture memos" that have come into the public domain show that the government failed in its international obligation to "keep under systematic review interrogation rules, instructions, methods and practices" with a view to preventing any cases of torture or cruel, inhuman or degrading treatment, as Articles 11 and 16 of the UN Convention against Torture require. Instead the administration discussed how to avoid Geneva Convention protections, how to push the legal limits on torture and have its agents avoid criminal liability, and sanctioned the use of interrogation techniques which violated the international prohibition on torture and cruel, inhuman or degrading treatment. This clearly contradicted the government's assurances that it was committed to all its legal obligations prohibiting torture. In so doing, the administration failed to meet Point 1 of Amnesty International's 12-Point program against torture, that the highest authorities of every country should make clear to all members of the police, military and other security forces that torture and cruel, inhuman or degrading treatment will never be tolerated.

### 1.3 'Un-American' activities?
*I think it's appropriate to have as a part of the record at this point that the incidents of abuses in our prisons in the United States appear to be far greater than what we're experiencing over there in Abu Ghraib.*
US Senator, 9 September 2004(310)

From early on in the "war on terror", the White House issued assurances that "as Americans, the way we treat people is a reflection of America's values..., based upon the dignity of every individual."(311) This has become a standard response. In 2003, asked to respond to allegations that detainees had been ill-treated in Bagram air base in Afghanistan, the military spokesman there said: "I think you would have to agree, America, and for the most part the other countries involved in this coalition, don't have a reputation for treating individuals in an inhumane way. It's not part of our culture."(312) Asked about allegations of ill-treatment of Guantánamo detainees, President Bush responded: "We don't torture people in America. And people who make that claim just don't know anything about our country".(313) Around that time, acts of torture against Iraqi detainees were being filmed by US personnel in Abu Ghraib prison. Once the photographs were made public numerous officials claimed that what they depicted was an affront to "American values".(314) Secretary of Defense Rumsfeld told members of Congress that what happened in Abu Ghraib was "un-American".(315)

At best, such responses suggest a degree of complacency and a misunderstanding of the roots of torture. Torture is a human phenomenon, not an indigenous or cultural one. History shows that it can occur whenever safeguards against it are absent, regardless of the culture or nationality of the interrogators or jailers. In the "war on terror" the US administration has removed or lowered such safeguards, and failed to respond to evidence that torture and ill-treatment were the result.

**Familiarity breeds contempt**
The common refrain about "un-American" conduct or conduct inconsistent with "American values" should also be set against the USA's domestic human rights record, including its resort to judicial killing; its practice of holding detainees in long-term isolation in super-maximum security facilities; its excessive and cruel use of restraints against detainees; its failure adequately to confront racism in the criminal justice system; and its selective approach to international human rights law. This reluctance towards international standards has manifested itself in numerous ways. For example:
· The UN Committee against Torture has criticized the USA's domestic use of remote-controlled electro-shock stun belts, restraint chairs and "excessively harsh" conditions in super-maximum security prisons. The US government has ignored the Committee's concerns. In the "war on terror", excessive and cruel use of restraints has been routine.(316) In May 2004, the US authorities opened Camp Five at Guantánamo Bay. This appears to have been modelled on the super-max prisons on the US mainland. Detainees are held in solitary confinement for up to 24 hours a day in concrete cells and are under 24-hour video surveillance.

It is noteworthy, with this in mind, that among the first six soldiers charged in connection with the Abu Ghraib torture were two men who in their civilian life had been prison guards, one with the Virginia Department of Corrections, and one in a notorious maximum security prison housing Pennsylvania's death row.(317) The Taguba report found that the military police guards' lack of training in detentions meant that they "relied heavily on individuals... who had civilian corrections experience, including many who worked as prison guards or corrections officials in their civilian jobs". Two of the soldiers allegedly involved in abuses in June 2003 at Camp Whitehorse, a US detention facility in Iraq, were corrections officers in civilian life.(318) According to prosecutors at a subsequent court-martial, one of them had allegedly told other soldiers that