# EXHIBIT 7

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

Westlaw.

28-AUG CHAMP 4

28-AUG Champion 4

**(Cite as: 28-AUG Champion 4)**

Page 1

Champion
August, 2004

**Column**
**From the President**

*4 THE 'NEW PARADIGM' AND OUR CIVIL LIBERTIES

Barry C. **Scheck** [FNa1]
Innocence Project 100 5th Ave., 3rd Fl. New York, NY 10011 (212) 790-0368 Fax
(212) 790-0256 E-mail bcsinnocence@aol.com

Copyright © 2004 by National Association of Criminal Defense Lawyers, Inc.;

Barry C. **Scheck**

Democracies must defend themselves. Democracies are entitled to try officers and soldiers of enemy forces for war crimes. But it is a recurring theme in history that in times of war, armed conflict, or perceived national danger, even liberal democracies adopt measures infringing human rights in ways that are wholly disproportionate to the crisis. Ill-conceived, rushed legislation is passed granting excessive powers to executive governments which compromise the rights of individuals beyond the exigencies of the situation. Often the loss of liberty is permanent....

Lord Justice Johan Steyn, 23 November 2003, as quoted in the play **Guantanamo:** Honor Bound to Defend Freedom, by Victoria Brittain & Gillian Slovo.

Democracy dodged a bullet when the Supreme Court rejected the government's most aggressive positions in Rasul, Hamdi, and Padilla, but this assault on our most basic freedoms, heralded by our Justice Department as a "new paradigm" or "new thinking," is far from over. As an organization whose members proudly call themselves "liberty's last champions," we have a special obligation to act.

It is time to mobilize lawyers effectively to restore the rule of law for detainees at **Guantanamo** and get the truth about how they were interrogated. It is time to fight in the halls of Congress inevitable efforts by the Bush administration to win by legislation what they lost in Hamdi and Rasul -- authority to declare American citizens enemy combatants and seize them indefinitely without meaningful review by a court, authority to deprive them of counsel so that they can be more easily broken down during incommunicado interrogation (actually one of the government's arguments in Padilla), and authority to set up a military tribunal system without the procedural due process safeguards we expect even in our military justice system.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

28-AUG CHAMP 4                                                                                    Page 2

28-AUG Champion 4

**(Cite as: 28-AUG Champion 4)**

And it is time, as Anthony Lewis suggested recently in the New York Times, to demand an investigation of torture and inhumane treatment of prisoners in Iraq and Afghanistan by a joint committee of Congress, or an independent counsel, to do what investigators of official crimes have done since Nuremberg: apply the principle of command responsibility and work up the chain to the source of misconduct, wherever that leads. Nothing less, Lewis rightly suggests, will restore America's good name and its moral sense of self. It is also the only way to accomplish what even the Defense Department claims to want: to find and punish those responsible, and to prevent this from recurring.

None of this will be easy, especially if there is soon another attack within the United States by a terrorist group, or if the government's monumental intelligence failures (the miscommunication and adversarial competition between and within agencies, the "group think," and the incompetence) is twisted into an excuse to make intelligence gathering easier by further gutting civil liberties. But our resolve to fight can be strengthened by taking a true measure of our peril: a realistic, objective look at what government lawyers, and the president himself, mean when they say our criminal justice system needs "new thinking" or a "new paradigm" to wage the war on terrorism.

First, let's consider the "new paradigm" created for the hundreds of suspected foot soldiers for the Taliban who were swept up in Afghanistan and elsewhere and sent to **Guantanamo** Bay. Ordinarily, the United States would follow the Third Geneva Convention by establishing a "competent" tribunal to determine if these individuals were prisoners of war, innocents, or unprivileged belligerents, such as members of a terrorist group, like al-Qaeda (unprivileged belligerents are not entitled to combatant immunity, and therefore are not necessarily entitled to treatment as prisoner of war under the Geneva Conventions). This is not a mysterious process. In the 1991 Gulf War, the U.S. military held 1,196 such hearings before military tribunals, and discovered, incidentally, that 75 percent of the prisoners were innocent civilians. This time, over the objections of Secretary of State Colin Powell, and his legal counsel William H. Taft IV, who warned that failure to follow the Geneva Convention at **Guantanamo** would "reverse over a century of U.S. policy and practice...and undermine the protection of the law of war for our troops," President Bush sided with his counsel, Alberto Gonzales, who argued that the "nature of the new war" on terrorism places such a premium on getting information from captured terrorists quickly, that "[t]his new paradigm" makes the restrictions of the Geneva Convention for prisoners of war (just name, rank and serial number) "obsolete."

So for more than two years the government has maintained that the **Guantanamo** detainees are "unlawful combatants" (a term found nowhere in the Third Geneva Convention), dragged its feet about setting up a tribunal system to determine officially their status, and conducted nonstop interrogations using aggressive techniques for extracting information not contained in traditional military manuals that required special approval from Defense Secretary *22 Rumsfeld -- justified, again, as more "new paradigm" thinking.

