# EXHIBIT 10

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

**Previous**

# UNITED STATES OF AMERICA

# Guantánamo – an icon of lawlessness (1)

| 6 January 2005 | | AI Index: AMR 51/002/2005 |
|---|---|---|

Imagine this.

Hundreds of US nationals are picked up around the world by a foreign government fighting a "war for national security". The government in question is reacting to evidence that a recent bombing on its territory which left thousands of civilians dead was instigated by a shadowy network based in the United States. The detainees, according to evidence the detaining power says it has but refuses to reveal, are in some way associated with this network. The detainees, a few of them children, are strapped, shackled and blindfolded, into transport planes. Some are forced to urinate and defecate on themselves during the long flights to an island military base. In this offshore prison camp they are held incommunicado in tiny cells, denied access to lawyers, relatives or the courts, and subjected to repeated interrogations and a punitive regime aimed at encouraging their "cooperation". A presidential order announces plans to try some of the detainees in front of executive bodies with the power to hand down death sentences against which there would be no right of appeal to any court.

The months turn into years. Allegations of torture and ill-treatment of the US detainees emerge from the island base, as do reports of psychological deterioration and suicide attempts among the detainees. Interrogation teams are said to have access to the medical files of the detainees in order to help them locate individual weaknesses. The detaining power admits to having authorized interrogation techniques including sleep deprivation, stress positions, isolation, hooding, sensory deprivation and the use of dogs to induce fear. Evidence mounts that these and other techniques have been more widely used than the authorities are willing to admit. It becomes known that the detaining power earlier discussed how its agents could avoid prosecution for torture and war crimes committed during interrogations in the "war for national security".

Some detainees are released back to the USA, appearing to have had no or only very tenuous links to the shadowy network. At every turn, the detaining power continues to resist efforts to have the lawfulness of the hundreds of remaining detentions challenged in court. All the time, it continues to profess its commitment to the rule of law and human rights. Its words are increasingly recognized as empty rhetoric, but some other governments begin to imitate its practices, using the "war for national security" as a pretext for their own repressive conduct.

Would the USA tolerate this treatment of its citizens by another government? Would the international community accept this threat to the rule of law and human rights? Surely not, and yet the USA continues to perpetrate just such abuses in the far from hypothetical Guantánamo Bay prison camp in Cuba, where almost 550 detainees of more than 30 nationalities remain detained without charge or trial. On 11 January 2005, the Guantánamo prison will enter its fourth year. In its more than 1,000 days of executive detentions, Guantánamo has become a symbol of a government's attempt to put itself above the law. The example it sets is of a world where basic human rights are negotiable rather than universal. Such a world, although built in the name of national security, is dangerous to us all.

The question of lawfulness in relation to Guantánamo can be divided into four categories: the legal limbo of the detainees; their treatment and conditions; secrecy and the suffering of family members; and the planned trials by military commission.

### The continuing legal limbo

More than six months after the US Supreme Court ruled that the federal courts can hear appeals from the Guantánamo detainees, it is not because of the slowness of the legal system that hundreds remain held without charge or trial and virtually incommunicado in the naval base. It is the result of a government seeking to drain the Supreme Court ruling of any real meaning and aiming to keep any review of detentions as far from a judicial process as possible.

The US administration responded to the June 2004 decision by establishing the Combatant Status Review Tribunal (CSRT), panels of three military officers whose sole aim is to confirm or reject each detainee's status as a so-called "enemy combatant". This is neither a court of law, nor the "competent tribunal" required by the Third Geneva Convention. Unlike the latter which presumes a detainee to be a prisoner of war until proved otherwise, the CSRT process places the burden on the detainee to disprove his "enemy combatant" status. The detainee does not have access to legal counsel or to secret evidence. Many have boycotted the CSRT process, and to date only two have been released as a result of it, while 230 have been confirmed as "enemy combatants".

Each detainee confirmed as an "enemy combatant" will also have an annual review of his case by an Administrative Review Board (ARB) to assess whether he "continues to pose a threat to the United States or its allies, or whether there are other factors bearing upon the need for continued detention". In December 2004 the Pentagon announced that it had conducted its first ARB. Again, detainees have no access to lawyers or to secret evidence for this administrative review. Evidence extracted under torture or other coercion could be admitted by either body.

Also in December, six months after the US Supreme Court's ruling, the government notified the detainees that they can file *habeas corpus* petitions in federal court. It even gave them the address of a US District Court in which to file them. In this Kafkaesque world of Guantánamo, however, the government has argued to that very same court that the detainees have no basis in constitutional or international law on which to challenge the lawfulness of their detentions. It maintains that review by the Combatant Status Review Tribunal and the Administrative Review Board is more than sufficient due process. Meanwhile, the vast majority of the detainees have still not had access to lawyers.

In Amnesty International's view, international human rights law applies to all the Guantánamo detainees, and as such each and every one of them has the right to full judicial review of his detention and to release if that detention is unlawful – a basic protection against arbitrary arrest, torture and "disappearance". This was always the case for those numerous detainees who were picked up outside the international armed conflict in Afghanistan. However, even those captured in that war – who should have been treated as prisoners of war until a competent tribunal determined otherwise (2) – are now also covered by human rights law because the international conflict in Afghanistan ended more than two years ago and their treatment by the USA remained unchanged by that fact. When the conflict ended, presumed prisoners of war were required to be released or charged and brought to fair trial. Although the administration claims that it is holding the detainees under the laws of war, it has refused to apply those laws as it should have. Previously secret government documents now tell us that the administration refused to apply the Geneva Conventions in order to free up US interrogators and make their prosecution for war crimes less likely. There is little sign of an apologetic mood within the administration. Indeed, one of the architects of this policy, White House Counsel Alberto Gonzales, has been nominated by President Bush to the post of Attorney General. In his draft statement to the Senate Judiciary Committee for the nomination hearing on 6 January 2005, Alberto Gonzales says that he has a "deep and abiding commitment to the rule of law". He must be held to that pledge.

