# EXHIBIT 18

Amended Petition for Issuance of a Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**



**U.S. Department of Justice**

Office of Legal Counsel

Office of the Deputy Assistant Attorney General          Washington, D.C. 20530

January 9, 2002

MEMORANDUM FOR WILLIAM J. HAYNES II
 GENERAL COUNSEL, DEPARTMENT OF DEFENSE

FROM: John Yoo
       Deputy Assistant Attorney General

       Robert J. Delahunty
       Special Counsel

RE:    *Application of Treaties and Laws to al Qaeda and Taliban Detainees*

DRAFT

You have asked for our Office's views concerning the effect of international treaties and federal laws on the treatment of individuals detained by the U.S. Armed Forces during the conflict in Afghanistan. In particular, you have asked whether the laws of armed conflict apply to the conditions of detention and the procedures for trial of members of al Qaeda and the Taliban militia. We conclude that these treaties do not protect members of the al Qaeda organization, which as a non-State actor cannot be a party to the international agreements governing war. We further conclude that that these treaties do not apply to the Taliban militia. This memorandum expresses no view as to whether the President should decide, as a matter of policy, that the U.S. Armed Forces should adhere to the standards of conduct in those treaties with respect to the treatment of prisoners.

We believe it most useful to structure the analysis of these questions by focusing on the War Crimes Act, 18 U.S.C. § 2441 (Supp. III 1997) ("WCA"). The WCA directly incorporates several provisions of international treaties governing the laws of war into the federal criminal code. Part I of this memorandum describes the WCA and the most relevant treaties that it incorporates: the four 1949 Geneva Conventions, which generally regulate the treatment of non-combatants, such as prisoners of war ("POWs"), the injured and sick, and civilians.[1]

Part II examines whether al Qaeda detainees can claim the protections of these agreements. Al Qaeda is merely a violent political movement or organization and not a nation-state. As a result, it is ineligible to be a signatory to any treaty. Because of the novel nature of

---

[1] The four Geneva Conventions for the Protection of Victims of War, dated August 12, 1949, were ratified by the United States on July 14, 1955. These are the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, 6 U.S.T. 3115 ("Geneva Convention I"); the Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, 6 U.S.T. 3219 ("Geneva Convention II"); the Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3517 ("Geneva Convention III"); and the Convention Relative to the Protection of Civilian Persons in Time of War, 6 U.S.T. 3317 ("Geneva Convention IV").

this conflict, moreover, we do not believe that al Qaeda would be included in non-international forms of armed conflict to which some provisions of the Geneva Conventions might apply. Therefore, neither the Geneva Conventions nor the WCA regulate the detention of al Qaeda prisoners captured during the Afghanistan conflict.

Part III discusses whether the same treaty provisions, as incorporated through the WCA, apply to the treatment of captured members of the Taliban militia. We believe that the Geneva Conventions do not apply for several reasons. First, the Taliban was not a government and Afghanistan was not – even prior to the beginning of the present conflict – a functioning State during the period in which they engaged in hostilities against the United States and its allies. Afghanistan's status as a failed state is ground alone to find that members of the Taliban militia are not entitled to enemy POW status under the Geneva Conventions. Further, it is clear that the President has the constitutional authority to suspend our treaties with Afghanistan pending the restoration of a legitimate government capable of performing Afghanistan's treaty obligations. Second, it appears from the public evidence that the Taliban militia may have been so intertwined with al Qaeda as to be functionally indistinguishable from it. To the extent that the Taliban militia was more akin to a non-governmental organization that used military force to pursue its religious and political ideology than a functioning government, its members would be on the same legal footing as al Qaeda.

In Part IV, we address the question whether any customary international law of armed conflict might apply to the al Qaeda or Taliban militia members detained during the course of the Afghanistan conflict. We conclude that customary international law, whatever its source and content, does not bind the President, or restrict the actions of the United States military, because it does not constitute federal law recognized under the Supremacy Clause of the Constitution. The President, however, has the constitutional authority as Commander in Chief to interpret and apply the customary or common laws of war in such a way that they would extend to the conduct of members of both al Qaeda and the Taliban, and also to the conduct of the U.S. Armed Forces towards members of those groups taken as prisoners in Afghanistan.

