# EXHIBIT 21

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

 **NEWS**

# AP: U.S. Report Details Guantanamo Abuses

### U.S. Military Report Obtained by AP Details Abuses of Detainees at Guantanamo Bay Prison

*The Associated Press*

**Nov. 5, 2004** - A detainee was forced to kneel so many times he was bruised, a barber gave reverse mohawks and a female interrogator ran her fingers through a prisoner's hair and sat in his lap, the U.S. government says in the most detailed accounting of eight abuse cases at its Guantanamo Bay prison for terror suspects.

Those responsible for the abuse have been demoted, reprimanded or sent for more training, according to an 800-word U.S. military response to a written query from The Associated Press.

Allegations of mistreatment at Guantanamo, where 550 terror suspects have been held for nearly three years, surfaced after the abuse scandal broke last year at the U.S.-run Abu Ghraib prison in Iraq, where pictures showed beatings and sexual humiliation of Iraqi prisoners.

The details of abuse at Guantanamo come as lawyers for several prisoners challenge evidence presented by the government, saying some could have been obtained by force.

Only four prisoners have been formally charged at Guantanamo, where most are held without charge or access to lawyers. The military has reported 34 suicide attempts among detainees, though none has been reported since January.

Guantanamo's new commander says lessons have been learned from past abuses cases and troops are treating detainees humanely with a rigorous system of checks and balances.

"They've not been mistreated, they've not been tortured in any respect," Army Brig. Gen. Jay Hood said in an interview Wednesday.

Human rights monitors are not convinced.

"We're confident that there's more information out there that hasn't been released," said Jameel Jaffer of the American Civil Liberties Union, which has obtained nearly 6,000 documents about procedures at U.S.-run prisons. He was in Guantanamo to observe pretrial hearings.

Maj. Gen. Geoffrey Miller, now in charge of U.S.-run prisons in Iraq, commanded the Guantanamo prison from November 2002 to March 2004 with a mandate to get better intelligence. Most abuses reported in August by James R. Schlesinger, who headed a U.S. Congressional committee to investigate abuses in Iraq, Afghanistan and Guantanamo, occurred under Miller's watch.

The Department of Defense, responding to an AP query made nearly two months ago, this week provided details of the eight Guantanamo abuses cases Schlesinger cited. No names were given.

In one case, a female interrogator took off her uniform top to expose her T-shirt to a detainee, ran her fingers through his hair and climbed on his lap in April 2003. A supervisor monitoring the session terminated it, and the woman was reprimanded and sent for more training, the military said.

The same month, an interrogator told military police to repeatedly bring a detainee from a standing to kneeling position, so much that his knees were bruised, the government said. The interrogator got a written reprimand and Miller reportedly stopped use of that technique.

Also that month, a guard was charged with dereliction of duty and assault after a detainee assaulted another guard. After the detainee was subdued, the guard punched the prisoner with his fist. He was demoted.

In a separate case, a guard was charged with assault after he sprayed a detainee with a hose when the prisoner allegedly tried to throw water from his toilet at him in September 2002. The guard was reduced in rank and reassigned.

Another female interrogator wiped dye from a red magic marker on a detainee's shirt, telling him it was blood, after he allegedly spat on her. She received a verbal reprimand in early 2003.

In March 2003, a military policeman used pepper spray on a detainee allegedly preparing to throw unidentified liquid on an officer. The policeman was acquitted by a court martial.

Incidents this year include a military policeman who squirted a detainee with water in February, and a camp barber who gave two "unusual haircuts." The haircuts were reverse mohawks, according to a government official who spoke on condition of anonymity.

The barber gave the cuts to frustrate detainee efforts to wear their hair the same way to demonstrate unity, the government said. The barber and his company were reprimanded.

Air Force Lt. Col. Sharon Shaffer, defense attorney for a Guantanamo prisoner, announced Thursday that she would file a petition in federal court challenging her client's detention and alleging systematic abuse at the prison. She represents Ibrahim Ahmed Mahmoud al-Qosi of Sudan, an alleged al-Qaida paymaster whose conspiracy trial is scheduled for February.

"The abuse allegations at Guantanamo are a matter of growing concern," Shaffer said. "He was constantly being told he would be sent to Egypt to be interrogated, where many of the detainees believed they would be killed. And he was forced to sit for hours in the freezing cold."

