# EXHIBIT 27

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

Updated 03 Jul 2003



United States Department of Defense

# News Transcript

On the web: http://www.defenselink.mil/cgi-bin/dlprint.cgi?
http://www.defenselink.mil/transcripts/2003/tr20030703-0323.html
Media contact: +1 (703) 697-5131
Public contact: http://www.dod.mil/faq/comment.html or +1 (703) 428-0711

**Presenter:** Senior Defense Official

Thursday, July 3, 2003

## Background Briefing on Military Commissions

Senior Defense Official: I just really wanted to put out some information very quickly and then we'll go right to questions and answers.

Today the President has determined that six enemy combatants currently detained by the United States are subject to his military order of November 13, 2001. The President determined that there is reason to believe that each of these enemy combatants was a member of al Qaeda or was otherwise involved in terrorism directed against the United States.

I think with that setup, there are obviously a lot of questions, I assume, on your mind and we'll be happy to take those.

Charlie?

Q: We assume that Dr. Wolfowitz will determine whether or not they will be subject to commissions. In other words, the President has determined that they are eligible to go before commissions, and the Pentagon now determines whether or not they will in fact be charged, what they will be charged with --

Senior Defense Official: Why don't I talk just a little bit about the process.

Senior Defense Official: I think you're in effect correct. In effect, it is a grant of jurisdiction over the person. Then after that the prosecution would look at the cases, determine if there were appropriate charges, would then present the charges to the appointing authority, and at that time it would be up to the appointing authority, Dr. Wolfowitz in this case, who would determine whether or not to approve the charges and perhaps to appoint a commission and refer those charges to the commission.

Q: These six, we assume, are among those held at GTMO, and why these six? Are the things that they have done especially egregious to single them out?

Senior Defense Official: It's really not so much -- These are people among others who have been evaluated. There are a lot of factors. The quality of the evidence we have against them, how far along we are in intelligence gathering, and it's really mostly that these are people who are available, and according to the process we've established for gathering this information we've determined that we have sufficient action -- The President has indeed determined that he's got reason to believe that they are as I described them.

Q: And they are at GTMO. They're among those being held at GTMO?

Senior Defense Official: We're not talking about the individual cases and I don't think we need to discuss exactly where they're being held because that's a little bit more specificity than I think we're prepared to discuss.

Q: Will they be moved from wherever they are now, assuming GTMO, to a regular military prison?

Senior Defense Official: I think that also would be premature to discuss that since in fact there have been no charges approved in any of these cases, nor has there been a commission appointed or any specific directions given by the appointing authority. So at this juncture we just don't have --

Q: How fast do you expect that to happen?

Senior Defense Official: Again, I think it would be best -- We'll discuss process and the kinds of things that can happen because there will be so many factors involved in --

Q: Should we see something before the end of the year, or is this going to be --

Senior Defense Official: -- kinds of steps that are involved. Again, repeating what we told Charlie.

Q: I wrote it down. So what about timeline? Will it take six months to do this or is it going to be on a fast track? We have the what, where, when, why thing, and this is the when part. So when?

Senior Defense Official: It's like a what part, too. We gave you a lot of what --

Senior Defense Official: As you can tell in the past we've been proceeding very methodically and deliberately and carefully and I think that that will continue to guide the military commission process. In that regard it probably wouldn't be prudent to set any kind of a timeline because the criminal justice system should not be driven by timelines, they should be driven by the facts of the case. That's what's the next step is for the chief prosecutor to look at the facts of the case and see if there are appropriate charges for those facts. So I think that's the reason we wouldn't want to set ourselves to a timeline. We want to look at each individual case on a case-by-case basis and do the right thing.

Q: Can you take us a little further on the who's and what's of these? Are they Afghan, are they al Qaeda, are they terrorists that you found in this country?

Senior Defense Official: Again, we're not going to discuss particular aspects of any of the individual cases because it's just premature to do that.

Q: How about a ballpark? Are the majority of them one or the other?

Senior Defense Official: All I think we're really prepared to say is there's evidence that they may have attended terrorist training camps.

