# <u>EXHIBIT 34</u>

Amended Petition for Issuance of a
Writ of Habeas Corpus

On Behalf of Petitioner,

**IBRAHIM OSMAN IBRAHIM IDRIS**

Army Regulation 190–8
OPNAVINST 3461.6
AFJI 31-304
MCO 3461.1

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

**UNCLASSIFIED**

# *SUMMARY of CHANGE*

AR 190-8/OPNAVINST 3461.6/AFJI 31-304/MCO 3461.1
Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other
Detainees

This revision--

o  Establishes a multi-service regulation for all services (para 1-4a).

o  Ensures compliance with DOD Directive 2310.1 dated August 1994 (para 1-4g).

o  Establishes HQDA, Deputy Chief of Staff for Operations as the primary Army
   Staff responsibility for the Enemy Prisoner of War, Civilian Internee and
   Retained Persons Program (para 1-4c).

o  Establishes a DD FORM 2745, Enemy Prisoner of War(EPW) Capture Tag (para 2-
   1b).

o  Highlights Combatant Commanders, Task Force Commanders and Joint Task Force
   Commanders responsibilities (para 1-4g).

o  Establishes procedures for conducting tribunals (para 1-6).

o  Establishes Public Affairs policy (para 1-9).

o  Establishes policy for EPW held aboard ship (para 2-1b).

o  Updates OCONUS evacuation policy (para 2-3).

o  Establishes the use of Health and Comfort Packs as a temporary substitution
   for Advance of Pay for short term operations (para 3-4h).

o  Updates procedures for contracting EPW (para 4-22).

o  Combines AR 190-8 and AR 190-57 (para 6-1).

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

*Army Regulation 190–8
*OPNAVINST 3461.6
*AFJI 31–304
*MCO 3461.1

Effective 1 November 1997

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

By Order of the Secretary of the Navy:

~~Togo D. West Jr.~~
TOGO D. WEST JR.
*Secretary of the Army*

J.L. JOHNSON
*Admiral, United States Navy*
*Chief of Naval Operations*
*Acting*

J.S. Mobley
*Rear Admiral, United States Navy*
*Director, Navy Staff*

By Order of the Secretary of the Air Force:

RICHARD A. COLEMAN
*Colonel, USAF*
*Chief of Security Police*

By Order of the Secretary of the Navy:

LT GENERAL J.L. JONES, USMC
*Marine Corps Deputy Chief of Staff*
*for Plans, Policies and Operations*

**History.** This printing publishes a revision of this publication. Because the publication has been extensively revised the changed portions have not been highlighted.

**Summary.** This regulation implements Department Of Defense Directive 2310.1 and establishes policies and planning guidance for the treatment, care, accountability, legal status, and administrative procedures for Enemy Prisoners of War, Civilian Internees, Retained Persons, and Other Detainees. This regulation is a consolidation of Army Regulation 190-8 and Army Regulation 190-57 and incorporates SECNAV Instruction 3461.3 and Air Force Joint Instruction 31-304. Policy and procedures established herein apply to the services and their capabilities to the extent that they are resourced and organized for enemy prisoner of war operations.

**Applicability.** This is a multi-service regulation. It applies to the Army, Navy, Air Force and Marine Corps and to their Reserve components when lawfully ordered to active duty under the provisions of Title 10 United States Code.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff for Operations and Plans. The proponent has the authority to approve exceptions to this regulation that are consistent with controlling law and regulation. Proponents may delegate the approval authority, in writing, to a division chief within the proponent agency in the grade of colonel or the civilian equivalent.

**Army management control process.** The Regulation contains management control provisions in accordance with AR 11-2, but does not contain checklists for conducting management control. Reviews are used to accomplish assessment of management controls.

**Supplementation.** Army supplementation of this regulation and establishment of command or local forms is prohibited without prior approval from HQDA (DAMO-ODL), WASH DC 20310. Navy, Marine Corps and Air Force supplementation of this regulation is authorized, but is not required. If supplements are issued, major or second echelon commands will furnish one copy of each supplement to their headquarters, as follows: Navy, to the Chief of Naval Operations (N511), 2000 Navy Pentagon, Washington DC 20350-2000, Marine Corps, to the Commandant of the Marine Corps, HQ USMC (POS-10) 2 Navy Annex, Washington DC, 20380-1775 11), and Air Force, to HQ USAF/SPO,

1340 Air Force Pentagon, Washington, DC 20330-1340.

**Suggested Improvements.** Users are invited to send comments and suggested improvements through channels as follows: HQDA (DAMO-ODL), WASH DC 20310-0440.

**Distribution.** *Army:* Distribution of this regulation is made in accordance with initial distribution number (IDN) 092120, intended for command levels A, B, C, D, and E for Active Army, Army National Guard, U. S. Army Reserve.
*Navy:* SNDL A (Navy Department); B5 (Coast Guard); (COMDTCOGARD, only) 21A (Fleet Commanders in Chief); 22A (Fleet Commanders); 23 (Force Commanders); 24 (Type Commanders); 26A (Amphibious Groups); 28 (Squadron, Division, and Group Commanders—Ships); 41A (COMSC); SECNAV/OPNAV Directives Control Office,Washington Navy Yard Bldg 200, 901 M Street SE, Washington DC 20374-5074
*Air Force:* F
*Marine Corps:* PCN 10203324000

*This regulation supersedes AR 190-8, 1 June 1982, and rescinds AR 190-57, 4 March 1987. This regulation also rescinds DA Form 5451-R, August 1985; DA Form 5452-R, August 1985; and DA Form 5976, January 1991.

# UNCLASSIFIED

# Contents (Listed by paragraph and page number)

## Chapter 1
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
General protection policy • 1–5, *page 2*
Tribunals • 1–6, *page 2*
The National Prisoner of War Information Center (NPWIC) • 1–7, *page 3*
The Branch PWIC • 1–8, *page 3*
Public Affairs • 1–9, *page 4*

## Chapter 2
**Beginning of Captivity EPW/RP,** *page 4*
Initial actions upon capture • 2–1, *page 4*
Evacuation and care of EPW and RP • 2–2, *page 5*
Evacuation Policy • 2–3, *page 5*

## Chapter 3
**Administration and Operation of EPW Internment Facilities,**
*page 5*
Establishment • 3–1, *page 5*
EPW internment facilities • 3–2, *page 5*
EPW Facility Management • 3–3, *page 5*
Operation of prisoner of war internment facilities • 3–4, *page 6*
Procedures for prisoner of war correspondence • 3–5, *page 7*
Discipline and security • 3–6, *page 9*
Punitive Jurisdiction • 3–7, *page 10*
Judicial proceedings • 3–8, *page 10*
Loss or damage to property • 3–9, *page 11*
Death and burial • 3–10, *page 11*
Transfer of prisoners of war • 3–11, *page 12*
Repatriation of sick and wounded EPW/RP • 3–12, *page 13*
Repatriation of other EPW/RP • 3–13, *page 14*
Repatriation transfer procedures • 3–14, *page 14*
Retained personnel • 3–15, *page 14*
Complaints and requests to camp commanders • 3–16, *page 15*
EPW/RP safety program • 3–17, *page 15*

## Chapter 4
**Employment and Compensation for EPWs,** *page 15*

*Section I*
*General Policy and Guidelines, page 15*
General principles • 4–1, *page 15*
Restricted employment • 4–2, *page 15*
Liability to perform labor • 4–3, *page 15*
Authorized work • 4–4, *page 16*
Unauthorized work • 4–5, *page 16*
Decisions on work conditions and safeguards • 4–6, *page 16*
Referrals to HQDA, ODCSOPS • 4–7, *page 16*
Length of workday • 4–8, *page 16*
Rest periods • 4–9, *page 17*
Responsibility for work supervision • 4–10, *page 17*
Work detail leaders and interpreters • 4–11, *page 17*
Task system • 4–12, *page 17*
Employing EPW • 4–13, *page 17*
Paid work • 4–14, *page 17*
Restriction on paid work • 4–15, *page 17*
Rates for paid work • 4–16, *page 17*
Days of paid work per month • 4–17, *page 18*
Unpaid work • 4–18, *page 18*
Sale of articles and repair services • 4–19, *page 18*
Disability compensation • 4–20, *page 18*

Operation of government vehicles • 4–21, *page 18*

*Section II*
*Contract Employment, page 18*
Rules and procedures • 4–22, *page 18*

## Chapter 5
**Beginning of Internment (CI),** *page 18*
General protection policy—civilian internee • 5–1, *page 18*
Civilian Internee Safety Program • 5–2, *page 19*
Republic of Korea/United States Agreement on processing civilian
internees in Korea • 5–3, *page 19*

## Chapter 6
**Administration and Operation of CI Internment Facilities,**
*page 19*
Internment Facility • 6–1, *page 19*
Administrative processing • 6–2, *page 20*
Personal effects • 6–3, *page 20*
Internee Committee • 6–4, *page 21*
Supplies • 6–5, *page 21*
Medical Care and Sanitation • 6–6, *page 22*
Social, Intellectual, and Religious activities • 6–7, *page 22*
Procedures for communications • 6–8, *page 23*
Complaints and requests to camp commanders and protecting
power • 6–9, *page 24*
Discipline and security • 6–10, *page 24*
Provisions common to disciplinary and judicial punishments
• 6–11, *page 25*
Disciplinary proceedings and punishments • 6–12, *page 25*
Judicial proceedings • 6–13, *page 26*
Death and burial • 6–14, *page 27*
Transfers • 6–15, *page 27*
Release • 6–16, *page 28*

## Chapter 7
**Employment and Compensation—Civilian Internees,**
*page 28*
General • 7–1, *page 28*
Ability to perform labor • 7–2, *page 28*
Authorized work • 7–3, *page 28*
Unauthorized work • 7–4, *page 28*
Working conditions • 7–5, *page 28*
Length of workday • 7–6, *page 28*
Day of rest • 7–7, *page 28*
Paid work • 7–8, *page 28*
Unpaid work • 7–9, *page 28*
Compensation for paid work • 7–10, *page 29*
Disability compensation • 7–11, *page 29*

## Appendixes
A.  References, *page 30*
B.  Internment Serial Number, *page 31*

## Glossary

## Index

# Chapter 1
## Introduction

### 1–1. Purpose

*a.* This regulation provides policy, procedures, and responsibilities for the administration, treatment, employment, and compensation of enemy prisoners of war (EPW), retained personnel (RP), civilian internees (CI) and other detainees (OD) in the custody of U.S. Armed Forces. This regulation also establishes procedures for transfer of custody from the United States to another detaining power.

*b.* This regulation implements international law, both customary and codified, relating to EPW, RP, CI, and ODs which includes those persons held during military operations other than war. The principal treaties relevant to this regulation are:

(1) The 1949 Geneva Convention Relative to the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (GWS).

(2) The 1949 Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea (GWS SEA).

(3) The 1949 Geneva Convention Relative to the Treatment of Prisoners of War (GPW).

(4) The 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War (GC), and In the event of conflicts or discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence.

### 1–2. References

Required and related publications and prescribed and referenced forms are listed in appendix A.

### 1–3. Explanation of abbreviations and terms

Abbreviations and special terms used in this regulation are explained in the glossary.

### 1–4. Responsibilities

*a. The Secretaries of the Military Departments.* The Secretaries will—

(1) Develop internal policies and procedures consistent with this regulation in support of the Department of Defense (DOD), EPW/CI and other detainee programs.

(2) Ensure that appropriate training, as required, pursuant to DOD Directive 5100.77 is provided so that the principles of the Geneva Conventions, and the rights and obligations thereunder, are known by members of their service.

(3) Ensure that suspected or alleged violations of the international law of war are promptly reported and investigated per DOD Directive 5100.77.

(4) Conduct a periodic review of the EPW, CI and RP Program and training to ensure compliance with the law of war.

*b. The Secretary of the Army (SA).* The Secretary of the Army is the DOD Executive Agent (EA) for administering the DOD EPW, CI and RP Program. The SA, in coordination with the Assistant Secretary of Defense, International Security Affairs (ASD-ISA), will plan and develop the policy and coordinate the operation of the programs.

*c. The Army Deputy Chief of Staff for Operations and Plans (DCSOPS).* DCSOPS has primary Headquarters, Department of the Army (HQDA) staff responsibility for the EPW, CI and RP programs. The DCSOPS will—

(1) Develop and disseminate policy guidance for the treatment, care, accountability, legal status, and processing of EPW, CI, RP, and ODs.

(2) Report suspected or alleged violations of law committed by or against military personnel or civilians.

(3) Provide HQDA staff supervision for National Prisoner of War Information Center (NPWIC).

(4) Develop plans for the initial assignment and replacement of block internment serial numbers (ISNs) from the NPWIC to the Branch PWIC and for the assignment of the theater code section of the ISN.

(5) Provide necessary reports, coordination, technical advice, and staff assistance to:

(a) The Office of the Secretary of Defense (OSD).

(b) The Joint Chiefs of Staff (JCS).

(c) The military departments.

(d) Unified commands.

(e) Department of State and other Federal agencies.

(f) The International Committee of the Red Cross (ICRC).

(g) Protecting powers.

*d. The Army Judge Advocate General (TJAG).* The TJAG will provide HQDA guidance and advice to commanders on the legal aspects of the EPW, CI and RP program. TJAG will—

(1) Conduct liaison in coordination with the ASA-ISA, the Department of State, the Department of Justice, and other Federal agencies; the JCS; the Defense Intelligence Agency (DIA); the military departments; the ICRC; the Protecting Powers; and other detaining powers, as required.

(2) Provide advice and assistance to commanders on legal aspects of reported violations by EPW, CI, RP, and ODs.

(3) Provide theater guidelines for any EPW, CI and RP claims against the U.S. Government.

(4) Provide guidance regarding GPW Article 5 Tribunals.

*e. Deputy Chief of Staff for Logistics (DCSLOG).* The DCSLOG will ensure logistical resources are available to support EPW operations.

*f. The Assistant Secretary of the Army Financial Management (ASA-FM&C).* The ASA-FM&C will establish the policies and procedures governing entitlement, control, and accounting for pay, allowances, and personal funds for EPW, CI, RP, and ODs per the provisions of the GPW and GC.

*g. Combatant Commanders, Task Force Commanders and Joint Task Force Commanders.* Combatant Commanders, Task Force Commanders and Joint Task Force Commanders have the overall responsibility for the EPW, CI and RP program, operations, and contingency plans in the theater of operation involved to ensure compliance with international law of war. DOD Directive 2310.1 provides that persons captured or detained by the U.S. Military Services shall normally be handed over for safeguarding to U.S. Army Military Police, or to detainee collecting points or other holding facilities and installations operated by U.S. Army Military Police as soon as practical. U.S. Army Military Police have units specifically organized to perform the long-term functions associated with EPW/CI internment. Commanders must ensure the proper force structure is included in any joint operational plans. Commanders at all levels will ensure that all EPW, CI, RP, and ODs are accounted for and humanely treated, and that collection, evacuation, internment, transfers, release, and repatriation operations are conducted per this regulation. Combatant Commanders, Task Force Commanders and Joint Task Force Commanders will—

(1) Provide for an EPW, CI and RP camp liaison and assistance program to ensure the protection of U.S. interests per the Geneva Conventions upon the capture and transfer of EPW, CI, RP, and ODs to a host or other nation.

(2) Plan and procure logistical support to include: transportation, subsistence, personal, organizational and Nuclear, Biological & Chemical (NBC) clothing and equipment items, mail collection and distribution, laundry, and bath for EPW, CI and RP.

(3) Collect and dispose of captured enemy supplies and equipment through theater logistics and Explosive Ordnance Disposal (EOD) channels.

(4) Coordinate for acquisition of real estate, and as required, for planning, design, contracting, and construction of facilities for EPW, CI and RP with the Theater or JTF Engineer.

(5) Establish guidance for the use, transport, and evacuation of EPW, CI, RP, and ODs in logistical support operations.

(6) Identify requirements and allocations for Army Medical units in support of the EPW, CI and RP Program, and ensure that the

medical annex of OPLANs, OPORDs and contingency plans includes procedures for treatment of EPW, CI, RP, and ODs. Medical support will specifically include:

*(a)* First aid and all sanitary aspects of food service including provisions for potable water, pest management, and entomological support.