Were there interrogation abuses in Afghanistan and at **Guantanamo**? One certainly has to wonder whether we are getting the truth about these matters. As Clive Stafford Smith points out, in the first months of **Guantanamo** detention, 32 suicide attempts were reported. Then they seemed to stop. But it turns out they didn't; they were just reclassified as "Manipulative Self-Injurious Behavior" (the "new paradigm" obviously requires new, Orwellian language). Did the "new" techniques produce reliable information that can be properly used against detainees? We know similar techniques produce false confessions in America's jails and police precincts, where people have lawyers, phone calls, and access to courts. Indeed, a recent Newsweek story by Michael Isikoff documents that an al-Qaeda member subjected to the most extreme interrogation methods did produce questionable information and has reportedly since recanted. (Ibn al-Shaykh al-Libi was supposedly the "crucial source" for the administration's claims that Iraq had aided al-Qaeda in the development and deployment of "poisons and gases." Some officials now suspect that al-Libi had been subjected to or threatened with extreme interrogation methods, causing him to tell his captors what he thought they wanted to hear.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

28-AUG CHAMP 4

28-AUG Champion 4

**(Cite as: 28-AUG Champion 4)**

If these issues cannot be effectively raised when the government gets around to conducting military tribunals to determine status, much less criminal charges, then those proceedings will be properly rejected around the world as illegitimate. Only the continued valiant efforts of American military lawyers, the pro bono assistance of civilian criminal lawyers, and the determination of the media to get the real story will breathe some true democratic life into the military tribunal system. If not for the press firestorm over prison abuses at Abu Ghraib, one has to wonder whether the "new paradigm" legal memos about **Guantanamo** interrogation methods would have ever been disclosed.

The "new paradigm" legal memos from the Justice Department making arguments about how an American interrogator could defend against torture charges if he or she used techniques with the general, but not specific, intent to cause "severe physical or mental pain and suffering," make very amusing reading for the criminal practitioner (would government lawyers really acknowledge the viability of such defenses in one of our cases?) were it not for the chilling conduct being suggested. The most troubling question about the memos is not their legal validity (few have risen to defend them now that they are public) but to what extent they were written to justify actions that had already taken place, or influenced others in the chain of command who have abused prisoners in Iraq, Afghanistan, and **Guantanamo**. Unless a special committee of Congress, such as the 9/11 Commission, or a special prosecutor is appointed, these questions won't get satisfactory answers. Secretary Rumsfeld and Vice-President Cheney, who consistently deflect criticism about the Abu Ghraib prisoner abuse by promising, "Watch how a democracy responds," ought to take this suggestion.

Finally, the "new paradigm" reasoning rejected by the Supreme Court in Hamdi -- that the executive as Commander in Chief has a "blank check" to label an American citizen an "enemy combatant" and keep him incommunicado beyond the reach of the courts, or contact with a lawyer, indefinitely -- is by no means dead. "New paradigm" advocates probably have a better chance of succeeding right now in Congress than the Bush Administration did in the Supreme Court. They will argue this war on terrorism is different than anything America has faced before and our traditional criminal justice system cannot efficiently or safely bring terrorists to justice. The mechanisms available to protect classified information or satisfy rights to confrontation and due process in prior national security cases just won't work. Lives will be lost. Our beleaguered intelligence gathering system will be unduly hamstrung. They will probably propose a system similar to the diplock courts set up in Ireland by the British to deal with the IRA, a handy model of a democracy setting up special terrorism courts.

I don't think most Americans would find the diplock court system very congenial. Twenty years ago, I represented Eamon Meehan on charges he was running guns to the IRA from America. I learned that before fleeing to America, Eamon was "lifted" in 1969 and tried in a diplock court. He was accused of being a member of the IRA and killing someone in Belfast. The witnesses against him testified behind a curtain and didn't have to give their names. When the murder took place, Eamon was getting married in another part of Belfast to a Protestant girl (lots of witnesses). He was convicted with dispatch and sent to Long Kesh prison, a detention center similar to **Guantanamo,** where his interrogation was conducted using some of the "new methods" Rumsfeld has approved -- sleep deprivation, dietary manipulation, isolation, hooding during transport and interrogation that last up to 20 hours, stress positions, nakedness, and dogs. I remember thinking at the time such a process could not take place in America, that we had learned a fundamental lesson from the Japanese internment camp fiasco-- I was young, wrong and naïve.