### Treatment of the detainees

The very conditions in which the detainees are held – harsh, isolating and indefinite – can in themselves amount to torture or cruel, inhuman or degrading treatment. There is much additional evidence that numerous detainees in Guantánamo – as well as in Afghanistan, Iraq and elsewhere – have been subjected to direct torture or other cruel, inhuman or degrading treatment during the interrogation or detention process. This situation could be seen as an inevitable outcome where a government believes there are people "who are not legally entitled" to humane treatment, as President Bush suggested in a previously secret memorandum, dated 7 February 2002, on "war on terror" detention policy. Yet no detainee anywhere, not even "killers" or "bad people", as the President has described those held without charge or trial in Guantánamo, can ever fall outside the prohibition on torture and ill-treatment. To suggest otherwise, as this central policy memorandum does, points to a serious gap in a government's understanding of international law and indicates that it views human rights as privileges that can be granted, and therefore taken away, by the state.(3)

Secretary of Defense Donald Rumsfeld, echoing President Bush, has described Guantánamo detainee Mohammed al-Kahtani as "a very bad person". A harsh interrogation plan was approved for this Saudi national. According to recent revelations, Mohammed al-Kahtani was put on a plane, blindfolded in conditions of sensory deprivation, and made to believe that he was being flown to the Middle East. After several hours in the air, the plane returned to Guantánamo and Mohammed al-Kahtani was allegedly put in an isolation cell and subjected to harsh interrogations conducted by people he was encouraged to believe were Egyptian security agents. (4) This is an interrogation technique known in the USA as "false flag" and was one of several methods authorized by Secretary Rumsfeld in April 2003. Another technique promoted by the Pentagon's April 2003 *Working Group Report on Detainee Interrogations in the Global War on Terrorism* is "threatening to transfer to a 3rd country where subject is likely to fear he would be tortured or killed".

In February 2002, following President Bush's decision to reject the application of the Geneva Conventions to those held in Guantánamo, the White House gave assurances that the International Committee of the Red Cross (ICRC) would be able to visit all detainees in private (5). The ICRC was denied access to Mohammed al-Kahtani during the period of interrogations described above. The ICRC protested such denial of access to a number of detainees in meetings with the Guantánamo authorities in late 2003. Four months later, in a meeting on 2 February 2004, the ICRC was informed that it could still not see one of the detainees "because of military necessity" (6). The detainee in question, reported to be Moroccan national Abdullah Tabarak, was transferred to Morocco in August 2004. In an interview last month, he alleged that he had been tortured and ill-treated in US custody. In Guantánamo, he said that he had been beaten, given forcible injections, and held in a dark cell which has left him with eyesight problems. He said that he suffers from other physical ailments as a result of his confinement, as well as insomnia and nightmares (7).

It is more than a year since the ICRC made public its concern about the serious deterioration the detention regime was having on the psychological health of the detainees. In November it emerged that it had also protested more direct torture and ill-treatment, adding yet more weight to the allegations of released detainees and others. In heavily redacted documents released to the American Civil Liberties Union following a Freedom of Information Act lawsuit filed a year earlier, FBI agents have referred to "torture techniques" and "highly aggressive interrogation techniques" being used in Guantánamo. In one email, an FBI agent sends a colleague "an outline of coercive techniques in the military's interviewing tool kit". Of the military's interrogation plan for one particular detainee, the sender writes: "You won't believe it!" Another FBI agent reported seeing a detainee in Guantánamo "sitting on the floor of the interview room with an Israeli flag draped around him, loud music being played and a strobe light flashing". Another tells of having witnessed the use of a dog to intimidate a Guantánamo detainee, who was also subjected to three months of isolation in a cell with 24-hour illumination. The detainee was later witnessed to be displaying conduct "consistent with extreme psychological trauma". In an email, another FBI agent wrote:

> "Here is a brief summary of what I observed at GTMO. On a couple of occassions (sic), I entered interview rooms to find a detainee chained hand and foot in a fetal position to the floor, with no chair, food, or water. Most times they had urinated or defacated (sic) on themselves and had been left there for 18, 24 hours or more. On one occassion (sic), the air conditioning had been turned down so far and the temperature was so cold in the room, that the barefooted detainee was shaking with cold. When I asked the [military police guards] what was going on, I was told that interrogators from the day prior had ordered this treatment, and the detainee was not to be moved. On another occassion (sic), the A/C had been turned off, making the temperature in the unventilated room probably well over 100 degrees. The detainee was almost unconscious on the floor with a pile of hair next to him. He had apparently been literally pulling his own hair out throughout the night. On another occassion (sic), not only was the temperature unbearably hot, but extremely loud rap music was being played in the room, and had been since the day before, with the detainee chained hand and foot in the fetal position on the tile floor."

Such evidence adds weight to earlier allegations made by released detainees. For example, in July 2004, Swedish national Mehdi Ghezali recalled to Amnesty International how:

> "One prisoner had removed his ID-strap that the prisoners were forced to wear around their wrist. As punishment, the guards shackled both his hands and feet in his cell for more than 10 hours. During this time, the prisoner was not given any food and was not allowed to go to the toilet, although he had to. He could not hold himself. It was very degrading for him."

Mehdi Ghezali also described to Amnesty International the pain of "short shackling", temperature manipulation, and the use of loud noise and music during interrogations. He said that he was subjected to sleep deprivation, and that Australian detainee Mamdouh Habib had been subjected to sleep deprivation at the end of which "there was blood coming from both his nose and ears." In an affidavit made public, another Australian national David Hicks alleges that he has been "deprived of sleep as a matter of policy" and that he and other detainees have been subjected to other forms of torture and ill-treatment in US custody. UK national Moazzam Begg was held in isolation for 600 days.

The administration has yet to denounce such interrogation techniques or detention conditions. In similar vein, Amnesty International has still not received a substantive response from the US authorities to the allegation that a Chinese delegation visited Guantánamo in September 2002 and participated in interrogations of ethnic Uighurs held there. An inside source told the organization that during this time, the detainees were subjected to intimidation and threats, and other torture or ill-treatment, some of it on the instruction of the Chinese delegation. Other detainees, the source has informed Amnesty International, were subjected to sexual humiliation during interrogations. A former interrogator recently confirmed that female interrogators had sexually harassed detainees (8).