### I. Background and Overview of the War Crimes Act and the Geneva Conventions

It is our understanding that your Department is considering two basic plans regarding the treatment of members of al Qaeda and the Taliban militia detained during the Afghanistan conflict. First, the Defense Department intends to make available a facility at the U.S. Navy base at Guantanamo Bay, Cuba, for the long-term detention of these individuals, who have come under our control either through capture by our military or transfer from our allies in Afghanistan. We have discussed in a separate memorandum the federal jurisdiction issues that might arise concerning Guantanamo Bay.[2] Second, your Department is developing procedures to implement the President's Military Order of November 13, 2001, which establishes military

---

[2] See Memorandum for William J. Haynes II, General Counsel, Department of Defense, from: Patrick F. Philbin, Deputy Assistant Attorney General, and John Yoo, Deputy Assistant Attorney General, Re: Possible Habeas Jurisdiction over Aliens Held in Guantanamo Bay, Cuba (Dec. 28, 2001).

2

commissions for the trial of violations of the laws of war committed by non-U.S. citizens.[3] The question has arisen whether the Geneva Conventions, or other relevant international treaties or federal laws, regulate these proposed policies.

We believe that the WCA provides a useful starting point for our analysis of the application of the Geneva Conventions to the treatment of detainees captured in the Afghanistan theater of operations.[4] Section 2441 of Title 18 renders certain acts punishable as "war crimes." The statute's definition of that term incorporates, by reference, certain treaties or treaty provisions relating to the laws of war, including the Geneva Conventions.

### A. Section 2441: An Overview

Section 2441 reads in full as follows:

*War crimes*

(a) Offense.—Whoever, whether inside or outside the United States, commits a war crime, in any of the circumstances described in subsection (b), shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death.

(b) Circumstances.—The circumstances referred to in subsection (a) are that the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States (as defined in section 101 of the Immigration and Nationality Act).

(c) Definition.—As used in this section the term "war crime" means any conduct—

(1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party;

(2) prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907;

(3) which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949, or any protocol to such convention to which the United States is a party and which deals with non-international armed conflict; or

---

[3] *See generally* Memorandum for Alberto R. Gonzales, Counsel to the President, from Patrick F. Philbin, Deputy Assistant Attorney General, Office of Legal Counsel, Re: *Legality of the Use of Military Commissions to Try Terrorists* (Nov. 6, 2001).

[4] The rule of lenity requires that the WCA be read so as to ensure that prospective defendants have adequate notice of the nature of the acts that the statute condemns. *See, e.g., Castillo v. United States*, 530 U.S. 120, 131 (2000). In those cases in which the application of a treaty incorporated by the WCA is unclear, therefore, the rule of lenity requires that the interpretative issue be resolved in the defendant's favor.

3

(4) of a person who, in relation to an armed conflict and contrary to the provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended at Geneva on 3 May 1996 (Protocol II as amended on 3 May 1996), when the United States is a party to such Protocol, willfully kills or causes serious injury to civilians.

18 U.S.C. § 2441.

Section 2441 lists four categories of war crimes. First, it criminalizes "grave breaches" of the Geneva Conventions, which are defined by treaty and will be discussed below. Second, it makes illegal conduct prohibited by articles 23, 25, 27 and 28 of the Annex to the Hague Convention IV. Third, it criminalizes violations of what is known as "common" Article 3, which is an identical provision common to all four of the Geneva Conventions. Fourth, it criminalizes conduct prohibited by certain other laws of war treaties, once the United States joins them. A House Report states that the original legislation "carries out the international obligations of the United States under the Geneva Conventions of 1949 to provide criminal penalties for certain war crimes." H.R. Rep. No. 104-698 at 1 (1996), reprinted in 1996 U.S.C.C.A.N. 2166, 2166. Each of those four conventions includes a clause relating to legislative implementation and to criminal punishment.[5]

In enacting section 2441, Congress also sought to fill certain perceived gaps in the coverage of federal criminal law. The main gaps were thought to be of two kinds: subject matter jurisdiction and personal jurisdiction. First, Congress found that "[t]here are major gaps in the prosecutability of individuals under federal criminal law for war crimes committed against Americans." H.R. Rep. No. 104-698 at 6, reprinted in 1996 U.S.C.C.A.N. at 2171. For example, "the simple killing of a[n American] prisoner of war" was not covered by any existing Federal statute. Id. at 5, reprinted in 1996 U.S.C.C.A.N. at 2170.[6] Second, Congress found that "[t]he ability to court martial members of our armed services who commit war crimes ends when they leave military service. [Section 2441] would allow for prosecution even after discharge." Id. at

---

[5] That common clause reads as follows:

The [signatory Nations] undertake to enact any legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches of the present Convention. . . Each [signatory nation] shall be under the obligation to search for persons alleged to have committed, or to have ordered to be committed, such grave breaches, and shall bring such persons, regardless of their nationality, before its own courts. . . . It may also, if it prefers, . . . hand such persons over for trial to another [signatory nation], provided such [nation] has made out a prima facie case.