At least one military insider at Guantanamo has gone public with allegations of abuse a military police officer who was injured after going undercover as a detainee.

National Guardsman Sean Baker said the attack occurred in November 2002, the month after Miller arrived in Guantanamo, when he was told to put on an orange detainee jumpsuit, get in a cell and wait for an Initial Response Force the teams used to subdue misbehaving detainees.

From under the bunk, Baker heard the extraction team come in, he said in his latest comments during a CBS television program aired Wednesday.

"My face was down. And of course, they're pushing it down against the steel floor, you know, my right temple, pushing it down against the floor," Baker told CBS.

The incident was purportedly recorded, one of some 500 hours of tapes that the military has refused to publicly release.

Baker said he tried to tell his attackers he was a soldier but they repeatedly slammed his head against the floor. Baker was airlifted to a naval hospital in Virginia where doctors said he suffered a brain injury. He has been plagued by seizures since, he said.

*Copyright 2005 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.*

Copyright © 2005 ABC News Internet Ventures

# <u>EXHIBIT 22</u>

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

## IBRAHIM OSMAN IBRAHIM IDRIS

Westlaw.                                                      The New York Times

1/19/05 NYT A17                                                          Page 1

1/19/05 N.Y. Times A17
2005 WLNR 726171

New York Times (NY)

Copyright (c) 2005 The New York Times. All rights reserved.

January 19, 2005


Section: A

## Gonzales Says Humane-Policy Order Doesn't Bind C.I.A.

### ERIC LICHTBLAU

White House counsel Alberto R Gonzales says in newly released documents that
officers of Central Intelligence Agency and other nonmilitary personnel fall
outside bounds of 2002 directive issued by Pres Bush that pledged humane treatment
of prisoners in American custody; also says that separate Congressional ban on
cruel, unusual and inhumane treatment has 'a limited reach' and does not apply in
all cases to 'aliens overseas'; legal analysts say that position has implications
for prisoners held in American custody at Guantanamo Bay and in Iraq (M)

WASHINGTON, Jan. 18 Officers of the Central Intelligence Agency and other
nonmilitary personnel fall outside the bounds of a 2002 directive issued by
President Bush that pledged the humane treatment of prisoners in American custody,
Alberto R. Gonzales, the White House counsel, said in documents released on
Tuesday.

In written responses to questions posed by senators as part of his confirmation
for attorney general, Mr. Gonzales also said a separate Congressional ban on
cruel, unusual and inhumane treatment had "a limited reach" and did not apply in
all cases to "aliens overseas." That position has clear implications for prisoners
held in American custody at Guantanamo Bay, Cuba, and in Iraq, legal analysts said.

At the same time, however, the president has a clear policy opposing torture, and
"the C.I.A. and other nonmilitary personnel are fully bound" by it, Mr. Gonzales
said.

The administration's views on torture and the treatment of prisoners have been the
focus of the process of confirming Mr. Gonzales, and a number of senators had
pressed him for a fuller explanation, unsatisfied with the answers he gave at his
confirmation hearing before the Senate Judiciary Committee.

His written responses, totaling more than 200 pages on torture and other questions
and released Tuesday by the committee's Democrats, offered one of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

administration's most expansive statements of its positions on a variety of issues, particularly regarding laws and policies governing C.I.A. interrogation of terror suspects.

Mr. Gonzales's acknowledgment in the written statements that the White House did not consider the C.I.A. bound by the same rules as military personnel is significant because the intelligence agency has carried out some of the government's most aggressive and controversial interrogation tactics in interviewing "high value" terror suspects. These techniques include "water boarding," in which interrogators make it appear that the suspect will be drowned.

Martin Lederman, a former Justice Department lawyer who has analyzed the administration's legal positions on treatment of prisoners, said the documents released Tuesday made it clear that the White House had carved an exemption for the C.I.A. in how it goes about interrogating terror suspects, allowing the agency to engage in conduct outside the United States that would be unconstitutionally abusive within its borders. Although the C.I.A. has been largely bound by Congressional bans on torture, Mr. Lederman said that standard was more permissive than the 2002 directive from Mr. Bush.