Q:  In Afghanistan? And --

Senior Defense Official:  I'm not going to discuss those kinds of details. They may have attended training camps, they may have been involved in the kinds of activities that are consistent with terrorist activities -- financing, recruiting. Those are the kinds of things that would lead us to the kind of determination that the President made today.

Do you have any more to add?

Senior Defense Official:  I'd just say that is a summary of the kind of evidence involved in the six cases that we've seen come back from the President today. But we wouldn't want to discuss any specific case or a specific kind of evidence associated with those activities.

Q:  Will you hold the trials in the same place if they are held? Will they be in GTMO, will they be in this country?

Senior Defense Official:  Again, that's a decision that gets made at a later point in this process. That would be at the point when the appointing authority in fact refers charges to a commission.

Q:  But not -- I mean are the options in this country or another country or --

Senior Defense Official:  The military commission order that the Secretary of Defense signed March 21, 2002 and the Military Commission Instructions were written, designed to give us the flexibility to do what was appropriate in every case so we have a large range of options. That's why the rules were written the way they were written.

Q:  Will we find out the identities of these people and the specificity of the charges when they are actually referred to a commission, when a commission is appointed? Or when?

Senior Defense Official:  We may indeed at the time of charging provide that information. At the time of charging or perhaps at the time when a defense counsel would be assigned to an individual.

It would be inappropriate at this time since in fact no charges have been brought against any of these detainees.

Senior Defense Official:  And let me just emphasize one point the Colonel made is that we may identify those things, and we may not. We will at the point of a commission should any of these get to a commission, the objective is as much transparency as practicable, and those are the kinds of things we consider at the time.

Q:  So it's possible you won't ever identify them to us?

Senior Defense Official:  I suppose that is possible. Yeah, I suppose that is possible.

Senior Defense Official:  But the intent is, as directed by the Secretary of Defense, that these proceedings will be as open as practicable.

Senior Defense Official:  Remembering again that one of the principal objectives of this third

way, the President sought a third way, we have an Article 3 system of justice, we have courts-martial, a third way to be able to set up a body of rules that will allow us to protect information to achieve additional intelligence gathering purposes that may lead to the capture of more terrorists. So it's important to remember.

Q: Can you describe the makeup of a commission?

Senior Defense Official: In general, you mean?

Q: How these commissions will be made up.

Senior Defense Official: There may not be commissions in this case. It's important to keep that in mind. We may have commissions, we may not. But in general, commissions.

Senior Defense Official: Under the Military Commission Order No. 1 you see that the commissions are constituted by a three to seven member panel of commissioned officers from the armed forces, one of whom is a presiding officer who must be a judge advocate.

Q: And for a guilty verdict, what's the percentage of commission members that have to vote --

Senior Defense Official: A two-thirds vote of the three to seven member panel.

Q: Do the six know that they've been chosen?

[Laughter]

Senior Defense Official: Again, I don't think we want to answer specific questions that might involve those individuals.

Q: Can you say a little bit more about what this means in terms of status now or change of status? Are they still to be described as enemy combatants? How should they be described then?

Senior Defense Official: Legally there is no change to the status. They are being held as enemy combatants right now. They are being held simply as a function of the war on terrorism and detained because they are a threat to the United States.

A criminal process has not begun in any of these cases. Again, it's a decision the President has made that's akin to a granting of jurisdiction but there's been no exercise of that jurisdiction so therefore no criminal process or rights and procedures that normally attend a criminal process are in place yet.

Q: So their right to representation doesn't start until they're charged?

Senior Defense Official: The way the order reads, they will be given a defense counsel sufficiently in advance of any trial to make sure that they can prepare an adequate defense. Certainly there's no trial that has been directed at this point in time.

Q: Are these six the first ones who've been put in this jurisdiction? And is it a rolling process where we might expect to see more down the line? Have you looked at the entire universe of enemy

combatants and decided these are the only six that will --

Senior Defense Official: Yes, to both your questions. It is the first time that the President has made a "reason to believe" determination; and there may well be more.