*(b)* Preventive medicine.

*(c)* Professional medical services and medical supply.

*(d)* Reviewing, recommending, and coordinating the use and assignment of medically trained EPW, CI, RP and OD personnel and medical material.

*(e)* Establishing policy for medical repatriation of EPW, CI and RP and monitoring the actions of the Mixed Medical Commission.

*h. U. S. Army Criminal Investigation Command (USACIDC).* USACIDC will provide criminal investigative support to EPW, CI and RP Camp Commanders per AR 195-2.

## 1–5. General protection policy

*a.* U.S. policy, relative to the treatment of EPW, CI and RP in the custody of the U.S. Armed Forces, is as follows:

(1) All persons captured, detained, interned, or otherwise held in U.S. Armed Forces custody during the course of conflict will be given humanitarian care and treatment from the moment they fall into the hands of U.S. forces until final release or repatriation.

(2) All persons taken into custody by U.S. forces will be provided with the protections of the GPW until some other legal status is determined by competent authority.

(3) The punishment of EPW, CI and RP known to have, or suspected of having, committed serious offenses will be administered IAW due process of law and under legally constituted authority per the GPW, GC, the Uniform Code of Military Justice and the Manual for Courts Martial.

(4) The inhumane treatment of EPW, CI, RP is prohibited and is not justified by the stress of combat or with deep provocation. Inhumane treatment is a serious and punishable violation under international law and the Uniform Code of Military Justice (UCMJ).

*b.* All prisoners will receive humane treatment without regard to race, nationality, religion, political opinion, sex, or other criteria. The following acts are prohibited: murder, torture, corporal punishment, mutilation, the taking of hostages, sensory deprivation, collective punishments, execution without trial by proper authority, and all cruel and degrading treatment.

*c.* All persons will be respected as human beings. They will be protected against all acts of violence to include rape, forced prostitution, assault and theft, insults, public curiosity, bodily injury, and reprisals of any kind. They will not be subjected to medical or scientific experiments. This list is not exclusive. EPW/RP are to be protected from all threats or acts of violence.

*d.* Photographing, filming, and video taping of individual EPW, CI and RP for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of EPW, CI and RP or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command.

*e.* A neutral state or an international humanitarian organization, such as the ICRC, may be designated by the U.S. Government as a Protecting Power (PP) to monitor whether protected persons are receiving humane treatment as required by the Geneva Conventions. The text of the Geneva Convention, its annexes, and any special agreements, will be posted in each camp in the language of the EPW, CI and RP.

*f.* Medical Personnel. Retained medical personnel shall receive as a minimum the benefits and protection given to EPW and shall also be granted all facilities necessary to provide for the medical care of EPW. They shall continue to exercise their medical functions for the benefit of EPW, preferably those belonging to the armed forces upon which they depend, within the scope of the military laws and regulations of the United States Armed Forces. They shall be provided with necessary transport and allowed to periodically visit EPW situated in working detachments or in hospitals outside the EPW camp. Although subject to the internal discipline of the camp in which they are retained such personnel may not be compelled to carry out any work other than that concerned with their medical duties. The senior medical officer shall be responsible to the camp military authorities for everything connected with the activities of retained medical personnel.

*g.* Religion.

(1) EPW, and RP will enjoy latitude in the exercise of their religious practices, including attendance at the service of their faith, on condition that they comply with the disciplinary routine prescribed by the military authorities. Adequate space will be provided where religious services may be held.

(2) Military chaplains who fall into the hands of the U.S. and who remain or are retained to assist EPW, and RP, will be allowed to minister to EPW, RP, of the same religion. Chaplains will be allocated among various camps and labor detachments containing EPW, RP, belonging to the same forces, speaking the same language, or practicing the same religion. They will enjoy the necessary facilities, including the means of transport provided in the Geneva Convention, for visiting the EPW, RP, outside their camp. They will be free to correspond, subject to censorship, on matters concerning their religious duties with the ecclesiastical authorities in the country of detention and with international religious organizations. Chaplains shall not be compelled to carry out any work other than their religious duties.

(3) Enemy Prisoners of War, who are ministers of religion, without having officiated as chaplains to their own forces, will be at liberty, whatever their denomination, to minister freely to the members of their faith in U.S. custody. For this purpose, they will receive the same treatment as the chaplains retained by the United States. They are not to be obligated to do any additional work.

(4) If EPW, RP, do not have the assistance of a chaplain or a minister of their faith. A minister belonging to the prisoner's denomination, or in a minister's absence, a qualified layman, will be appointed, at the request of the prisoners, to fill this office. This appointment, subject to approval of the camp commander, will take place with agreement from the religious community of prisoners concerned and, wherever necessary, with approval of the local religious authorities of the same faith. The appointed person will comply with all regulations established by the United States.

## 1–6. Tribunals

*a.* In accordance with Article 5, GPW, if any doubt arises as to whether a person, having committed a belligerent act and been taken into custody by the US Armed Forces, belongs to any of the categories enumerated in Article 4, GPW, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

*b.* A competent tribunal shall determine the status of any person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.

*c.* A competent tribunal shall be composed of three commissioned officers, one of whom must be of a field grade. The senior officer shall serve as President of the Tribunal. Another non-voting officer, preferably an officer in the Judge Advocate General Corps, shall serve as the recorder.

*d.* The convening authority shall be a commander exercising general courts-martial convening authority.

*e.* Procedures.

(1) Members of the Tribunal and the recorder shall be sworn. The recorder shall be sworn first by the President of the Tribunal. The recorder will then administer the oath to all voting members of the Tribunal to include the President.

(2) A written record shall be made of proceedings.

(3) Proceedings shall be open except for deliberation and voting by the members and testimony or other matters which would compromise security if held in the open.

(4) Persons whose status is to be determined shall be advised of their rights at the beginning of their hearings.

(5) Persons whose status is to be determined shall be allowed to attend all open sessions and will be provided with an interpreter if necessary.

(6) Persons whose status is to be determined shall be allowed to call witnesses if reasonably available, and to question those witnesses called by the Tribunal. Witnesses shall not be considered reasonably available if, as determined by their commanders, their presence at a hearing would affect combat or support operations. In these cases, written statements, preferably sworn, may be submitted and considered as evidence.

(7) Persons whose status is to be determined have a right to testify or otherwise address the Tribunal.

(8) Persons whose status is to be determined may not be compelled to testify before the Tribunal.

(9) Following the hearing of testimony and the review of documents and other evidence, the Tribunal shall determine the status of the subject of the proceeding in closed session by majority vote. Preponderance of evidence shall be the standard used in reaching this determination.

(10) A written report of the tribunal decision is completed in each case. Possible board determinations are:

*(a)* EPW.

*(b)* Recommended RP, entitled to EPW protections, who should be considered for certification as a medical, religious, or volunteer aid society RP.

*(c)* Innocent civilian who should be immediately returned to his home or released.

*(d)* Civilian Internee who for reasons of operational security, or probable cause incident to criminal investigation, should be detained.

*f.* The recorder shall prepare the record of the Tribunal within three work days of the announcement of the tribunal's decision. The record will then be forwarded to the first Staff Judge Advocate in the internment facility's chain of command.

*g.* Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed. The record of every Tribunal proceeding resulting in a determination denying EPW status shall be reviewed for legal sufficiency when the record is received at the office of the Staff Judge Advocate for the convening authority.

## 1–7. The National Prisoner of War Information Center (NPWIC)

The NPWIC will—

*a.* Forward blocks of ISNs to designated Branch PWIC in Theater and CONUS, as required.

*b.* Obtain and store information concerning EPW, CI and RP, and their confiscated personal property. Information will be collected and stored on each EPW, CI, and RP captured and detained by U.S. Armed Forces. This includes those EPW, RP, who were captured by the United States but are in custody of other powers and those who have been released or repatriated. EPW, CI and RP cannot be forced to reveal any information however they are required to provide their name, rank, serial number and date of birth. The Geneva Convention requires the NPWIC to collect and store the following information for EPW, RP:

(1) Complete name.

(2) ISN.

(3) Rank.

(4) Serial number.

(5) Date of birth.

(6) City of birth.

(7) Country of birth.

(8) Name and address of next of kin.

(9) Date of capture.

(10) Place of capture.

(11) Capturing unit.

(12) Circumstances of capture.

(13) Location of confiscated personal property.

(14) Nationality.

(15) General statement of health.

(16) Nation in whose armed services the individual is serving.

(17) Name and address of a person to be notified of the individual's capture.

(18) Address to which correspondence may be sent.

(19) Certificates of death or duly authenticated lists of the dead.

(20) Information showing the exact location of war graves together with particulars of the dead.

(21) Notification of capture.

(22) List of personal articles of value not restored upon repatriation.

*c.* Obtain and store information concerning CI and ODs who are kept in the custody of U.S. Armed Forces who are subjected to assigned residence, or who were interned and then released. The following information will be collected:

(1) Any particulars that may assist in the individual's identification. This information shall include at least the person's surname, first names, place and date of birth, nationality, last residence and distinguishing characteristics, the first name of the father and the maiden name of the mother, the date, place and nature of the action taken with regard to the individual, the address at which correspondence may be sent and the name and address of the person to be informed.

(2) The individual's personal data for notification of his or her interment, state of health, and changes to this data.

(3) Certificates of death or authenticated lists of the dead and information showing the location of graves.

(4) Authenticated lists of personal valuables left by these protected persons.

(5) Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

*d.* Process all inquiries concerning EPW and RP captured by U.S. Armed Forces.

*e.* Make reports to the ICRC, the State Department, and other Federal agencies as required.

*f.* Provide to the adverse party via the ICRC's Central Tracing Agency (CTA) all pertinent information pertaining to EPW, CI, and RP, in custody of the U.S. Armed Forces.

*g.* Transmit via the CTA/ICRC/PP, all official documents and information on judicial proceedings concerning EPW and RP captured, interned, retained or detained by U.S. Armed Forces.

*h.* Information and Property Transfers.

(1) In response to an inquiry, the NPWIC will forward all information and documents to the CTA or PP.

(2) Valuables and personal property which can be returned to a released or repatriated person will be forwarded through the CTA or PP.

(3) Valuables and personal property of deceased EPW/RP, which can be released, will be forwarded to the next of kin through the CTA or PP.

*i.* The ICRC/PP transmits information, documents, and personal effects to the State it represents as follows:

(1) If civilians are concerned, to their countries of origin and/or residence.

(2) If combatants or EPW, CI, and RP are concerned, to their country of origin or to the Power on which they depend.

## 1–8. The Branch PWIC

*a.* The Branch PWIC functions as the field operations agency for the NPWIC. It is the central agency responsible to maintain information on all EPW, CI and RP and their personal property within an assigned theater of operations or in CONUS.

*b.* The Branch PWIC serves as the theater repository for information pertaining to:

(1) Accountability of EPW, CI, and RP and implementation of DOD policy.

(2) Providing initial and replacement block ISN assignments to theater EPW, CI and RP processing organizations, and requests replacement ISNs from the NPWIC.

(3) Obtaining and storing information concerning all EPW, CI and RP, in the custody of U.S. Armed Forces, those captured by U.S. Armed Forces and transferred to other powers for internment (either temporarily or permanently), those EPW and RP transferred to CONUS for internment, and EPW, CI and RP released or repatriated. Obtaining and storing information about CI kept in the custody of U.S. Armed Forces within its assigned theater of operations who are subjected to assigned residence, interned, or released. Information required includes:

(a) That which may assist in an individual's identification.

(b) Certificates of death or authenticated lists of the dead.

(c) Information showing the location of war graves, together with particulars of the dead.

(d) Individual personal data, notification of capture, state of health, and changes.

(e) Certificates of death or authenticated lists of the dead and information showing the location of graves.

(f) Authenticated lists of personal valuables left by CI.

(g) Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

(4) Processing, storing and maintaining all personal property of escaped or dead EPW/CI/RP or articles of value which were not restored upon repatriation, until final disposition instructions are received from the NPWIC or next higher headquarters.

(5) Processing and replying to all inquiries received from the NPWIC, the chain of command, or other agencies as directed by the NPWIC concerning EPW/CI/RP and other protected persons in the theater of operations that the U.S. is responsible for under the Geneva Convention.

(6) Making regular reports to the NPWIC, the chain of command, and supported internment facilities as required. This will include all pertinent information, official documents and information on judicial proceedings pertaining to EPW/CI/RP in the theater of operations for which the U.S. is responsible under the Geneva Convention.

(7) Valuables and personal property which can be returned to a released or repatriated person are forwarded to the ICRC CTA or Protecting Power, as directed by the NPWIC.

(8) Valuables and personal property of deceased EPW, CI, and RP which can be released, will be forwarded to the next of kin through the NPWIC to the ICRC Central Tracing Agency or Protecting Power.

(9) Confiscated property which cannot be released or returned will be stored until final disposition is determined.

(a) Unclaimed property will be safeguarded by the Branch PWIC until all EPW/CI have been repatriated. If property ownership cannot be determined, said property shall be released through the MP BDE G-4 and SUPCOM to the Defense Reutilization and Marketing Office (DRMO).

(b) Unclaimed money and negotiable instruments will be maintained by the PWIC pending inquiry. Upon completion of all repatriation actions and inquiries, unclaimed money and negotiable instruments will be transferred to the FAO as abandoned property.

(10) Accountability data concerning personal and confiscated property of EPW, CI, and RP transferred to CONUS will be forwarded directly to the PWIC designated to support CONUS operations.

(11) The Branch PWIC is responsible for establishing and enforcing the information requirements that the United States forces will collect on EPW,CI and RP taken or held in the Branch PWIC's area of responsibility. The Branch PWIC will receive its information requirements from the NPWIC.

## 1–9. Public Affairs
In the interest of national security, and the protection of the prisoners from public curiosity, and in adherence with the GPW and GC,

EPW, CI, RP and other detainees will not be photographed as per paragraph 1-5d. Interviews of EPW, CI, RP and other detainees by news media will not be permitted. Requests for media access to EPW, CI, or other detainee internment facilities will be coordinated through the Public Affairs Office, and the Staff Judge Advocate, and approved by the first commander who exercises General Court Martial Convening Authority over the internment facility. Requests for exception to policy will be forwarded through command channels to HQDA (SAPA-PP), Washington, D.C. 20310-4420

## Chapter 2
## Beginning of Captivity EPW/RP

### 2–1. Initial actions upon capture
a. The commanding officer of the capturing unit will ensure that:
(1) All EPW/RP are protected, safeguarded, and accounted for per this regulation. This regulation applies from the time of capture until evacuation to designated internment facilities.

(a) Each EPW/RP will be searched immediately after capture. Use males to search males and females to search female prisoners, when possible. Weapons, ammunition, and equipment or documents with intelligence value will be confiscated and turned over to the nearest intelligence unit. Propaganda and other Psychological Operations (PSYOP) materials will be confiscated, identified by the EPW/RP name and ISN and turned over to the supporting EPW/CI PSYOP unit through intelligence channels. Currency will only be confiscated on the order of a commissioned officer and will be receipted for using DA Form 4137 (Evidence/Property Custody Document). EPW and RP are allowed to retain personal effects such as jewelry, helmets, canteens, protective mask and chemical protective garments, clothing, identification cards and tags, badges of rank and nationality, and Red Cross brassards, articles having personal or sentimental or religious value, and items used for eating except knives and forks.

(b) All prisoners of war and retained persons will, at the time of capture, be tagged using DD Form 2745. They will be searched for concealed weapons and items of intelligence. All equipment, documents, and personal property confiscated during the search must be tagged and administratively accounted for by the capturing unit. Capturing units must provide the: date of capture, location of capture (grid coordinates), capturing unit, and any special circumstances of the capture (how the EPW was captured). The remaining information will be included on the tag as it becomes available.

(c) The DD Form 2745 is perforated in three parts. The form is individually numbered and is constructed of durable, waterproof, tear-resistant material, and has reinforced eye-holes at the top of parts A and C. Part A is attached to the detainee with wire, string, or other type of durable material. Part B is retained by the capturing unit and maintained in the unit's records. Part C is attached to the property confiscated from the detainee, so that it may later be matched to that detainee.