The "new paradigm" and "new thinking" about terrorism undermines old fashioned conservative values -- Barry Goldwater ("extremism in defense of liberty is no vice") would surely have disapproved. The administration knows this is true and tries to disguise it, and confuse the issues. That's why the USA-PATRIOT Act is called the "PATRIOT Act." That's why Secretary Rumsfeld consistently says **Guantanamo** detainees are being treated as prisoners of war even though they are not, and that the Geneva Convention doesn't apply to them but we are treating them as though the Geneva Convention applied. In fact, as the wonderful British barrister Gareth Pierce

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

28-AUG CHAMP 4

28-AUG Champion 4

**(Cite as: 28-AUG Champion 4)**

points out, **"Guantanamo** is an experiment in how you obtain information from people, and it's an experiment in whether anyone is going to protest about that." If now isn't the time to protest and expose, with all our resources, the deeply anti-democratic core of this "new paradigm," when? If we, as lawyers, don't cut through the obfuscation and lead the charge, who will?

[FNa1]. Barry C. **Scheck** is the 47th President of NACDL, having previously served as Secretary, Treasurer, First and Second Vice President and President elect. A professor of law at Cardozo Law School, Yeshiva University, in New York City, he is co-director and co-founder of The Innocence Project.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# <u>EXHIBIT 8</u>

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

Westlaw.

The New York Times

11/30/04 NYT A1

11/30/04 N.Y. Times A1
2004 WLNR 12506677

New York Times (NY)
Copyright (c) 2004 The New York Times. All rights reserved.

November 30, 2004

Section: A

### RED CROSS FINDS DETAINEE ABUSE IN GUANTANAMO

NEIL A. LEWIS

International Committee of Red Cross charges in confidential reports to United States government that American military has intentionally used psychological and sometimes physical coercion 'tantamount to torture' on prisoners at Guantanamo Bay, Cuba; report follows monthlong visit to Guantanamo by Red Cross inspection team last June; it claims some doctors and other medical workers at Guantanamo participated in planning for interrogations, calling this 'flagrant violation of medical ethics'; Bush administration and military officials sharply reject report's charges; Red Cross has been conducting visits to Guantanamo since Jan 2002; this is first time it has asserted in such strong terms that treatment of detainees, both physical and psychological, amounts to torture; report says methods used on prisoners in latest visit are 'more refined and repressive' than those seen on previous visits; cites as examples 'humiliating acts, solitary confinement, temperature extremes, use of forced positions'; conclusions by inspection team, especially findings involving alleged complicity in mistreatment by medical professionals, have provoked stormy debate within Red Cross committee, some of whom say they should make their concerns public or at least aggressively confront Bush administration; photos (L)

WASHINGTON, Nov. 29 The International Committee of the Red Cross has charged in confidential reports to the United States government that the American military has intentionally used psychological and sometimes physical coercion "tantamount to torture" on prisoners at Guantanamo Bay, Cuba.

The finding that the handling of prisoners detained and interrogated at Guantanamo amounted to torture came after a visit by a Red Cross inspection team that spent most of last June in Guantanamo.

The team of humanitarian workers, which included experienced medical personnel, also asserted that some doctors and other medical workers at Guantanamo were participating in planning for interrogations, in what the report called "a flagrant violation of medical ethics."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11/30/04 NYT A1

Doctors and medical personnel conveyed information about prisoners' mental health and vulnerabilities to interrogators, the report said, sometimes directly, but usually through a group called the Behavioral Science Consultation Team, or B.S.C.T. The team, known informally as Biscuit, is composed of psychologists and psychological workers who advise the interrogators, the report said.

The United States government, which received the report in July, sharply rejected its charges, administration and military officials said.

The report was distributed to lawyers at the White House, Pentagon and State Department and to the commander of the detention facility at Guantanamo, Gen. Jay W. Hood. The New York Times recently obtained a memorandum, based on the report, that quotes from it in detail and lists its major findings.

It was the first time that the Red Cross, which has been conducting visits to Guantanamo since January 2002, asserted in such strong terms that the treatment of detainees, both physical and psychological, amounted to torture. The report said that another confidential report in January 2003, which has never been disclosed, raised questions of whether "psychological torture" was taking place.

The Red Cross said publicly 13 months ago that the system of keeping detainees indefinitely without allowing them to know their fates was unacceptable and would lead to mental health problems.

The report of the June visit said investigators had found a system devised to break the will of the prisoners at Guantanamo, who now number about 550, and make them wholly dependent on their interrogators through "humiliating acts, solitary confinement, temperature extremes, use of forced positions." Investigators said that the methods used were increasingly "more refined and repressive" than learned about on previous visits.

"The construction of such a system, whose stated purpose is the production of intelligence, cannot be considered other than an intentional system of cruel, unusual and degrading treatment and a form of torture," the report said. It said that in addition to the exposure to loud and persistent noise and music and to prolonged cold, detainees were subjected to "some beatings." The report did not say how many of the detainees were subjected to such treatment.