The administration has continued with its assurances that all detainees in US custody are treated humanely and all allegations of abuse investigated. The evidence is mounting that this is simply false. "They don't use dogs in Guantánamo Bay during the interrogation process and never did", the Senate Armed Services Committee was told in September 2004 (9). The former commander of Guantánamo, Major General Geoffrey Miller, testified on oath that dogs were never used to intimidate detainees at the base. Yet, now FBI agents have added to the allegations of detainees that dogs have been used. For example, FBI agents have reported witnessing sleep deprivation and "the utilization of loud music/bright lights/growling dogs" in interrogations at Guantánamo.

According to a leaked military document, the ICRC raised allegations in a meeting with the Guantánamo authorities in October 2003 that interrogators at the base had had access to the medical files of detainees, that the files were "being used by interrogators to gain information in developing an interrogation plan", and "that there is a link between the interrogation team and the medical team". Major General Miller rejected the allegations (10). However, in a new article published in The New England Medical Journal of Medicine, two medical doctors write that their own research into "medical involvement in military intelligence gathering in Iraq and Guantánamo Bay has revealed a more troublesome

picture":

> "Not only did caregivers pass health information to military intelligence personnel; physicians assisted in the design of interrogation strategies, including sleep deprivation and other coercive methods tailored to detainees' medical conditions. Medical personnel also coached interrogators on questioning technique…
>
> The conclusion that doctors participated in torture is premature, but there is probable cause for suspecting it. Follow-up investigation is essential…" (11).

On 5 January 2005, US Southern Command announced that it would carry out an internal investigation into the FBI allegations of abuses (12). In Amnesty International's view, more is needed. There is a need for a full independent commission of inquiry into the USA's detentions in Guantánamo and elsewhere. Such a commission, called for by Amnesty International since May 2004, must have the power to investigate the role of officials in the highest echelons of government, including in the White House and the Office of the Secretary of Defense, and must cover all aspects of the USA's "war on terror" detention and interrogation policy and practices, in all locations.

### Secrecy and imprecision as avenues for abuse and suffering

The Pentagon refuses to give precise numbers of detainees held in Guantánamo. The concern is that this could allow secret detainee transfers to take place. In early 2004, for example, approximately seven detainees remained unaccounted for in the official announcements about transfers to and from Guantánamo (13). In the light of revelations about so-called "ghost detainees" in US custody in Iraq and the continued allegations of secret transfers between the USA and countries with records of torture, there is reason for deep concern in this regard.

A legal motion filed in federal court in November 2004 and declassified on 5 January 2005, renews concern on the case of Australian detainee Mamdouh Habib. The motion begins:

> "In October, 2001, the Unites States military – in cooperation with the Pakistani and Egyptian Governments – rendered Mamdouh Habib to Egypt, knowing and intending he would be tortured Mr. Habib spent six months in Egyptian custody, where he was subjected to unspeakable brutality. Afterwards, Mr. Habib was returned to United States custody, travelling first to Bagram Air Force Base, then to the U.S. military facility at Kandahar, then to Guantánamo Bay, Cuba, where he has been held since May, 2002.
>
> Recently, undersigned counsel learned from press reports that the United States Government is negotiating with Egypt to render Mr. Habib back to that country, where he would once again be tortured."

The motion seeks a restraining order to prevent the feared transfer of Mamdouh Habib to Egypt or the Egyptian authorities (14). The document details the alleged torture to which Mamdouh Habib was previously subjected in Egypt, including electric shocks, water torture, physical assaults, suspension from hooks, and threats with dogs. It gives details about how US agents were present at his interrogations in Pakistan after his arrest, and during his secret transfer to Egypt. The details echo those given by others who claim to have been subjected to such "rendition". For example, Amnesty International is still awaiting a reply to a letter it sent to the US authorities in August 2004 on the case of Khalid El Masri, a German national of Lebanese origin who alleges that he was secretly flown to incommunicado detention in Afghanistan from Macedonia in early 2004, and that US agents were present during interrogations in secret detention in Kabul (15).

His claims that he was taken to a plane by agents dressed in black, that he had his clothes cut from him with scissors, and that he was made to wear a blue track suit, match the allegations raised in federal court about Mamdouh Habib's previous transfer to Egypt with the involvement of US agents.

Amnesty International has spoken to many relatives of Guantánamo detainees who themselves are in deep distress from the lack of transparency and information about their loved ones. In November 2004, for example, the sister and brother of Kuwaiti detainee Abdullah Al Kandari told the organization of how their parents "are not the same people they were three years ago" because of losing their son to the black hole of Guantánamo. Earlier in the year, the brother of Yemeni detainee Jamal Mar'i related how his mother has developed high blood pressure and sinks into bouts of depression from the strain of not knowing what is happening to the son she has not seen for more than three years. In other contexts, the suffering of the relatives of the "disappeared" has been found by the UN Human Rights Committee to amount to torture or cruel, inhuman or degrading treatment. Similar cruelty is inflicted upon the relatives of people held in indefinite virtual incommunicado detention without charge or trial. It is notable that numerous relatives of the Guantánamo detainees have referred to their loved one as having disappeared.

### Military commissions

The fourth category of unlawfulness in relation to the Guantánamo concerns the US administration's continuing efforts to bring selected detainees to trial by military commission. These bodies entirely lack independence from the executive. Set up to obtain convictions on lesser standards of evidence, they can admit secret or coerced testimony. Their verdicts cannot be appealed to any court. Only non-US nationals can be so tried, in violation of the prohibition on the discriminatory application of fair trial rights.