Geneva Convention I, art. 49; Geneva Convention II, art. 50; Geneva Convention III, art. 129; Geneva Convention IV, art. 146.

[6] In projecting our criminal law extraterritorially in order to protect victims who are United States nationals, Congress was apparently relying on the international law principle of passive personality. The passive personality principle "asserts that a state may apply law – particularly criminal law – to an act committed outside its territory by a person not its national where the victim of the act was its national." United States v. Rezaq, 134 F.3d 1121, 1133 (D.C. Cir.), cert. denied, 525 U.S. 834 (1998). The principle marks recognition of the fact that "each nation has a legitimate interest that its nationals and permanent inhabitants not be maimed or disabled from self-support," or otherwise injured. Lauritzen v. Larsen, 345 U.S. 571, 586 (1953); see also Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 309 (1970).

4

7, *reprinted in* 1996 U.S.C.C.A.N. at 2172.[7] Congress considered it important to fill this gap, not only in the interest of the victims of war crimes, but also of the accused. "The Americans prosecuted would have available all the procedural protections of the American justice system. These might be lacking if the United States extradited the individuals to their victims' home countries for prosecution." *Id.*[8] Accordingly, Section 2441 criminalizes forms of conduct in which a U.S. national or a member of the Armed Forces may be either a victim or a perpetrator.

### B. *Grave Breaches of the Geneva Conventions*

The Geneva Conventions were approved by a diplomatic conference on August 12, 1949, and remain the agreements to which more States have become parties than any other concerning the laws of war. Convention I deals with the treatment of wounded and sick in armed forces in the field; Convention II addresses treatment of the wounded, sick, and shipwrecked in armed forces at sea; Convention III regulates treatment of POWs; Convention IV addresses the treatment of citizens. While the Hague Convention IV establishes the rules of conduct against the enemy, the Geneva Conventions set the rules for the treatment of the victims of war.

The Geneva Conventions, like treaties generally, structure legal relationships between Nation States, not between Nation States and private, subnational groups or organizations.[9] All four Conventions share the same Article 2, known as "common Article 2." It states:

> In addition to the provisions which shall be implemented in peacetime, the present Convention shall apply to all cases of declared war or of any other armed conflict *which may arise between two or more of the High Contracting Parties,* even if the state of war is not recognized by one of them.
>
> The Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party, even if the said occupation meets with no armed resistance.
>
> Although one of the Powers in conflict may not be a party to the present Convention, the Powers who are parties thereto shall remain bound by it in their mutual relations. They shall furthermore be bound by the Convention in relation to the said Power, if the latter accepts and applies the provisions thereof.

---

[7] In *United States ex rel. Toth v. Quarles,* 350 U.S. 11 (1955), the Supreme Court had held that a former serviceman could not constitutionally be tried before a court martial under the Uniform Code for Military Justice (the "UCMJ") for crimes he was alleged to have committed while in the armed services.

[8] The principle of nationality in international law recognizes that (as Congress did here) a State may criminalize acts performed extraterritorially by its own nationals. *See, e.g., Skiriotes v. Florida,* 313 U.S. 69, 73 (1941); *Steele v. Bulova Watch Co.,* 344 U.S. 280, 282 (1952).

[9] *See Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 253 (1984) ("A treaty is in the nature of a contract between nations."); *The Head Money Cases,* 112 U.S. 580, 598 (1884) ("A treaty is primarily a compact between independent nations."); *United States ex rel. Saroop v. Garcia,* 109 F.3d 165, 167 (3d Cir. 1997) ("[T]reaties are agreements between nations."); *Vienna Convention on the Law of Treaties,* May 23, 1969, art. 2, § 1(a), 1155 U.N.T.S. 331, 333 ("'[T]reaty' means an international agreement concluded between States in written form and governed by international law. . . .") (the "Vienna Convention"); *see generally Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 422 (1964) ("The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another.").

5

(Emphasis added).

As incorporated by § 2441(c)(1), the four Geneva Conventions similarly define "grave breaches." Geneva Convention III on POWs defines a grave breach as:

> wilful killing, torture or inhuman treatment, including biological experiments, wilfully causing great suffering or serious injury to body or health, compelling a prisoner of war to serve in the forces of the hostile Power, or wilfully depriving a prisoner of war of the rights of fair and regular trial prescribed in this Convention.