Last month, at the urging of the White House, Congressional leaders scrapped a legislative measure that would have imposed new restrictions on the use of extreme interrogation measures by intelligence officers at the C.I.A. and elsewhere. Mr. Gonzales said in the newly released answers that he had not been involved in the lobbying effort

"But it's notable," Mr. Lederman added, "that Gonzales is not willing to tell the senators or anyone else just what techniques the C.I.A. has actually been authorized to use."

Indeed, Mr. Gonzales declined to say in his written responses to the committee what interrogation tactics would constitute torture in his view or which ones should be banned.

That question, he indicated, is again under review by the administration. But if the administration "were to begin ruling out speculated interrogation practices" in public, he wrote, "we would fairly rapidly provide Al Qaeda with a road map concerning the interrogation that captured terrorists can expect to face and would enable Al Qaeda to improve its counter-interrogation training to match it."

Some Democrats said they remained unsatisfied with Mr. Gonzales's responses.

"This was another missed opportunity for straight answers and accountability," declared Senator Patrick J. Leahy of Vermont, the Judiciary Committee's ranking Democrat, who said he considered most of Mr. Gonzales's written answers to be "vague, unresponsive or AWOL."

Senator Arlen Specter, the Pennsylvania Republican who leads the committee, has scheduled a meeting for Wednesday on the nomination. But Congressional officials said it was unlikely that the nomination would come to a vote for at least a week, in part because the committee may not have enough senators for a quorum Wednesday and in part because some Democrats want to press the nominee further about the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

administration's positions on torture.

While Mr. Gonzales still appears likely to be confirmed, several Democratic senators, including Edward M. Kennedy of Massachusetts and Charles E. Schumer of New York, say they are rethinking their support.

Among the issues addressed by Mr. Gonzales in his written responses Tuesday were his continued support for the USA Patriot Act, his support for Roe v. Wade as "the law of the land" and his support for a ban on assault weapons, a prohibition that Congress allowed to expire last year. But the bulk of the questions, after abuses in Iraq and at Guantanamo Bay, centered on the administration's treatment of prisoners in the campaign against terrorism.

In a directive issued to senior administration officials in February 2002 on the treatment of the hundreds of men seized during the war in Afghanistan, President Bush reaffirmed a Pentagon policy requiring humane treatment of prisoners.

At the time, the White House cast the directive in broad terms. Ari Fleischer, then the White House spokesman, said in announcing the policy, "Consistent with the American values and the principles of the Geneva Convention, the United States has treated and will continue to treat all Taliban and Al Qaeda detainees in Guantanamo Bay humanely and consistent with the principles of the Geneva Convention."

Questioned by Senator Leahy and others about the directive, Mr. Gonzales said in his written reply that the president's policy "was designed to provided guidance to the United States armed services." Asked whether C.I.A. officers and other nonmilitary personnel fell under that order, he said, "No."

In intense internal discussions that began soon after the Sept. 11 attacks, the C.I.A. and other intelligence agencies pressed for greater power to use coercive techniques against "high value" military targets, and for legal protection of their officers who used such tactics.

Such discussions, Mr. Gonzales said in one written answer Tuesday, resulted from "concerns that certain terrorists had information that might save American lives."

"There was a desire to explore certain methods of questioning these terrorists," he said, "but there was concern that nothing be done that would violate the law."

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36))

INDUSTRY:  (Security (1SE29); Defense Intelligence (1DE90); Defense Policy (1DE81); Aerospace & Defense (1AE96); Defense (1DE43))

REGION:  (Americas (1AM92); North America (1NO39); Western Europe (1WE41); Latin America (1LA15); Cuba (1CU43); Middle East (1MI23); Europe (1EU83); Central Europe (1CE50); USA (1US73); Switzerland (1SW77); Iraq (1IR87); Caribbean (1CA06); Arab States (1AR46))

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1/19/05 NYT A17                                                    Page 4