Q: Secretary Wolfowitz, as I understand, sent a report over to the White House and gave reasons why the six should be eligible for possible commissions or possible trials. Were these six the only ones that were pulled initially? Or was there a large list and the President just picked six from it initially? Or are these six -- Are these the only six suggested initially?

Senior Defense Official: First of all, there are a number of factors beyond what may have been recommended from this building that have led to the President's determination that he has reason to believe that these are people engaged in terrorism against the United States. So it's more than just the recommendations or suggestions that may have come from here.

With regard to whether there are others that the President has considered, I don't think we have anything to say on that, do we?

Senior Defense Official: The only legally relevant thing that has happened today is the President's decision to provide these "reason to believe" determinations. It wasn't an action by the Pentagon.

Q: A couple of procedural questions.

The appointing authority is responsible both for deciding which if any of these half dozen are to be charged; and the appointing authority also is responsible for forming the commissions.

Should any of these be charged and decide to plead guilty, some sort of plea bargain, is it necessary for them to go before a commission to execute that bargain? Need there be a commission for a plea bargain to be finalized?

Senior Defense Official: Yes. The way the rules are written there needs to be a commission in any event. And in fact the commission does have responsibilities even for a plea agreement in that they have to determine whether or not a plea is voluntary and informed.

Q: And in the sequence of those two chores of the appointing authority, does either one necessarily come first? Deciding to charge somebody and then creating a commission? Must the commission be created first?

They're both chores in separate sections of the order.

Senior Defense Official: I think you've read the order correctly and the order does not specify a particular chronology as to how those events would have to occur.

Q: Lastly, if you had a couple of questions from here and there about where it could be and you're declining to say where, but someone said could they be brought to a military base, surely you can say you don't wish to bring them into U.S. territory after winning a case that says they have no habeas corpus rights outside of U.S. territory. You're not suggesting that's an open question to bring them to the United States --

Senior Defense Official:  We're not suggesting anything with respect to locale. I think that's the way to take it. That's speculation on your part.

Senior Defense Official:  In view of the day and the hour I think we probably have time for maybe two more.

Q:  This might be putting the cart before the horse, but if no charges are preferred against one of these six or if they come through and the tribunal finds them not guilty, are they automatically set free? Or would they go back into detention for intelligence purposes?

Senior Defense Official:  We can't really answer that right now.

I can say this, that as this process develops we certainly will be getting more information about those people. If one of them were to go through a commission process, at the end of that process we would know much more than we know now.

So any decision like that would have to be made at that time.

It would also be a bit misleading to say that we wouldn't consider sending one of these people before a commission. Certainly the acting chief prosecutor will be looking at potential charges on these cases that have had determinations made on them.

Senior Defense Official:  Let me talk about one thing in terms of your question about after a potential commission what might happen. Remember the purpose of the commission, and that was to have a third way, something different, and the rules were structured in a very deliberate fashion but deliberately flexible. So there are a lot of things.

As the colonel said, there's going to be further intelligence gathering. And that, by the way, is the second point. A principal purpose of this third way is to be able to protect intelligence and what intelligence may be gathered during the process would help determine sort of the ultimate outcome of any of these individuals.

Q:  So is it possible then that somebody could go through a commission, be found not guilty, and then have them say well, congratulations, you're not guilty but you're still an enemy combatant so back into wherever we're holding you?

Senior Defense Official:  As a legal matter, they're two completely different questions. They're not being held because of any criminal activity or any charges. They're being held because they're enemy combatants in an ongoing armed conflict.

What we're talking about with military commissions is a criminal process so in that regard they're two distinct issues.

With respect to factually whether or not the Department of Defense would want to continue holding someone, that's an issue  -- My only point there is if a military commission process starts up certainly the facts available to decision makers will be greater. So that's a decision they'll make at that point in time.

Senior Defense Official:  Anything else?

Thank you very much. Have a great 4th of July.

Q:  Is there any [inaudible], like does this set any kind of process going that says at the end of five years they have to be done or is it still open ended?

Senior Defense Official:  The war on terrorism is open ended.