(d) Prisoners may be interrogated in the combat zone. The use of physical or mental torture or any coercion to compel prisoners to provide information is prohibited. Prisoners may voluntarily cooperate with PSYOP personnel in the development, evaluation, or dissemination of PSYOP messages or products. Prisoners may not be threatened, insulted, or exposed to unpleasant or disparate treatment of any kind because of their refusal to answer questions. Interrogations will normally be performed by intelligence or counterintelligence personnel.

(e) Prisoners will be humanely evacuated from the combat zone and into appropriate channels as quickly as possible. Instructions given to prisoners during evacuation from the combat zone will be, if possible, in their own language and as brief as possible. When military necessity requires delay in evacuation beyond a reasonable period of time, health and comfort items will be issued, such as food, potable water, appropriate clothing, shelter, and medical attention. Prisoners will not be unnecessarily exposed to danger while awaiting evacuation. The capturing unit may keep prisoners in the

combat zone in cases where, due to wounds or sickness, prompt evacuation would be more dangerous to their survival than retention in the combat zone. Individuals presumed to have intelligence value should be separated immediately from other EPW.

*(f)* Accountability will be maintained for all evacuated prisoners, regardless of the evacuation channel used. Units designated to receive the prisoners at the collecting points or camps will prepare a receipt DD Form 629 (Receipt for Prisoner or Detained Person) with a list of each prisoner's name attached and provide a copy of the receipt to the escort.

*(2)* Prisoners will not be located next to obvious targets such as ammunition sites, fuel facilities, or communications equipment. First aid and medical treatment will be provided to the same extent that the United States provides to its own forces. Sick and wounded prisoners will be evacuated separately, but in the same manner as U.S. and allied forces. Accountability and security of prisoners and their possessions in medical facilities is the responsibility of the respective echelon commander.

*b.* Special policy pertaining to the temporary detention of EPW, CI, RP and other detained persons aboard United States Naval Vessels:

(1) Detention of EPW/RP on board naval vessels will be limited.

(2) EPW recovered at sea may be temporarily held on board as operational needs dictate, pending a reasonable opportunity to transfer them to a shore facility, or to another vessel for transfer to a shore facility.

(3) EPW/RP may be temporarily held aboard naval vessels while being transported between land facilities. They may also be treated and temporarily quartered aboard naval vessels incidental to their treatment, to receive necessary and appropriate medical attention if such detention would appreciably improve their health or safety prospects.

(4) Holding of EPW/RP on vessels must be temporary, limited to the minimum period necessary to evacuate them from the combat zone or to avoid significant harm that would be faced if detained on land.

(5) Use of immobilized vessels for temporary holding of EPW/RP is not authorized without SECDEF approval.

## 2–2. Evacuation and care of EPW and RP

Those units designated to hold and evacuate EPW and RP will:

*a.* Collect prisoners from capturing units, and evacuate them from the combat zone as soon as possible.

*b.* Ensure sick and wounded EPW and RP in their custody are classified, by qualified medical personnel, as either walking wounded or litter, or as non-walking wounded. Walking wounded or litter EPW will be evacuated through established evacuation channels. Non-walking wounded or sick EPW will be delivered to the nearest medical aid station and evacuated through medical channels. All detained personnel will remain physically segregated from U.S. and allied patients.

(1) Appropriate intelligence sources will be notified when EPW and RP are found in possession of large sums of U.S. or foreign currency. A receipt DA Form 4137 will be prepared to account for all property that is taken from the EPW. Copies of DD Form 629 (Receipt for Prisoner or Detained Person) and DA Form 4137 will be maintained to establish positive accountability of the EPW and their property and can be used to substantiate proper care and treatment at a later time. DA Form 4137 will be used to account for property released before final disposition is ordered. Records of disposition of property will be evacuated with prisoners for inclusion in their personnel records.

(2) EPW will be segregated into categories of officer, noncommissioned officer, enlisted, male, female, nationality, recognized ethnic groups, deserters or any other category that the senior officer or NCO having custody of the prisoners designate to ensure the security, health and welfare of the prisoners. Segregation should prevent prisoners from communicating by voice or visual means. Guards will communicate with the prisoners only to give commands and instructions.

(3) The requirements for safeguarding prisoners are the same as those for capturing units.

*c.* In cases of mass capture or surrender of entire units, combatants should be disarmed and those with the greatest intelligence value identified for debriefing.

*d.* Repatriation or parole of the remainder should be considered, with final determination directed by HQDA. Prisoners will not be forced to be repatriated against their will. Prisoners who refuse repatriation will be treated as prisoners of war until their legal status and further disposition can be determined by competent authority.

## 2–3. Evacuation Policy

*a.* Evacuation of EPW or RP outside the theater of operations requires SECDEF approval.

*b.* Wounded EPW generally will not be evacuated to CONUS until released from medical channels. They will be processed through U.S. military police assets. If EPW are to be medically evacuated, they will be processed and accounted for per this regulation.

# Chapter 3
# Administration and Operation of EPW Internment Facilities

## 3–1. Establishment

Internment facilities will be established in the communications zone of each theater of operations for the purpose of receiving, accounting for, administering, securing, and logistically supporting EPW/RP.

## 3–2. EPW internment facilities

*a.* The operation of all EPW internment facilities is governed by the provisions of the Geneva Conventions.

*b.* The theater commander remains responsible for the location of EPW facilities. EPW/RP may be interned only in premises located on land and affording proper health and hygiene standards. Except in extreme circumstances, in the best interests of the individual, EPW/RP will not be interned in correctional facilities housing military or civilian prisoners. Prisoners will not normally be interned in unhealthy areas, or where the climate proves to be injurious to them, and will be removed as soon as possible to a more favorable climate. Transit camps or collecting points will operate under conditions similar to those prescribed for permanent prisoner of war camps, and the prisoners will receive the same treatment as in permanent EPW camps.

*c.* The internment facility will be marked with the letters "PW" (Prisoner of War Camps) and will be placed so they will be clearly visible from the air during the daytime. Other markings may be used when agreed to by the combatant commanders and approved by HQDA.

## 3–3. EPW Facility Management

*a.* The United States may subject EPW/RP to internment and may have contingency plans to confine and enclose EPW in camps located both in and outside CONUS. Medical personnel and chaplains classified as RP, while retained by the Detaining Power with a view to assisting prisoners of war, shall not be considered prisoners of war. The EPW facility commander will provide command, control, accountability, administrative, and logistical support for the operation of all EPW/CI facilities. The EPW/CI facility commander will:

(1) Intern prisoners captured by or transferred to the custody of U.S. forces.

(2) Process interned prisoners to include tagging, assignment of ISN, fingerprinting, photographing, and weighing, as needed.

*(a)* EPW and RP may be required to show their identity card issued by his or her government; however in no case may the card be taken from the individual.

*(b)* If an EPW does not hold an identity card issued by his or her

government, the EPW will be issued a completed DA Form 2662-R (EPW Identity Card). The identity card will be in the possession of the EPW at all times. A notation indicating preparation of DA Form 2662-R will be made under item 36 of DA Form 4237-R (Detainee Personnel Record). DA Form 2662-R will be reproduced locally on 5-by 3-inch card head to foot. A copy for reproduction purposes is located at the back of this regulation. DA Form 4237-R will be reproduced locally on 8 1/2 by 11-inch paper. A copy for reproduction purposes is located at the back of this regulation. These forms are for the use of Army only.

(c) DA Form 2663-R (Fingerprint Card) will be prepared in duplicate for each EPW/RP. One copy will be retained at the camp in which the EPW/RP is confined and will accompany the EPW/RP upon transfer. The other is forwarded to the Branch PWIC.

(3) Provide prisoners with humane treatment, health and welfare items, quarters, food, clothing, and medical care. Health Services Command (HSC) provides medical and dental care for EPW in federal or civilian health care facilities per HSC plans.

(4) Provide for morale, religious, intellectual, educational, social, physical and recreational activities for the prisoners.

(5) Establish liaison with the supporting Branch PWIC, collect necessary information regarding the location, the physical well-being, legal status, and any change thereto, of all prisoners interned by the command.

(6) Allow prisoners to correspond with their families and receive relief shipments.

(7) Provide prisoners copies of the 1949 Geneva Conventions (in their own language, if possible).

(8) Employ and compensate assigned prisoners based on verified needs/requirements and monitor all aspects of EPW and RP employment per this regulation. If sundry packets are provided, no advance pay is required.

(9) Provide command and control, and operate, administer, and secure the camp.

(10) Prepare necessary documents for administrative actions, court-martial charges or any disciplinary proceedings for prisoners.

(11) Post personnel files and maintain unit level records of proceedings.

(12) Supervise qualified EPW/RP in providing medical care and field sanitation/preventive medicine for prisoners.

(13) Provide the initial medical examination and monthly screening of prisoners.

(14) Maintain EPW labor and finance records on each prisoner per AR 37-1.

(15) Ensure preparation of monthly pay credit statements of prisoner's personal accounts and ensure pay for prisoners.

(16) Direct activities relating to the assignment and supervision of work projects for prisoners.

(17) Advise employers of provisions for handling EPW.

(18) Establish and maintain records of prisoner labor projects.

(19) Provide initial reports of and perform initial investigation and inquiries into prisoner labor injuries or incidents.

(20) Report allegations of criminal acts or war crimes committed by or against EPW/RP to the supporting element of the U.S. Army Criminal Investigation Command (USACIDC). Deaths resulting from other than natural causes will be investigated by USACIDC.

(21) Provide assistance to the medical facility commander to assess the threat posed by hospitalized EPW.

(22) Establish and maintain complete and accurate accountability information regarding the location, physical and legal status, training, and employment of all individuals in the custody of, or assigned to, the EPW facility. Information will be posted to the individual's personal, medical, and financial records, and will be provided to the supporting PWIC and next higher headquarters, as required.

(23) Provide an area for intelligence collection efforts.

b. USACIDC will ensure criminal investigative support for EPW and RP is planned and resources are allocated for this purpose.

## 3–4. Operation of prisoner of war internment facilities

EPW camps will be organized and operated, when possible, as other military commands. Each internment facility will be commanded by a commissioned officer of the U.S. Military. The following provisions will be observed:

a. The Geneva Conventions will be posted within the camp in the language(s) of the EPW/RP nation(s). A copy of the text will be supplied, on request, to any person who does not have access to posted copies. The supporting EPW/CI PSYOP unit can assist in preparing and disseminating native language copies of the text as well as other translation, printing, and audio-visual information dissemination support.

b. EPW will be interned in camps according to their nationality and language. They will not be separated from other prisoners belonging to the Armed Forces with which they were serving at the time of their capture, except with their consent. Officers will be separated from enlisted personnel and females will be separated from males.

c. EPW representatives will be authorized for EPW Camps.

(1) At each enlisted EPW or branch camp, EPW will select a prisoner representative. These representatives will be elected by secret ballot every 6 months and are eligible for reelection. EPW will be permitted to consult freely with their representatives. In turn, their representatives will represent them before:

(a) The military authorities.

(b) The Protecting Power.

(c) The ICRC.

(d) Other relief or aid organizations.

(2) In officer EPW camps or in camps with both officers and enlisted EPW, the senior EPW officer, unless incapacitated or incompetent, will be recognized as the prisoner representative. In officer EPW camps, one or more advisers chosen by the EPW officers will assist the prisoner representative. The supporting EPW/CI PSYOP unit can assist in identifying officers, key communicators, and English speaking EPW who may be hiding within the camp population.

(3) In mixed camps (officers and enlisted), one or more enlisted advisors will be elected to assist the EPW officer representative.

(4) The camp commander will be designated as the final approval authority for each elected prisoner representative. When the camp commander denies, approves, or dismisses an elected representative, a notice to that effect will be sent through channels to HQDA, (DAMO-ODL) NPWIC for forwarding to the ICRC or the PP. Reasons for the refusal will be included. EPW will then be permitted to elect another representative.

(5) RP (medical personnel and chaplains) are not considered prisoners of war and therefore may not elect prisoner representatives. The senior medical officer in each camp will be responsible for matters connected with the activities of retained medical personnel. Individual chaplains, like the responsible medical officer, will have direct access to camp authorities.

(6) Prisoner representatives may appoint EPW assistants. These assistants are in addition to the advisers provided for in (2) above. The camp commander will also approve the selection of such assistants and their continuance in those positions.

(7) Prisoner representatives must be of the same nationality, observe the same customs, and speak the same language as the EPW they represent. EPW interned in separate compounds due to differing nationality, language, or customs will be permitted to have their own prisoner representative according to (1) through (4) above. The internment facility commander will establish the local policy for an escort to accompany the representative.

(8) Duties, responsibilities, and available resources.

(a) Representatives will be responsible for furthering the physical, spiritual, and intellectual well-being of the persons they represent. They will not exercise any disciplinary powers. They will not perform any other work if the work interferes with their duties as representatives. They will be allowed a reasonable time to acquaint their successors with their duties and related current affairs.

(b) Representatives may be given the freedom of movement

needed to accomplish their duties, such as inspection of labor detachments and receipt of supplies. Ordinarily, representatives will be permitted to visit places where EPW, whose interests they represent are detained.

*(c)* Postal and telegraph facilities will be made available to prisoner representatives for communicating with the U.S. Army authorities; Protecting Powers, if any; the ICRC and its delegates; the Mixed Medical Commission, and other organizations authorized to assist EPW. Prisoner representatives at branch camps will be granted the same facilities for communication with the prisoner representative of the parent camp.

*d.* EPW/RP social privileges. Social privileges will be subject to security considerations and camp discipline. EPW/RP will be encouraged to take part in intellectual, educational, and recreational activities. The introduction of political overtones into or the furtherance of anti-U.S. propaganda objectives through these activities is prohibited. The supporting EPW/CI PSYOP unit can assist in identifying agitators, malcontents, and political officers who may create resistance within the camp. These units are also trained to develop and implement programs to reduce hostile political activity and to persuade EPW/CI populations to accept U.S. authority and regulations.

*e.* EPW/RP will be quartered under conditions as favorable as those for the force of the detaining power billeted in the same area. The conditions shall make allowance for the habits and customs of the prisoners and shall in no case be prejudicial to their health. The forgoing shall apply in particular to the dormitories of EPW/RP as it regards both total surface and minimum cubic space and the general installation of bedding and blankets. Quarters furnished to EPW/RP must be protected from dampness, must be adequately lit and heated (particularly between dusk and lights-out), and must have adequate precautions taken against the dangers of fire. In camps accommodating both sexes, EPW/RP will be provided with separate facilities for women. When possible consult the preventive medicine authority in theater for provisions of minimum living space and sanitary facilities.

*f.* The daily food rations will be sufficient in quantity, quality, and variety to keep EPW/RP in good health and prevent loss of weight or development of nutritional deficiencies.

(1) Account will be taken of the habitual diet of the prisoners.

(2) EPW/RP who work may be given additional rations when required.

(3) Sufficient drinking water will be supplied to EPW/RP.

(4) The use of tobacco will be permitted in designated smoking areas.

(5) EPW will, as far as possible, be associated with the preparation of their meals and may be employed for that purpose in the kitchens. Furthermore, they will be given means of preparing additional food in their possession. Food service handlers must have training in sanitary methods of food service.

(6) Adequate premises will be provided for messing.

(7) Collective disciplinary measures affecting food are prohibited.

*g.* Clothing, underwear, and footwear will be supplied to EPW/RP in sufficient quantities, and allowances will be made for the climate of the region where the prisoners are detained. Captured uniforms of enemy armed forces will, if suitable for the climate, be made available to clothe EPW/RP. The camp commander will ensure the regular replacement and repair of the above articles. EPW/RP who work will receive clothing appropriate to the nature or location of the work demands.

*h.* Canteens. EPW/RP will be provided sundry/health and comfort packs, which may be supplemented with items tailored to their cultural needs, as a temporary substitute for establishing canteen operations. When directed by the Theater Area Provost Marshal or senior Military Police officer in the internment facilities' chain of command, canteens will be installed in all camps, where EPW/RP may procure foodstuffs, soap, tobacco and ordinary articles in daily use. The tariff will never exceed local market prices. When authorized, canteens will be operated IAW the provisions of the GPW. Procedures regarding EPW/RP payment for canteen purchases are

contained in AR 37-1. Profits made by camp canteens will be used for the benefit of the prisoners; a special fund will be created for this purpose. The prisoners' representative may make suggestions regarding the management of the canteen and of this fund. When an internment facility is closed, the credit balance of the special fund will be transferred to another U.S. internment facility operating in theater. When all facilities are closed, funds will be turned over to an international welfare organization. The fund will be employed for the benefit of EPW/RP of the same nationalities as those who have contributed to the fund. In case of a general repatriation, profits will be kept by the United States.