Asked about the accusations in the report, a Pentagon spokesman provided a statement saying, "The United States operates a safe, humane and professional detention operation at Guantanamo that is providing valuable information in the war on terrorism."

It continued that personnel assigned to Guantanamo "go through extensive professional and sensitivity training to ensure they understand the procedures for protecting the rights and dignity of detainees."

The conclusions by the inspection team, especially the findings involving alleged complicity in mistreatment by medical professionals, have provoked a stormy debate within the Red Cross committee. Some officials have argued that it should make its concerns public or at least aggressively confront the Bush administration.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The International Committee of the Red Cross, which is based in Geneva and is separate from the American Red Cross, was founded in 1863 as an independent, neutral organization intended to provide humanitarian protection and assistance for victims of war.

Its officials are able to visit prisoners at Guantanamo under the kind of arrangement the committee has made with governments for decades. In exchange for exclusive access to the prison camp and meetings with detainees, the committee has agreed to keep its findings confidential. The findings are shared only with the government that is detaining people.

Beatrice Megevand-Roggo, a senior Red Cross official, said in an interview that she could not say anything about information relayed to the United States government because "we do not comment in any way on the substance of the reports we submit to the authorities."

Ms. Megevand-Roggo, the committee's delegate-general for Europe and the Americas, acknowledged that the issue of confidentiality was a chronic and vexing one for the organization. "Many people do not understand why we have these bilateral agreements about confidentiality," she said. "People are led to believe that we are a fig leaf or worse, that we are complicit with the detaining authorities."

She added, "It's a daily dilemma for us to put in the balance the positive effects our visits have for detainees against the confidentiality."

Antonella Notari, a veteran Red Cross official and spokeswoman, said that the organization frequently complained to the Pentagon and other arms of the American government when government officials cite the Red Cross visits to suggest that there is no abuse at Guantanamo. Most statements from the Pentagon in response to queries about mistreatment at Guantanamo do, in fact, include mention of the visits.

In a recent interview with reporters, General Hood, the commander of the detention and interrogation facility at Guantanamo, also cited the committee's visits in response to questions about treatment of detainees. "We take everything the Red Cross gives us and study it very carefully to look for ways to do our job better," he said in his Guantanamo headquarters, adding that he agrees "with some things and not others."

"I'm satisfied that the detainees here have not been abused, they've not been mistreated, they've not been tortured in any way," he said.

Scott Horton, a New York lawyer, who is familiar with some of the Red Cross's views, said the issue of medical ethics at Guantanamo had produced "a tremendous controversy in the committee." He said that some Red Cross officials believed it was important to maintain confidentiality while others believed the United States government was misrepresenting the inspections and using them to counter criticisms.

Mr. Horton, who heads the human rights committee of the Bar Association of the City of New York, said the Red Cross committee was considering whether to bring more senior officials to Washington and whether to make public its criticisms.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The report from the June visit said the Red Cross team found a far greater incidence of mental illness produced by stress than did American medical authorities, much of it caused by prolonged solitary confinement. It said the medical files of detainees were "literally open" to interrogators.

The report said the Biscuit team met regularly with the medical staff to discuss the medical situations of detainees. At other times, interrogators sometimes went directly to members of the medical staff to learn about detainees' conditions, it said.

The report said that such "apparent integration of access to medical care within the system of coercion" meant that inmates were not cooperating with doctors. Inmates learn from their interrogators that they have knowledge of their medical histories and the result is that the prisoners no longer trust the doctors.

Asked for a response, the Pentagon issued a statement saying, "The allegation that detainee medical files were used to harm detainees is false." The statement said that the detainees were "enemy combatants who were fighting against U.S. and coalition forces."

"It's important to understand that when enemy combatants were first detained on the battlefield, they did not have any medical records in their possession," the statement continued. "The detainees had a wide range of pre-existing health issues including battlefield injuries."

The Pentagon also said the medical care given detainees was first-rate. Although the Red Cross criticized the lack of confidentiality, it agreed in the report that the medical care was of high quality.

Leonard S. Rubenstein, the executive director of Physicians for Human Rights, was asked to comment on the account of the Red Cross report, and said, "The use of medical personnel to facilitate abusive interrogations places them in an untenable position and violates international ethical standards."

Mr. Rubenstein added, "We need to know more about these practices, including whether health professionals engaged in calibrating levels of pain inflicted on detainees."

The issue of whether torture at Guantanamo was condoned or encouraged has been a problem before for the Bush administration.

In February 2002, President Bush ordered that the prisoners at Guantanamo be treated "humanely and, to the extent appropriate with military necessity, in a manner consistent with" the Geneva Conventions. That statement masked a roiling legal discussion within the administration as government lawyers wrote a series of memorandums, many of which seemed to justify harsh and coercive treatment.