Amnesty International had an observer at the recent pre-trial hearings for the first four detainees charged in preparation for trial by commission. Her observations confirmed the organization's worst fears that this is a system unable to deliver a fair trial. The commission panel's ignorance of the law and the disparity of resources allocated to prosecution and defence team in a process controlled by the executive, were particularly obvious. So too was the low quality of interpreting and translation standards – on several occasions the defence had to request that proceedings be halted because the quality of interpreting was so bad. The commission rejected the defence counsel's attempt to bring in six expert witnesses to explain various aspects of international law and military law. The prosecution asserted that the only law that binds the panel is "commission law", a set of rules and orders developed in the US Department of Defense. It is shocking that people could face execution after such trials, which clearly fail to meet basic international standards.

Commission proceedings were suspended in November 2004 after a federal judge concluded that those captured in Afghanistan should have been presumed to be prisoners of war, which precluded their trial by military commission. Even if they were found not to be POWs by a competent tribunal, the judge said, the commission rules allowing the use of secret evidence would still violate due process. The administration has appealed to a higher court arguing that the judge's ruling "constitutes an extraordinary intrusion into the Executive's power to conduct military operations". The outgoing Attorney General, presumably referring not only to this judge's ruling, but also that of the Supreme Court in June, condemned what he characterized as a "profoundly disturbing trend" of "intrusive judicial oversight and second-guessing of presidential determinations".

With the US administration showing disdain for its own courts, the international community faces an uphill task to persuade it to change course. The USA should be reminded not only of the various aspects of unlawfulness raised by the Guantánamo detentions, but that this regime also contravenes the USA's National Security Strategy which proclaims that respect for human dignity and the rule of law is the route to security, as well as its National Strategy for Combating Terrorism, which asserts that a world in which such standards are embraced as the norm will be "the best antidote to the spread of terrorism". "This", the latter strategy concludes "is the world we must build today". Instead, the USA built a prison camp which has become an affront to human rights and the rule of law. The international community must redouble its efforts to bring this intolerable situation to an end.

**Endnotes**

(1) Amnesty International delivered a shorter version of this text at a hearing on the *Lawfulness of Detentions by the United Sates in Guantánamo Bay* held by the Council of Europe's Committee on Legal Affairs and Human Rights in Paris, France, on 17 December 2004.

(2) Even the US Army's interrogation Field Manual FM 34-52 of 1992 states that "Captured insurgents and other detained personnel whose status is not clear, such as suspected terrorists, are entitled to [Prisoner of War] protection until their precise status has been determined by competent authority".

(3) See *USA: Human dignity denied: Torture and accountability in the 'war on terror'*, AI Index: AMR 51/145/2004, October 2004, http://web.amnesty.org/library/Index/ENGAMR511452004.

(4) *Fresh details emerge on harsh methods at Guantánamo*. New York Times, 1 January 2005.

(5) *Fact Sheet. Status of detainees at Guantánamo*. The White House, 7 February 2002.

(6) *ICRC meeting*, 2 February 2004. http://www.washingtonpost.com/wp-srv/nation/documents/GitmoMemo02-02-04.pdf

(7) *Released Moroccan Guantánamo detainee tells Islamist paper of his 'ordeal'*. BBC, 30 December 2004.

(8) *Fresh details emerge on harsh methods at Guantánamo*. New York Times, 1 January 2005.

(9) Major General George Fay. Testimony to Senate Armed Services Committee, 9 September 2004.

Case 1:05-cv-01535-UNA    Document 3-6    Filed 11/11/2005    Page 6 of 6

(10) See page 94 of *Human dignity denied: Torture and accountability in the 'war on terror'*.

(11) *When doctors go to war*. By M. Gregg Bloche and Jonathan H. Marks. The New England Medical Journal of Medicine, Volume 352:3-6, 6 January 2005, Number 1.

(12) *Southcom investigates abuse allegations at Guantánamo*. United States Southern Command News Release, 5 January 2004.

(13) See page 101-102 of *Human dignity denied: Torture and accountability in the 'war on terror'*.

(14) *Habib v Bush*. Petitioner's memorandum of points and authorities in support of his application for injunctive relief. Civil Action No. O2-CV-1130 (CKK), in the United States District Court for the District of Columbia.

(15) See page 186 of *Human dignity denied: Torture and accountability in the 'war on terror'*.

**Previous**

# EXHIBIT 11

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

Westlaw.                                                              The New York Times

1/1/05 NYT A11                                                                    Page 1


1/1/05 N.Y. Times A11
2005 WLNR 22583

                               New York Times (NY)
                Copyright (c) 2005 The New York Times. All rights reserved.

                               January 1, 2005


                                   Section: A

                    **Fresh Details Emerge on Harsh Methods at Guantanamo**

                                  NEIL A. LEWIS

WASHINGTON, Dec. 31 Sometime after Mohamed al-Kahtani was imprisoned at Guantanamo
around the beginning of 2003, military officials believed they had a prize on
their hands -- someone who was perhaps intended to have been a hijacker in the
Sept. 11 plot.

But his interrogation was not yielding much, so they decided in the middle of 2003
to try a new tactic. Mr. Kahtani, a Saudi, was given a tranquilizer, put in
sensory deprivation garb with blackened goggles, and hustled aboard a plane that
was supposedly taking him to the Middle East.

After hours in the air, the plane landed back at the United States naval base at
Guantanamo Bay, Cuba, where he was not returned to the regular prison compound but
put in an isolation cell in the base's brig. There, he was subjected to harsh
interrogation procedures that he was encouraged to believe were being conducted by
Egyptian national security operatives.

The account of Mr. Kahtani's treatment given to The New York Times recently by
military intelligence officials and interrogators is the latest of several
developments that have severely damaged the military's longstanding public version
of how the detention and interrogation center at Guantanamo operated.

Interviews with former intelligence officers and interrogators provided new
details and confirmed earlier accounts of inmates being shackled for hours and
left to soil themselves while exposed to blaring music or the insistent meowing of
a cat-food commercial. In addition, some may have been forcibly given enemas as
punishment.

While all the detainees were threatened with harsh tactics if they did not
cooperate, about one in six were eventually subjected to those procedures, one
former interrogator estimated. The interrogator said that when new interrogators
arrived they were told they had great flexibility in extracting information from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

detainees because the Geneva Conventions did not apply at the base.