Geneva Convention III, art. 130. As mentioned before, the Geneva Conventions require the High Contracting Parties to enact penal legislation to punish anyone who commits or orders a grave breach. *See, e.g., id.* art. 129. Further, each State party has the obligation to search for and bring to justice (either before its courts or by delivering a suspect to another State party) anyone who commits a grave breach. No State party is permitted to absolve itself or any other nation of liability for committing a grave breach.

Thus, the WCA does not criminalize all breaches of the Geneva Conventions. Failure to follow some of the regulations regarding the treatment of POWs, such as difficulty in meeting all of the conditions set forth for POW camp conditions, does not constitute a grave breach within the meaning of Geneva Convention III, art. 130. Only by causing great suffering or serious bodily injury to POWs, killing or torturing them, depriving them of access to a fair trial, or forcing them to serve in the Armed Forces, could the United States actually commit a grave breach. Similarly, unintentional, isolated collateral damage on civilian targets would not constitute a grave breach within the meaning of Geneva Convention IV, art. 147. Article 147 requires that for a grave breach to have occurred, destruction of property must have been done "wantonly" and without military justification, while the killing or injury of civilians must have been "wilful."

### D. Common Article 3 of the Geneva Conventions

Section 2441(c)(3) also defines as a war crime conduct that "constitutes a violation of common Article 3" of the Geneva Conventions. Article 3 is a unique provision that governs the conduct of signatories to the Conventions in a particular kind of conflict that is *not* one between High Contracting Parties to the Conventions. Thus, common Article 3 may require the United States, as a High Contracting Party, to follow certain rules even if other parties to the conflict are not parties to the Conventions. On the other hand, Article 3 requires state parties to follow only certain minimum standards of treatment toward prisoners, civilians, or the sick and wounded, rather than the Conventions as a whole.

Common Article 3 reads in relevant part as follows:

> In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

6

(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, color, religion or faith, sex, birth or wealth, or any other similar criteria.

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) taking of hostages;

(c) outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for. . . .

The application of the preceding provisions shall not affect the legal status of the Parties to the conflict.

Common article 3 complements common Article 2. Article 2 applies to cases of declared war or of any other armed conflict that may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.[10] Common Article 3, however, covers "armed conflict not of an international character" -- a war that does not involve cross-border attacks -- that occurs within the territory of one of the High Contracting Parties. There is substantial reason to think that this language refers specifically to a condition of civil war, or a large-scale armed conflict between a State and an armed movement within its own territory.

To begin with, Article 3's text strongly supports the interpretation that it applies to large-scale conflicts between a State and an insurgent group. First, the language at the end of Article 3 states that "[t]he application of the preceding provisions shall not affect the legal status of the Parties to the conflict." This provision was designed to ensure that a Party that observed Article 3 during a civil war would not be understood to have granted the "recognition of the insurgents as an adverse party." Frits Kalshoven, *Constraints on the Waging of War* 59 (1987). Second, Article 3 is in terms limited to "armed conflict . . . occurring *in the territory of one of the High Contracting Parties*" (emphasis added). This limitation makes perfect sense if the Article

---

[10] Article 2's reference to a state of war "not recognized" by a belligerent was apparently intended to refer to conflicts such as the 1937 war between China and Japan. Both sides denied that a state of war existed. *See* Joyce A. C. Gutteridge, *The Geneva Conventions of 1949*, 26 Brit. Y.B. Int'l L. 294, 298-99 (1949).

7

applies to civil wars, which are fought primarily or solely within the territory of a single state. The limitation makes little sense, however, as applied to a conflict between a State and a transnational terrorist group, which may operate from different territorial bases, some of which might be located in States that are parties to the Conventions and some of which might not be. In such a case, the Conventions would apply to a single armed conflict in some scenes of action but not in others – which seems inexplicable.

This interpretation is supported by commentators. One well-known commentary states that "a non-international armed conflict is distinct from an international armed conflict because of the legal status of the entities opposing each other: the parties to the conflict are not sovereign States, but the government of a single State in conflict with one or more armed factions within its territory."[11] A legal scholar writing in the same year in which the Conventions were prepared stated that "a conflict not of an international character occurring in the territory of one of the High Contracting Parties . . . must normally mean a civil war."[12]

Analysis of the background to the adoption of the Geneva Conventions in 1949 confirms our understanding of common Article 3. It appears that the drafters of the Conventions had in mind only the two forms of armed conflict that were regarded as matters of general *international* concern at the time: armed conflict between Nation States (subject to Article 2), and large-scale civil war within a Nation State (subject to Article 3). To understand the context in which the Geneva Conventions were drafted, it will be helpful to identify three distinct phases in the development of the laws of war.