Language:  EN

OTHER INDEXING:  (Lichtblau, Eric; Gonzales, Alberto R; Bush, George W (Pres))
(AWOL; CENTRAL INTELLIGENCE AGENCY; CONGRESS; GENEVA CONVENTION; HUMANE POLICY
ORDER DOESN; JUDICIARY COMMITTEE; JUSTICE DEPARTMENT; PENNSYLVANIA REPUBLICAN;
PENTAGON; SENATE JUDICIARY COMMITTEE; WHITE HOUSE)  (Al Qaeda; Alberto; Alberto R.
Gonzales; Ari Fleischer; Arlen Specter; Bush; Charles E. Schumer; Democrat;
Democrats; Edward M. Kennedy; Gonzales; Leahy; Lederman; Martin Lederman; Patrick
J. Leahy; Pres Bush; Wade)  (Attorneys General; Torture; Prisoners of War; United
States Armament and Defense; Terrorism; Prisoners of War)  (Afghanistan; Iraq;
Guantanamo Bay Naval Base (Cuba))

COMPANY TERMS: JUSTICE DEPARTMENT; JUSTICE DEPARTMENT; CENTRAL INTELLIGENCE AGENCY

EDITION: Late Edition - Final

Word Count: 1326
1/19/05 NYT A17


END OF DOCUMENT


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 23

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

1 of 1 DOCUMENT

Copyright 2005 The Washington Post
The Washington Post

January 19, 2005 Wednesday
Final Edition

**SECTION:** A Section; A04

**LENGTH:** 1198 words

**HEADLINE:** Torture by U.S. Personnel Illegal, Gonzales Tells Senate

**BYLINE:** Dan Eggen and Charles Babington, Washington Post Staff Writers

**BODY:**

Attorney general nominee Alberto R. Gonzales, responding to questions about his role in setting controversial detention policies, told members of the Senate Judiciary Committee that any form of torture by U.S. personnel is illegal, according to new documents released yesterday.

But Gonzales, the White House counsel who is expected to be confirmed by the Senate in coming weeks, declined to identify the techniques allowed under U.S. interrogation policies, citing restrictions on classified information. He also reiterated his view that a president could theoretically decide that a U.S. law -- such as the prohibition against torture -- is unconstitutional, though he dismissed the question as irrelevant under President Bush.

"The president has consistently stated that the United States will not use torture in any circumstances, so it is simply implausible that I would ever be called upon to address whether the president's constitutional authority as commander-in-chief would permit him to, in effect, nullify the torture statute for national security reasons," Gonzales wrote in one response. He added later: "I would approach such a question with a great deal of care."

In more than 200 pages of responses to questions from Democratic and Republican lawmakers, Gonzales also said that U.S. laws and the Constitution might not forbid interrogation techniques overseas that would be considered "cruel and inhuman" in the United States. He said, however, that the Bush administration has banned such treatment.

The answers did little to mollify some Democratic critics of Gonzales's role in drafting the administration's torture and detention policies, which have come under steady attack amid revelations of alleged prisoner abuse at U.S. military facilities in Iraq, Afghanistan and Guantanamo Bay, Cuba. The detention policies dominated the discussion at Gonzales's confirmation hearing Jan. 6, and some senators asked for the additional information that he provided in writing.

Sen. Patrick J. Leahy (Vt.), the Judiciary Committee's ranking Democrat, said Gonzales's refusal to reply to many of the panel's questions on interrogation policies amounted to a "pattern of stonewalling and non-cooperation."

"This was another missed opportunity for straight answers and accountability," Leahy said in a statement. ". . . Judge Gonzales gives the impression that he feels that he does not have to substantively answer questions before his confirmation, even though he wants to be Attorney General of the United States."

On other issues, Gonzales said he will push for renewal of the controversial USA Patriot Act anti-terrorism law this year, and said he will support reinstating the federal ban on assault weapons, which Congress allowed to expire in September.

The GOP-controlled Senate appears certain to confirm Gonzales to succeed Attorney General John D. Ashcroft this month or in early February, according to Democratic and Republican lawmakers. But some Democratic senators are nonetheless raising questions and building a paper trail on Gonzales, hoping to prevent the former Texas judge and longtime Bush confidant from ever being named to the U.S. Supreme Court.

The Washington Post January 19, 2005 Wednesday

Several senators said Bush is unlikely to nominate Gonzales if Chief Justice William H. Rehnquist, who is 80 and battling cancer, were to step down this year. But these senators said that with several justices in their seventies or eighties, Bush could have additional vacancies to fill during his second term and might turn to his longtime Texas friend.