Q:  All right.

http://www.defenselink.mil/transcripts/2003/tr20030703-0323.html

# EXHIBIT 28

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3

4    MOURAD BENCHELLALI, ET AL..

5         Plaintiffs,                 .

6              vs.                    .    Docket No. CV04-1142 (RJL)

7    GEORGE W. BUSH, ET AL.,          .

8         Defendants.                 .

9         and                        .

10   LAKHDAR BOUMEDIENE, ET AL..   Docket No. CV04-1166 (RJL)

11        Plaintiffs,                 .

12             vs.                    .

13   GEORGE W. BUSH, ET AL.    .    Washington, D.C.

14        Defendants.           .    December 2, 2004

15   . . . . . . . . . . . . .

16             TRANSCRIPT OF MOTION HEARING

           BEFORE THE HONORABLE RICHARD J. LEON

17             UNITED STATES DISTRICT JUDGE

18

19   APPEARANCES:

20

21   For the Plaintiffs:          WESLEY R. POWELL, ESQ.

                                  TINA M. FOSTER, ESQ.

22                                Clifford Chance US LLP

                                  31 West 52nd Street

23                                New York, New York 10019

                                        and

24

25

Page 2

```
 1   APPEARANCES (Continued):        ROBERT KIRSCH, ESQ.
                                     MELISSA A. HOFFER, ESQ.
 2                                   Wilmer Cutler Pickering Hale
                                          and Door, LLP
 3                                   60 State Street
                                     Boston, Massachusetts 02109
 4

 5                                   BARBARA J. OLSHANSKY, ESQ.
                                     Deputy Legal Director for
 6                                        Litigation and Movement
                                          Support
 7                                   Center For Constitutional Rights
                                     666 Broadway
 8                                   New York, New York 10012

 9   For the Defendants:            TERRY M. HENRY, ESQ.
                                     Senior Counsel
10                                   Federal Programs Branch
                                     U.S. Department of Justice
11                                   20 Massachusetts Avenue, NW
                                     Room 7144
12                                   Washington, D.C. 20530

13                                   BRIAN D. BOYLE, ESQ.
                                     Principal Deputy Associate Attorney
14                                        General
                                     Office of the Associate Attorney
15                                        General
                                     U.S. Department of Justice
16                                   Washington, D.C. 20530

17   Court Reporter:                Patty Artrip Gels, RMR
                                     Official Court Reporter
18                                   U.S. District Court
                                     333 Constitution Avenue, NW
19                                   Washington, D.C. 20001

20   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
21
22
23
24
25
```

1    treaty questions.

2            THE COURT:  All right.

3            MR. BOYLE:  As your Honor knows, the Petitioners focus

4    on their supposed rights under the Geneva Conventions.  I don't

5    believe they have been able to identify, however, any provision

6    in those conventions that would purport to entitle them to

7    release from confinement.  Of course, that's what these habeas

8    petitions are about.  Even assuming they applied, Article 118 of

9    the Geneva (III) Convention for prisoners of war allows the

10   detention of combatants at least until the cessation of

11   hostilities.

12           And I think it is fair to say that there can be no

13   debate about the proposition that there has been a cessation of

14   hostilities.  Even last week in Afghanistan two American troops

15   lost their lives.  American bases were bombed by rockets and, of

16   course, if you pay attention to satellite television, there is a

17   fresh threat from a senior al-Qaeda operative in recent memory.

18           So in any event, the Geneva Convention is plainly

19   applicable to these Petitioners.

20           THE COURT:  Well, at least some of the Petitioners say

21   they are also.

22           MR. BOYLE:  As I say, the Boumediene and El-Banna

23   petitions -- El-Banna is not before you -- hopefully say that

24   they are not protected by the Geneva Conventions and I couldn't

25   agree more.

1           With respect to the others and the President

2      determined correctly that al-Qaeda could never be a high

3      contracting party to Geneva and thus its operatives could never

4      derive protection from the conventions.  The Taliban the

5      President determined could not meet Article 4 criteria in Geneva

6      (III) as a regular armed forces and, therefore, the protections

7      could not be extended to them.