*i.* Hygiene and medical care:

(1) The United States is bound to take all sanitary measures necessary to ensure clean and healthy camps to prevent epidemics. EPW/RP will have access, day and night, to latrines that conform to the rules of hygiene and are maintained in a constant state of cleanliness. In any camps in which women EPW/RP are accommodated, separate latrines will be provided for them. EPW/RP will have sufficient water and soap for their personal needs and laundry. The necessary facilities and time will be made available for those purposes. The supporting EPW/CI PSYOP unit can assist in maintaining and improving health and sanitary conditions by producing and disseminating informational products concerning proper hygiene, sanitation, and food preparation, where required.

(2) Every camp will have an infirmary. EPW/RP with a contagious disease, mental condition, or other illness, as determined by the medical officer, will be isolated from other patients. A list of endemic diseases of military importance can be obtained from the theater surgeon or preventive medicine officer. EPW/RP will be immunized and reimmunized against other diseases as recommended by the Theater Surgeon. EPW/RP suffering from serious disease, or whose condition necessitates special treatment, surgery, or hospital care, must be admitted to any military or civilian medical unit where such treatment can be given. Special facilities will be available for the care and rehabilitation of the disabled, particularly the blind. EPW/RP will be accorded the attention of medical personnel of the power on which they depend and, if possible, of their nationality. EPW/RP will not be denied medical care. The detaining authorities shall, upon request, issue to every EPW/RP who has undergone treatment, an official certificate indicating the nature of the illness or injury, and the duration and kind of treatment received. A duplicate of this certificate will be forwarded to the ICRC. The detaining authority will also ensure medical personnel properly complete the SF 88 (Report of Medical Examination), SF 600 (Chronological Record of Medical Care and DA Form 3444 (Treatment Record). The cost of treatment will be borne by the United States.

(3) Medical inspections of EPW/RP will be held at least once a month, where each detainee will be weighed and the weight recorded on DA Form 2664-R (Weight Register). DA Form 2664-R will be reproduced locally on 8- by 5-inch card. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only. The purpose of these inspections will be to monitor the general state of health, nutrition, and cleanliness of prisoners and to detect contagious diseases, especially tuberculosis, venereal disease, lice, louse-borne diseases and HIV.

(4) EPW who, though not attached to the medical service of the Armed Forces, are physicians, surgeons, dentists, nurses, or medical orderlies may be required to exercise their medical functions in the interests of prisoners of war dependent on the same power after being certified per Paragraph 3-15. They will continue to be classified as EPW, but will receive the same treatment as corresponding RP (medical personnel). They will be exempted from any other work.

(5) Experimental research will not be conducted on EPW/RP.

## 3–5. Procedures for prisoner of war correspondence

*a.* EPW/RP will be allowed to send and receive letters and cards. There is no restriction on the number or length of letters or cards EPW/RP may receive. EPW/RP will be permitted to send not less than two letters and four cards monthly, in addition to the capture

cards provided in Article 70, GPW. In the event EPW/RP are prevented from writing their monthly quota of letters and cards because of a lack of stationery forms, they will be allowed to make up their quotas when forms are available.

b. All persons may address complaints, in writing to U.S. military authorities and the Protecting Power. These communications will not be limited in length or number, nor will they be charged against the person's correspondence quota. They will be transmitted without delay.

c. Letters and cards addressed to persons other than representatives of a Protecting Power or to U.S. military authorities will not:

(1) Contain complaints or criticism of any governmental agency or official.

(2) Refer to events of capture.

(3) Compare camps.

(4) Contain quotations from books or other writings.

(5) Contain numbers, ciphers, codes, music symbols, shorthand, marks, or signs other than those used for normal punctuation.

(6) Contain military information on numbers of EPW/RP. (Exceptions: Letters to a Protecting Power or prisoner representative or to a relief or aid organization.)

(7) Should any such correspondence be discovered, it will be turned over to the supporting counterintelligence element.

d. Correspondence forms.

(1) EPW will use DA Form 2667-R (Prisoner of War Mail (Letter)) and DA Form 2668-R (Prisoner of War (Post Card)) for correspondence, except as authorized elsewhere in this regulation. DA Form 2667-R will be reproduced on 8 1/2-by 11-inch paper, head to head. DA Form 2668-R will be reproduced locally on 6-by 4-inch cards, head to foot. Copies for reproduction purposes are located at the back of this regulation. These forms are for the use of Army only. Legal documents may be written on blank paper instead of DA forms. Prisoner representatives may use ordinary paper in writing to:

(a) The Protecting Power.

(b) ICRC.

(c) Other approved relief or aid organizations.

(d) U.S. military authorities.

(2) Except for official correspondence by prisoner representatives or unless required by HQDA, communication in two or more copies is prohibited.

(3) Camp commanders will distribute DA letter and card forms to EPW/RP.

(4) Upon Completion of DA Form 4237-R, but not later than 1 week after arrival at a camp for processing, each EPW or RP will be permitted to send a DA Form 2666-R to a relative or next of kin.

(5) Within a period of not more than 1 week after arrival at the first EPW camp or when an EPW/RP's address is changed by transfer to a hospital or to another camp, a DA Form 2665-R (Capture Card for Prisoner of War) will be filled out and forwarded to the Branch PWIC. DA Form 2665-R will be reproduced locally on 6-by 4-inch card, head to foot, a copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only.

e. Subject to (1) and (2) below, outgoing letters and cards will be sent unsealed directly from the camp to the theater commander's designated censorship element. All incoming letters and cards that arrive at a camp without having been censored will be sent to the designated censorship element before delivery to addressees.

(1) Communication to the Protecting Power or the ICRC. Letters and cards not intended for other addresses and not containing enclosure for other addresses will be forwarded directly from the camp to the proper Branch PWIC

(2) Other correspondence. Outgoing letters and cards from a branch camp's EPW will be forwarded as soon as possible.

f. Date and packaging of correspondence. Letters and cards will be forwarded without undue delay in pouches or in government envelopes.

(1) EPW/RP may not write letters for others who are able to write. If an EPW/RP is unable to write, the camp commander may permit another person to write the message. The person doing the writing will countersign the message.

(2) EPW/RP legal documents may be enclosed with outgoing correspondence. When it becomes necessary for a detainee to send a legal document, the document and forwarding letter or card may be enclosed in a plain envelope.

(3) EPW/RP will not send maps, sketches, or drawings in outgoing correspondence.

g. Individuals will not be permitted to mail or receive registered, certified, insured, or COD.

h. Letters and cards to or from EPW/RP sent by ordinary mail are postage free.

i. Outgoing letters and cards will be secured by using locked boxes or similar means. Only authorized U.S. personnel will handle outgoing mail. Incoming mail may be sorted by detainees when supervised by U.S. personnel.

j. Censorship of EPW/RP mail may be instituted by the theater commander as follows:

(1) Outgoing letters and cards may be examined and read by the camp commander or his designated representative. No censorship action of any kind will be taken at the camp. The camp commander will return to the sender for rewriting any outgoing correspondence containing obvious deviations from regulations with a copy provided to the supporting counterintelligence element.

(2) Camp commanders will designate U.S. military personnel to supervise the opening of all mail pouches containing incoming letters and cards for detainees. These items will be carefully examined by the named personnel before delivery to detainees.

(3) EPW/CI wishing to make complaints concerning mail delivery must direct those complaints to:

(a) The camp authorities

(b) The responsible major commander.

(c) The Protecting Power/ICRC.

k. Parcels.

(1) Persons may receive individual parcels and collective shipments containing:

(a) Foodstuffs.

(b) Clothing.

(c) Medical supplies.

(d) Articles of a religious, educational, or recreational nature.

(2) EPW/RP will not be permitted to mail parcels (Article 16, 1974 Universal Postal Convention).

(3) Parcels received for transferred persons will be forwarded immediately.

(4) Nonperishable articles received for persons who have died or escaped, or who have been repatriated, will be forwarded to the Branch PWIC. Perishable items received for deceased or escaped persons will be released to the prisoner representative who will deliver them to the camp infirmary or hospital for the benefit of EPW/RP.

(5) The contents of all incoming parcels will be examined at the camp by a U.S. officer in the presence of the addressee or the named representative. When considered necessary, the camp commander may request that the parcel be examined by the censors. The articles in each parcel will be removed. The string, the inner wrappings, the outer container, and any extraneous items found in the parcel will not be turned over to the EPW/RP or the designated representative. Examination will be close enough to reveal concealed articles and messages; however, undue destruction of contents of parcels will be avoided.

l. EPW/RP may send and receive telegrams as determined by the camp commander. They may not make or receive telephone calls.

(1) At a minimum:

(a) A detainee who has not received mail from next of kin for 3 months may send a telegram. One month from the date a previous telegram was sent, a detainee who has not received a written answer or other communication from the addressee may send another telegram.

(b) Detainees unable to receive mail from their next of kin or send mail to them by ordinary postal routes, or who are a great

distance from their home, will be permitted to send one telegram a month.

*(c)* A person who is seriously ill, or who has received news of serious illness or death in the family, may be permitted to send a telegram. The camp commander may authorize the sending of additional telegrams.

(2) The sending of telegrams as provided for in (1) above will be governed by the following:

*(a)* The message proper will consist of not more than 15 words.

*(b)* The cost of sending the telegram will be debited to the person's account.

*(c)* Arrangements for messages going to or through enemy-occupied countries will be made with the ICRC Field Director.

*(d)* Telegrams, as a general rule, shall be written in their native language.

*(e)* No telegram will be sent to a Government official or to a Protecting Power.

*(f)* Telegrams are subject to the same procedures for censorship listed in paragraph 3-5j(2).

*m.* EPW/RP may receive books. Books that arrive at camps uncensored will be censored. Publications containing maps may be made available to the EPW/RP upon approval of the camp commander, provided they do not contain maps of the territory surrounding the camps. Books, included in parcels of clothing and foodstuffs, may be confiscated on order of the camp commander.

*n.* The following may be made available to EPW/RP:

(1) Current newspapers and magazines published in the English language and selected by the camp commander.

(2) Unmarked, unused magazines in the English language, published in the United States, and distributed by approved relief or aid organizations at the discretion of the camp commanders after censorship.

(3) Foreign language newspapers and magazines published in the United States, upon approval of the camp commander and after censorship of individual issues.

(4) Newspapers and magazines published outside the United States, regardless of language, must be approved by the theater commander.

## 3–6. Discipline and security

Measures needed to maintain discipline and security will be established in each camp and rigidly enforced. The camp commander will maintain records of disciplinary punishments. These records will be open to inspection by the Protecting Power.

*a.* The following acts will not be permitted:

(1) Fraternization between EPW, RP and U.S. military or civilian personnel. Fraternization is defined as improper or intimate communications or actions between U.S. Armed Forces personnel and EPW/RP.

(2) Donating or receiving gifts or engaging in any commercial activity between persons in U.S. custody and U.S. personnel.

(3) Setting up of courts by detainees. Disciplinary powers will not be delegated to or exercised by EPW/RP. Punishment will not be administered by EPW/RP.

*b.* The GPW, regulations, orders, the contents of any special agreements and notices on the conduct and activities of detainees will be published in a language the detainee understands. They will be posted in places within each camp where the detainees may read them and will be made available to persons who do not have access to posted copies. Additional copies will be given to the prisoner representatives. Every order and command will be addressed to detainees personally. The supporting EPW/CI PSYOP unit may assist in providing necessary printed, loudspeaker, or other audiovisual support in communicating directly to EPW/RP. To protect persons from acts of violence, bodily injury, and threats of reprisals at the hands of fellow detainees, a copy of the following notice in the detainees' language will be posted in every compound:

### NOTICE

EPW/RP who fear that their lives are in danger or that they may

suffer physical injury at the hands of other EPW/RP will immediately report the fact personally to any U.S. Armed Forces Personnel of this camp without consulting the EPW/CI representative. From that time on, the camp commander will assure adequate protection to such EPW/RP by segregation, transfer, or other means. EPW/RP who mistreat fellow detainees will be punished.

Signed (Commanding Officer)

*c.* The following military courtesies are required of EPW:

(1) When the U.S. national anthem is played or "To the Colors" or "Retreat" is sounded, EPW not in buildings will stand at attention and face toward the music or colors.

(2) Besides the courtesies required in their own armies toward their officers, enlisted EPW will salute all commissioned officers of the U.S. Armed Forces. Officer EPW will be required to salute only officers of a higher rank and the camp commander regardless of grade.

(3) EPW may salute in the way prescribed by regulations in force in their own armies.

(4) Other military courtesies will be rendered per AR 600-25 (Salutes, Honors, and Visits of Courtesy) and FM-22-5 (Drill and Ceremonies).

*d.* U.S. military personnel will extend the following courtesies toward EPW:

(1) U.S. military personnel will not be required to salute EPW or assume the position of attention when addressing them; however, U.S. officers will return the salutes of EPW.

(2) When addressing senior officer EPW on official business, U.S. military personnel will be courteous and extend the respect due them by grade and age.

*e.* Flags upon which an enemy political emblem or device appears will be seized. EPW/RP will not have any political emblem, insignia, flag, or picture of political leaders. Badges of grade and nationality, and decoration worn as part of the uniform are permitted. EPW/RP may have pictures of political leaders that appear in magazines, books, and newspapers if the pictures are not removed.

*f.* Security guidelines outlined below concern the custody and use of EPW/RP.

(1) *Guard work details.* EPW on work details will be guarded as required to provide security against escape. Selected EPW/RP may be employed without guards in areas where military personnel are on duty if:

*(a)* EPW/RP are under a U.S. work supervisor.

*(b)* Frequent counts of detainees and work inspections are made at irregular intervals.

(2) *Preventing escape.* The camp commander will ensure that each EPW/RP understands the meaning of the English word "halt". If EPW/RP attempt to escape, the guard will shout "halt" three times, thereafter the guard will use the least amount of force necessary to halt the EPW/RP. If there is no other effective means of preventing escape, deadly force may be used.

*(a)* In an attempted escape from a fenced enclosure, a prisoner will not be fired at unless he/she has cleared the outside fence and is making further effort to escape.

*(b)* EPW/RP attempting to escape outside a fenced enclosure will be fired on if they do not halt after the third command to halt.

*(c)* An EPW/RP will have succeeded in escaping when he or she has:

*1.* Joined the armed forces of the power on which he or she depends or those of an ally of that power.

*2.* Left the territory under U.S. control or control of U.S. allied powers.

*3.* Joined a ship flying the flag of the power on which he or she depends, or of an ally of that power, in U.S. territorial waters, and the ship is not under U.S. control.

*(d)* An EPW who has successfully escaped shall not be punished for the escape if subsequently recaptured.

## 3–7. Punitive Jurisdiction

*a.* EPW/RP are subject to punishment under the Uniform Code of Military Justice and other U.S. Laws, regulations and orders in force during the time of their detention.

*b.* Judicial proceedings against EPW and RP will be by courts-martial or by civil courts. When EPW are tried by courts-martial, pretrial, trial, and post-trial procedures will be according to the UCMJ and the U.S. Manual for Courts-Martial. An EPW will not be tried by a civil court for committing an offense unless a member of the U.S. Armed Forces would be so tried.

*c.* When possible, disciplinary rather than judicial measures will be taken for an offense. The disciplinary measures below are authorized:

(1) Suspend or eliminate privileges granted over and above the minimum privileges provided for in the GPW and GC.

(2) Confinement.

(3) A fine not to exceed one-half of the advance of pay (article 60 GPW) and working pay (article 62 GPW) that the detainee would otherwise receive during a period of not more than 30 days.

(4) Fatigue duties not exceeding 2 hours daily. This punishment will not be applied to officers.