A month after Mr. Bush's public statement, a team of administration lawyers accepted a view first advocated by the Justice Department that the president had wide powers in authorizing coercive treatment of detainees. The legal team in a memorandum concluded that Mr. Bush was not bound by either the international Convention Against Torture or a federal antitorture statute because he had the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

authority to protect the nation from terrorism.

That document provides tightly constructed definitions of torture. For example, if an interrogator "knows that severe pain will result from his actions, if causing such harm is not his objective, he lacks the requisite specific intent even though the defendant did not act in good faith," it said. "Instead, a defendant is guilty of torture only if he acts with the express purpose of inflicting severe pain or suffering on a person within his control."

When some administration memorandums about coercive treatment or torture were disclosed, the White House said they were only advisory.

Last month, military guards, intelligence agents and others described in interviews with The Times a range of procedures that they said were highly abusive occurring over a long period, as well as rewards for prisoners who cooperated with interrogators. The people who worked at Camp Delta, the main prison facility, said that one regular procedure was making uncooperative prisoners strip to their underwear, having them sit in a chair while shackled hand and foot to a bolt in the floor, and forcing them to endure strobe lights and loud rock and rap music played through two close loudspeakers, while the air-conditioning was turned up to maximum levels.

Some accounts of techniques at Guantanamo have been easy to dismiss because they seemed so implausible. The most striking of the accusations, which have come mainly from a group of detainees released to their native Britain, has been that the military used prostitutes who made coarse comments and come-ons to taunt some prisoners who are Muslims.

But the Red Cross report hints strongly at an explanation of some of those accusations by stating that there were frequent complaints by prisoners in 2003 that some of the female interrogators baited their subjects with sexual overtures.

Gen. Geoffrey Miller, who commanded the detention and intelligence operation at Guantanamo until April, when he took over prison operations in Iraq, said in an interview early this year about general interrogation procedures that the female interrogators had proved to be among the most effective. General Miller's observation matches common wisdom among experienced intelligence officers that women may be effective as interrogators when seen by their subjects as mothers or sisters. Sexual taunting does not, however, comport with what is often referred to as the "mother-sister syndrome."

But the Red Cross report said that complaints about the practice of sexual taunting stopped in the last year. Guantanamo officials have acknowledged that they have improved their techniques and that some earlier methods they tried proved to be ineffective, raising the possibility that the sexual taunting was an experiment that was abandoned.

Photos: A detainee who cooperates with interrogators and follows rules is given white clothing to wear.; A cell and a meeting room at Camp Echo at Guantanamo, where lawyers can meet with detainees. (Photographs by Angel Franco/The New York Times)(pg. A19)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

December 1, 2004, Wednesday - A front-page article yesterday citing a confidential report in which the International Committee of the Red Cross accused the American military of using psychological and sometimes physical coercion on prisoners at Guantanamo Bay, Cuba, misstated the rank of Jay W. Hood, commander of the detention facility there. He is a brigadier general, not a general.

---- INDEX REFERENCES ----

COMPANY: AMERICAN RED CROSS

NEWS SUBJECT: (Legal (1LE33); Social Issues (1SO05); Judicial (1JU36))

INDUSTRY: (Construction (1CO11); Psychology (1PS96); Healthcare Services (1HE13); Correctional Facilities (1CO72); Commercial Construction (1CO15); Healthcare (1HE06))

REGION: (Americas (1AM92); North America (1NO39); Western Europe (1WE41); Latin America (1LA15); Cuba (1CU43); District Of Columbia (1DI60); Europe (1EU83); Central Europe (1CE50); USA (1US73); Switzerland (1SW77); New York (1NE72); Caribbean (1CA06))

Language: EN

OTHER INDEXING: (Lewis, Neil A; Bush, George W (Pres)) (AMERICAN RED CROSS; BAR ASSOCIATION; BEHAVIORAL SCIENCE CONSULTATION TEAM; COMMITTEE; GUANTANAMO; INTERNATIONAL COMMITTEE; INTERNATIONAL COMMITTEE OF RED CROSS; JUSTICE DEPARTMENT; PENTAGON; RED CROSS; RED CROSS COMMITTEE; STATE DEPARTMENT; WHITE HOUSE) (Against Torture; Americas; Angel Franco; Antonella Notari; Beatrice Megevand-Roggo; Bush; Geoffrey Miller; Hood; Horton; Jay W. Hood; Leonard S. Rubenstein; Megevand; Miller; RED CROSS FINDS DETAINEE ABUSE; Rubenstein; Scott Horton) (War Crimes, Genocide and Crimes Against Humanity; Torture; Guantanamo Bay Naval Base (Cuba); United States International Relations; United States Armament and Defense; Terrorism) (Afghanistan; Afghanistan; Afghanistan)

COMPANY TERMS: RED CROSS

EDITION: Late Edition - Final

Word Count: 2915
11/30/04 NYT A1

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

Westlaw.                                                                    NewsRoom

1/6/05 NEWENGJMED 3                                                          Page 1


1/6/05 New Eng. J. Med. 3
2005 WLNR 294104

                        New England Journal of Medicine
                Copyright 2005 by the Massachusetts Medical Society

                               January 6, 2005

                             Volume 352; Issue 1

                           **When Doctors Go to War**
                              Bloche, M. Gregg
                              Marks, Jonathan H.