Military officials have gone to great lengths to portray Guantanamo as a largely humane facility for several hundred prisoners, where the harshest sanctioned punishments consisted of isolation or taking away items like blankets, toothpaste, dessert or reading material. Maj. Gen. Geoffrey D. Miller, who was the commander of the Guantanamo operation from November 2002 to March 2004, regularly told visiting members of Congress and journalists that the approach was designed to build trust between the detainee and his questioner.

"We are detaining these enemy combatants in a humane manner," General Miller told reporters in March 2004. "Should our men or women be held in similar circumstances, I would hope they would be treated in this manner."

His successor, Brig. Gen. Jay W. Hood, told reporters in November that he was "satisfied that the detainees here have not been abused, they've not been mistreated, they've not been tortured in any way."

Journalists who were permitted to view an interview session from behind a glass wall during General Hood's tenure were shown an interrogator and detainee sharing a milkshake and fries from the base's McDonald's and appearing to chat amiably. It became apparent to reporters comparing notes in August, however, that the tableau of the interrogator and prisoner sharing a McDonald's meal was presented to at least three sets of journalists.

In addition to the account of Mr. Kahtani's treatment, the new interviews provide details and confirm some of the accounts in other recent disclosures about procedures at Guantanamo: the November report in which the International Committee of the Red Cross complained privately last summer to the United States government that the procedures at Guantanamo were "tantamount to torture"; memorandums from F.B.I. officials, most of which were released in December as part of a lawsuit brought by the American Civil Liberties Union; and another set of interviews with The Times in October in which other former Guantanamo officials described coercive and abusive techniques regularly employed there.

The information from the various sources frequently matched, providing corroboration of the use of specific procedures, which included prolonged sleep deprivation and shackling prisoners in uncomfortable positions for many hours. One F.B.I. agent wrote his superiors that he saw such restraining techniques several times. In the most gruesome of the bureau memorandums, he recounted observing a detainee who had been shackled overnight in a hot cell, soiled himself and pulled out tufts of hair in misery.

Military officials who participated in the practices said in October that prisoners had been tormented by being chained to a low chair for hours with bright flashing lights in their eyes and audio tapes played loudly next to their ears, including songs by Lil' Kim and Rage Against the Machine and rap performances by Eminem.

In a recent interview, another former official added new details, saying that many interrogators used a different audio tape on prisoners, a mix of babies crying and the television commercial for Meow Mix in which the jingle consists of repetition

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the word "meow."

The people who spoke about what they saw or whose duties made them aware of what was occurring said they had different reasons for granting interviews. Some said they objected to the methods, others said they objected to what they regarded as a chaotic and badly run system, while others offered no reason. They all declined to be identified by name, some saying they feared retaliation.

Lt. Col. Leon H. Sumpter, the spokesman for the military command at Guantanamo, said in a statement that officials would not comment on accusations about the treatment of any individual detainee including Mr. Kahtani, who was captured in Afghanistan.

"We do not discuss specific interrogation techniques nor do we identify any specific detainee," Colonel Sumpter said in a statement. "All detainees are safeguarded and are assured food, drink, clothing, shelter, health care and basic rights, all in accordance with the Geneva Convention. The U.S. does not permit, tolerate or condone torture by any of its personnel or employees."

Colonel Sumpter said that the interrogation regimen at Guantanamo had produced useful intelligence "based on trust and not out of fear or duress."

The intelligence officials who spoke with The Times said that the interrogation personnel and their assigned prisoners were divided into five groups. Four were geographically based -- one for Saudi Arabia, one for the Gulf States, another for Pakistan and Afghanistan and the last for Asia, Europe and the Americas. The fifth, termed "special projects," included Mr. Kahtani.

There was a high confidence among military intelligence officials that Mr. Kahtani was a dangerous operative of Al Qaeda. The federal commission investigating the Sept. 11 attacks concluded in its June report that he was denied entry into the United States on Aug. 4, 2001, at the Orlando airport, the same day that Mohamed Atta, the plot's ringleader, was there and most likely intended to meet him.

The officials who spoke about the detainees' treatment said, however, that very few of the other prisoners had much value. "So much of the questioning was about Afghanistan," one intelligence official said. "Most of it was dated. Information about facilitators and recruiters was useful only in style, not in facts."

The clearest indication that senior commanders at Guantanamo were aware of and supported what was occurring may be in some F.B.I. memorandums. One, dated May 10, 2003, and written by an unidentified agent, describes a sharp exchange between bureau officials and General Miller and Maj. Gen. Michael Dunlavey, who was in charge of the intelligence operations at Guantanamo then.

"Both sides agreed that the bureau has its way of doing things and the D.O.D. has their marching orders from SecDef," the memorandum said, using abbreviations for the Department of Defense and the secretary of defense. "Although the two techniques differed drastically, both generals believed they had a job to do."

The frustration caused by Mr. Kahtani's refusal to cooperate set off a high-level review of allowable interrogation techniques, according to documents released

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

earlier by the Pentagon. After officials at Guantanamo asked for more leeway in dealing with Mr. Kahtani, Defense Secretary Donald H. Rumsfeld in December 2002 approved a list of 16 techniques for use there in addition to the 17 methods in the Army Field Manual. He suspended those approvals the next month after some Navy lawyers complained that they were excessive and possibly illegal. But after a review, Mr. Rumsfeld issued a final policy in April 2003, approving 24 techniques, some of which needed his permission to be used.

None of the approved techniques, however, covered some of what people have now said occurred. Mr. Kahtani was, for example, forcibly given an enema, officials said, which was used because it was uncomfortable and degrading.

Pentagon spokesmen said the procedure was medically necessary because Mr. Kahtani was dehydrated after an especially difficult interrogation session. Another official, told of the use of the enema, said, however, "I bet they said he was dehydrated," adding that that was the justification whenever an enema was used as a coercive technique, as it had been on several detainees.