First, the traditional law of war was based on a stark dichotomy between "belligerency" and "insurgency." The category of "belligerency" applied to armed conflicts between sovereign States (unless there was recognition of belligerency in a civil war), while the category of "insurgency" applied to armed violence breaking out within the territory of a sovereign State.[13] Correspondingly, international law treated the two classes of conflict in different ways. Interstate wars were regulated by a body of international legal rules governing both the conduct of hostilities and the protection of noncombatants. By contrast, there were very few international rules governing civil unrest, for States preferred to regard internal strife as rebellion, mutiny and treason coming within the purview of national criminal law, which precluded any possible intrusion by other States.[14] This was a "clearly sovereignty-oriented" phase of international law.[15]

---

[11] Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, at ¶ 4339 (Yves Sandoz et al. eds., 1987)
[12] Gutteridge, *supra* n.10, at 300.
[13] *See* Joseph H. Beale, Jr., *The Recognition of Cuban Belligerency*, 9 Harv. L. Rev. 406, 406 n.1 (1896).
[14] *See The Prosecutor v. Dusko Tadic (Jurisdiction of the Tribunal)*, (Appeals Chamber of the International Criminal Tribunal for the Former Yugoslavia 1995) (the "ICTY"), 105 I.L.R. 453, 504-05 (E. Lauterpacht and C.J. Greenwood eds., 1997).
[15] *Id.* at 505; *see also* Gerald Irving Draper, *Reflections on Law and Armed Conflicts* 107 (1998) ("Before 1949, in the absence of recognized belligerency accorded to the elements opposed to the government of a State, the law of war . . . had no application to internal armed conflicts. . . . International law had little or nothing to say as to how the armed rebellion was crushed by the government concerned, for such matters fell within the domestic jurisdiction of States. Such conflicts were often waged with great lack of restraint and cruelty. Such conduct was a domestic matter.").

8

The second phase began as early as the Spanish Civil War (1936-39) and extended through the time of the drafting of the Geneva Conventions until relatively recently. During this period, State practice began to apply certain general principles of humanitarian law beyond the traditional field of State-to-State conflict to "those internal conflicts that constituted large-scale civil wars."[16] In addition to the Spanish Civil War, events in 1947 during the Civil War between the Communists and the Nationalist regime in China illustrated this new tendency.[17] Common Article 3, which was prepared during this second phase, was apparently addressed to armed conflicts akin to the Chinese and Spanish civil wars. As one commentator has described it, Article 3 was designed to restrain governments "in the handling of armed violence directed against them for the express purpose of secession or at securing a change in the government of a State," but even after the adoption of the Conventions it remained "uncertain whether [Article 3] applied to full-scale civil war."[18]

The third phase represents a more complete break than the second with the traditional "State-sovereignty-oriented approach" of international law. This approach gives central place to individual human rights. As a consequence, it blurs the distinction between international and internal armed conflicts, and even that between civil wars and other forms of internal armed conflict. This approach is well illustrated by the ICTY's decision in *Tadic*, which appears to take the view that common Article 3 applies to non-international armed conflicts of *any* description, and is not limited to civil wars between a State and an insurgent group. In this conception, common Article 3 is not just a complement to common Article 2; rather, it is a catch-all that establishes standards for any and all armed conflicts not included in common Article 2.[19]

---

[16] *Tadic*, 105 I.L.R. at 507. Indeed, the events of the Spanish Civil War, in which "both the republican Government [of Spain] and third States refused to recognize the [Nationalist] insurgents as belligerents," *id.* at 507, may be reflected in common Article 3's reference to "the legal status of the Parties to the conflict."

[17] *See id.* at 508.

[18] *See* Draper, *Reflections on Law and Armed Conflicts, supra*, at 108.