Should that happen, Democrats said, some senators who may vote in favor of Gonzales as attorney general will not hesitate to vote against his lifetime appointment to the highest court if they believe his record, philosophy and temperament do not warrant it.

"I assume he'll get every Republican vote" plus an unknown number of Democratic senators' votes for confirmation as attorney general, Sen. Charles E. Schumer (D-N.Y.) said in an interview.

But Schumer said there is "no question" that he and other Democrats might try to use the same questions and answers as part of an argument to stop Gonzales if he is tapped for the Supreme Court, which they say demands higher standards than a Cabinet appointment.

Of the Judiciary Committee's eight Democrats, only Sen. Edward M. Kennedy (Mass.) has publicly signaled how he might vote on Gonzales's nomination. He said Sunday he is "leaning against" confirmation, largely because the nominee said he had forgotten or did not know about many important questions of administration policy.

Other committee Democrats have raised objections, but have not said they will vote against Gonzales. "I was disappointed in the testimony that I heard," Sen. Dianne Feinstein (Calif.) said in a statement earlier this month.

At Gonzales's Jan. 6 confirmation hearing, for example, senators pressed him to explain the origins of an August 2002 Justice Department memo that gave a narrow definition of torture in outlining the techniques U.S. interrogators might use on terrorism suspects. Gonzales said he did not recall "whether or not I was in agreement with all of the analysis," a response that exasperated several senators.

In the responses released yesterday, Gonzales said he "accepted the final memorandum as representing the considered views of the Department of Justice." In other responses, Gonzales referred to a new Justice memorandum, released Dec. 30, that repudiated the earlier analysis and broadened the government's definition of unlawful torture.

Some of Gonzales's responses appeared aimed at clarifying points that remained murky during his testimony. He had told Sen. Richard J. Durbin (D-Ill.) that he needed to research whether there were any circumstances in which U.S. personnel could legally engage in torture; Gonzales answered "no" in writing. He also wrote that other nations would be barred from torturing Americans under international agreements. During the hearing, he had said he was not sure.

But Gonzales also reiterated his defense of some of his most controversial decisions, including the conclusion in January 2002 that suspected Taliban soldiers and al Qaeda members captured in Afghanistan were not entitled to prisoner of war status under the Geneva Conventions. Human rights advocates and some Democrats have alleged that the decision was a misreading of international law and helped set the stage for prisoner abuse scandals.

Gonzales also provided a rare acknowledgment of the secretive practice of "rendition," in which the United States turns over suspected terrorists to other nations for questioning. In one case that has become public, an Australian man detained as a suspected al Qaeda trainer alleges that he was transferred to Egypt and tortured there for six months. The United States agreed last week to release him and four British prisoners to their home governments.

"It is my understanding that the United States does not render individuals to countries where we believe it is more likely than not they will be tortured," he wrote. Gonzales declined to confirm whether a presidential directive authorizing the practice exists.

**LOAD-DATE:** January 19, 2005

# EXHIBIT 24

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

1 of 1 DOCUMENT

Copyright 2002 Times Newspapers Limited
The Times (London)

January 18, 2002, Friday

**SECTION:** Overseas news

**LENGTH:** 300 words

**HEADLINE:** British team to question Cuba detainees

**BYLINE:** Roland Watson in Washington

**BODY:**

A team of British officials including intelligence officers are en route to Cuba to question al-Qaeda prisoners claiming UK citizenship. The group are expected to stay into the weekend before reporting back to ministers in London.

They will try to establish the identity of the half-dozen captives who claim to be British, and report on their welfare. The trip is more than a simple consular visit, and similar access is not expected to be extended to officials from other countries who also have nationals at Guantanamo Bay, the US naval base on Cuba.

Some of the British team are part of the post-September 11 investigation, and will link up with US authorities in seeking to build a case against any individuals or glean intelligence to prevent future atrocities. Their visit will coincide with the first access to prisoners extended to the International Committee of the Red Cross, whose officials were arriving on the island last night.

Donald Rumsfeld, the US Defence Secretary, suggested last night that al-Qaeda prisoners could be held indefinitely at the base. He said that the detention of some would be open-ended as the United States tried to build a case against them.