8           The Court in Hamden we would respectfully submit erred

9      on both points.  With respect to the conclusion that al-Qaeda

10     operatives working alongside or in the vicinity of Taliban

11     troops in Afghanistan could be entitled to Geneva protection, we

12     think the Court gave insufficient deference, no deference to the

13     President's contrary determination; and the President who has

14     the constitutional responsibility to implement and enforce

15     treaties to which the U.S. is signatory is entitled to deference

16     on that determination.

17          It is also counter textual because common Article 2 of

18     the conventions explicitly contemplates that there could be

19     powers in a conflict working alongside with powers who were

20     signatories that are not entitled to protection.

21          With respect to the ruling that those detained could

22     raise doubts about their status under the conventions and must

23     be entitled to an Article V hearing before a competent tribunal,

24     I think the structure of the treaties suggests otherwise.  It is

25     evident that the treaties contemplate there being organized

1  forces that at least technically satisfy the Geneva Convention's

2  criteria to trigger prisoner of war protections.

3        And when there are such forces in play, there can be

4  doubt raised about a specific individual whether in fact he was

5  associated with the uniformed organization that was

6  distinguishable from the civilian population carrying weapons

7  openly, but where there has been a finding that there are no

8  such forces in play and the President determined that on the

9  basis of information supplied from the Defense Department and

10  indeed this information was discussed in the Lynd case that we

11  have cited to the Court.  There is no need for a competent

12  tribunal to address the question.  There is no doubt.  There can

13  be no doubt.

14        Let me address the question of judicial enforceability

15  because we think there too the Court in Hamden erred.  The

16  Eisentrager opinion that has been cited for other purposes, that

17  decision holds that very clearly that the 1929 Geneva

18  Conventions are not judicially enforceable. The decisional

19  principle was that where the treaties specify a corrective

20  mechanism that is non-judicial and otherwise don't breathe a

21  word about judicial enforcement, then that is the mechanism that

22  is operative; and there is to room for the conclusion that the

23  treaties are self-executing in the sense that they would permit

24  enforceability.

25        That principle by the way was explained in the Holmes

1    v Laird decision that we have cited, D.C. Circuit.

2          If you think about it, a regime of judicial

3    enforceability where there is a great imbalance among the

4    world's nations in terms of the independence, impartiality, the

5    powers of their judicial branches, their Judges, creates a huge

6    mutuality problem.

7          THE COURT:  Well, have there ever been -- isn't the

8    bottom line from your perspective there has never been any

9    international treaty ever engaged in by any country including

10   the United States that is conceptually designed to address a war

11   of this kind? There is no --

12         MR. BOYLE:  That is certainly true.  I am entering the

13   make-believe world that these individuals would be covered by

14   Geneva in some way and could enforce the protections.  I am

15   saying even if they were, they couldn't get to Court.

16         THE COURT:  So if the Court were to accept that

17   position by the Government, if the Court agreed with that

18   position by the Government, then what the Court would be left

19   with essentially is a situation where there are no treaties

20   limiting the President's power to conduct this kind of war that

21   exists today and until such time as they are ratified by the

22   Congress and signed by the President that there is no

23   restriction on the President in the conducting of this kind of

24   war with regard to these issues?

25         MR. BOYLE:  Well --

1    THE COURT:  Is that your position?

2    MR. BOYLE:  Yes, but that would also be true it seems

3 to me in terms of the judicial role in the context of a war that

4 was explicitly governed by Geneva because in that --

5    THE COURT:  I thought your position was this isn't

6 that kind of war.  This is not that kind of war.

7    MR. BOYLE:  Granted, it isn't; but I am making the

8 point that even if it were --

9    THE COURT:  Okay.

10    MR. BOYLE:  -- the corrective mechanism would be that

11 specified in the laws of war, the case of Geneva diplomacy,

12 diplomatic interaction.

13    And so it seems to me that same corrective mechanism,

14 that same reservoir of protection is available to these

15 detainees as well.  They are the subject of diplomatic

16 discussions and indeed many of them have been addressed in

17 diplomatic dialogue between the United States and other

18 countries.