*d.* EPW and RP rights. Before any disciplinary punishment is pronounced, EPW/RP will be given precise information regarding the offenses for which they are accused. They will be given a chance to explain their conduct and to defend themselves. They will be permitted to call witnesses and to have use of a qualified interpreter, if necessary and reasonably available. The board's decision will be announced to the person and to the person's representative.

*e.* The following are limitations on punishment:

(1) Collective punishment for individual acts, corporal punishment, imprisonment in premises without sunlight, and any form of torture or cruelty is forbidden.

(2) EPW may not be deprived of their grade or prevented from wearing insignia of grade and nationality.

(3) No EPW or RP will be handcuffed or tied, except to ensure safe custody or when prescribed by a responsible medical officer as needed to control a medical case requiring restraint.

(4) No EPW or RP may be punished more than once for the same act or sentenced to any penalties except those authorized herein.

(5) In no case will disciplinary punishments be inhumane, brutal, or dangerous to the person's health. The length of a single disciplinary punishment will not exceed 30 days. Confinement served while awaiting the hearing of a disciplinary offense or the award of disciplinary punishment will be deducted from punishment awarded. No more than 30 days punishment may be prescribed even if a person is answerable for several acts at the same time. This is true whether such acts are related or not. The period between pronouncing an award of disciplinary punishment and commencing punishment will not exceed 30 days.

(6) When EPW or RP are awarded a further disciplinary punishment, a period of at least 3 days will elapse between punishments if the length of one of the punishments is 10 days or more.

(7) EPW or RP being disciplined or judicially punished will not be subjected to more severe treatment than that authorized for the same offense by members of the U.S. Armed Forces of equal grade.

(8) EPW or RP sentenced by a courts-martial or awarded disciplinary punishment will not be treated differently from other detainees after their punishment.

*f.* Offenses and warranted punishments. EPW or RP who attempt to escape or escape the confines of the camp, but who do not succeed in their escape, will be liable only to disciplinary punishments for those escape acts. They will not be liable to judicial proceedings, even if they are repeat offenders. Escapes or attempts to escape, even if they are repeat offenses, will not be considered aggravating circumstances if detainees are tried by judicial proceedings for offenses committed during their escapes or attempts to

escape. Offenses, such as those against public property, theft without intention of self-enrichment, drawing up or use of false papers, or wearing of civilian clothing, that are committed by detainees with the sole intent of making their escape easier and that do not entail any violence against life or limb will warrant disciplinary punishment only. Because of attempts to escape, EPW and RP may be subjected to close watch. The watch must not affect the state of their health. The EPW and RP watched must be in camp. The watch must not deprive them of the safeguards granted by the Geneva Conventions. Persons who aid or abet an escape or an attempt to escape will be liable on this count for disciplinary punishment only.

*g.* Offenses against discipline. EPW and RP accused of an offense against disciplinary measures will not be confined pending a hearing, unless members of the U.S. Armed Forces would be confined if they were accused of a similar offense or unless camp order and discipline would be jeopardized. A period spent in confinement awaiting disposal of an offense against disciplinary measures will be reduced to an absolute minimum. It will not exceed 14 days.

*h.* Confinement. A pretrial investigation of an offense alleged to have been committed by a detainee will be conducted as soon as circumstances permit so that trial, if warranted, will take place as soon as possible. A detainee will not be confined while awaiting trial unless a member of the U.S. Armed Forces would be so confined if accused of a similar offense, or unless national security would be served. In no case will this confinement exceed 3 months. A period spent in confinement while awaiting trial will be deducted from a sentence of imprisonment. The period will be taken into account in fixing a penalty.

*i.* Retention of Geneva Convention benefits. Persons prosecuted for an act committed before capture will retain, even if convicted, the protection of the Geneva Conventions. EPW, RP undergoing confinement will:

(1) Continue to enjoy the benefits of the Geneva Convention except when such benefits do not apply because detainees are confined.

(2) Be permitted to exercise their right to complain and to confer with visiting representatives of the Protecting Power.

(3) Not be deprived of the prerogatives attached to their grade.

(4) Be allowed to exercise and to stay in the open air at least 2 hours daily.

(5) Be given medical attention as prescribed in this regulation.

(6) Be permitted to read and write and to send and receive letters and cards. Parcels, however, may be withheld from them until the punishment is completed. Such parcels will be released to the safekeeping of the detainee representative. If perishable goods are contained in the parcels, the detainee representative will give them to the camp infirmary or hospital to distribute them fairly among the other detainees.

## 3–8. Judicial proceedings

*a.* No EPW or RP will be tried or sentenced for an act that was not forbidden by U.S. law or by international law in force at the time the act was committed.

*b.* No moral or physical coercion will be exerted to induce EPW or RP to admit guilt for any act.

*c.* No EPW or RP will be convicted without having had the chance to present a defense and without having the assistance of a qualified advocate or counsel.

*d.* Accused persons will be notified promptly of the charges in writing. Charges will be in a language understood by the accused. These persons will be tried as soon as possible. A notification (in duplicate) of proceedings against a detainee will be submitted through channels to the NPWIC. The NPWIC will send such notification to the Protecting Power in cases of charges involving the death penalty or imprisonment for 2 years or more. Upon request, the Protecting Power will be furnished data on the status of such proceedings. Furthermore, the Protecting Power will be entitled, upon request, to be furnished with all data or any other proceedings started against a detainee. The information will be sent without delay. Trial will not commence until 3 weeks after the Protecting

Power has been notified. Unless evidence is submitted at the opening of the trial that this regulation has been fully complied with, the trial will not proceed. The following information will be provided:

(1) Surname and first name, grade, if proper, ISN, date of birth, and profession, trade, or prior civil capacity of the detainee.

(2) Place of internment or confinement.

(3) Specification of the charges with penal provisions under which they are brought.

(4) Designation of the court that will hear the case.

*e.* The EPW representatives will be informed of all judicial proceedings against EPW and RP and the results of the proceedings. Records of trials will be kept by the first Staff Judge Advocates General office in the internment facility's chain of command. These records will be open to inspection by representatives of the Protecting Power.

*f.* In each trial by court-martial, accused persons will be entitled to assistance by one of his prisoner comrades, a qualified advocate or counsel of their own choice, to the calling of witnesses, and services of a competent interpreter, if needed. The commander concerned will appoint a Judge Advocate to serve as defense counsel in additional to any other counsel of the accused person's choice. The commander concerned will notify the accused person of these rights in ample time before the trial.

(1) If the accused does not exercise the right to choose an advocate or counsel, notice to that effect will be sent through the NPWIC to the Protecting Power to permit the Protecting Power to choose counsel. If the accused and the Protecting Power fail to choose an advocate or counsel, the commander concerned shall appoint a counsel, which in normal circumstances will be the judge advocate previously appointed. The accused person must consent to the service of the appointed advocate or counsel..

(2) If requested by the accused person, the commander concerned will appoint an interpreter to assist the accused person during the preliminary hearing and the hearing in court. The interpreter must not be a trial counsel, a defense counsel, an assistant to either, a witness, or have any bias or interest in the case. Accused persons have the right to object to the interpreter appointed, and to ask for a replacement.

(3) A judge advocate will serve as defense counsel in any general or special court-martial of an EPW/RP.

*g.* Representatives of the Protecting Power may attend the trial. It may be decided that in the interest of security, the trial will be conducted with the public excluded. If so, a notice will be given to NPWIC at least 3 weeks before the trial opens to permit notice to the Protecting Power.

*h.* Two copies of the findings and the sentence, if applicable, will be forwarded immediately to NPWIC. A summary will be sent to the Protecting Power, and the detainee representative. Notice of the EPW, RP decision to use or waive the right of appeal to the Court of Appeals for the Armed Forces, when review by that court is not mandatory, will also be forwarded (in duplicate) to HQDA (DAMO-ODL), NPWIC, WASH, DC 20310-0400. NPWIC will send a copy of the decision to the Protecting Power. An EPW, RP waiver of the right to appeal will in no way affect, or change the requirement for, review by a supervisory authority, a board of review, or the U.S. Court of Military Appeals when such review is required under the UCMJ. If the sentence adjudged is death, one copy of the court-martial record of trial will be forwarded to ODCSOPS, NPWIC. NPWIC will send a copy of the record of trial to the Protecting Power. The following information will be included:

(1) A precise wording of the approved finding and sentence.

(2) A summary report of the evidence, including any preliminary investigation, elements of offenses, and any defense raised thereto.

(3) If applicable, the place where the detainee will serve confinement.

*i.* A sentence to confinement imposed on EPW, or RP will be served in the same type of place and under the same conditions as in the case of a member of the U.S. Armed Forces. EPW and RP sentenced to U.S. Disciplinary Barracks (USDB) or Federal penitentiaries will remain EPW/RP. Accountability requirements will be

coordinated prior to any transfer by the losing commander and Commandant, USDB through HQDA (DAMO-ODL) NPWIC. Accused persons and the Protecting Power will be informed as soon as possible of all offenses that are punishable by the death sentence under U.S. laws. Lists of these offenses will be posted in all camps. Duplicate lists will be given to detainee representatives. Other offenses will not thereafter be made punishable by the death penalty without the concurrence of the power on which the detainee depends.

(1) An EPW or RP can be sentenced to death only if the court has taken into consideration, to the maximum extent possible, the fact that the accused is not a US citizen and is not bound to it by any duty or allegiance and is in US custody as a result of circumstances beyond their own will or control.

(2) If the death sentence is pronounced, it will not be carried out until 6 months have passed from the date the Protecting Power received the U.S. notice of the judgment and sentence.

(3) ODCSOPS will monitor and acknowledge when the ICRC/Protecting Power has received the notice permitting the execution of the sentence.

## 3–9. Loss or damage to property

*a.* Persons will be held responsible for the loss of, or damage to, any Government property through negligence or wrongful acts. A complaint may be made to the installation commander that property of a private person has been destroyed, lost, or damaged by a person interned at the installation, including any branch camp. If the EPW, RP does not accept responsibility for the damage, the commander will appoint a board of one to three officers to investigate the complaint.

*b.* Reports of survey or statements of charges will be processed according to AR 735-5. For this purpose, the commanding officer of an internment facility will be considered an installation commander. Amounts collected will be disposed of according to AR 735-5.

*c.* Supporting EPW/CI PSYOP units can assist the commanding officer in improving relations with local populations following loss or damage to private property.

## 3–10. Death and burial

*a.* For general procedures and authorized expenses for the care and disposition of remains, see AR 638-30 and AR 600-8-1.

*b.* When EPW and RP have chosen to make a will, the original will and two certified copies will be forwarded to the supporting PWIC upon death or at their request.

*c.* When an EPW or RP in U.S. custody dies, the attending medical officer will immediately furnish the camp (or hospital) commander or other officer charged with their custody before death, the following information:

(1) Full name of deceased.

(2) ISN of deceased.

(3) Date, place, and cause of death.

(4) Statement that death was, or was not, the result of the deceased's own misconduct.

(5) When the cause of death is undetermined, the attending medical officer will make a statement to that effect. When the cause of death is finally determined, a supplemental report will be made.

*d.* The camp or hospital commander, or other officer charged with custody of the person before death, will notify the proper Branch PWIC immediately, by telegram or the most expeditious means, of the death. The data listed in subparagraph *c* above will be included. If the required data has not been determined, a supplemental report will be made as soon as possible.

*e.* The attending medical officer and the appropriate camp commander will complete a DA Form 2669-R (Certificate of Death). DA Form 2669-R will be reproduced locally on 8 1/2 by 11-inch paper. The form is located at the back of this regulation. This form is for the use of Army only. Enough copies of form will be made out to provide distribution as follows:

(1) Original—information center.

(2) Copy—information center (branch), if necessary.

(3) Copy—The Surgeon General.

(4) Copy—EPW or RP personal file.

(5) The proper civil authorities responsible for recording deaths in the particular state if the EPW dies in the United States.

*f.* Investigating officer's report:

(1) The camp commander will appoint an officer to investigate and report:

*(a)* Each death or serious injury caused by guards or suspected to have been caused by guards or sentries, another detainee, or any other person.

*(b)* Each suicide or death resulting from unnatural or unknown causes.

(2) One copy of the investigating officer's report will be forwarded to the NPWIC.

(3) USACIDC special agents will investigate deaths from other than natural causes per AR 195-2. A copy of the USACIDC report of investigation, if any, will be attached to the camp commander's report.

*g.* Burial, record of internment, and cremation. Deceased detainees will be buried honorably in a cemetery established for them according to AR 638-30. Deceased detainees will be buried, if possible, according to the rites of their religion and customs of their military forces. Unless unavoidable circumstances require the use of collective (group or mass) graves, detainees will be buried individually. Graves Registration Services will record any later movement of the remains. The United States will also care for the ashes of cremated persons. Ashes will be kept by Graves Registration Service persons until proper disposal can be decided according to the wishes of the power on which that person depended. A body may be cremated only due to imperative hygiene reasons, the detainee's religion, or the detainee's request for cremation. When a body is cremated, this fact together with the reasons will be set forth in the death certificate.

*h.* Burial at sea and after land transfer. If a detainee dies at sea, the body will not be buried there unless absolutely necessary. If the body has to be buried at sea, the procedures prescribed for U.S. troops will be followed as far as possible; however, a U.S. flag will not be used. When death occurs during a land transfer, the responsible officer will follow the same procedures for burial prescribed for U.S. military personnel.

*i.* The personnel file of a deceased person with all pertinent records will be forwarded to the Branch PWIC.

## 3–11. Transfer of prisoners of war

*a.* General. Permanent transfer of EPW in the custody of the U.S. forces to the host nation or other allied forces requires approval of the Secretary of Defense (SECDEF). The permanent transfer of EPW to foreign national control will be governed by bilateral national agreement and in accordance with subparagraph b below following SECDEF approval. Temporary transfer of EPW/RP to accommodate surges in prisoner population beyond the immediate capability of U.S. forces to manage is authorized. Theater commanders will develop measures to ensure accountability and humane treatment of prisoners so transferred.

*b.* EPW/RP may only be transferred from the custody of the United States to a power which is a party to the GPW, and only after a representative of the United States has visited the Power's internment facilities and is satisfied that the Power in question is willing and able to apply the GPW. EPW/RP transfers should not increase the difficulty of repatriation. Prisoners of war during transfer will have sufficient food and drinking water to keep them in good health, and will be provided adequate clothing, shelter, and medical attention. Precautions will be taken, especially in case of transport by sea or by air, to ensure their safety during transfer. A complete list of all transferred prisoners will be made before their departure and maintained by the Branch PWIC.

*c.* The supporting Branch PWIC and NPWIC will be notified immediately by the EPW camp commander of any EPW or RP transferred.

*d.* Transfer within the territory of the detaining power will always be carried out humanely and in conditions no less favorable than those enjoyed by the troops of the detaining power during their movements. If EPW/RP are transferred on foot, only those who are fit to walk may be so transferred. The EPW/RP will not be exposed to excessive fatigue during transfer by foot.

*e.* The sick, wounded, or infirm EPW and RP as well as maternity cases will be evacuated through U.S. military medical channels and will remain in medical channels until they are certified "fit for normal internment" by competent medical authorities.

*f.* Necessary clothing, adequate shelter, and medical attention will be made available.

*g.* Suitable precautions will be taken to prevent EPW and RP, from escaping and to ensure their safety. Wounded and sick EPW and RP will not be transferred as long as their recovery may be endangered by the journey, unless their safety demands it.

*h.* The EPW and RP will be permitted to take with them their personal effects and property. The weight of their baggage may be limited if the conditions of transfer so require, but in no case will it be limited to less than 55 pounds per EPW/RP. The personal property that the EPW and RP are unable to carry will be forwarded separately.

*i.* The mail and parcels addressed to EPW and RP who have been transferred will be forwarded to them without delay.

*j.* Property, such as that used for religious services, or items donated by welfare agencies, will be forwarded as community property. These items are not to be considered a part of the 55 pounds of personal effects and property that each EPW is authorized to take.

*k.* When EPW and RP are to be transferred, they will be notified of their new postal addresses before departure. Notice will be given in time to pack and tag their luggage. They will also be given time to inform their next of kin and the Branch PWIC of their transfer and new address.