     Dr. Bloche is professor of law at Georgetown University, Washington, D.C., and
        adjunct professor at the Bloomberg School of Public Health, Johns Hopkins
     University, Baltimore. Mr. Marks is a barrister at Matrix Chambers, London, and
        Greenwall Fellow in Bioethics at Georgetown University Law Center and the
                         Bloomberg School of Public Health.

When military forces go into combat, they are typically accompanied by medical
personnel (physicians, physician assistants, nurses, and medics) who serve in
noncombat roles. These professionals are bound by international law to treat
wounded combatants from all sides and to care for injured civilians. They are also
required to care for enemy prisoners and to report any evidence of abuse of
detainees. In exchange, the Geneva Conventions protect them from direct attack, so
long as they themselves do not become combatants.

Recently, there have been accounts of failure by U.S. medical personnel to report
evidence of detainee abuse, even murder, in Iraq and Afghanistan. (Ref. 1) There
have also been claims, less well supported, that medics and others neglected the
clinical needs of some detainees. The Department of Defense says it is
investigating these allegations, though no charges have been brought against
caregivers.

But Pentagon officials deny another set of allegations: that physicians and other
medical professionals breached their professional ethics and the laws of war by
participating in abusive interrogation practices (see Photo). The International
Committee of the Red Cross (ICRC) has concluded that medical personnel at
Guantanamo Bay shared health information, including patient records, with army
units that planned interrogations. (Ref. 2) The ICRC called this ``a flagrant
violation of medical ethics'' and said some of the interrogation methods used were
``tantamount to torture.'' (Ref. 2) The Pentagon answered that its detention
operations are ``safe, humane, and professional'' and that ``the allegation that
detainee medical files were used to harm detainees is false.'' (Ref.
2)!*Guantanamo Bay, Cuba.Chris Hondros, Getty Images *.**PHOTO OMITTED**

Our own inquiry into medical involvement in military intelligence gathering in

                 © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Iraq and Guantanamo Bay has revealed a more troublesome picture. Recently released documents and interviews with military sources point to a pattern of such involvement, including participation in interrogation procedures that violate the laws of war. Not only did caregivers pass health information to military intelligence personnel; physicians assisted in the design of interrogation strategies, including sleep deprivation and other coercive methods tailored to detainees' medical conditions. Medical personnel also coached interrogators on questioning technique.

Physicians who did such work tend not to see these practices as unethical. On the contrary, a common understanding among those who helped to plan interrogations is that physicians serving in these roles do not act as physicians and are therefore not bound by patient-oriented ethics. In an interview, Dr. David Tornberg, Deputy Assistant Secretary of Defense for Health Affairs, endorsed this view. Physicians assigned to military intelligence, he contended, have no doctor-patient relationship with detainees and, in the absence of life-threatening emergency, have no obligation to offer medical aid.

Most people we interviewed who had served or spent time in detention facilities in Iraq or Guantanamo Bay reported being told not to talk about their experiences and impressions. Dr. David Auch, commander of the medical unit that staffed Abu Ghraib during the time of the abuses made notorious by soldiers' photographs, said military intelligence told his medics and physician assistants not to discuss deaths that occurred in detention. Physicians who cared for so-called high-value detainees were especially hesitant to share their observations.

Yet available documents, the consistency of multiple confidential accounts, and confirmation of key facts by persons who spoke on the record make possible an understanding of the medical role in military intelligence in Iraq and Guantanamo. They also shed light on how those involved tried to justify this role in ethical terms.

In testimony taken in February 2004, as part of an inquiry into abuses at Abu Ghraib (and recently made public under the Freedom of Information Act and posted on the Web site of the American Civil Liberties Union ACLU at www.aclu.org), Colonel Thomas M. Pappas, chief of military intelligence at the prison, described physicians' systematic role in developing and executing interrogation strategies. Military intelligence teams, Pappas said, prepared individualized ``interrogation plans'' for detainees that included a ``sleep plan'' and medical standards. ``A physician and a psychiatrist,'' he added, ``are on hand to monitor what we are doing.''