In order to carry on the charade that he was not at Guantanamo, the military arranged it so Mr. Kahtani was not visited by the Red Cross on a few of its regular visits, creating a window of several months, said a person who dealt with him at Guantanamo. Officials at the Washington office of the Red Cross, which makes periodic visits to each of the Guantanamo detainees, said they would not discuss their meetings with any prisoners as part of their agreement with the United States government.

Two interrogators confirmed several of the complaints in the Red Cross report, including the notion that interrogators were able to obtain prisoners' medical records easily, which human rights groups say could discourage inmates from seeking medical care. The interrogators also discussed another factor in the Red Cross report, the use of a Behavioral Science Consultation Team, known as Biscuit, comprising a psychologist or psychiatrist and psychiatric workers. The team was used to suggest ways to make prisoners more cooperative in interrogations.

"They were supposed to help us break them down," one said.

The same former interrogator said the Red Cross report was correct in asserting that some female interrogators used sexual taunts to harass the detainees.

It is unclear whether the Justice Department's new, broader definition of torture, posted on the department's Web site late Thursday, would have affected operations at Guantanamo.

---- INDEX REFERENCES ----

NEWS SUBJECT: (International Terrorism (1IN37); Sept 11th Aftermath (1SE05))

INDUSTRY: (Defense Policy (1DE81); Aerospace & Defense (1AE96); Defense (1DE43))

REGION: (Afghanistan (1AF45); Americas (1AM92); Saudi Arabia (1SA38); North America (1NO39); Western Europe (1WE41); Asia (1AS61); Latin America (1LA15); Cuba (1CU43); Middle East (1MI23); Europe (1EU83); Central Europe (1CE50); USA (1US73);

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Switzerland (1SW77); Caribbean (1CA06); Arab States (1AR46); Western Asia (1WE54))

Language:  EN

OTHER INDEXING:  (AL QAEDA; AMERICAN CIVIL LIBERTIES UNION; AMERICAS; ARMY FIELD
MANUAL; BEHAVIORAL SCIENCE CONSULTATION TEAM; CONGRESS; DEFENSE; DEPARTMENT OF
DEFENSE; FRESH DETAILS EMERGE; GENEVA CONVENTION; GENEVA CONVENTIONS;
INTERNATIONAL COMMITTEE; JUSTICE DEPARTMENT; MCDONALDS; NAVY; PENTAGON; RED CROSS)
 (D.O.D.; Donald H. Rumsfeld; Geoffrey D. Miller; Hood; Jay W. Hood; Kahtani; Leon
H. Sumpter; Michael Dunlavey; Miller; Mohamed Atta; Rumsfeld; Sumpter)

EDITION: Late Edition - Final

Word Count: 2155
1/1/05 NYT A11


END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

**washingtonpost.com**

# Further Detainee Abuse Alleged

Guantanamo Prison Cited in FBI Memos

By Carol D. Leonnig
Washington Post Staff Writer
Sunday, December 26, 2004; Page A01

Advertisement


At least 10 current and former detainees at the U.S. military prison in Guantanamo Bay, Cuba, have lodged allegations of abuse similar to the incidents described by FBI agents in newly released documents, claims that were denied by the government but gained credibility with the reports from the agents, their attorneys say.

In public statements after their release and in documents filed with federal courts, the detainees have said they were beaten before and during interrogations, "short-shackled" to the floor and otherwise mistreated as part of the effort to get them to confess to being members of al Qaeda or the Taliban.

Even some of the detainees' attorneys acknowledged that they were initially skeptical, mainly because there has been little evidence that captors at Guantanamo Bay engaged in the kind of abuse discovered at Iraq's Abu Ghraib prison. But last Monday, the American Civil Liberties Union released FBI memos, which it obtained through a Freedom of Information Act lawsuit, in which agents described witnessing or learning of serious mistreatment of detainees.

"On a couple of occasions, I entered interview rooms to find a detainee chained hand and foot in a fetal position to the floor, with no chair, food or water," an unidentified agent wrote on Aug. 2, 2004, for example. "Most times they had urinated or defecated on themselves, and had been left there for 18, 24 hours or more."

Brent Mickum, a Washington attorney for one of the detainees, said that "now there's no question these guys have been tortured. When we first got involved in this case, I wondered whether this could all be true. But every allegation that I've heard has now come to pass and been confirmed by the government's own papers."

A Pentagon spokesman has said the military has an ongoing investigation of torture claims and takes credible allegations seriously. Pentagon officials and lawyers say the military has been careful not to abuse detainees and has complied with treaties on the handling of enemy prisoners "to the extent possible" in the middle of a war.

The detainees who made public claims of torture at Guantanamo Bay describe a prison camp in which abuse is employed as a coordinated tool to aid interrogators and as punishment for minor offenses that irked prison guards. They say military personnel beat and kicked them while they had hoods on their heads and tight shackles on their legs, left them in freezing temperatures and stifling heat, subjected them to repeated, prolonged rectal exams and paraded them naked around the prison as military police snapped pictures.

In some allegations, the detainees say they have been threatened with sexual abuse. British detainee Martin Mubanga, one of Mickum's clients, wrote his sister that the American military police were treating him like a "rent boy," British slang for a male prostitute.

A group of released British detainees said that several young prisoners told them they were raped and sexually violated after guards took them to isolated sections of the prison. They said an Algerian man was "forced to watch a video supposedly showing two detainees dressed in orange, one sodomizing the other, and was told that it would happen to him if he didn't cooperate."

Another detainee, Ibrahim Ahmed Mahmoud al Qosi of Sudan, an alleged paymaster for al Qaeda, has claimed in court documents that Guantanamo Bay interrogators wrapped prisoners in an Israeli flag. In an Aug. 16 e-mail, an FBI agent reported observing a detainee sitting in an interview room "with an Israeli flag draped around him, loud music being played and a strobe light flashing."

Many of the claims were filed in federal courts as a result of a landmark Supreme Court ruling in June that gave the Guantanamo Bay detainees the right to challenge their imprisonment in court. More than 60 of the 550 men who are detained have filed claims. Some have been held at the U.S. Navy base for nearly three years.