[19] An interpretation of common Article 3 that would apply it to all forms of non-international armed conflict accords better with some recent approaches to international humanitarian law. For example, the *Commentary on the Additional Protocols of 8 June 1977 to the Geneva Conventions of 12 August 1949, supra*, after first stating in the text that Article 3 applies when "the government of a single State [is] in conflict with one or more armed factions within its territory," thereafter suggests, in a footnote, that an armed conflict not of an international character "may also exist in which armed factions fight against each other without intervention by the armed forces of the established government." *Id.* ¶ 4339 at n.2. A still broader interpretation appears to be supported by the language of the decision of the International Court of Justice (the "ICJ") in *Nicaragua v. United States* – which, it should be made clear, the United States refused to acknowledge by withdrawing from the compulsory jurisdiction of the ICJ:

> Article 3 which is common to all four Geneva Conventions of 12 August 1949 defines certain rules to be applied *in the armed conflicts of a non-international character*. There is no doubt that, in the event of international armed conflicts, these rules also constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts; and they are rules which, in the Court's opinion, reflect what the Court in 1949 called "elementary considerations of humanity."

*Military and Paramilitary Activities In and Against Nicaragua (Nicaragua v. United States)*, (International Court of Justice 1986), 76 I.L.R. 1, 448, ¶ 218 (E. Lauterpacht and C.J. Greenwood eds., 1988) (emphasis added). The ICJ's language is probably best read to suggest that all "armed conflicts" are either international or non-international, and that if they are non-international, they are governed by common Article 3. If that is the correct understanding of the quoted language, however, it should be noted that the result was merely stated as a conclusion, without taking account either of the precise language of Article 3 or of the background to its adoption. Moreover, while it was true

9

Nonetheless, despite this recent trend, we think that such an interpretation of common Article 3 fails to take into account, not only the language of the provision, but also its historical context. First, as we have described above, such a reading is inconsistent with the text of Article 3 itself, which applies only to "armed conflict not of an international character occurring in the territory of one of the High Contracting Parties." In conjunction with common Article 2, the text of Article 3 simply does not reach international conflicts where one of the parties is not a Nation State. If we were to read the Geneva Conventions as applying to all forms of armed conflict, we would expect the High Contracting Parties to have used broader language, which they easily could have done. To interpret common Article 3 by expanding its scope well beyond the meaning borne by the text is effectively to amend the Geneva Conventions without the approval of the State Parties to the agreements.

Second, as we have discussed, Article 3 was prepared during a period in which the traditional, State-centered view of international law was still dominant and was only just beginning to give way to a human-rights-based approach. Giving due weight to the State practice and doctrinal understanding of the time, it seems to us overwhelmingly likely that an armed conflict between a Nation State and a transnational terrorist organization, or between a Nation State and a failed State harboring and supporting a transnational terrorist organization, could not have been within the contemplation of the drafters of common Article 3. These would have been simply unforeseen and, therefore, not provided for. Indeed, it seems to have been uncertain even a decade after the Conventions were signed whether common Article 3 applied to armed conflicts that were neither international in character nor civil wars but anti-colonialist wars of independence such as those in Algeria and Kenya. *See* Gerald Irving Draper, *The Red Cross Conventions* 15 (1957). Further, it is telling that in order to address this unforeseen circumstance, the State Parties to the Geneva Conventions did not attempt to distort the terms of common Article 3 to apply it to cases that did not fit within its terms. Instead, they drafted two new protocols (neither of which the United States has ratified) to adapt the Conventions to the conditions of contemporary hostilities.[20] Accordingly, common Article 3 is best understood not to apply to such armed conflicts.

Third, it appears that in enacting the WCA, Congress did not understand the scope of Article 3 to extend beyond civil wars to all other types of internal armed conflict. As discussed in our review of the legislative history, when extending the WCA to cover violations of common Article 3, the House apparently understood that it was codifying treaty provisions that "forbid atrocities occurring in both civil wars and wars between nations."[21] If Congress had embraced a much broader view of common Article 3, and hence of 18 U.S.C. § 2441, we would expect both

---

that one of the conflicts to which the ICJ was addressing itself – "[t]he conflict between the contras' forces and those of the Government of Nicaragua" – "was an armed conflict which is 'not of an international character,'" *id.* at 448, ¶ 219, that conflict was recognizably a civil war between a State and an insurgent group, not a conflict between or among violent factions in a territory in which the State had collapsed. Thus there is substantial reason to question the logic and scope of the ICJ's interpretation of common Article 3.

[20] *See, e.g.*, Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, 1125 U.N.T.S. 4; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), June 8, 1977, 1125 U.N.T.S. 610.

[21] 143 Cong. Rec. H5865-66 (daily ed. July 28, 1997) (remarks of Rep. Jenkins).

10