Mr Rumsfeld said that prisoners who did not go before military tribunals could end up in American civilian courts. Others would be sent home for trial in their countries, although British officials have already indicated that they would not want custody of UK al-Qaeda prisoners.

Others considered too dangerous to release but against whom there was little evidence would remain at Guantanamo Bay, Mr Rumsfeld said. The camp is being extended to hold up to 2,000 detainees.

The four-man Red Cross team will be given access to each prisoner without the presence of US military personnel.

**LOAD-DATE:** January 18, 2002

# EXHIBIT 25

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

## Westlaw.

(c) 2005 Associated Press. All rights reserved.

(THIS IS THE FULLTEXT)
Detainee Camp Getting More Scrutiny
Associated Press
January 22, 2002
13:56 EST

TEXT:
By LYNNE SLADKY
Associated Press Writer

GUANTANAMO BAY NAVAL BASE, Cuba (AP) -- The treatment of detained
terrorist suspects from the Afghanistan war is getting more
scrutiny from the international community.

A **federal** judge in Los Angeles, meanwhile, delayed ruling on a
petition that alleges the prisoners are being held in violation of
the Geneva Conventions and U.S. Constitution.

U.S. District Judge A. Howard Matz said he had grave doubts'
about his jurisdiction and gave **federal** prosecutors until Jan. 31
to file papers calling for dismissal of the petition on
jurisdictional grounds. The judge said he will hold another hearing
Feb. 14. **Federal** attorneys said they would file for dismissal of
the case.

The court challenge of the **detention** of al-Qaida suspects at the
Guantanamo Bay Naval Base demanded that the U.S. government bring
the suspects before a court and define the charges against them. A
coalition that includes former U.S. Attorney General Ramsey Clark
and other prominent civil rights advocates brought the suit.

The European Union and Germany on Tuesday joined a chorus of
protests from the Netherlands, British legislators, Amnesty
International and the International Committee of the Red Cross
demanding that the detainees be given prisoner-of-war status
subject to the Geneva Conventions.
Sweden called Monday for fair treatment for a Swedish captive.
Denmark said one of its citizens was also among the prisoners
detained by the United States -- though it did not specify whether
he was being held in Afghanistan or Cuba -- and said all prisoners
should be treated with respect.

EU foreign policy chief Javier Solana told Spanish National
Television that the **detention** of people like this should be as
laid down by international conventions.'

Defense Secretary Donald H. Rumsfeld said Tuesday the United

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

States is treating the prisoners at Guantanamo Bay humanely,'
and in accordance with Geneva Conventions.

No detainee has been harmed. No detainee has been mistreated
in any way,' the defense secretary said in Washington.

The detainees are receiving warm showers, toiletries, water,
clean clothes, blankets, regular, culturally appropriate meals,
prayer mats, and the right to practice their religions,' in
addition to medical care, writing materials and visits from the
International Red Cross, Rumsfeld said.

Rumsfeld said critics were not taking into account the danger
detainees pose to military guards. He said that one detainee at
Guantanamo has threatened to kill Americans, and another has bitten
a U.S. military guard.

The West risks losing support in the fight against terrorism if
it mistreats the prisoners or subjects them to the death penalty,
said EU External Relations Commissioner Chris Patten.

That would be a way of losing international support and losing
the moral high ground,' Patten said. He urged a show of decency
and generosity of spirit to the vanquished, even if they are pretty
dangerous.'

Rumsfeld said the United States has not decided if the detainees
should be treated as prisoners of war, and for now calls them
battlefield detainees. He said the Geneva Conventions call for
so-called unlawful combatants' to be treated humanely, and the
United States military is treating them humanely.

Under the Geneva Conventions, POWs would have to be tried by the
same courts and procedures as American soldiers, not by military
tribunals.

The International Committee of the Red Cross said Tuesday that
the U.S. military has implemented some recommendations from its
team in Guatanamo. But Urs Boegli, the agency's senior
representative from Washington, D.C., declined to say what those
were.

I'm confident through this work we can make a difference,' he
told reporters.

Boegli said his team had interviewed 20 detainees on a
one-to-one basis in a calm, serene situation.' They gave them
cigarettes to smoke and the inmates gave them written messages to
send home, he said.