19    The Petitioners say that Geneva '49 is judicially

20 enforceable because it differs so much from Geneva '29 in that

21 Geneva '49 focuses on individual rights, and I beg to differ.

22 The passages that the Petitioners rely on to suggest that the

23 Conventions focus on individual rights are almost verbatim in

24 the '29 Convention.  Let me read a couple of them.

25    This is from the '29 Convention:  "Prisoners shall at

1   all times be treated humanely and protected particularly against

2   acts of violence and from public curiosity."  From Article 3,

3   "Prisoners of war are entitled to respect for their persons and

4   honor."  From Article 16, "Prisoners of war shall be permitted

5   complete freedom in the performance of their religious duties."

6   The same provisions are in the '49 Convention.

7           THE COURT:  Right.

8           MR. BOYLE:  It is obvious that both Conventions

9   focused on the plight of the individual.  That did not mean and

10  does not mean that the Conventions are judicially enforceable.

11          THE COURT:  So your position is that those Conventions

12  don't apply to this kind of war and although you may be engaged,

13  the Defense Department may be engaged in coming up with systems

14  that are in the spirit of the Convention, they are not bound by

15  the Geneva Convention as it applies to these detainees?  It is

16  not bound by it?

17          MR. BOYLE:  It is certainly not.

18          THE COURT:  Okay.

19          MR. BOYLE:  There are other Conventions that the

20  United States -- well, in addition to honoring the spirit of the

21  Geneva Conventions and applying them insofar as consistent with

22  the mission at Guantanamo, the United States is a signatory to

23  the Convention against torture and honors, it is stated

24  publicly, that it honors that Convention.

25          But, in any event, these are not questions that given

1    the nature of these treaties are the subject of judicial

2    enforcement, proper judicial enforcement.  There is an argument

3    they set out that because the habeas statute allows them to

4    question the lawfulness of detention, whether the detention is

5    consistent with treaties means that you don't need to have a

6    cause of action or enforceable cause of action under the treaty

7    in order to raise a treaty issue.  And that proposition has been

8    rejected many times, and the decisions are cited in our briefs.

9        THE COURT:  So from your point of view is it possible

10   under the present construct since the law of war doesn't apply

11   to this kind of war and the Conventions don't apply to this kind

12   of war, is there any scenario where the detention could be

13   unlawful?

14       From the Government's point of view, is there any

15   scenario assuming for the sake of discussion someone is being

16   held erroneously, the intelligence data that was relied upon by

17   the team that took into custody people and brought them to

18   Guantanamo, they were wrong; they had the wrong person?

19       But assuming that, could it be unlawful under any

20   scenario from your point of view?

21       MR. POWELL:  Petitioners have cited none that we would

22   think would be a basis for a judicial correction.  That said, we

23   are not -- the military is not detaining individuals for some

24   sort of perverse enjoyment.  I mean there is a reason this is

25   happening.

1      These individuals have been determined to be enemy

2    combatants on the best information we have.  They are detained

3    precisely because it has been concluded that they would pose a

4    danger to the United States, a continuing danger, if they were

5    released.  I think we started with 800 or so combatants at

6    Guantanamo.  At least 250 have been released.

7      To illustrate the sensitivity of that judgment, it has

8    publicly been reported and acknowledged by DoD that some of the

9    individuals who have been released have returned to hostilities

10   against Americans, and that is quite unfortunate but I think it

11   illustrates, provides the basis for the great deference that the

12   executive and the military is owed in making these judgments.

13     And it is also certainly open -- in addition to there

14   being the world of diplomacy open for discussion about this

15   unconventional war and the possibility that new treaties could

16   be negotiated, there is no reason that couldn't happen.

17         THE COURT:  So if someone --

18         MR. BOYLE:  More specific treaties dealing with this

19   kind of unconventional conflict, sure.  There have been

20   attempts, by the way, to broaden the scope of treaties to cover

21   aspects of conflicts like the one with al-Qaeda and those have

22   been rejected.  The U.S. in particular has rejected them.

23         THE COURT:  Hold on.  You are saying if someone is

24   being held unlawfully, that it is in the province of the

25   military to decide through its own review process whether or not

1    that's the case or not?

2          MR. BOYLE:  What do you mean unlawfully? You mean in

3    error?