*l.* EPW and RP will not be confined in a jail or other correctional institution during transfer except in an emergency. They will be confined only in such fashion while the circumstances that necessitate the measures continue to exist. Transfer will be effected under conditions not less favorable than those under which U.S. Armed Forces are transferred.

*m.* Receipt of transferred EPW/RP.

(1) EPW and RP will not be accepted for detainment or transfer to U.S. Military control from outside nations without prior approval from SECDEF. EPW and RP received by transfer from an allied nation will be properly receipted for by the officer designated to accept them. The receipt will indicate the place and date the United States assumed custody and the name, grade, ISN, and nationality of each transferred EPW and RP. Three or more copies of the receipt will be prepared. The original, plus one copy, will be delivered to the commander of the camp to which the EPW and RP are assigned. Upon receiving the receipt, the camp commander will forward immediately one copy directly to the Branch PWIC, or to the NPWIC if the Branch PWIC is not operational. A DA Form 4237-R or an allied equivalent form for individuals listed on the receipt should be delivered to the accepting officer at the time the transfer is effected.

(2) EPW and RP transferred between EPW facilities and hospitals will be receipted for as above when there is little chance that the EPW/RP will be returned to the original camp. When EPW and RP are transferred to hospitals outside the jurisdiction of the EPW/CI camp, the hospital commander is required to submit their strength accountability reports to the supporting Branch PWIC.

(3) The use of a manifest identifying the name, rank/status, ISN, power served/nationality, and physical condition of each EPW and RP transferred and received is required. The manifest will be attached to the original receipt of transfer and forwarded to the Branch PWIC.

*n.* EPW and RP captured or detained by the U.S. Marine Corps, Navy, Air Force, or Coast Guard are turned over to the U.S. Army at receiving points designated by the Theater Commander.

(1) All inter-service transfers should be effected as soon as possible after initial classification and administrative processing has been accomplished.

(2) CI will only be transferred within theater, unless directed by DOD.

(3) A manifest is required to identify as a minimum the: name, rank/status, ISN (if assigned), power served/nationality, and physical condition of each EPW and RP transferred and received. The manifest will be attached to the receipt of transfer and will become a permanent record to assure accountability of each prisoner.

*o.* When EPW are moved to a port of debarkation from an interior point, the theater commander will provide for:

(1) Transportation of the EPW up to and including their departure from the port.

(2) Care and security of the EPW, their baggage, monies, other valuables, and records until their custody is assumed by the CONUS EPW command.

*p. Transfers between Army commands.* The EPW's command, with the advice of military medical authority, is authorized to transfer injured, sick, and wounded EPW to other commands.

*q. Transfer of personal effects.*

*(1)* Each EPW and retained person will be permitted to hand carry personal effects and property not to exceed 55 pounds.

*(2)* EPW/RP who have been serving as chaplains or clergymen during their internment will be permitted to transfer, at Government expense, an additional 110 pounds to take other religious materials with them.

*r.* The transfer of physically disabled, insane, mentally incompetent, or wounded EPW/RP in a theater of operations will be according to procedures set up by the Theater Commander.

*s.* When a railroad car other than an U.S. Military-owned or operated hospital car is used to transfer EPW or RP patients, Red Cross signs will be placed on the inside of the middle window of each side of the car and on the inside of each door window of the car. These signs will be made of white paper or cardboard with a large red cross in the center of the sign. The word "hospital" will be placed above, and the word "car" below the red cross, in black letters. When EPW/RP patients are transferred in a compartment, drawing room, bedroom, or roomette, a sign as described above, with the exception of the word "car," in proportionate dimensions will be placed on the outside of the door of the compartment, drawing room, bedroom, or roomette.

*t.* Theater commanders are subject to the general restrictions on transfers contained in this regulation. They may transfer injured, sick, or wounded EPW who are within their commands to or from hospitals designated by the theater surgeon or Commander, HSC with guidance from the Joint Medical Regulation Office (JMRO) or the Theater Patient Movement Requirements Center (TPMRC) if:

(1) The EPW requires prolonged hospitalization or specialized treatment, including surgery, that is not available locally.

(2) The transfer is recommended by a medical officer after an examination of the EPW.

*u.* When EPW no longer require hospital care, they may be returned to the command from which transferred or to an EPW camp within the receiving command.

## 3–12. Repatriation of sick and wounded EPW/RP

*a.* Sick and wounded prisoners will be processed and their eligibility determined for repatriation or accommodation in a neutral country during hostilities. Both will be according to the procedures set forth below.

(1) Sick and wounded prisoners will not be repatriated against their will during hostilities.

(2) Procedures for a Mixed Medical Commission will be established by HQDA, according to this regulation and Annex II of the GPW. The purpose of the Commission will be to determine cases eligible for repatriation. The Mixed Medical Commission will be composed of three members. Two of the members, appointed by the ICRC and approved by the parties to the conflict, will be from a neutral country. As far as possible, one of the neutral members will be a surgeon and the other a physician. The third member will be a medical officer of the U.S. Army selected by HQDA. One of the members from the neutral country will act as chairman.

*b.* If for any reason the use of neutral doctors cannot be arranged for by the ICRC, the United States, acting in agreement with the

Protecting Power concerned, will set up a Medical Commission. This Commission will perform the duties of a Mixed Medical Commission.

*c.* The Mixed Medical Commission will:

(1) Examine EPW, and RP who have applied for repatriation.

(2) Inspect clinical records pertaining to these EPW.

(3) Determine those cases eligible for repatriation or hospitalization in a neutral country.

*d.* Decisions made by the Mixed Medical Commission will be a majority vote and cannot be changed to the detriment of the EPW and RP examined, except upon concurrence of the Commission.

*e.* The decisions made by the Mixed Medical Commission on all cases will be communicated to HQDA (DAMO-ODL), NPWIC, the Protecting Power, and the ICRC, during the month following the Commission's visit. Each EPW and RP examined will be informed by the Mixed Medical Commission of the decision made on the case.

*f.* The United States will carry out the decisions of the Mixed Medical Commission as soon as possible and within 3 months of the time after it receives due notice of the decisions.

*g.* The U.S. member will arrange all administrative details to expedite the work of the Commission. Commanders concerned will assist, facilitate, and expedite the operations of the Commission to the fullest extent.

*h.* The EPW and RP noted below will be examined by the Mixed Medical Commission.

(1) EPW and RP designated by a camp or hospital surgeon or a retained physician or surgeon who is exercising the functions of the surgeon in a camp.

(2) EPW and RP whose applications are submitted by a prisoner representative.

(3) EPW and RP recommended for examination by the power on which the EPW and RP depend or by an organization duly recognized by that power and that gives assistance to them.

(4) EPW, RP who submit written requests. These EPW will not be examined until the EPW listed in (1), (2), and (3) above have been examined.

*i.* An EPW or RP found ineligible by the Mixed Medical Commission may apply for reexamination 3 months after the last examination.

*j.* Each commander will be notified before arrival of the Commission. Before arrival of the Commission at a camp, hospital, or other designated place, the commander will prepare DA Form 2670-R (Mixed Medical Commission Certificate for EPW) and update and make available the records. For each EPW and RP to be examined, DA Form 2670-R will be completed in four copies. DA Form 2670-R will be locally reproduced on 8 1/2 by 11-inch paper. This form is located at the back of this regulation. This form is for the use of Army only.

*k.* The commanding officers of designated hospitals will complete DA Form 2671-R (Certificate of Direct Repatriation for EPW) and forward to the Branch PWIC. DA Form 2671-R will be locally reproduced on 8 1/2 by 11-inch paper. The form is located at the back of this publication. This form is for the use of Army only. The certificate will be in four copies to:

(1) Make the repatriation of sick and wounded EPW, RP easier.

(2) Relieve the Mixed Medical Commission of the need to visit EPW and RP patients who are eligible for direct repatriation.

*l.* The following EPW and RP are eligible for direct repatriation:

(1) EPW and RP suffering from disabilities as a result of injury, loss of limb, paralysis, or other disabilities, when these disabilities are at least the loss of a hand or foot, or the equivalent.

(2) Sick or wounded EPW and RP whose conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from inception of disease or date of injury.

*m.* The original and one copy of DA Form 2671-R will be forwarded to ODCSOPS, NPWIC. The other two copies will be attached to the clinical record. In all instances, these records will accompany the records of the EPW or RP when transferred.

**3–13. Repatriation of other EPW/RP**

Prisoners who are not sick or wounded will be repatriated or released at the cessation of hostilities as directed by OSD.

**3–14. Repatriation transfer procedures**

a. Control and accountability of EPW and RP will be maintained until the EPW or RP is receipted for by the serving power or designated protecting power.

b. The use of a manifest identifying at the minimum; name, rank/status, ISN, power served/nationality, and physical condition of each EPW and RP transferred is required. The manifest will be used as an official receipt of transfer and will become a permanent record to assure accountability of each EPW and RP until final release.

c. Copies of appropriate personnel, finance, and medical records will accompany the released and/or repatriated EPW/RP. These records will be transferred to the custody of the designated official receipting for the EPW/RP.

d. All confiscated personal property that can be released, will accompany the released or repatriated EPW/RP. An inventory will be conducted and any discrepancies identified. The individual will sign a property receipt for his personal items.

e. Upon completion of the transfer, the U.S. escort guard will forward the official receipt of transfer to the Branch PWIC.

f. Upon notification from the PWIC that the transfer is complete, the losing EPW or RP internment facility will forward all official records and confiscated property that cannot be released to the Branch PWIC for final disposition.

g. The PWIC will:

(1) Notify the NPWIC of final status of released/ repatriated EPW and RP.

(2) Forward all EPW and RP records and reports per AR 25-400-2, The Modern Army Recordkeeping System (MARKS).

(3) Dispose of confiscated property in their possession per instructions received from the NPWIC and applicable Army Regulations.

**3–15. Retained personnel**

a. Enemy personnel entitled to a retained status should have on their person at the time of capture a special identity card attesting to their status. The minimum data shown on the card will be the name, date of birth, grade, and service number of the bearer. The card will state in what capacity the bearer is entitled to the protection of GPW. The card will also bear the photograph of the owner and either the signature or fingerprints or both. It will be embossed with the stamp of the military authority with which the person was serving at time of capture.

b. Enemy personnel who fall within any of the following categories, are eligible to be certified as RP:

(1) Medical personnel who are members of the medical service of their armed forces.

(2) Medical personnel who are exclusively engaged in:

(a) The search for or the collection, transport, or treatment of the wounded or sick.

(b) The prevention of disease.

(c) Staffs exclusively engaged in administering medical units and establishments.

(3) Chaplains.

(4) The staff of the National Red Cross, Red Crescent, and other voluntary aid organizations. These organizations must be duly recognized and authorized by their governments. The staff of these organizations may be employed on the same duties as persons in (2) above, if such organizations are subject to military laws and regulations.

c. RP whose status is certified will not be considered as EPW; however, they will receive the benefits and protection of an EPW.

d. EPW who are certified to be proficient medically or religiously continue to be considered and identified as EPW, as appropriate, but will be administered and treated in the same way prescribed for RP. Enemy personnel who are classified in these categories and are determined qualified by competent Army authority are eligible to be certified as proficient to perform medical or religious duties:

(1) EPW who are ministers of religion; however, they have not officiated as chaplains to their own forces.

(2) Specially trained EPW, employed at the time of their capture as hospital orderlies, nurses, or auxiliary stretcher-bearers, in search for, or in collecting, transporting, or treating of the wounded and sick. These EPW are not eligible for RP status but may be employed only on medical duties they are qualified to perform.

e. Certification of the retained status of personnel will be effected upon the decision that the special identity card held by each such person is valid and authentic. This certification will be decided, if possible, at the time of processing by the camp commander.

f. The Theater Commander, or CINCUSACOM will confirm the certification of the technical proficiency of the persons described in paragraph 3-15d. Qualified U.S. Military medical and religious personnel must first confirm the medical or religious proficiency of each EPW.

g. Classification forms will be completed as follows:

(1) DA Form 2672-R (Classification Questionnaire for Officer Retained Personnel) will be completed in three copies by captured officers and civilians of equal grade who have or:

(a) Claim RP status.

(b) Are applicants for a certificate of medical proficiency. DA Form 2672-R will be locally reproduced on 8 1/2 by 11-inch paper. The form is located at the back of this publication. This form is for the use of Army only.

(2) DA Form 2673-R (Classification Questionnaire for Enlisted Retained Personnel) will be completed in three copies by all captured enlisted persons and civilians of equal grade who have or are applicants for a certificate of medical proficiency. DA Form 2673-R will be loally reproduced on 8 1/2 by 11-inch paper. The form is located at the back of this publication. This form is for the use of Army only.

h. The camp commander will retain one copy of each of the forms noted in subparagraph g above. The second will be forwarded to the next higher commander. The third copy will be forwarded to the Branch PWIC.

i. Verifications of retained status and religious or medical proficiency will be recorded on the DA Form 4237-R of the person concerned. Denials of claims to retained status or certification of proficiency will also be recorded together with a brief statement of the reason.

j. RP are subject to the internal discipline of the camp in which they are retained; however, they may not be compelled to do any work except that relating to their medical or religious duties.

k. RP, who are members of the enemy's Armed Forces, will be assigned to EPW camps. If available, they will be assigned in the ratio of two physicians, two nurses, one chaplain, and seven enlisted medical personnel per 1,000 EPW. Economy of medical staffing may be achieved at higher levels per guidance from Commanding General, HSC. As much as possible, these RP will be assigned to camps containing EPW from the same Armed Forces upon which the RP depend.

l. CINCs, Task Force Commanders, Joint Task Force Commanders are authorized to transfer RP and EPW who are qualified to perform medical or religious duties between EPW camps within their jurisdiction in order to distribute them equitably.

m. Subject to security requirements the theater commander will ensure:

(1) Full use of enemy medical personnel for the treatment of sick and wounded EPW/RP.

(2) Release of U.S. medical personnel, when possible, from caring for sick and wounded EPW except for supervision and training of enemy medical personnel.

n. The senior medical officer in each camp will provide close and continuing supervision of the professional activities of the retained medical persons and report all improper activities.

o. RP will not be allowed access to or custody of narcotic drugs or other controlled substances as delineated in Title 21, United

States Code, except under close supervision of U.S. medical personnel.

*p.* EPW camp surgeons or hospital commanders in which retained persons are used will verify:

(1) Accuracy of the final diagnosis.

(2) Adequacy of treatment.

(3) Final disposition of patients treated by RP.

*q.* While caring for the sick and wounded, RP will receive the same daily rate of pay as is received by EPW.

*r.* Monthly allowances for RP will be the same as those prescribed for EPW of the same rank.

*s.* RP may be detained in EPW camps. When practical, they will be assigned quarters separate from EPW.

*t.* RP will wear on their left sleeve a water resistant arm band bearing the distinctive emblem (Red Cross, Red Crescent) issued and stamped by the military authority of the power with which they have served. Authorized persons who do not have such armbands in their possession will be provided with Geneva Convention brassards (AR 670-1).

*u.* RP will enjoy the same correspondence privileges as EPW. Chaplains will be free to correspond, subject to censorship, on matters about their religious duties. Correspondence may be with ecclesiastical authorities both in the country where they are retained and in the country on which they depend, and with international religious organizations. RP will be authorized the following additional privileges:

(1) They will be granted facilities necessary to provide EPW with medical care, spiritual assistance, and welfare services.

(2) They will be authorized to visit EPW periodically in branch camps and in hospitals outside the EPW camps in order to carry out their medical, spiritual, or welfare duties.

(3) They will be given the necessary means of transportation for making such visits.

(4) The senior retained medical officer, as well as chaplains, will have the right to correspond and consult with the camp commander or his or her authorized representatives on all questions about their duties.

*v.* RP are subject to the same disciplinary measures as are EPW.

*w.* RP will be retained only insofar as the state of health, the spiritual needs, and the number of EPW require. Persons whose retention is not required will be repatriated as soon as military requirements permit. Nothing precludes reasonable measures to prevent such persons from carrying information of strategic or tactical value. Should they come into possession of such information, their return to their own armed force may be delayed until the information is of no significant value.