What was in these interrogation plans? None have become public, though Pappas's testimony indicates that he showed army investigators a sample, including a sleep deprivation schedule. However, a January 2004 ``Memorandum for Record'' (also available on the ACLU Web site) lays out an ``Interrogation and Counter-Resistance Policy'' calling for aggressive measures. Among these approaches are ``dietary manipulation -- minimum bread and water, monitored by medics''; ``environmental manipulation -- i.e., reducing A.C. air conditioning] in summer, lower ing] heat in winter''; ``sleep management -- for 72-hour time period maximum, monitored by medics''; ``sensory deprivation -- for 72-hour time period maximum, monitored by medics''; ``isolation -- for longer than 30 days''; ``stress positions''; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

``presence of working dogs.''

Physicians collaborated with prison guards and military interrogators to put such approaches into practice. ``Typically,'' said Pappas, military intelligence personnel give guards ``a copy of the interrogation plan and a written note as to how to execute it]. . . . The doctor and psychiatrist also look at the files to see what the interrogation plan recommends; they have the final say as to what is implemented.'' The psychiatrist would accompany interrogators to the prison and ``review all those people under a management plan and provide feedback as to whether they were being medically and physically taken care of,'' said Pappas. These practices, he conceded, were without precedent. ``The execution of this type of operation . . . is not codified in doctrine,'' he said. ``Except for Guantanamo Bay, this sort of thing was a first.''

At both Abu Ghraib (Ref. 3) and Guantanamo, (Ref. 2) ``behavioral science consultation teams'' advised military intelligence personnel on interrogation tactics. These teams, each of which included psychologists and a psychiatrist, functioned more formally at Guantanamo; staff shortages and other administrative difficulties reduced their role at Abu Ghraib.

A slide presentation prepared by medical ethics advisors to the military as a starting point for internal discussion poses a hypothetical case that, we were told, is a ``thinly veiled'' account of actual events. A physician newly deployed to ``Irakistan'' must decide whether to post physician assistants and medics behind a one-way mirror during interrogations. A military police commander tells the doctor that ``the way this worked with the unit here before you was: We'd capture a guy; the medic would screen him and ensure he was fit for interrogation. If he had questions he'd check with the supervising doctor. The medic would get his screening signed by the doc. After that, the medic would watch over the interrogation from behind the glass.'' (Ref. 4)

Interrogation facilities at Abu Ghraib included a one-way mirror, according to internal FBI documents obtained and made public by the ACLU in December. Draft rules of conduct, now under review, would permit army medical personnel to attend interrogations but would give them a right to refuse on ethical grounds.

Military intelligence interrogation units also had access to detainees' medical records and to clinical caregivers in both Iraq and Guantanamo Bay. ``They couldn't conduct their job without that info,'' Tornberg told us. Caregivers, he said, have only a limited doctor-patient relationship with detainees and ``make it very clear to the individuals that their medical information will not be protected . . . To the extent it is military-relevant . . ., that information can be used.''

In helping to plan and execute interrogation strategies, did doctors breach medical ethics? Military physicians and Pentagon officials make a case to the contrary. Doctors, they argue, act as combatants, not physicians, when they put their knowledge to use for military ends. A medical degree, Tornberg said, is not a ``sacramental vow'' -- it is a certification of skill. When a doctor participates in interrogation, ``he's not functioning as a physician,'' and the Hippocratic ethic of commitment to patient welfare does not apply. According to this view, as long as the military maintains a separation of roles between clinical caregivers and physicians with intelligence-gathering responsibilities,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assisting interrogators is legitimate.

Military physicians point to civilian parallels, including forensic psychiatry and occupational health, in arguing that the medical profession sometimes serves purposes at odds with patient welfare. They argue, persuasively in our view, that the Hippocratic ideal of undivided loyalty to patients fails to capture the breadth of the profession's social role. This role encompasses the legitimate needs of the criminal and civil justice systems, employers' concerns about workers' fitness for duty, allocation of limited medical resources, and protection of the public's health.

But the proposition that doctors who serve these social purposes don't act as physicians is self-contradictory. Their ``physicianhood'' -- encompassing technical skill, scientific understanding, a caring ethos, and cultural authority -- is the reason they are called on to assume these roles. The forensic psychiatrist's judgments about personal responsibility and competence rest on his or her moral sensibility and grasp of mental illness. And the military physician's contributions to interrogation -- to its effectiveness, lawfulness, and social acceptance in a rights-respecting society -- arise from his or her psychological insight, clinical knowledge, and perceived humanistic commitment.

In denying their status as physicians, military doctors divert attention from an urgent moral challenge -- the need to manage conflict between the medical profession's therapeutic and social purposes. The Hippocratic ethical tradition offers no road map for resolving this conflict, but it provides a starting point. The therapeutic mission is the profession's primary role and the core of physicians' professional identity. If this mission and identity are to be preserved, there are some things doctors must not do. Consensus holds, for example, that physicians should not administer the death penalty, even in countries where capital punishment is lawful. Similarly, when physicians are involved in war, some simple rules should apply.