Moazzam Begg, a British detainee first imprisoned in Egypt and kept since February 2003 in solitary confinement in Guantanamo Bay, said in a recently declassified letter to the court that he has been repeatedly beaten and has heard "the terrifying screams of fellow detainees facing similar methods." He said he witnessed two detainees die after U.S. military personnel had beaten them.

Feroz Abbasi, a British man captured in Afghanistan, has been kept in solitary confinement for more than a year. He said that on the same day U.S. officials say he "confessed" to training as a suicide bomber for al Qaeda, his captors tortured him so badly that he had to be treated for injuries at the prison hospital.

Government officials say they do not know what detainees Begg was referring to. A military tribunal concluded that Abbasi's medical treatment was not related to his confession.

In other cases, the U.S. military has declined to declassify detailed allegations of abuse, so it is not possible to know what the detainees claim happened. In recent months, the government has said Begg, Abbasi and hundreds of other detainees confessed to being Taliban and al Qaeda fighters to interrogators, but their lawyers say the statements were coerced.

Gitanjali S. Gutierrez, Abbasi's lawyer and one of the first attorneys to receive clearance to visit Guantanamo Bay, said she was convinced he and others were in grave danger in the U.S. military's hands as soon as she saw them.

"I left my first visit with them thinking the longer they are in Guantanamo, the more psychological and physical damage they are going to suffer at that place," she said.

The first public claims of U.S. torture at Guantanamo Bay were made by three Britons from Tipton, England. Shafiq Rasul, 27, and Asif Iqbal and Rhuhel Ahmed, both 22, were released without charge in March under pressure from the British government. In August, they and their lawyers presented a 115-page report on their treatment, likening it to the abuse of prisoners at the Abu Ghraib prison in Iraq.

The Britons said they were beaten, shackled in painful positions, left in extreme temperatures and

forcibly injected with unknown drugs while held for more than two years. At that time, the U.S. military denied the Tipton men's allegations.

"The claim that detainees have been physically abused, beaten or tortured is simply not true," said Army Col. David McWilliams, spokesman for the U.S. Southern Command, which is in charge of the prison. "From the beginning, we have taken extra steps to treat prisoners not only humanely but extra cautiously. We do not use any kind of coercive or physically harmful techniques."

Some detainees who have retained lawyers have refused to participate in military reviews of their cases at Guantanamo Bay, and have instead asked the International Committee of the Red Cross to investigate their claims of abuse.

That's the case for Mamdouh Habib, an Australian at Guantanamo Bay. Lawyers familiar with his case, and British detainees, said Habib was in "catastrophic shape" when he arrived in Cuba. Most of his fingernails were missing, and while sleeping at the prison he regularly bled from his nose, mouth and ears, but U.S. officials there denied him treatment, released British detainees said in a report. Fellow detainees said Habib asked medics for help, but they said "if you cooperate with your interrogators, then we can do something."

Habib's lawyer, Joseph Margulies, said he cannot elaborate because the records are classified. He said he will press Habib's claims in court.

"Now it's not just my allegations of torture, not just my client's -- but now it's the FBI's," Margulies said. "President Bush should make a public statement: It now appears torture is going on at Guantanamo and we won't rely on these coerced confessions."

*Researcher Julie Tate contributed to this report.*

© 2004 The Washington Post Company

Advertising Links                                                                    What's this?

**Save on All Your Calls with Vonage**
When looking for local regional and long distance calling, use Vonage to make calls to all 50 states and Canada. Get voicemail, great international rates and more. Sign up today.
www.vonage.com

**Comcast High-Speed Internet**
Order today for a $19.99/mo. special, free modem, plus get $75 cash back when you order online.
www.comcastoffers.com

**$160,000 Mortgage for $633/mo**
Refinance rates are at record lows. Compare rates â€" free service.
www.lowermybills.com

# EXHIBIT 13

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

**Westlaw.**

*The New York Times*

12/21/04 NYT A1

Page 1

12/21/04 N.Y. Times A1
2004 WLNR 14475410

New York Times (NY)
Copyright (c) 2004 The New York Times. All rights reserved.

December 21, 2004

Section: A

THE CONFLICT IN IRAQ: PRISONERS; New F.B.I. Files Describe Abuse Of Iraq Inmates

**NEIL A. LEWIS** and DAVID JOHNSTON

**FBI** memorandums released in connection with lawsuit show that abuse of Iraqi inmates by American military personnel was known to wide circle of government officials; memorandums written by agents to superiors in Washington over past year also include claims that some military interrogaters had posed as **FBI** officials while using harsh tactics on detainees, both in Iraq and at Guantanamo Bay; Dec 5, 2003 memo in which agent frets about **FBI** being left 'holding the bag' also claims that threats and abuses of one detainee did not produce any intelligence that could help thwart attack; one memorandum addressed to **FBI** Dir Robert S Mueller III and other senior bureau officials, and labeled 'Urgent Report,' provides account of serious physical abuses of civilian detainees in Iraq, including strangulation, beatings, placement of lit cigarettes into detainees' ears and unauthorized interrogations; memorandums provide new details about nature and extent of abuses, if not exact times or places; lawsuit brought by American Civil Liberties Union and other groups accuses government of being complicit in torture of detainees (M)

WASHINGTON, Dec. 20 F.B.I. memorandums portray abuse of prisoners by American military personnel in Iraq that included detainees' being beaten and choked and having lit cigarettes placed in their ears, according to newly released government documents.

The documents, released Monday in connection with a lawsuit accusing the government of being complicit in torture, also include accounts by Federal Bureau of Investigation agents who said they had seen detainees in Guantanamo Bay, Cuba, being chained in uncomfortable positions for up to 24 hours and left to urinate and defecate on themselves. An agent wrote that in one case a detainee who was nearly unconscious had pulled out much of his hair during the night.