I'm satisfied with the access, with the cooperation from
authorities down to the guards in the camp,' he said.

Britain's Prime Minister Tony Blair tried to defuse London press
accusations of torture at the base, saying through a spokesman
Monday that three Britons among the detainees say they have no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaints about their treatment.

The number of detainees at the base in remote Cuba rose to 158 with Monday's arrival of 14 battle-scarred fighters on stretchers, including two amputees and three with infections requiring surgery. The military C-141 cargo plane bringing them here was the sixth flight bringing detainees from the U.S. base at Kandahar in Afghanistan, where 218 detainees remain. The 14 prisoners were carried from the aircraft on stretchers by Marines in yellow rubber gloves and turquoise surgical masks.

The Marines seemed to frisk the captives before carrying them to a bus. The detainees wore blacked-out goggles and orange jumpsuits, and appeared to have their arms strapped to their bodies.

They were restrained in a manner appropriate, in a way that would not aggravate their medical conditions,' Coast Guard Lt. Cmdr. Brendan McPherson said.

Similar photographs of detainees kneeling on rocky earth, published by the U.S. Department of Defense on Friday, have provoked protests in Britain.

U.S. military officials say the precautions are taken during the flight and are removed once prisoners are processed and led to their cell.

The Red Cross, which has a team at Guantanamo, said Monday it considers the detainees prisoners of war, and the photographs violate a Geneva Convention protecting them from public curiosity.'

Such pictures should not be disseminated. They could have a strong impact on the family and the Muslim community worldwide,' spokesman Darcy Christen said in Geneva.

Recognizing the detainees as prisoners of war would mean trying them under the same procedures as U.S. soldiers -- by court-martial or civilian courts, not military tribunals.

Monday night, Marine Brig. Gen. Mike **Lehnert**, who is in charge of the **detention** mission, defended the temporary cells where detainees are being held -- a concrete slab divided by chain-link fences and topped by a corrugated metal roof that some human rights advocates have likened to kennels and cages.

We have to look at Camp **X-ray** as a work in progress, a told CNN.

All but two of the 160 cells were occupied Monday, but officials said another 60 would be built in three days and they could put two captives in one cell.
**Lehnert** said plans are to build a more permanent **prison** exactly in accordance with **federal prison standards'** which will be much more comfortable.'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

At the camp, a new green-and-white sign in Arabic points in the direction of Mecca, which Muslims face to pray.

**Lehnert** said a Muslim cleric from the U.S. Navy was to arrive Tuesday to discuss religious issues, including whether detainees are allowed to grow hair and beards that were shaved off.

**Prison** guards said leaders are emerging among the detainees. The Miami Herald said one tried to use a prayer period to rally prisoners, chanting Be strong. Allah will save us.'

The Herald reported that the most prominent inmate appears to be former Taliban army chief of staff Mullah Fazel Mazloom, though U.S. commanders refuse to identify inmates.
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 26

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

## IBRAHIM OSMAN IBRAHIM IDRIS

1 of 1 DOCUMENT

Copyright 2002 The Washington Post
The Washington Post

February 13, 2002 Wednesday
Final Edition

**SECTION:** A SECTION; Pg. A16

**LENGTH:** 1012 words

**HEADLINE:** Extended Detention in Cuba Mulled;
Officials Indicate Guantanamo Bay Could Hold Tribunals, Carry Out Sentences

**BYLINE:** John Mintz, Washington Post Staff Writer

**BODY:**

As the Bush administration nears completion of new rules for conducting military trials of foreign detainees, U.S. officials say they envision the naval base at Guantanamo Bay, Cuba, as a site for the tribunals and as a terrorist penal colony for many years to come.

"It's become clear that some of the al Qaeda detainees, even if they're not convicted of anything, will have to remain in detention for quite some time" because of the continuing threat of terrorist activity, said one knowledgeable source. Terrorists convicted at the military tribunals also could be imprisoned at the base, which offers the government a number of security advantages, officials said.

U.S. military officials have drawn up blueprints for a 408-bed, air-conditioned prison building that would replace the clusters of temporary, open-air cells occupied by 254 al Qaeda and Taliban fighters captured in Afghanistan. U.S. officials expect that once built, the semi-permanent structure would remain in use for at least five years, sources said.