4          THE COURT:  Well, wouldn't that be unlawful? What if

5    a --

6          MR. BOYLE:  It would make no sense.

7          THE COURT:  Let me finish.

8          MR. BOYLE:  Yes, your Honor.

9          THE COURT:  What if a team of soldiers went in and

10   used force to capture people they believed were enemy combatants

11   as the Deputy Secretary defined the term and relying upon

12   intelligence and they took them into custody and brought them to

13   Guantanamo Bay and they had this hearing process that you have

14   come up with that's going on right now, and it turns out that

15   they were taken erroneously?

16          Your position is that that wouldn't be, although

17   erroneous, it is not unlawful; is that right? Is that your

18   position? It is not unlawful; it is erroneous?

19          MR. BOYLE:  It would not be a violation of --

20          THE COURT:  Of any law.

21          MR. BOYLE:  -- domestic law, international treaties.

22   I find it inconceivable.  In fact, there was one of the

23   detainees of the 150 or so tribunal proceedings that have come

24   to a conclusion was released because it was determined that he

25   was not an enemy combatant, didn't qualify based on the best

1    information that we had available at that point.

2         And so I repeat what I said earlier.  The process that

3    in fact is being applied is designed to ensure that individuals

4    of the sort your Honor described will be released; and so the

5    question you raise about the potential role for the judiciary I

6    don't think will ever be addressed.  But I will answer your

7    question clearly there is no provision of law that would declare

8    unlawful or no treaty that would make it unlawful for there to

9    be such an erroneous detention decision.

10        Again, inconceivable because the process that is being

11   applied, the process that frankly has been applied from the

12   beginning albeit less formally is designed to ensure that no

13   individuals are held mistakenly.

14        Let me -- I probably burned through all of my 45

15   minutes and I didn't get --

16        THE COURT:  You have got about two minutes left, but

17   you will get another chance to speak.

18        MR. BOYLE:  The one argument that is not set out

19   clearly in the briefs that I want to focus on is one of the many

20   bases for the conclusion that there is no APA waiver of

21   sovereign immunity for an ATS claim.

22        If you look at -- and that's in addition to the one

23   that Judge Kollar-Kotelly, by the way, recognized in her initial

24   opinion in Al Odah, the 701(b)(1)(g) exception for the exercise

25   of military authority in time of war.  That has not been

# EXHIBIT 29

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

1 of 1 DOCUMENT

Copyright 2005 The Washington Post
The Washington Post

January 2, 2005 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1165 words

**HEADLINE:** Long-Term Plan Sought For Terror Suspects

**BYLINE:** Dana Priest, Washington Post Staff Writer

**BODY:**

Administration officials are preparing long-range plans for indefinitely imprisoning suspected terrorists whom they do not want to set free or turn over to courts in the United States or other countries, according to intelligence, defense and diplomatic officials.

The Pentagon and the CIA have asked the White House to decide on a more permanent approach for potentially lifetime detentions, including for hundreds of people now in military and CIA custody whom the government does not have enough evidence to charge in courts. The outcome of the review, which also involves the State Department, would also affect those expected to be captured in the course of future counterterrorism operations.

"We've been operating in the moment because that's what has been required," said a senior administration official involved in the discussions, who said the current detention system has strained relations between the United States and other countries. "Now we can take a breath. We have the ability and need to look at long-term solutions."

One proposal under review is the transfer of large numbers of Afghan, Saudi and Yemeni detainees from the military's Guantanamo Bay, Cuba, detention center into new U.S.-built prisons in their home countries. The prisons would be operated by those countries, but the State Department, where this idea originated, would ask them to abide by recognized human rights standards and would monitor compliance, the senior administration official said.

As part of a solution, the Defense Department, which holds 500 prisoners at Guantanamo Bay, plans to ask Congress for $25 million to build a 200-bed prison to hold detainees who are unlikely to ever go through a military tribunal for lack of evidence, according to defense officials.

The new prison, dubbed Camp 6, would allow inmates more comfort and freedom than they have now, and would be designed for prisoners the government believes have no more intelligence to share, the officials said. It would be modeled on a U.S. prison and would allow socializing among inmates.