### 3–16. Complaints and requests to camp commanders

*a.* EPW and RP have the right to make complaints and requests to camp commanders and the ICRC/protecting powers regarding the conditions of their internment. EPW and RP may not be punished for making complaints, even if those complaints later prove unfounded. Complaints will be received in confidence, as they might endanger the safety of other detainees. Appropriate action, including segregation, will be taken to protect detainees when necessary. This policy also applies to persons who are confined pending trial or as a result of a trial.

*b.* EPW and RP may take complaints or requests to the camp commander.

*c.* Persons exercising the right to complain to the ICRC or protecting power about their treatment and camp may do so:

(1) By mail.

(2) In person to the visiting representatives of the ICRC or protecting power.

(3) Through their detainee representative.

*d.* Written complaints to the protecting power will be forwarded promptly through HQDA, ODCSOPS (DAMO-ODL) NPWIC. A separate letter with the camp commander's comments will be included. Military endorsements will not be placed on a detainee's communication.

*e.* If an ICRC/protecting power communicates directly with an EPW/CI camp commander about any matter requiring an answer, the communication and commander's reply will be forwarded to HQDA, ODCSOPS (DAMO-ODL) NPWIC, for proper action.

*f.* Any act or allegation of inhumane treatment will be investigated and, if substantiated, reported to HQDA as a Serious Incident Report (SIR) per AR 190-40. Once completed, a copy of the SIR accompanies the prisoner to the EPW/CI camp, and a copy is furnished to the monitoring Branch PWIC. All available pertinent information that the EPW or RP is willing to give, will be entered on the form.

### 3–17. EPW/RP safety program

A safety program for EPW and RP will be set up and administered in each EPW camp. Army regulations, circulars, and pamphlets in the 385-series may be used as guides for establishing an EPW and RP safety program. Accident injury forms used in the EPW and RP safety programs will be prepared, administered, and maintained separately from those prepared for other persons included under the Army Safety Program.

## Chapter 4
## Employment and Compensation for EPWs

### Section I
### General Policy and Guidelines

### 4–1. General principles

*a.* To the extent possible, EPW will be employed in work needed to construct, administer, manage, and maintain EPW camps. EPW will be employed in other essential work permitted by this regulation only when qualified civilian labor is not available. Essential work is work that must be done, despite the availability of EPW.

*b.* EPW labor, external to DOD, is regulated by contract. When authorized by theater directives, EPW, RP may be given advance pay. Procedures for administering this advance pay are set forth in AR 37-1.

### 4–2. Restricted employment

*a.* EPW will not be employed in positions that require or permit them:

(1) Access to classified defense information or records of other personnel.

(2) Access to telephone or other communication systems.

(3) Authority to command or instruct U.S. personnel.

*b.* EPW may be employed in the following types of labor:

(1) EPW camp administration, installation, or maintenance.

(2) Agriculture.

(3) Public works, public utilities, and building operations which have no military character or purpose.

(4) Transportation and handling of stores which are not military in nature or purpose.

(5) Domestic service.

### 4–3. Liability to perform labor

*a.* Subject to the limitations stated in paragraph 4-5 and 4-6, EPW will be required to perform any and all work consistent with their grade and status as follows:

(1) Officer EPW. Officer EPW will not be required to work. Officer EPW, however, may make a written request for work. The camp commander will provide such work, if feasible. Officer EPW may, at any time, revoke a voluntary request for work. Officer EPW are required to maintain their personal areas, equipment and other items/areas in a manner that promotes good health and personal hygiene.

(2) Noncommissioned officer (NCO) EPW. NCO EPW will be required to do supervisory work only. NCO EPW, however, may make a written request for work other than supervisory work. NCO

EPW may, at any time, revoke a voluntary request for work other than supervisory work.

(3) Enlisted EPW. Enlisted EPW will be required to do any and all work consistent with this regulation.

b. Fitness of EPW for labor will be verified at least once a month by medical examination. An attending medical officer will classify the level of physical fitness EPW can perform for work as follows: heavy work, light work, and no work. Lists of these individual labor levels of EPW will be posted in each EPW camp. If physical conditions permit, each EPW will perform labor as directed by the camp commander.

## 4–4. Authorized work

a. Categories. Levels of work for which each EPW are authorized and may be compelled to perform are categorized as follows:

(1) Restricted work. EPW may be compelled to perform the following types which may not be of a military nature or purpose:

(a) Public works and building operations. The primary factor in deciding whether EPW may be employed is the nature of the construction being undertaken. If the construction is purely military in nature, each EPW may not be compelled to engage in such work. If the construction is not purely military in nature, the purpose for which the structure is to be used is the deciding factor. If the completed construction is intended to be used primarily by units engaged in, or in direct support of, military operations against the enemy, EPW may not be compelled to work on the project.

(b) Transporting and handling stores. The first consideration is the nature of the property being handled. If the stores are military in nature, EPW may not be compelled to transport or handle them. If the items are not military in nature, then their purpose is the deciding factor. EPW may not be required to transport or handle stores specifically consigned to units engaged in military operations. EPW and RP may, however, be required to handle stores when handling is incidental to the performance of authorized types of work. For example, work in a military mess may be classified as domestic service. Handling of rations by EPW in connection with domestic service may be required.

(c) Public utility services. Construction, repair, or maintenance of water, sewage, drainage, gas, or electrical facilities are not of an inherent military nature. The purpose of these services is the deciding factor as to whether or not EPW may be compelled to engage in such activities. Such services may be intended primarily or exclusively for the benefit of units engaged in, or directly supporting, operations against the enemy. If so, EPW may not be required to perform these services. On the other hand, services intended primarily or exclusively for other purposes represent work that EPW may be compelled to perform.

(2) Nonrestricted work. EPW may be compelled to perform types of work listed below having no direct military purpose:

(a) Construction, administration, management, and maintenance of EPW camps.

(b) Agriculture.

(c) Manufacturing industries, with the exception of metallurgical, machinery, and chemical industries.

(d) Commercial business and arts and crafts.

(e) Domestic service, including a clothing repair shop, laundry, bakery, or a mess hall.

## 4–5. Unauthorized work

a. Unhealthy or dangerous work. EPW and RP may not be employed in any job considered injurious to health or dangerous because of the inherent nature of the work, the conditions under which it is performed, or the person's physical unfitness or lack of technical skill. A specific task should be considered, not the industry as a whole. The specific conditions for each job are the deciding factors. For example, an otherwise dangerous task may be rendered safe by the use of safety equipment. Likewise, an otherwise safe job may be dangerous because of the circumstances under which the work is required to be done. Similarly, dangerous work may be safe for

those whose training and experience have made them adept at it. EPW will not be employed in tasks requiring:

(1) Exertion beyond physical capacity.

(2) Use of inherently dangerous mechanisms or materials such as:

(a) explosives or mine removal.

(b) Mechanisms that are dangerous because the person is unskilled in their use.

(3) Climbing to dangerous heights or exposure to risk of injury from falling objects under motion and not under full control.

b. Humiliating work. No person will be assigned labor that is humiliating or degrading for a member of the U.S. Armed Forces. This prohibition does not prevent EPW from doing ordinary and frequently unpleasant tasks such as maintaining sanitation facilities, ditch digging and manual labor in agriculture.

c. Other specifically prohibited work. Certain occupations or types of work are prohibited for safety, security, or other reasons. EPW and RP will not be:

(1) Permitted to work in an area where they may be exposed to combat zone fire.

(2) Employed as personal servants to members of the U.S. Armed Forces.

(3) Employed to tend bars or serve alcoholic beverages in officers' messes or similar establishments.

(4) Permitted to work inside correctional facility walls or near inmates.

d. Questionable work. In case of doubt as to whether certain work is authorized, the next higher HQ Staff Judge Advocate (SJA) will review the proposed tasks. The purpose of the review will be to ensure consistency with this regulation and the law of war. The SJA will provide recommendations in writing to the camp commander. A copy will be forwarded to HQDA (DAJA-IA), WASH DC 20310-2214.

## 4–6. Decisions on work conditions and safeguards

Commanders will make on-the-job decisions as to whether work is safe. They will take into account the guidance set forth in this regulation. Commanders will make decisions by ordinary standards of sound judgment, assisted by the informed advice of persons familiar with the occupations and other available data. Data will include the opinions of the SJA. Preliminary job training will be given when necessary and; protective clothing and accessories will be provided as required (e.g., hard-toed shoes, goggles, and gloves). Such safety devices will be equal to safeguards provided for civilian labor. Commanders will make periodic inspections to ensure satisfactory conditions and safeguards are maintained at all times.

## 4–7. Referrals to HQDA, ODCSOPS

a. When substantial doubt exists as to whether or not a type of work is permissible according to this regulation, a request to ODCSOPS for specific instructions will be made through channels by the most expeditious means.

b. Each question forwarded will be accompanied by a statement as to:

(1) Type and place of work.

(2) Tasks to be performed.

(3) Number of EPW to be employed.

(4) Other facts having a direct bearing on the employment.

## 4–8. Length of workday

a. The length of the workday for EPW, including the time for travel will not exceed that permitted for civilians in the locale who are employed in the same general type of work. The working period may be extended but will not be considered excessive because EPW are laboring under a task system. EPW contracts will contain specific terms on the hours of employment.

b. Except as provided in subparagraph c below, the EPW will not be required to work more than 10 hours (in one day) exclusive of a one hour lunch and rest period. They will not be kept out of camp for more than 12 consecutive hours, including travel time. Rest

cycles consistent with the wet bulb, black globe temperature will be monitored and followed.

*c.* EPW may be required to work any number of hours for the efficient operation of the EPW compound messes. EPW are responsible for preparing food within these messes.

**4-9. Rest periods**

*a.* Day of rest. Each EPW will be allowed a rest period of 24 consecutive hours every week. These hours will preferably be on Sunday or on the day of rest in the prisoner's country of origin or as established by his or her religious affiliation.

*b.* Annual. Each EPW who has worked for one full year will be given a rest of eight consecutive days during which the U.S. will give working pay to the EPW.

**4-10. Responsibility for work supervision**

The EPW camp commander will:

(1) Decide, as far as practical, how adequate the technical supervision is which is provided by the using agency.

(2) Report the facts on inadequately supervised details to the using agency.

(3) Refuse to continue details on contract work unless adequate work supervision is provided.

**4-11. Work detail leaders and interpreters**

EPW camp commanders are authorized to use selected EPW as work detail leaders and interpreters. The time of work detail leaders and interpreters will be included in labor reports under the same project work classification as their details. The supporting EPW/CI PSYOP unit can assist the camp commander in identifying key communicators, informal leaders, and linguists among the camp population for use as work detail leaders and interpreters.

**4-12. Task system**

The task system will be used when it is possible to predetermine the amount of finished work that an EPW, or group of EPW, can reasonably be expected to complete in a specific period of time.

*a.* Elements of the task system. The task system consists of:

(1) Assigning each EPW, or each group of EPW, a definite and reasonable amount of work to be completed within each workday or other predetermined time period.

(2) Payment for completed work according to this regulation.

(3) Incentive adjustments of the required work according to this regulation.

(4) Penalty measures needed to enforce the task system.

*b.* Decision on daily tasks. The camp commander will decide the reasonable amount of completed work to be required of each EPW or group of EPW during a day.

*c.* Notice to EPW. EPW will be informed of the adoption of the task system before it is put into effect. Each EPW or group of EPW, depending upon whether separate or group tasks are assigned, will be informed of the amount of completed work required each day.

*d.* Incentives. As an incentive, EPW who have completed the required amount of work in less than normal time may be returned to quarters.

*e.* Enforcing the task systems. The camp commander may take disciplinary action against physically qualified EPW who habitually fail to complete the assigned tasks.

**4-13. Employing EPW**

*a.* The greatest benefit from EPW labor on work projects will be obtained. EPW will be employed, as far as practical, on work for which they are qualified. The Dictionary of Occupational Titles, U.S. Government Printing Office, WASH, DC, will be used as a guide in deciding the qualifications of each EPW.

*b.* In assigning EPW to details requiring special training and skills, the following qualification will be considered:

(1) Technical skills.

(2) Aptitudes.

(3) Past work records.

(4) On-the-job training.

*c.* EPW capable of performing skilled and semi-skilled work should be employed on essential work. Persons on work details that require special training or skill will remain as constant as practical. When it is necessary to substitute an EPW in such a detail, the using agency will be notified.

**4-14. Paid work**

EPW will be compensated for performing work for which pay is authorized. The rate of such pay shall be not less than as prescribed in Article 62, GPW. Compensation for all such work will be made as authorized from U.S. Army appropriated funds, canteen funds, or camp EPW funds. Types of paid work for which compensation is authorized are:

*a.* Labor performed for a contract employer or for a federal agency.

*b.* Services as orderlies and cooks (for officer EPW).

*c.* Services to construct, administer, manage, and maintain EPW camps, branch camps, and hospitals when such services are performed by EPW permanently assigned to certain duties or occupations.

*d.* Labor of RP for their duties.

*e.* Spiritual or medical duties required to be performed by EPW for fellow EPW.

*f.* Service as prisoner representative or assistant. Such persons will be paid from the camp EPW fund. If no such fund exists, they will be paid the prescribed rate of pay from U.S. Army appropriated funds.

*g.* Work as detail leaders or interpreters.

**4-15. Restriction on paid work**

*a.* Mess personnel. The number of EPW cooks and assistant cooks who will be paid for work in camp messes will in no case exceed the total number authorized for Army enlisted messes of the same or similar size.

*b.* Fatigue details. Kitchen police, latrine orderlies, and other fatigue details will normally be provided by rotating enlisted EPW. Each EPW assigned to these details will not be paid from Government canteen or camp EPW funds. Assignment of persons to such details by rotation on a duty roster may interfere with the work program. If so, the Camp Commander may assign those duties to EPW who volunteer and whose skills or training are not essential for other work details. In such cases, EPW assigned may be paid the authorized daily rate from canteen credits contributed by all EPW. Payment will be under supervision of the Camp Commander.

*c.* Gardening work.

(1) To the extent practical, EPW will be required to raise their own vegetables. This work will be classified as paid work.

(2) The produce from gardens operated with EPW labor will be U.S. property. It will be used for the benefit of EPW and U.S. Armed Forces personnel. It should not be sold or traded in civilian markets.

**4-16. Rates for paid work**

EPW employed for paid work will be compensated at a rate to be specified, on either piecework or by the workday, as provided below:

*a.* Piecework rates. Piecework rates will be used in compensating EPW when the work performed is for a contract employer or a Federal agency other than DOD.

*b.* Working rates. Working rates will be used for compensating all other paid work (other than contract work) as follows:

(1) EPW of all grades, whether acting in a supervisory capacity or otherwise, will be compensated at the authorized daily rate per full workday.

(2) EPW laboring less than the full workday will be compensated in proportion to the number of hours worked, except when working under a task system and having completed the required task, EPW working under a task system will be paid only for the completed parts of the task despite the number of hours worked.

(3) The U.S. work supervisor may decide that an EPW who is not under a task system is producing less than should be produced

in a full workday. If so, the EPW will be compensated at a rate proportionately lower than the authorized daily rate. Such a decision must be approved by the Camp Commander.

### 4–17. Days of paid work per month
The maximum number of days of paid work for an EPW will be limited to the number of workdays in a calendar month. The total workdays include the total number of days minus Sunday and any holiday specifically authorized by HQDA, ODCSOPS, (DAMO-ODL) NPWIC.

### 4–18. Unpaid work
EPW/RP will not be paid for those services connected with administering and maintaining EPW camps, branch camps, and hospitals when such services are performed on a daily rotation or other temporary basis. Unpaid work, in all cases, will include:

    *a.* Kitchen police.

    *b.* Latrine orderlies.

    *c.* Ground police.

    *d.* Other routine fatigue details of the types normally assigned and performed equitably and temporarily by persons in U.S. Army units.

### 4–19. Sale of articles and repair services
The canteen officer may sell articles made to order for, or repair services performed for, U.S. personnel by EPW. This sale is subject to the following provisions:

    *a.* Articles will be manufactured or repair services will be performed only during the spare time of EPW.

    *b.* No expense to the U.S. will be incurred for equipment, materials, or labor.

    *c.* Repair work or the making of articles to order for U.S. personnel will be prohibited unless an order for the work is placed through the EPW canteen.