Physicians should not use drugs or other biologic means to subdue enemy combatants or extract information from detainees, nor should they aid others in doing so. They should not be party to interrogation practices contrary to human rights law or the laws of war, and their role in legitimate interrogation should not extend beyond limit setting, as guardians of detainees' health. (Ref. 5) This role does not carry patient care responsibilities, but it requires physicians to tell detainees about health problems they find and to make treatment available. It also demands that physicians document abuses and report them to chains of command. By these standards, military medicine has fallen short.

The conclusion that doctors participated in torture is premature, but there is probable cause for suspecting it. Follow-up investigation is essential to determine whether they helped to craft and carry out the counter-resistance strategies -- e.g., prolonged isolation and exposure to temperature extremes -- that rise to the level of torture.

But, clearly, the medical personnel who helped to develop and execute aggressive counter-resistance plans thereby breached the laws of war. The Third Geneva Convention states that `` n]o physical or mental torture, nor any other form of coercion, may be inflicted on prisoners of war to secure from them information of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

any kind whatever.'' It adds that ``prisoners of war who refuse to answer questions} may not be threatened, insulted, or exposed to any unpleasant or disadvantageous treatment of any kind.'' The tactics used at Abu Ghraib and Guantanamo were transparently coercive, threatening, unpleasant, and disadvantageous. Although the Bush administration took the position (rejected by the ICRC) that none of the Guantanamo detainees were ``prisoners of war,'' entitled to the full protections of the Third Geneva Convention, it has acknowledged that combatants detained in Iraq are indeed prisoners of war, fully protected under this Convention.

The Surgeon General of the U.S. Army has begun a confidential effort to develop rules for health care professionals who work with detainees. Such an initiative is much needed, but it ought not to happen behind a veil of secrecy. Ethicists, legal scholars, and civilian professional leaders should participate, and the process should address role conflict in medicine more generally. An Institute of Medicine study committee, broadly representative of competing concerns (including the military's), would be a more suitable venue. To their credit, some military physicians in leadership roles have tried to involve outside ethicists in discussion of duties toward detainees. The Pentagon's civilian leadership has blocked these efforts.

Military physicians, nurses, and other health care professionals have served with courage in Iraq and other theatres of war since September 11, 2001. Some have received serious wounds, and some have died in the line of duty. By most accounts, they have delivered superb care to U.S. soldiers, enemy combatants, and wounded civilians alike. We owe them our gratitude and respect. We would affirm their honor, not besmirch it, by acknowledging the tensions between their Hippocratic and national service commitments and by working with them to map a course between the two.

REFERENCES: 1. Miles SH. Abu Ghraib: its legacy for military medicine. Lancet 2004;364:725-9.
  2. Lewis NA. Red Cross finds detainee abuse in Guantanamo. New York Times. November 30, 2004:A1.
  3. Joint Interrogation & Debriefing Center. Abu Ghraib, Iraq. 2004. (Accessed December 16, 2004, at http:www.publicintegrity.orgdocsAbuGhraibTag29.pdf.)
  4. Medics, detainee: muddy waters. Presented at the USU Faculty Workshop on Military Healthcare Ethics, 14 October 2004.
  5. Principles of medical ethics relevant to the role of health personnel, particularly physicians, in the protection of prisoners and detainees against torture and other cruel, inhuman, or degrading treatment or punishment. Adopted by U.N. General Assembly resolution 37194 of 18 December 1982. (Accessed December 16, 2004, at http:www.unhchr.chhtmlmenu3bh comp40.html.)


---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Technology Law (1TE30); International Issues (1IN59))

INDUSTRY:  (Hospital (1HO39); Healthcare Services (1HE13); Hospital Administration (1HO60); Healthcare (1HE06); Healthcare Service Providers (1HE78))

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1/6/05 NEWENGJMED 3                                                    Page 6

REGION:  (Americas (1AM92); North America (1NO39); Western Europe (1WE41); Latin
America (1LA15); Cuba (1CU43); Middle East (1MI23); Europe (1EU83); Central Europe
(1CE50); USA (1US73); Switzerland (1SW77); Iraq (1IR87); Caribbean (1CA06); Arab
States (1AR46))

Language:  EN

OTHER INDEXING:  (ACLU; ACLU WEB; AMERICAN CIVIL LIBERTIES UNION; DEPARTMENT OF
DEFENSE; FBI; HEALTH AFFAIRS; HIPPOCRATIC; ICRC; INSTITUTE OF MEDICINE;
INTERNATIONAL COMMITTEE; PENTAGON; RED CROSS; US ARMY)  (Abu; Abu Ghraib; Bush;
Chris Hondros; David Auch; David Tornberg; Doctors; Draft; Getty Images; Pappas;
Ref; Similarly; Thomas M. Pappas; Tornberg)  (Perspective)

Word Count: 2842
1/6/05 NEWENGJMED 3
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.