One of the memorandums released Monday was addressed to Robert S. Mueller III, the F.B.I. director, and other senior bureau officials, and it provided the account of someone "who observed serious physical abuses of civilian detainees" in Iraq. The memorandum, dated June 24 this year, was an "Urgent Report," meaning that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sender regarded it as a priority. It said the witness "described that such abuses included strangulation, beatings, placement of lit cigarettes into the detainees' ear openings and unauthorized interrogations."

The memorandum did not make clear whether the witness was an agent or an informant, and it said there had also been an effort to cover up the abuses. The writer of the memorandum said Mr. Mueller should be aware of what was occurring because "of potential significant public, media and Congressional interest which may generate calls to the director." The document does not provide further details of the abuse, but suggests that such treatment of prisoners in Iraq was the subject of an investigation conducted by the bureau's Sacramento office.

Beyond providing new details about the nature and extent of abuses, if not the exact times or places, the newly disclosed documents are the latest to show that such activities were known to a wide circle of government officials.

The documents, mostly memorandums written by agents to superiors in Washington over the past year, also include claims that some military interrogators had posed as F.B.I. officials while using harsh tactics on detainees, both in Iraq and at Guantanamo Bay.

In one memorandum, dated Dec. 5, 2003, an agent whose name is blanked out on the document expressed concern about military interrogators' posing as F.B.I. agents at the Guantanamo camp.

The agent wrote that the memorandum was intended as an official record of the interrogators' behavior because, "If this detainee is ever released or his story made public in any way, D.O.D. interrogators will not be held accountable because these torture techniques were done by 'F.B.I.' interrogators. The F.B.I. will be left holding the bag before the public." D.O.D. is an abbreviation for the Department of Defense.

Asked about the possible impersonation of F.B.I. agents by military personnel, Bryan Whitman, the deputy Pentagon spokesman, said Monday that "It is difficult to determine from the secondhand description whether the technique" was permissible.

The Pentagon did not offer any fresh reaction to the descriptions of alleged abuse. But it said in response to other recent disclosures that the Defense Department did not tolerate abusive tactics and that some of the allegations contained in such documents were under investigation.

The documents were in the latest batch of papers to be released by the government in response to a lawsuit brought by the American Civil Liberties Union and other groups to determine the extent, if any, of American participation in the mistreatment of prisoners. The documents are the most recent in a series of disclosures that have increasingly contradicted the military's statements that harsh treatment of prisoners happened only in limited, isolated cases.

Anthony D. Romero, the executive director of the A.C.L.U., said the documents meant that "top government officials can no longer hide from public scrutiny by pointing the finger at a few low-ranking soldiers."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12/21/04 NYT A1                                                                    Page 3

Another message sent to F.B.I. officials including Valerie E. Caproni, the
bureau's top lawyer, recounted witnessing detainees chained in interrogation rooms
at Guantanamo, where about 550 prisoners are being held.

The agent, whose name was deleted from the document, wrote on July 29, 2004: "On a
couple of occasions, I entered interview rooms to find a detainee chained hand and
foot in a fetal position to the floor, with no chair, food or water. Most times
they had urinated or defecated on themselves and had been left there for 18 24
hours or more."

The agent said that on another occasion, the air-conditioning had been turned up
so high that a chained detainee was shivering. The agent said the military police
had explained by saying that interrogators from the previous day had ordered the
treatment and "that the detainee was not to be moved."

The agent also wrote: "On another occasion, the A/C had been turned off, making
the temperature in the unventilated room probably well over 100 degrees. The
detainee was almost unconscious on the floor, with a pile of hair next to him. He
had apparently been literally pulling his own hair out throughout the night."

As in previously released memorandums in the case, F.B.I. officials expressed
their deep concerns about seeing the use of interrogation techniques that they are
prohibited from using in their own investigations.

The Dec. 5, 2003, memorandum in which an agent frets about the F.B.I. being left
"holding the bag," also asserted that the threats and abuses of one detainee did
not produce any intelligence that could help thwart an attack. Further, the
memorandum said other bureau officials believed that the harsh interrogation
techniques would have meant that any chances of prosecuting the individual were
destroyed because the evidence would have to be thrown out in court because it was
coerced.

The issue of military interrogators' impersonating F.B.I. agents was especially
troubling to bureau officials, according to the memorandums, not least because
they seem to have been unsuccessful in persuading the military to stop the
practice.

                          --------------------

Guantanamo Inmate to Be Freed

WASHINGTON, Dec. 20 (AP) -- A military review has determined that a second
prisoner held at Guantanamo Bay, Cuba, is wrongly classified as an enemy combatant
and will be released to his home country soon, the Navy secretary said Monday.

Navy Secretary Gordon England refused to provide the man's name or nationality.

                      ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Judicial (1JU36); Legal (1LE33); Prisons (1PR87); Government

            © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12/21/04 NYT A1

Litigation (1GO18))

REGION:  (Cuba (1CU43); Middle East (1MI23); USA (1US73); Americas (1AM92); North
America (1NO39); Iraq (1IR87); Arab States (1AR46); Caribbean (1CA06); Latin
America (1LA15))

Language:  EN

OTHER INDEXING:  (Lewis, Neil A; Johnston, David; Mueller, Robert S III (Dir))
(AMERICAN CIVIL LIBERTIES UNION; DEFENSE DEPARTMENT; DEPARTMENT OF DEFENSE; **FBI**;
FEDERAL BUREAU OF INVESTIGATION; NAVY; PENTAGON)  (Anthony D. Romero; Bryan
Whitman; D.O.D. is; Dec; Gordon England; Mueller; Robert S. Mueller; Valerie E.
Caproni)  (War Crimes, Genocide and Crimes Against Humanity; Suits and Litigation;
United States International Relations; United States Armament and Defense;
Torture; Impersonations; Threats and Threatening Messages; Intelligence Services;
Terrorism; Prisoners of War)  (Iraq; Iraq; Guantanamo Bay Naval Base (Cuba);
Afghanistan; Iraq)

COMPANY TERMS: FEDERAL BUREAU OF INVESTIGATION; AMERICAN CIVIL LIBERTIES UNION

EDITION: Late Edition - Final

Word Count: 1548
12/21/04 NYT A1


END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.