Since President Bush announced plans for the military tribunals Nov. 13, his administration has scrambled to develop comprehensive regulations under which the detainees would be tried and held. Rules under consideration would require a unanimous vote of judges to impose a death sentence and would allow defendants avenues for appeal, sources said.

Tom Malinowski, a Washington representative for Human Rights Watch, raised questions about the prospect of extended detention of unprosecuted prisoners. "It is a basic principle of law" that people shouldn't be jailed indefinitely without charges, he said. Yet it could be argued that under international law, detainees such as these could be held for the duration of a war, he added.

"The question is, which war?" he said. "Is it the war in Afghanistan, the one against al Qaeda or the one against terrorism? That could be 50 years."

The Guantanamo naval base also is the front-runner to be the site where suspects would be tried in tribunals, sources said. After early criticism from human rights groups, U.S. officials have drawn up guidelines for trials that more closely resemble criminal trials and military courts-martial.

In his Nov. 13 presidential order, Bush said convicted terrorists could receive the death penalty with just a two-thirds vote of judges. But the latest draft of the rules would require a unanimous vote, sources said.

Bush's initial directive ruled out appeals to any court, but the new guidelines allow some appellate review, though the details remain hazy.

The Washington Post February 13, 2002 Wednesday

The Defense Department's office of general counsel is the lead agency fashioning the guidelines, in consultation with the White House and the State and Justice departments.

"The staffs are still working on it," a White House official said. "The plan hasn't gotten to any decision-makers, like [Defense Secretary Donald H.] Rumsfeld or Bush."

Suspects in any tribunal would have the right to hire private defense lawyers, to present evidence and witnesses and avoid testifying, sources said. Hearsay or second-hand evidence would be allowed at the tribunals, although it is barred in both courts-martial and civilian trials.

The prosecutors and judges for the planned tribunals would come from the military's judge advocate general's office, or JAG, sources said.

"Insofar as JAG officers are involved, they'll bring a JAG sensibility to the proceedings, and they are very careful people," said Ruth Wedgwood, an expert on international law at Yale University who supports the Bush tribunal plan. "They're proud of having brought military justice to the point that it provides up to and sometimes beyond" the protections afforded in civil justice.

But earlier in the deliberations, top officials in the Army, Navy and Air Force JAG offices opposed military tribunals, saying they preferred that terrorism suspects be prosecuted in ordinary criminal courts, a military official said. White House officials responded that holding tribunals in U.S. federal courthouses would present overwhelming security problems, the official said.

Administration officials expect that military tribunals would largely be open to the public, except for portions that would be closed to hear classified evidence. But one reason for holding the tribunals at Guantanamo Bay is that access to the base -- and therefore to the hearing sites and prison -- is strictly controlled by the U.S. military, knowledgeable attorneys said.

The base has similar advantages as a prison. Detaining war captives aboard ships would violate the Geneva Conventions -- which Bush recently decided to apply to Taliban fighters but not members of al Qaeda -- as would commingling them in ordinary prisons with domestic criminals.

Military officials also cited dangers found in history: In World War II, when 435,000 captured German military personnel were held as prisoners of war in this country, 2,222 escaped. Some blended into the population and were not located for years, an unacceptable risk when it comes to al Qaeda fighters, U.S. officials believe.

Guantanamo's unique legal status also is an attraction. It is Cuban territory that is leased essentially in perpetuity to the United States under a series of agreements.

"It is not in any federal judicial district, so it is not subject to habeas corpus," the legal right for someone in custody to demand a hearing before a judge to decide the legality of the detention, said a lawyer informed about the government's deliberations.

Moreover, the administration believes that a 1950 U.S. Supreme Court decision minimizes the chances a prisoner could file an appeal in federal court. The ruling said that captured German soldiers, who had aided the Japanese military after the armistice in Europe, had no legal right while outside the country to demand a U.S. court hearing on their case.

But many of these deliberations remain murky, one informed lawyer said, because "so much of all this is very, very, very closely held."

Staff writer Thomas E. Ricks contributed to this report.

**LOAD-DATE:** February 13, 2002