"Since global war on terror is a long-term effort, it makes sense for us to be looking at solutions for long-term problems," said Bryan Whitman, a Pentagon spokesman. "This has been evolutionary, but we are at a point in time where we have to say, 'How do you deal with them in the long term?' "

The administration considers its toughest detention problem to involve the prisoners held by the CIA. The CIA has been scurrying since Sept. 11, 2001, to find secure locations abroad where it could detain and interrogate captives without risk of discovery, and without having to give them access to legal proceedings.

Little is known about the CIA's captives, the conditions under which they are kept -- or the procedures used to decide how long they are held or when they may be freed. That has prompted criticism from human rights groups, and from some in Congress and the administration, who say the lack of scrutiny or oversight creates an unacceptable risk of abuse.

Page 2

The Washington Post January 2, 2005 Sunday

Rep. Jane Harman (D-Calif.), vice chairman of the House intelligence committee who has received classified brief-ings on the CIA's detainees and interrogation methods, said that given the long-term nature of the detention situation, "I think there should be a public debate about whether the entire system should be secret.

"The details about the system may need to remain secret," Harman said. At the least, she said, detainees should be registered so that their treatment can be tracked and monitored within the government. "This is complicated. We don't want to set up a bureaucracy that ends up making it impossible to protect sources and informants who operate within the groups we want to penetrate."

The CIA is believed to be holding fewer than three dozen al Qaeda leaders in prison. The agency holds most, if not all, of the top captured al Qaeda leaders, including Khalid Sheik Mohammed, Ramzi Binalshibh, Abu Zubaida and the lead Southeast Asia terrorist, Nurjaman Riduan Isamuddin, known as Hambali.

CIA detention facilities have been located on an off-limits corner of the Bagram air base in Afghanistan, on ships at sea and on Britain's Diego Garcia island in the Indian Ocean. The Washington Post reported  last month that the CIA has also maintained a  facility within the Pentagon's Guantanamo Bay complex, though it is unclear whether it is still in use.

In contrast to the CIA, the military produced and declassified hundreds of pages of documents about its detention and interrogation procedures after the Abu Ghraib prison scandal. And the military detainees are guaranteed access to the International Committee of the Red Cross and, as a result of a U.S. Supreme Court ruling, have the right to chal-lenge their imprisonment in federal court.

But no public hearings in Congress have been held on CIA detention practices, and congressional officials say CIA briefings on the subject have been too superficial and were limited to the chairman and vice chairman of the House and Senate intelligence committees.

The CIA had floated a proposal to build an isolated prison with the intent of keeping it secret, one intelligence offi-cial said. That was dismissed immediately as impractical.

One approach used by the CIA has been to transfer captives it picks up abroad to third countries willing to hold them indefinitely and without public proceedings. The transfers, called "renditions," depend on arrangements between the United States and other countries, such as Egypt, Jordan and Afghanistan, that agree to have local security services hold certain terror suspects in their facilities for interrogation by CIA and foreign liaison officers.

The practice has been criticized by civil liberties groups and others, who point out that some of the countries have human rights records that are criticized by the State Department in annual reports.

Renditions originated in the 1990s as a way of picking up criminals abroad, such as drug kingpins, and delivering them to courts in the United States or other countries. Since 2001, the practice has been used to make certain detainees do not go to court or go back on the streets, officials said.

"The whole idea has become a corruption of renditions," said one CIA officer who has been involved in the prac-tice. "It's not rendering to justice, it's kidnapping."

But top intelligence officials and other experts, including former CIA director George J. Tenet in his testimony be-fore Congress, say renditions are an effective method of disrupting terrorist cells and persuading detainees to reveal information.

"Renditions are the most effective way to hold people," said Rohan Gunaratna, author of "Inside al Qaeda: Global Network of Terror." "The threat of sending someone to one of these countries is very important. In Europe, the custodial interrogations have yielded almost nothing" because they do not use the threat of sending detainees  to a country where they are likely to be tortured.

**LOAD-DATE:** January 2, 2005