    *d.* The canteen officer will fix the price of each article or repair service. The price will reasonably conform to prices for similar articles or services in the civilian market, less the cost of any material supplied by the customer.

    *e.* The canteen officer and the Camp Commander will enter into a blanket contract. Under this contract, the canteen officer will pay to the Camp Commander amounts derived from the sale of articles made to order for, and repair service performed for, U.S. personnel, less a handling charge by the canteen of not more than 10 percent. The canteen officer will submit a voucher monthly to the camp commander. The voucher will list:

    (1) The individual sales and services performed during the month.

    (2) The price charged for each.

    (3) The deductions made for handling charges.

    *f.* The Camp Commander will deposit the amount derived from the sale of articles made to order for, or repair services performed for, U.S. personnel with the U.S. Treasurer. Procedures for these transactions are prescribed in AR 37-1. The EPW will be paid an hourly rate. The rate will not exceed the authorized daily rate for paid work for the services performed. However, in no case will the amount paid to the EPW exceed the price of the article or repair service fixed under subparagraph *d* above. Amounts will be subject to deductions provided for in this regulation. Any residual money will be disbursed by the EPW camp counsel for use by camp EPW. This disbursement must be approved by the Camp Commander.

### 4–20. Disability compensation
    *a.* An EPW may be injured or suffer a disability while working under circumstances that may be attributed to work. If so, DA Form 2675-R (Certificate of Work Incurred Injury or Disability) will be completed in four copies. The original will be given to the EPW; the second copy will be forwarded to the PWIC to be sent to the National Prisoner of War Information Center; and the third and fourth will be placed in the EPW's personnel file.

    *b.* A claim by the EPW for compensation for work-incurred injury or disability will be forwarded to the PWIC. The PWIC will send the claim to the Power on which the EPW depends for settlement. A copy of the completed DA Form 2675-R taken from the personnel files of the EPW will be attached to the claim. DA Form 2675-R will be reproduced locally on 8 1/2 by 11 inch paper. This form is for the use of Army only.

### 4–21. Operation of government vehicles
EPW may be licensed to operate Government motor vehicles according to AR 600-55.

## Section II
## Contract Employment

### 4–22. Rules and procedures
Rules and procedures governing the military and contract employment of EPW will be according to the most current contract laws, procedures and guidelines and comply with the provisions of the Geneva Convention. All requests for the contracting of EPW will be forwarded promptly through channels to HQDA, ODCSOPS (DAMO-ODL) and be coordinated with HQDA, DAJA.

## Chapter 5
## Beginning of Internment (CI)

### 5–1. General protection policy—civilian internee
    *a.* Treatment.

    (1) No form of physical torture or moral coercion will be exercised against the CI. This provision does not constitute a prohibition against the use of minimum force necessary to effect compliance with measures authorized or directed by these regulations.

    (2) In all circumstances, the CI will be treated with respect for their person, their honor, their family rights, their religious convictions and practices, and their manners and customs. At all times the CI will be humanely treated and protected against all acts of violence or threats and insults and public curiosity. In all official cases they will be entitled to a fair and regular trial as prescribed by this regulation.

    (3) The CI will be especially protected against all acts of violence, insults, public curiosity, bodily injury, reprisals of any kind, sexual attack such as rape, forced prostitution, or any form of indecent assault.

    (4) The CI will be treated with the same consideration and without adverse distinction based on race, religion, political opinion, sex, or age.

    (5) The CI will be entitled to apply for assistance to the protecting powers, the International Committee of the Red Cross, approved religious organizations, relief societies, and any other organizations that can assist the CI. The commander will grant these organizations the necessary facilities to enable them to assist the CI within the limits of military and security considerations.

    (6) The following acts are specifically prohibited:

    *(a)* Any measures of such character as to cause the physical suffering or extermination of the CI. This prohibition applies not only to murder, torture, corporal punishment, mutilation, and medical or scientific experiments, but also to any other measure of brutality.

    *(b)* Punishment of the CI for an offense they did not personally commit.

    *(c)* Collective penalties and all measures of intimidation and terrorism against the CI.

    *(d)* Reprisals against the CI and their property.

    *(e)* The taking and holding of the CI as hostages.

    *(f)* Deportations from occupied territory to the territory of the occupying power or to that of any other country, occupied or not, are prohibited.

    *b.* Authorization to intern. Internment of protected civilian persons in a CI camp is authorized and directed provided that such

persons satisfy the requirements for being accorded the status of CI. One of the following two conditions must apply:

(1) Internment has been determined by competent U.S. Military authority to be necessary for imperative reasons of security to the United States Armed Forces in the occupied territory.

(2) Internment has been directed by a properly constituted U.S. military court sitting in the occupied territory as the sentence for conviction of an offense in violation of penal provisions issued by the occupying U.S. Armed Forces.

c. Order for internment.

(1) A protected civilian person in occupied territory will be accepted for evacuation to, and/or for internment in, a CI camp only on receipt of one of the following:

(a) An internment order for imperative security reasons authenticated by a responsible commissioned officer of the United States Military specifically delegated such authority by the theater commander.

(b) An order of an authorized commander approving and ordering into execution a sentence to internment pronounced by a properly constituted U.S. military court sitting in the occupied territory.

(2) The internment order will contain, as a minimum, the following information:

(a) The internee's personal data to include full name, home address, and identification document number, if any.

(b) A brief statement of the reason for internment.

(c) Authentication to include the signature of the authenticating officer over his or her typed name, grade, service number, and organization.

d. Compassionate internment. Notwithstanding the provisions of b and c above, requests by the CI for the compassionate internment of their dependent children who are at liberty without parental care in the occupied territory will normally be granted when both parents or the only surviving parent is interned.

e. Spies and saboteurs.

(1) As individually determined by the theater commander, protected civilian persons who are detained as alleged spies or saboteurs or as persons under definite suspicion of activities hostile to the security of the United States as an occupying power, will be regarded as having forfeited rights of communication with the outside world under the Geneva Convention (GC) for reasons of military security. Such forfeiture will be viewed as an exceptional and temporary measure. Due to the seriousness of the charges, such persons will not be processed as ordinary CI.

(2) Suspected spies and saboteurs will be afforded the same human rights treatment as the CI, and in case of trial, will be accorded the rights of fair and regular trial prescribed by the GC and by this regulation.

(3) When by the direction of the theater commander, suspected spies and saboteurs rights of communication with the outside world have been restored, their internment in a CI camp may be ordered in accordance with the provisions stated in paragraphs b and c above. When so interned, they will be accorded full CI status and rights and privileges as provided for by these regulations.

(4) At the earliest date consistent with the security of the United States, they will be released and granted full rights and privileges as protected persons under the GC.

f. Custodial security. The degree of security and control exercised over the CI will reflect the conditions under which their internment is authorized and directed and will recognize the escape hazards and difficulties of apprehension attendant on the internment of the CI in the occupied territory.

g. Appeals and periodic review of security internment cases.

(1) Appeals. The CI who are interned for imperative security reasons will be accorded the right to appeal the order directing their internment. Such appeals will be decided with the least possible delay by a board of officers. Appeals will be decided only on the grounds of the existence or nonexistence of imperative security reasons requiring the internment of the protected person.

(2) Periodic review. In the case where an appeal has been rejected, the board will review the case at least every 6 months, if

possible, to determine whether continued internment is essential to the security of the U.S. Armed Forces.

(3) Reclassification to assigned residence. In each CI case reviewed by the board in which continued control is necessary, the CI will be considered for an assignment to a residence in an area where there is adequate control.

h. Support of dependents. The United States will financially support the CI's dependents who are at liberty in the occupied territory and are without adequate means of support or are unable to earn a living.

## 5–2. Civilian Internee Safety Program

a. Establishment. A safety program for the CI will be established and administered in accordance with the policies prescribed in AR 385-10 and other pertinent safety directives.

b. Reports and records. DA forms and procedures outlined in AR 385-40 will be used in the implementation of the CI safety program. When so used, the letters "CI" will be clearly stamped at the top and bottom of each form. All such forms will be prepared, administered, and maintained separately from those prepared for personnel included under the Army Safety Program.

## 5–3. Republic of Korea/United States Agreement on processing civilian internees in Korea

a. On 12 February 1982, the United States and Korea signed The Memorandum of Agreement for the Transfer of the CI. The agreement applies to both the Republic of Korea (ROK) Armed Forces and the United States Armed Forces in Korea (USFK) who handle the CI.

b. As a result of this agreement, USFK Regulation 190-6 reflects minor modifications to procedures and forms concerning the processing of CI applicable only to the Korean theater of operations.

# Chapter 6
# Administration and Operation of CI Internment Facilities

## 6–1. Internment Facility

a. Location. The theater commander will be responsible for the location of the CI internment facilities within his or her command. The CI retained temporarily in an unhealthy area or where the climate is harmful to their health will be removed to a more suitable place of internment as soon as possible.

b. Quarters. Adequate shelters to ensure protection against air bombardments and other hazards of war will be provided and precautions against fire will be taken at each CI camp and branch camp.

(1) All necessary and possible measures will be taken to ensure that CI shall, from the outset of their internment, be accommodated in buildings or quarters which afford every possible safeguard as regards hygiene and health, and provide efficient protection against the rigors of the climate and the effects of war. in no case shall permanent places of internment be placed in unhealthy areas, or in districts the climate of which is injurious to CI.

(2) The premises shall be fully protected from dampness, adequately heated and lighted, in particular between dusk and lights out. The sleeping quarters shall be sufficiently spacious and well ventilated, and the internees shall have suitable bedding and sufficient blankets, account being taken of the climate, and the age, sex and state of health of the internees.

(3) Internees shall have for their use, day and night, sanitary conveniences which conform to the rules of hygiene and are constantly maintained in a state of cleanliness. They shall be provided with sufficient water and soap for their daily personal hygiene and for washing their personal laundry; installations and facilities necessary for this purpose shall be provided. Showers or baths shall also be available. The necessary time shall be set aside for washing and for cleaning.

(4) CI shall be administered and housed separately from EPW/

RP. Except in the case of families, female CI shall be housed in separate quarters and shall be under the direct supervision of women.

*c. Marking.* Whenever military considerations permit, internment facilities will be marked with the letters "CI" placed so as to be clearly visible in the daytime from the air. Only internment facilities for the CI will be so marked.

*d. Organizations and operation.*

(1) The CI internment facilities will be organized and operated, so far as possible, as other military commands.

(2) A U.S. Military commissioned officer will command each CI internment facility.

(3) When possible, the CI will be interned in CI camps according to their nationality, language, and customs. All CI who are nationals of the same country will not be separated merely because they speak different languages.

(4) Complete segregation of female and male CI will be maintained except—

*(a)* When possible, members of the same family, particularly parents and children, will be lodged together and will have facilities for leading a normal family life.

*(b)* A parent with children, if single or interned without spouse, will be provided quarters separate from those for single persons.

*(c)* CI may be searched for security purposes. Female CI may be searched only by female personnel.

## 6–2. Administrative processing

*a.* Military police processing.

(1) Military Police (MP) prisoner of war units officially establish CI status and processes the CI.

(2) Only civilian persons entitled to protected status and that meet the requirements set forth in the GC will be classified as a CI.

(3) Dependent children, who are interned for compassionate reasons with their parents, will not be classified as CI or otherwise processed except as required on DA Form 2674-R (Enemy Prisoner of War/Civilian Internee Strength Report) (RCS CSGP-1583) and DA Form 2663-R. DA Form 2663-R will be reproduced locally on 8 1/2 by 11 inch paper, head to head. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only. Children under the age of twelve are to be identified by the wearing of some form of identity badge or wristband or some other means of identification.

(4) All efforts will be made to take the necessary measures to ensure that children under fifteen, who are orphaned or are separated from their families as a result of the war, are not left to their own resources.

*b.* DA Form 2674-R

(1) General. DA Form 2674-R will be prepared for each CI camp and hospital to which CI are assigned. Preparation will be in accordance with applicable procedures set forth for EPWs. DA Form 2674-R will be reproduced locally on 8 1/2 by 11-inch paper, head to head. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only.

(2) Personnel to be accounted for. All civilians processed and classified as CI and for whom a DA Form 4237-R has been prepared in accordance with paragraph 6-2. of this regulation and dependent children for whom compassionate internment with their CI parents has been approved in accordance with procedures prescribed by the theater commander.

(3) Basic personnel data. References to entries in section B, Remarks, requiring basic personnel data, will be interpreted as follows:

*(a)* Name. Enter last names and first names, in that order, alphabetically according to section (assigned gains, losses, and so forth) of CI and dependent children.

*(b)* Internment serial number. Enter complete serial number of this regulation (dependent children are not assigned internment serial numbers (ISNs)).

*(c)* Grade. Civilian capacity or title, CI only.

*(d)* Sex. CI and dependent children.

*(e)* Nationality. CI and dependent children. Enter name of country of which parents claim citizenship.

*(f)* Occupational skill. Applies only to CI.

(4) Remarks column. On initial entry, enter in the "remarks" column the notation "approved by" (insert appropriate headquarters) on (insert date approved) CI and dependent children.

*c.* Civilian internee personnel record.

(1) DA Form 4237-R will be prepared for each protected civilian processed in an occupied territory as a CI or dependent child.

(2) All pertinent information available or which the CI is willing to give will be entered on the form. If a CI refuses or is unable to give any items of information, a notation will be made in item 36 on DA Form 4237-R. The codes to be used are contained in the Prisoner of War Information System (PWIS) Operator's Manual. Stamp the letters "CI" at the top and bottom of all pages of the form.

(3) All items on DA Form 4237-R are self explanatory except the following entries:

*(a)* Item 3. Civilian capacity or title (for example, mayor or police chief) if appropriate.

*(b)* Item 4. Serial number of identification document, if any.

*(c)* Item 5. Entry of "civilian internee."

*(d)* Items 19 through 21. Not applicable.

*(e)* Items 23 through 25. Name of apprehending unit and location, if known.

*(f)* Item 35. List impounded items from DA Form 1132 (Prisoner's Personal Property List-Personal Deposit Fund) and have the CI sign in the appropriate space verifying the impounded items.

(4) Entries will be typed if possible; otherwise, the form will be printed by hand in BLOCK LETTERS.

(5) Once completed, a copy of the form will accompany the CI to the CI camp. A copy will be furnished to the Branch PWIC monitoring CI activity for the theater commander.

*d. Internment serial number (ISN).* ISNs for each CI will be assigned according to the procedure set forth for EPW. The letters ACI@ will be substituted for AEPW@ e.g. US9AB-0001CI.

*e. DA Form 2677-R (Civilian Internee Identity Card).* Each CI will be issued a completed DA Form 2677-R. Notation thereof will be made under item 36 of DA Form 4237-R. DA Form 2677-R will be reproduced locally on 3- by 5- inch card head to foot. (Copy for local reproduction is located at the back of this regulation.) This form is for the use of Army only. All cards will be weatherproof. The CI will retain their identity cards at all times.

*f. Internment card.* On completion of a DA Form 4237-R, but not later than one week after arrival at a CI camp, each CI must complete two copies of DA Form 2678-R (Civilian Internee Notification of Address). One copy will be addressed to the EPW/CI information organization and the other copy to a relative or next-of-kin. DA Form 2678-R will be reproduced locally on 4- by 6-inch card, printed head to foot. (Copy for local reproduction is located at the back of this regulation.)

*g. DA Form 2663-R.* DA Form 2663-R will be completed in duplicate for each CI and for each interned dependent child. One copy will be retained in the camp at which the CI or dependent child is interned and will accompany internee on transfers; the other copy will be forwarded to the Branch PWIC.

## 6–3. Personal effects

*a.* All personal effects, including money and other valuables, of the CI will be safeguarded. Personal effects are classified according to their disposition.

*b.* The personal effects that detainees are allowed to retain, but are taken from them temporarily for intelligence purposes, will be receipted for and returned as soon as practical. Any national identification card or DA Form 2677-R will not be taken from the CI at any time.

(1) The camp commander may receive personal effects that the CI are permitted to retain, but which they wish stored. Individual receipts will be given to the CI for all items stored in this manner.

(2) Any claim by a CI for compensation for personal effects, money, or valuables stored or impounded by the United States and not returned upon repatriation or any loss alleged to be the fault of