the United States or its agents will be referred to the country to which the CI owes allegiance. In all cases, camp commanders will provide the CI with a statement, signed by a responsible officer, describing the property not returned and the reason. A copy of this statement will be forwarded to the Branch PWIC.

c. An inventory of personal effects that have been impounded will be entered on DA Form 4237-R, item 35. Also, DA Form 1132 will be completed by the CI and signed by the officer in charge or his or her authorized representative and a copy given to the CI.

d. The commanding officer of the camp where the CI is interned will be responsible for storing and safekeeping impounded personal effects. Such property will be marked or otherwise identified and securely bound or packaged. Upon transfer, the CI's impounded property will be delivered to the commanding officer of the receiving facility.

e. Money found in the possession of the CI will be handled according to AR 37-1.

f. Confiscated items of economic value will be receipted to the proper agency. Items of intelligence interest will be brought to the attention of military intelligence personnel immediately and receipted to them.

g. Personal property and documents of importance to the next-of-kin left by a CI who has been released, has died, or has been in an escaped status in excess of 30 days, will be forwarded to the Branch PWIC in sealed parcels. The parcels will be accompanied by statements identifying the CI and listing the contents. All parcels will be receipted for by the authorized losing or gaining facility representative.

h. The theater commander will be responsible for retaining and storing other personal effects, pending final disposition instructions from HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

## 6–4. Internee Committee

a. Election. At each camp and branch camp, CI will be elected by secret written ballot to the Internee Committee. This committee is empowered to represent the camp to the protecting powers, International Committee of the Red Cross, or other authorized relief or aid organizations and U.S. military authorities.

b. Composition. The Internee Committee will consist of not less than two and not more than three elected members. Elections will be held every 6 months or upon the existence of a vacancy. Committee members are eligible for re-election.

c. Approval. Each member of the Internee Committee will be approved by the camp commander prior to assumption of duty. If the camp commander refuses to approve or dismisses an elected member, a notice to that effect with the reasons for refusal or dismissal will be forwarded through channels to the Branch PWIC for transmittal to the protecting power with a copy furnished to NPWIC.

d. Assistants. Each member of the Internee Committee may have an assistant to act as an interpreter. The interpreter must be approved by the camp commander.

e. Duties.

(1) The Internee Committee will be responsible for furthering the physical, spiritual, and intellectual well being of the CI. Members will not be required to perform any other work if it interferes with their duties.

(2) Any mutual assistance organization set up by the CI will be under the jurisdiction of the Internee Committee.

(3) Internee Committee members will be provided with the necessary materials, facilities, and transportation and will be given the freedom required to accomplish their duties. Additional special duties performed by members of an Internee Committee include the following:

(a) Visits to outside labor details.

(b) Checking the management of the canteen and the canteen fund.

(c) The presentation and transmittal of petitions and complaints to the appropriate authorities.

(d) The distribution and disposition of collective relief shipments.

(e) Keeping informed of ongoing and final judicial proceedings instituted against a CI whom they represent.

(f) The delivery of perishable goods to the infirmary when addressed to a CI undergoing disciplinary punishment.

(g) Representing the interest of the CI by ensuring the transport of their community property and luggage that they are unable to take with them on transfers because of baggage weight limitations.

(4) Members of Internee Committees who are transferred will be allowed a reasonable time to acquaint their successors with their duties and related current CI affairs.

f. Communications facilities. Members of the Internee Committee will be accorded postal and telegraphic facilities for communicating with the protecting powers, International Committee of the Red Cross and its delegates, or other relief and aid organizations authorized to assist the CI and U.S. military authorities. Committee members of branch internment camps will be accorded similar facilities for communicating with the Internee Committee of the parent CI camp. These communications will be unlimited and will not be considered as forming a part of the correspondence quota outlined in paragraph 6-8.

## 6–5. Supplies

a. General.

(1) The CI must provide their own clothing and footwear. Approved items of clothing and equipment, general supplies, subsistence, and fuel will be supplied upon requisition.

(2) Except for work clothing or as circumstance warrant, or climatic conditions required, no replacement clothing will be issued.

(3) Except for hats and other accessories any item of clothing that may be worn as outer garments will be marked as prescribed below:

(a) All shirts, undershirts, blouses, jackets, coats including overcoats and raincoats, and similar articles will be marked with the letters "CI" across the back and on the front of each sleeve between the elbow and shoulder. The letters will be black and 4 inches high. If the clothing or uniforms are of such color that black letters do not contrast well, white will be used.

(b) Trousers, walking shorts, and like items of clothing will be similarly marked with the same letters across the back just below the belt and on the front of both legs just above the knees.

(c) At the discretion of the camp commander, the ISN or other identification marks may be written or stamped on the inside of all CI clothing.

b. Food.

(1) Subsistence for the CI will be issued on the basis of a master CI menu prepared by the theater commander. Preparation of the menu will include the following:

(a) The daily individual food ration will be sufficient in quantity, quality, and variety to maintain the CI in good health and to prevent nutritional deficiencies.

(b) The customary diet of the CI will be considered.

(c) The CI performing physical labor will receive additional food in proportion to the kind of labor performed.

(d) Expectant and nursing mothers and children under 15 years of age will receive additional food in proportion to their physiological needs.

(2) Facilities will be available to the CI for preparing additional food received or procured by them from authorized sources.

c. Miscellaneous.

(1) The issuance of expendable supplies is authorized according to allowances prescribed in Army publications.

(2) Equipment required to support vocational training projects such as gardening, carpentry, tinsmithing, blacksmithing, masonry, repairing shoes and clothing, tailoring, barbering, potting, and farming may be requisitioned through normal supply channels. Subject to restrictions imposed on authorized expenditures from the camp Civilian Internee Fund, camp commanders may purchase locally items of equipment, materials, and supplies needed in the vocational training program that are not available through supply channels.

## 6–6. Medical Care and Sanitation

*a. General.*

(1) Dental, surgical, and medical treatment will be furnished free to the CI.

(2) A medical officer will examine each CI upon arrival at a camp and monthly thereafter. The CI will not be admitted into the general population until medical fitness is determined. These examinations will detect vermin infestation and communicable diseases especially tuberculosis, malaria, and venereal disease. They will also determine the state of health, nutrition, and cleanliness of each CI. During these examinations, each CI will be weighed, and the weight will be recorded on DA Form 2664-R.

(3) Each CI will be immunized or reimmunized as prescribed by theater policy.

*b. CI medical personnel.*

(1) Qualified CI medical personnel will be used as much as possible in medical and hygiene work necessary for the well-being of all CI.

(2) Required Army medical personnel will be provided within the capability of the theater commander.

*c. Medical facilities.* Each CI camp will provide personnel, material, and facilities for adequate routine and emergency dispensary treatment. Patients requiring hospital treatment will be moved, if feasible, to a civilian hospital. The treatment must be as good as that provided for the general population. When civilian hospital facilities are not available or their use is not feasible due to security considerations, U.S. military hospital facilities may be used. Guards for hospitalized CI will be provided, as necessary.

*d. Medical care.*

(1) Medical and dental care, including dentures, spectacles, and other required artificial appliances, will be provided the CI in accordance with AR 40-3.

(2) Each CI will be given an initial radioscopic chest examination. If active disease is found, pulmonary disease consultation is indicated. If no active disease is found, the individual will be followed through routine periodic examinations.

(3) For children up to 14 years of age, a tuberculin skin test (TST) will be administered. No chest x-ray is necessary if the TST is negative. The local medical officer will establish guidance for subsequent tests based on the tuberculosis experience of the population. Routine annual tuberculin testing of children is not warranted unless there is clear-cut evidence of high risk. (See AR 40-26, para 8 f.)

(4) Experimental research will not be conducted on the CI even if the CI agrees to it.

(5) Sick call for the CI desiring medical attention will be held each day. Emergency treatment will be provided at all times.

*e. Blood donations.* At each CI camp and hospital, a list will be maintained according to blood types of CI who have volunteered to furnish blood.

*f. Records and reports*

(1) General. The medical records and forms used for the hospitalization and treatment of U.S. Army personnel and for EPWs will be used for CI. The letters "CI" will be stamped at the top of the form. Medical and dental records will accompany the CI when they are transferred.

(2) Certificate of Work Incurred Injury or Disability. If a CI is injured while working or incurs a disability that may be attributed to work, a DA Form 2675-R will be completed.

(3) Certificate of medical treatment. Each CI who has undergone medical treatment will be given on request an official certificate indicating the nature of his or her illness or injury, and the duration and kind of treatment given. A duplicate of this certificate will be forwarded to the Branch PWIC.

(4) Seriously ill report. When a CI is seriously ill because of injury or disease, the camp or hospital commander will notify the Branch PWIC without delay and provide a brief diagnosis of the case. Follow-up reports, including notification of removal from the seriously ill list, will be submitted each week thereafter during the period the CI remains critical.

*g. Sanitation.*

(1) Hygiene and sanitation measures will conform to those prescribed in AR 40-5 and related regulations. Camp commanders will conduct periodic and detailed sanitary inspections.

(2) A detailed sanitary order meeting the specific needs of each CI camp or branch camp will be published by the CI camp commander. Copies will be reproduced in a language that the CI understands and will be posted in each compound.

(3) Each CI will be provided with sanitary supplies, service, and facilities necessary for their personal cleanliness and sanitation. Separate sanitary facilities will be provided for each sex.

(4) All CI will have at their disposal, day and night, latrine facilities conforming to sanitary rules of the Army.

## 6–7. Social, Intellectual, and Religious activities

*a. General.*

(1) Subject to security considerations and camp discipline, the CI will be encouraged, but not required, to participate in social, intellectual, religious, and recreational activities. Introducing political overtones into or furthering enemy propaganda objectives through these activities will not be tolerated.

(2) Premises and facilities for conducting the activities in (1) above will be made available in each camp, if possible. Required materials and supplies will be requisitioned through normal supply channels.

(3) Carefully selected and qualified civilian nationals and CI may be used for the conducting of activities in (1) above where practical as long as they are closely supervised by U.S. Military personnel.

*b. Visits.*

(1) Official. Duly accredited representatives of the protecting powers and of the International Committee of the Red Cross and other will be permitted to visit and inspect CI camps and other places of internment in the discharge of their official duties. The inspections will be at times previously authorized by the theater commander. Such visits will not be prohibited, nor will their duration and frequency be restricted, except for reasons of imperative military necessity, and then only as a temporary measure. These representatives will be permitted to—

(a) Interview the CI without witnesses, if requested.

(b) Distribute relief supplies and approved materials intended for educational, recreational, or religious purposes, or for assisting the CI in organizing their leisure time within the places of internment. Visiting representatives may not accept from any CI any letters, papers, documents, or articles for delivery.

(2) Social. Near relatives and other persons authorized by the theater commander will be permitted to visit the CI as frequently as possible in accordance with theater regulations. They should be advised that the taking of photographs on or about the facility is prohibited.

(3) Emergency visits by civilian internees. Subject to theater policy, the CI may visit their homes in urgent cases, particularly in cases of death or serious illness of close relatives.

*c. Education.*

(1) The CI education program, as developed for each CI camp, will reflect consideration of the following:

(a) The several educational levels represented in the CI population of the camp.

(b) The establishment of basic courses of instruction to include elementary level reading, writing, geography, mathematics, language, music, art, history, and literature.

(c) The uninterrupted education of dependents residing with their CI parents. This education will reflect to the extent determined feasible by the theater commander, the educational curriculums of the particular country.

(d) The development of vocational training projects with an immediate view of developing skills that may be useful during internment and a longer range view of enabling the CI to learn a useful trade in which they may engage when returned to normal civilian life. Such projects may include, at the discretion of the theater commander, carpentry, tinsmithing, masonry, repairing shoes and clothing, tailoring, barbering, potting, and farming.

(2) Equipment required to support the education program will be requisitioned through normal supply channels. At the discretion of the camp commander, items not in supply may be purchased locally and paid for from the camp Civilian Internee Fund provided the items will benefit most CI. The CI personnel employed in the education program will be paid the established rate of pay from the camp Civilian Internee Fund.

*d.* Religion.

(1) CI will enjoy freedom of religion, including attendance at services of their respective faiths held within the internment camps. Wines used for religious purposes will be permitted.

(2) CI who are clergy may minister freely to CI who voluntarily request their ministration. Equitable allocation of CI clergy will be effected among the various camps.

(3) If there is a shortage of CI clergy and the circumstances warrant, the camp commander will provide the CI clergy with the necessary means of transport for visiting the CI in branch camps and hospitals.

(4) The CI clergy will be permitted to correspond on religious matters with the religious authorities in the country of detention and, as far as possible, with the international religious organizations of their faiths. This correspondence will not be considered as forming a part of the quota that may be established in accordance with paragraph 6-8, but will be subject to censorship.

(5) Ordained clergy or a theological student who are not CI may be authorized to enter a camp and conduct religious services. Visits by such personnel will be in accordance with procedures prescribed by the theater commander.

*e.* Recreation.

(1) Recreational activities and facilities, in addition to sports and outdoor games, may include concerts and plays put on by the CI, recorded music, selected motion pictures, and other activities provided by the theater commander.

(2) Special playgrounds will be reserved for dependent children of the CI.

(3) Expenditures from the camp Civilian Internee Fund for the purchase or rental of recreational equipment are authorized.

(4) Appointed delegates of the International Committee of Red Cross are authorized to assist in developing recreational and welfare activities.

## 6–8. Procedures for communications

*a.* Restrictions on numbers and addresses. Procedures for CI correspondence will be in accordance paragraph 3-5. a-f. except that DA Forms 2668-R and 2680-R (Civilian Internee PostCard) will be substituted for DA Forms 2667-R and 2679-R (Civilian Internee Letter) respectively. No restriction will be placed on persons with whom the CI may correspond. DA Form 2679-R will be reproduced on 8 1/2-by 11-inch paper, head to head. DA Form 2680-R will be reproduced on 4-by 6-inch card, head to foot. Copies for local reproduction are located at the back of this regulation. These forms are for the use of Army only.

*b.* Outgoing mail. The following procedures apply to outgoing mail:

(1) Letters and cards will be typed or written legibly in ink. Block printing may be used.

(2) Correspondence will be addressed as follows:

*(a)* Names and addresses will be complete; they will be placed in the spaces designated on the correspondence forms.

*(b)* The return address will be in block print to include the full name, grade, ISN, place and date of birth of the sender, and the name of the camp to which assigned. Instructions for including the APO number or the country in which the camp is located should be issued by local directives.

*(c)* A person at a branch camp will give the parent camp as the return address. The person will be retained on the rosters and postal records of the parent camp.

*(d)* The surnames in the address and return address of letters and cards will be underlined.

(3) Each person will be required to date his or her letters and

cards. The name of the month will be written, not shown by a number.

(4) To expedite the handling of mail, CIs will designate the language of their communication.

(5) The date will not be crossed off, written over, or otherwise modified.

(6) Letters and cards will not be numbered consecutively.

(7) The entire letter or card will be written by the same person. If necessary, the address may be written by someone else.

(8) The CI may not write letters for others who are able to do so themselves. A person may be unable to write because of lack of education, accident, or sickness. If so, the camp commander may permit another person to write the message. In these cases, the person doing the writing will countersign the message.

(9) Letters and cards with parts excised, deleted, or otherwise mutilated before being dispatched from the camp will be returned to the person for rewriting.

*c.* Correspondence sent to civilian internees. Instructions on letters and cards that are sent to CI should be communicated by CI to their correspondents.

(1) The name and return address of the sender will be typewritten or hand printed. For letters, the sender's name and address will always appear on the backs of the envelope. The addresser's surname will be underlined.

(2) The name, grade, ISN of the detainee, the name or number of the base camp, and the geographical designation or APO number will be placed in the center lower half of the envelope card. These items are specified by local directives or the camp commander. The entire name of the detainee will be in block print. The address will be placed as near the lower edge of the envelope as possible; the postmark at the top will not be obscured or obliterated.

(3) The term "Civilian Internee Mail" will be placed in the upper left corner on the address side. In the upper right corner the words "Postage Free" must be shown.

*d.* Legal documents. Legal documents, such as wills and deeds, may be enclosed with outgoing correspondence. When it is necessary for a CI to send a legal document, the document and forwarding letter or card may be enclosed in a plain envelope.

*e.* Maps, sketches, or drawings. The CI will not send maps, sketches, or drawings in outgoing correspondence.

*f.* Registered certified, insured, COD, or airmail items. Individuals will not be permitted to mail registered, certified, insured, COD, or airmail items. If registered, certified, insured, or COD mail of either domestic or foreign origin addressed to a detainee is received, it will be refused. The local post office will return them to the sender.

*g.* Postage. Letters and cards to and from the CI will be sent by ordinary mail and postage free.

*h.* Security. Outgoing letters and cards will be secured by using locked boxes or similar means. Only authorized U.S. personnel will handle outgoing mail. Incoming mail may be sorted by the CI when supervised by U.S. personnel.

*i.* Censorship. Censorship of the CI mail will be according to policies established by the theater commander:

(1) Outgoing letters and cards may be examined and read by the camp commander. The camp commander will return outgoing correspondence containing obvious deviations from regulations for rewriting.

(2) Camp commanders will name U.S. military personnel to supervise the opening of all mail pouches containing incoming letters and cards for CI. These items will be carefully examined by the named personnel before delivery to detainees. Those items that arrive without having been censored by appropriate censorship elements will be returned for censorship to the designated censorship elements.

(3) The CI complaints concerning mail delivery will not be directed to censorship elements. These will be directed to—

*(a)* The camp authorities.

*(b)* The responsible major Army commander.

*(c)* HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

*(d)* The protecting power.

*j.* Procedures for parcels.

(1) A person may receive individual parcels and collective shipments containing—

*(a)* Foodstuffs.

*(b)* Clothing.

*(c)* Medical supplies.

*(d)* Articles of religious, educational, or recreational nature.

(2) Books, included in parcels of clothing and foodstuffs, may be confiscated as the camp commander decides.

(3) The CI may send parcels subject to such restrictions as may be deemed necessary by the theater commander with respect to quotas, contents, size, and weight. The CI may send parcels free of charge up to a weight of 5 kilograms per package, or 10 kilograms in the case of articles that cannot be separated (Art 39, Universal Postal Convention).

(4) Parcels received for transferred persons will be forwarded immediately to them.

(5) Nonperishable articles received for persons who have died, escaped, or been released will be forwarded to the Branch PWIC. Perishable items received for deceased or escaped persons will be released to the Internee Committee who will deliver them to the camp infirmary or hospital for the benefit of the CI.

(6) The contents of all incoming parcels will be examined at the camp by a U.S. officer in the presence of the addressee or the named representative. When considered necessary, the camp commander may request that the parcel be examined by the censorship element. The articles in each parcel will be removed. The string, the inner wrappings, the outer container, and any extraneous items found in the parcel will not be turned over to the CI or the named representatives. Examination will be close enough to reveal concealed articles and messages; however, undue destruction of contents of parcels will be avoided.

*k.* Telegrams and telephone calls. The CI may read and receive telegrams. They may not make or receive telephone calls.

(1) Dispatching telegrams will be as follows:

*(a)* A CI who has not received mail from next-of-kin for 3 months may send a telegram not earlier than one month from the date a previous telegram was sent.

*(b)* CI who are unable to receive mail from their next-of-kin or send mail to them by ordinary postal routes or who are a great distance from their home will be permitted to send one telegram a month.

*(c)* The CI who is seriously ill or who has received news of serious illness or death in the family will be permitted to send a telegram. The camp commander will authorize the sending of additional telegrams.

(2) The sending of telegrams as provided for in (1) above will be governed by the following:

*(a)* The message proper will consist of not more than 15 words.

*(b)* The cost of sending the telegram will be charged to the personal account of the CI.

*(c)* Arrangements for messages going to or through enemy-occupied countries will be made with the local International Committee of the Red Cross field director and will be sent through the International Committee of Red Cross, Geneva, Switzerland.

*(d)* Telegrams will be in the English.

*(e)* No telegram, except by members of the Internee Committee, will be sent to a Government official or to a protecting power.

*(f)* Telegrams will be censored according to instructions issued by the chief censor.

*l.* Books. The CI may receive books. Persons or organizations may donate new or unmarked used books, singly or in collections, to camp libraries. Books that arrive at camps uncensored will be censored by a representative of the censorship element. Publications (books, magazines, newspapers, and so forth) containing maps may be made available to the CI upon approval by the camp commander, provided they do not contain maps of the territory surrounding the camps.

*m.* Newspapers and magazines. The following may be made available to the CI:

(1) Current newspapers and magazines published in English in the United States and selected by the camp commanders.

(2) Unmarked, unused magazines in English published in the United States and distributed by approved relief or aid organizations received at the discretion of the camp commanders for camp libraries after censorship by the censorship element.

(3) Foreign language newspapers and magazines published in the United States, upon approval of the camp commander and after censorship of individual issues by the censorship element.

(4) Newspapers and magazines published outside the United States, regardless of language, must be approved by the theater commander or HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

## 6–9. Complaints and requests to camp commanders and protecting power

*a.* Persons may make complaints or requests to the camp commander, who will try to resolve the complaints and answer the requests. If the CI are not satisfied with the way the commander handles a complaint or request, they may submit it in writing, through channels, to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

*b.* Persons exercising the right to complain to the protecting power about their treatment and camp may do so—

(1) By mail.

(2) In person to the visiting representatives of the protecting power.

(3) Through their Internee Committee.

*c.* Written complaints to the protecting power will be forwarded promptly through HQDA (DAMO-ODL)NPWIC, WASH DC 20310-0400. A separate letter with the comments of the camp commander will be included. Military endorsements will not be placed on any CI communications.

*d.* If a protecting power communicates with a CI camp commander about any matter requiring an answer, the communication and commander=s reply will be forwarded to HQDA (DAMO-ODL) NPWIC, WASH DC 20310-0400, for proper action.

*e.* Any act or allegation of inhumane treatment or other violations of this regulation will be reported to HQDA (DAMO-ODL), WASH DC 20310-0400 as a Serious Incident Report. Reporting instructions in AR 190-40 will be used.

## 6–10. Discipline and security

Measures needed to maintain discipline and security will be set up in each camp and rigidly enforced. Offensive acts against discipline will be dealt with promptly. The camp commander will record disciplinary punishments. The record will be open to inspection by the protecting power.

*a.* Prohibited acts.

(1) Associations on close terms between the CI and U.S. military or civilian personnel.

(2) Exchange of gifts between the CI and U.S. military or civilian personnel.

(3) Setting up of courts by the CI. The CI will not have any disciplinary power or administer any punishment.

*b.* Regulations, orders, and notices. Regulations, orders, and notices on the conduct and activities of the CI will be written in a language the CI can understand. They will be posted in a place within each camp where the CI may read them. They will also be made available to persons who do not have access to posted copies. Additional copies will be given to the Internee Committee. This requirement will also apply to the text of the GC and texts of special agreements concluded under it. Every order and command addressed personally to the CI must be given in a language he or she understands. To protect persons from acts of violence, bodily injury, and threats of reprisals at the hand of fellow internees, a copy of a notice in the internee's language will be posted in every compound.

**NOTICE**

The CI regardless of faith or political belief, who fear that their lives are in danger or that they may suffer physical injury at the hands of other detainees will immediately report the fact personally to any U.S. Army officer of this camp without consulting the Internee Committee. From that time on, the camp command will assure adequate protection to such civilian internees by segregation, transfer, or other means. Civilian internees who mistreat fellow internees will be punished.

Signed (Commanding Officer)

c. *Courtesies.* The normal civilian courtesies will be required of the CI in their relationships with military personnel. U.S. military personnel will be courteous and will extend to the CI the regard due them.

d. *Flags and political emblems.* Flags on which a political enemy emblem or device appears will be seized. The CI will not have any political emblem, insignia, flag, or picture of political leaders. The CI may have pictures of political leaders that appear in magazines, books, and newspapers if the pictures are not removed.

e. *Security.* All security matters connected with the custody and utilization of the CI are the responsibilities of the theater commanders in overseas areas.

## 6–11. Provisions common to disciplinary and judicial punishments

a. *General.*

(1) If general laws, regulations, or orders declare acts committed by the CI to be punishable, whereas the same acts are not punishable when committed by persons who are not interned, these acts will only entail disciplinary punishment.

(2) When possible disciplinary punishment rather than judicial punishment will be used.

(3) The courts or authorities in passing sentence or awarding disciplinary punishment will consider the fact that the defendant is not a national of the United States. They will be free to reduce the penalty prescribed for the offense with which the CI is charged and will not be obliged to apply the prescribed minimum sentence but may impose a lesser one.

(4) Punishment will not be inhumane, brutal, or dangerous to the health of the CI The age, sex, and state of health of the CI will be considered.

(5) Imprisonment in premises without daylight is prohibited.

(6) The length of time a CI is confined while awaiting a disciplinary hearing or a trial will be deducted from any disciplinary or judicial punishment involving confinement to which he or she may be sentenced and will be taken into account in finding any penalty.

(7) No CI may be punished more than once for the same offense.

(8) The CI who has served disciplinary punishment on judicial sentences will not be treated differently from other CI.

b. *Confinement benefits.* The CI undergoing confinement, whether before or after trial and whether in connection with disciplinary or judicial proceedings, will—

(1) Be allowed to exercise and stay in the open air at least two hours daily.

(2) Be allowed to attend daily sick call, receive medical attention as needed, and if necessary be transferred to a hospital.

(3) Be given enough food to maintain them in as good health as that provided other CI.

(4) Be permitted to confer with visiting representatives of the protecting power or the ICRC.

(5) Be permitted to receive spiritual assistance.

(6) If a minor, be treated with proper regard.

(7) Be provided with hygienic living conditions.

(8) Be provided adequate bedding and supplies and facilities necessary for personal cleanliness.

(9) If a female, be confined in separate quarters from male CI and will be under the immediate supervision of women.

## 6–12. Disciplinary proceedings and punishments

a. *Authority to order disciplinary punishment.* Without prejudice to the competence of courts and higher authorities, disciplinary punishment may be ordered only by the camp commander.

b. *Rights of accused prior to imposition of disciplinary punishment.* Prior to imposition of disciplinary punishment, the CI will be—

(1) Provided precise information regarding the offense of which they are accused.

(2) Given an opportunity to defend the allegation.

(3) Permitted to call witnesses and to have, if necessary, the service of a qualified interpreter.

c. *Authorized disciplinary punishment.* The following disciplinary punishments are authorized:

(1) Discontinuance of privileges granted over and above the treatment provided for by this regulation.

(2) Confinement.

(3) A fine not to exceed one-half of the wages that the CI may receive during a period of not more than 30 days.

(4) Extra fatigue duties, not exceeding 2 hours daily, in connection with maintaining the internment camp.

d. *Duration of disciplinary punishment.*

(1) The duration of any single disciplinary punishment will not exceed 30 consecutive days. The maximum of 30 days will not be exceeded even if the CI is answerable for several breaches of discipline, whether related or not, at the time when punishment is imposed.

(2) The period elapsing between the pronouncing of the disciplinary punishment and the completion of its execution will not exceed 30 days.

(3) After imposition of disciplinary punishment on the CI, further discipline will not be imposed on the same CI until at least 3 days have elapsed between the execution of any two of the punishments if the duration on one of the two punishments is 10 days or more.

e. *Escape and connected offenses.*

(1) The CI who are recaptured after having escaped or when attempting to escape will be liable to disciplinary punishment with respect to this act only, even if it is a repeated offense.

(2) The CI punished as a result of escape or attempt to escape may be subjected to special surveillance that does not affect the state of their health, when the punishment is exercised in a CI camp and if it does not violate any of the provisions of this regulation.

(3) The CI who aid and abet an escape or an attempt to escape, if no injury is done to a person, will be liable to disciplinary punishment only.

(4) Escape, or attempt to escape, even if it is a repeated offense, will not be deemed an aggravating circumstance in cases where the CI is prosecuted for offenses committed incidental to or during his or her escape or attempt to escape.

(5) The CI is liable to prosecution for an escape or attempted escape that results in a death or serious bodily injury to another person.

f. *Confinement pending hearing.*

(1) The CI accused of an offense for which disciplinary punishment is contemplated will not be confined pending a disciplinary hearing unless it is essential to the interest of camp order and discipline. Its duration will in any case be deducted from any sentence of confinement.

(2) Any period spent by the CI in confinement awaiting a hearing will be reduced to an absolute minimum. For offenses entailing disciplinary punishment only, it will not exceed 14 days.

g. *Confinement facilities.* CI confined as disciplinary punishment will undergo their punishment in a CI camp stockade.

h. *Confinement benefits.* In addition to the benefits provided by paragraph 6-11 b of this regulation, the CI placed in confinement in connection with disciplinary proceedings will be allowed to send and receive letters, cards, and telegrams in accordance with the

provisions of this chapter. Parcels and remittances of money, however, may be withheld from the CI until the completion of the punishment. Parcels will be released to the safekeeping of the Internee Committee. If perishable goods are contained in the parcels, the Internee Committee will give them to the infirmary or hospital.

## 6–13. Judicial proceedings

*a.* General principles.

(1) The penal laws of the occupied territory will remain in force, with the exception that they may be repealed or suspended by the United States in cases where they constitute a threat to its security or an obstacle to the application of the GC.

(2) The United States may subject the population of the occupied territory to provisions that are essential to enable it to fulfill its obligation under the GC, to maintain orderly government of the territory, and to ensure the security of the U.S. Armed Forces.

(3) The penal provisions enacted by the United States will not come into force before they have been published and brought to the knowledge of the inhabitants in their own language. The effect of penal provisions will not be retroactive.

(4) The CI may be tried by general court-martial that must sit within the occupied territory. The CI will not be tried before summary or special court-martial.

(5) No CI will be tried or sentenced for an act that was not forbidden by U.S. law or by international law in force at the time the act was committed.

(6) No protected person may be punished for an offense he or she has not personally committed.

(7) No moral or physical coercion will be exerted to induce the CI to admit guilt for any act.

(8) No CI will be convicted without having had the chance to present a defense with the assistance of a qualified advocate or counsel.

*b.* Notification of judicial procedures.

(1) The accused will be promptly notified, in writing in a language they understand, of the charges against them and will be tried as rapidly as possible.

(2) A notice (in duplicate) of proceedings against the CI will be submitted through channels to HQDA (DAMO-ODL) NPWIC, WASH DC 20310-0400 for transmittal to the protecting power, in cases of charges involving the death penalty or imprisonment for 2 years or more. Upon request, the protecting power will be furnished with information regarding the status of such proceedings. Furthermore, the protecting power will be entitled, on request, to be furnished with all particulars of any other proceedings instituted against the CI.

(3) The above notice will be sent without delay. The trial will not commence until 3 weeks after the protecting power has been notified.

(4) The notice will include the following:

*(a)* Surname and first names; internment serial number; date of birth; and profession, trade, or prior civil capacity of the CI.

*(b)* Place of internment.

*(c)* Specification of the charges with penal provisions under which they are brought.

*(d)* Designation of the court that will hear the case.

*(e)* Place and date of the first hearing.

(5) The Internee Committee will be informed of all judicial proceedings against the CI that it represents and of the results of the proceedings.

(6) The records of trials will be kept by the courts and will be open to inspection by the representatives of the protecting power.

*c.* Rights and means of defense.

(1) In each trial by court-martial, the accused will be entitled to assistance by a qualified advocate or counsel of his or her own choice, the calling of witnesses, and if necessary the services of a competent interpreter. The CI will be advised of these rights by the commander concerned in due time before the trial.

(2) When the accused does not exercise the right to choose an advocate or counsel, notice to that effect will be sent through

HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, to the protecting power. The protecting power may provide a counsel.

(3) When the protecting power is not functioning and the accused is faced with a serious charge, the convening authority will provide, subject to consent of the accused, an advocate or counsel.

(4) Unless the CI freely waives such assistance, an accused will be provided with the assistance of an interpreter both during preliminary investigation and during the hearing in court. The CI will have the right to object to the interpreter provided and to ask for a replacement.

(5) The defense counsel will be given at least 2 weeks before the opening of the trial and will be granted the necessary facilities to prepare the defense of the accused. The defense counsel will be permitted to visit the accused freely and to interview the accused in private. The defense counsel will also be permitted to confer with any witnesses for the defense including other CI. These privileges will continue until the term of appeal or petition has expired.

(6) Copies of the charge sheet will be given to the accused and the defense counsel in the language that they understand at least 2 weeks before the trial begins.

(7) The interpreter, appointed for and sworn by the court, will provide the official translation of all trial proceedings. The interpreter must not be a trial counsel, defense counsel, assistant to either, or witness; nor should he or she have any bias or interest in the case. The interpreter will translate testimony given in the language of the accused into English for the benefit of the court.

*d.* Participation of protecting power in criminal proceedings. Representatives of the protecting power will be permitted to attend the trial of any CI unless the hearing has to be held secretly as an exceptional measure in the interest of the security of the United States. If a trial is to be held in secret, a notice as to the reasons, the date, and place of the secret trial will be sent to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400. They will be notified at least three weeks before the opening of the trial to permit timely notification to the protecting power.

*e.* Notification of judgment and sentence.

(1) In all cases requiring notification to the protecting power, two copies of the findings, and if applicable the sentence will be forwarded immediately to HQDA, ODCSOPS(DAMO-ODL), NPWIC WASH DC 20310-0400, in the form of a summary communication for transmittal to the protecting power. When NPWIC transmits this information to the protecting power, it will include a brief statement of the appellate rights of the accused. Notification as to the decision of the CI to use or waive his or her right to appeal will also be forwarded (in duplicate) to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power. If the sentence adjudged is death, the information set forth in *g* below, together with one copy of the court-martial record of trial will be forwarded to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power.

(2) After final approval of a sentence involving the death penalty or imprisonment for 2 years or more, the following information will be forwarded (in duplicate) to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power:

*(a)* A precise wording of the approved finding and sentence.

*(b)* A summarized report of the evidence.

*(c)* If applicable, the name of the place where confinement will be served.

*f.* Appeals in criminal proceedings.

(1) The convicted CI sentenced to confinement or to punishment other than death will have the right of appeal provided for by the laws applied by the court. In all instances, the CI condemned to death will be permitted to petition for pardon or reprieve. The CI will be fully informed of the right to appeal or petition and of the time within which it must be done.

(2) When the laws applied by the court make no provision for appeals, the convicted CI will have the right to petition against the finding and sentence to the competent authority of the United States.

(3) Any period allowed for appeal in the case of sentences involving the death penalty or imprisonment of 2 years or more will not begin to run until notification of the judgment has been received by the protecting power.

(4) Courts of Appeal, if at all possible, will sit in the occupied territory.

*g.* Death penalty.

(1) The CI will be informed as soon as possible of all offenses that are punishable by the death sentence under applicable laws. Lists of these offenses will be posted in all camps. Duplicate lists will be given to the Internee Committee.

(2) The death sentence may not be pronounced against the CI who was under 18 years of age at the time of the offense unless the attention of the court has been particularly called to the fact that since the accused is not a national of the United States, he or she is not bound to it by any duty or allegiance.

(3) If the death sentence is pronounced, it will not be executed for at least 6 months from the date when the protecting power received the detailed communication furnished by the United States in regard to trial (e. above) except as provided in (4) below.

(4) The 6-month period after suspension of the death sentence ((3) above) may be reduced in an individual case in circumstances of grave emergency involving an organized threat to the security of the United States. However, the protecting power must always be notified by HQDA (DAMO-ODL) as to the exception to the 6-month waiting period.

*h.* Civil proceedings. In every case where the CI is a party to any civil litigation, the camp commander will if the CI so requests inform the court of his or her detention. The camp commander will, within legal limits, take all necessary steps to prevent the CI from being in any way prejudiced by reason of his or her internment regarding the preparation and conduct of the case or execution of any judgment of the court.

*i.* Confinement pending trial. A pretrial investigation of an offense alleged to have been committed by the CI will be conducted rapidly so that the trial will take place as soon as possible. The CI will not be confined while awaiting trial unless a civilian national of the occupied territory would be so confined if accused of a similar offense. The CI may be confined if it is essential to do so in the interest of camp or national security. However, this confinement will never exceed 3 months.

*j.* Confinement facilities. CI confined as judicial punishment will serve their sentences in an internment facility, assigned by the theater commander, in the occupied territory as long as U.S. authorities can guarantee their protection.

*k.* Confinement benefits. In addition to the benefits stated in paragraph 6-11b, the CI placed in confinement in connection with judicial proceedings will be permitted to receive one relief parcel each month.

## 6–14. Death and burial

*a.* Reference. For general procedures and authorized expenses for the care and disposition of remains, see AR 638-30 and AR 638-40.

*b.* Disposition of wills. When a person has chosen to make a will, the original and two certified copies will be forwarded to the Branch PWIC upon death or at the CI's request.

*c.* Information furnished to camp or hospital commander upon death. When the CI in U.S. custody dies, the attending medical officer will promptly furnish the following to the camp (or hospital) commander, the local provost marshal, or other officers who were charged with the custody of the CI prior to his or her death.

(1) Full name.

(2) ISN.

(3) Date, place, and cause of death.

(4) Statement that in his or her opinion death was, or was not, the result of the CI's own misconduct.

(5) When the cause of death is undetermined, the medical officer will make a statement to that effect.

(6) When the cause of death is finally determined, a supplemental report will be made.

*d.* Notifying the Branch PWIC of a death. The camp or hospital commander or other officer charged with custody of the CI prior to his or her death will notify the local Branch PWIC immediately by telegram of the death. Notification will include all data required in *c* above. The use of supplemental reports is authorized until requirements have been met.

*e.* Certificate of Death. A copy of DA Form 2669-R is contained in this regulation. For each death, the attending medical officer and the responsible camp commander will complete a DA Form 2669-R. The form will be made out in enough copies to provide the distribution below.

(1) Original—NPWIC.

(2) Copy—Branch PWIC.

(3) Copy—The Surgeon General.

(4) Copy—CI's Personnel File.

(5) If the CI dies in the United States, a copy will be sent to the proper civil authorities responsible for recording deaths in that State.

*f.* Investigating officer's report.

(1) The camp or hospital commander will appoint an officer to investigate and report the following:

*(a)* Each death or serious injury caused, or suspected to have been caused, by guards or sentries, another CI, or any other person.

*(b)* Each suicide or death resulting from unnatural or unknown causes.

(2) The precepts outlined in GC 1949, part IV, section 3, will be used as a guide. (See DA Pam 27-1.)

(3) Military police investigators may be used at the discretion of the camp commander.

*g.* Burial, record of internment, and cremation.

(1) The deceased CI will be buried honorably in a cemetery set up for them according to AR 638-30 and if possible, according to the rites of their religion. Unless unavoidable circumstances require the use of collective (group or mass) graves, the CI will be buried in a separate grave.

(2) Graves Registration Services will record information on burials and graves. A copy of DD Form 551 (Record of Interment) will be forwarded to the Branch PWIC. The United States will care for graves and record of any subsequent moves of the remains.

(3) A body may be cremated only because of imperative hygiene reasons, the CI's religion, or the CI's request for cremation. The reason for cremation of a body will be cited on the death certificate. Ashes will be kept by Graves Registration until proper disposal can be decided according to the instructions of the protecting power.

*h.* Forwarding deceased person's file. The personnel files of a deceased person with all pertinent records will be forwarded to the Branch PWIC.

## 6–15. Transfers

*a.* Authority to transfer. Theater commanders may direct the transfer of the CI, subject to the following conditions:

(1) The CI may not be transferred beyond the borders of the occupied country in which interned except when for material reasons it is impossible to avoid such displacement. The CI thus evacuated will be transferred back to the area from which they were evacuated as soon as hostilities in that area have ceased.

(2) The sick, wounded, or infirmed CI, as well as maternity cases, will not be transferred if the journey would be seriously detrimental to the health of the CI.

(3) If the combat zone draws close to an internment camp, CI may not be transferred unless they can be moved under adequate conditions of safety. However, CI may be moved if they would be exposed to greater risks by remaining than by being transferred.

*b.* Notification of transfer.

(1) The CI to be transferred will be officially advised of their departure and their new postal address in time for them to pack their luggage and notify their next-of-kin. The Internee Committee members to be transferred will be notified in time to acquaint their successors with their duties and related current affairs.

(2) The Branch PWIC and NPWIC will be notified immediately of any CI transferred.

*c.* Treatment during transfer.

(1) Generally, the CI will be transferred under conditions equal to those used for the transfer of personnel of the U.S. Military in the occupied territory. If, as an exceptional measure, the CI must be transferred on foot, only those who are in a fit state of health may be so transferred. The CI will not be exposed to excessive fatigue during transfer by foot.

(2) The sick, wounded, or infirmed CI as well as maternity cases will be evacuated through U.S. military medical channels and will remain in medical channels until they are certified "fit for normal internment" by competent medical authorities.

(3) Potable water and food sufficient in quantity, quality, and variety to maintain them in good health will be provided to the CI during transfer.

(4) Necessary clothing, adequate shelter, and medical attention will be made available.

(5) Suitable precautions will be taken to prevent CI from escaping and to ensure their safety.

*d.* Transfer of personal effects and property.

(1) The CI will be permitted to take with them their personal effects and property. The weight of their baggage may be limited if the conditions of transfer so require, but in no case will it be limited to less than 55 pounds per CI. The personal property that the CI are unable to carry will be forwarded separately.

(2) The mail and parcels addressed to CI who have been transferred will be forwarded to them.

(3) Property, such as that used for religious services, or items donated by welfare agencies will be forwarded as community property. These items are not to be considered a part of the 55 pounds of personal effects and property that each CI is authorized to take.

## 6–16. Release

*a.* General.

(1) Control and accountability of CI will be maintained until the CI is receipted for by a representative of his or her country of residence or a designated protecting power.

(2) After hostilities cease and subject to the provisions of (3) below, CI will be released as soon as the reasons for their internment are determined by the theater commander to no longer exist.

(3) The CI who are eligible for release but have judicial proceedings pending for offenses not exclusively subject to disciplinary punishment will be detained until the close of the proceedings. At the discretion of the theater commander, the CI may be detained until completion of their penalty. The CI previously sentenced to confinement as judicial punishment may be similarly detained. Lists of the CI held under this guidance will be forwarded to the Branch PWIC and NPWIC for transmittal to the protecting power.

*b.* Return of impounded personal effects. Upon release, the CI will be given all articles, moneys, or other valuables impounded during internment and will receive in currency the balance of any credit to their accounts. If the theater commander directs that any impounded currency or articles be withheld, the CI will be given a receipt.

*c.* Cost of transport. The United States will pay the cost of returning the released CI to the places where they were living when interned.

*d.* Medical fitness. The CI will not be admitted into the general population until their medical fitness is determined.

## Chapter 7
## Employment and Compensation—Civilian Internees

### 7–1. General

*a.* Theater commanders may issue, within their respective commands, implementing instructions governing the employment and compensation of the CI consistent with these regulations. Copies of such instructions will be forwarded promptly to ODCSOPS.

*b.* The CI will be employed, so far as possible, in work necessary for the construction, administration, management, and maintenance of the CI camps.

*c.* The CI compensation procedures will be accomplished in accordance with AR 37-1.

### 7–2. Ability to perform labor

*a.* The CI will be required to perform any work consistent with their age and physical condition and in accordance with this regulation.

*b.* The fitness of CI for labor will be determined using the same procedures as those outlined in paragraph 3-4 b.

*c.* The CI under 18 years of age will not be compelled to work.

### 7–3. Authorized work

*a.* Compulsory. The CI may be compelled to perform only the following type of work:

(1) Administrative, maintenance, and domestic work in an internment camp.

(2) Duties connected with the protection of the CI against aerial bombardment or other war risks.

(3) Medical duties if they are professionally and technically qualified.

*b.* Voluntary. Subject to the provisions of paragraph 4-4. and to other restrictions as may be imposed by the theater commander, the CI may volunteer for, but may not be compelled to perform, work of any type without regard to the military character, purpose, or classification of the work. They will be free to terminate such work at any time subject to having labored for 6 weeks and having given an 8-day notice.

### 7–4. Unauthorized work

The criteria for unauthorized work for CI is the same as those found for EPW/RP in paragraph 4-5.

### 7–5. Working conditions

The working conditions for the CI, to include protective clothing, equipment, and safety devices, will be at least as favorable as those prescribed for the civilian population of the occupied territory by the national laws and regulations and as provided for in existing practice. In no case will the working conditions for the CI be inferior to those for the civilian population employed in work of the same nature and in the same district.

### 7–6. Length of workday

*a.* The length of the working day of the CI will not exceed that permitted for civilians in the locality who are employed in the same general type of work. A rest period of not less than 1 hour will be allowed during the workday.

*b.* The length of the workday for CI will be in accordance with paragraph 4-8.

### 7–7. Day of rest

Each CI will be allowed a rest of 24 consecutive hours every week, preferably on Sunday or on the day of rest in his or her country.

### 7–8. Paid work

The following are types of work for which the CI will be compensated:

*a.* Services, including domestic tasks, in connection with administering and maintaining CI camps, branch camps, and hospitals when the CI performs these services permanently.

*b.* Spiritual and medical duties performed by the CI on behalf of their fellow CI.

*c.* Services as members and as assistants to the members of the Internee Committee. These persons will be paid from the camp Civilian Internee Account. If there is no such account, they will be paid the prescribed rate from U.S. Army appropriated funds.

*d.* All types of work that the CI does not have to do but does voluntarily.

**7–9. Unpaid work**
The criteria for unpaid work for CI is the same as for EPW/RP found in paragraph 4-18.

**7–10. Compensation for paid work**
The daily compensation that the CI will receive for paid work will be announced by the Department of the Army at an appropriate time subsequent to an outbreak of hostilities. The CI compensation procedures will be in accordance with AR 37-1.

**7–11. Disability compensation**
Procedures for CI disability compensation will be the same as those found in paragraph 4-20.

**Appendix A**
**References**

**Section I**
**Required Publications**

**AR 37–1**
Army Accounting and Fund Control. (Cited in para 3-3n.)

**AR 40–3**
Medical, Dental, and Veterinary Care. (Cited in para 6-6d.)

**AR 40–5**
Preventive Medicine. (Cited in para 6-6g.)

**AR 190–40**
Serious Incident Report. (Cited in para 3-16f.)

**AR 195–2**
Criminal Investigation Activities. (Cited in para 1-4h.)

**AR 600–8–1**
Army Casualty Operation/Assistance/Insurance. (Cited in para 3-10a.)

**AR 600–25**
Salutes, Honors, and Visits of Courtesy. (Cited in para 3-6c.(4))

**AR 600–55**
The Army Driver and Operator Standardization Program (Selection, Training,Testing, and Licensing). (Cited in para 4-21)

**AR 638–30**
Graves Registration Organization and Functions in Support Major Military Operations. (Cited in para 3-10a.)

**AR 670–1**
Wear and Appearance of Army Uniforms and Insignia. (Cited in para 3-15e.)

**AR 735–5**
Policies and Procedures for Property Accountability. (Cited in para 3-9b.)

**FM 22–5**
Drill and Ceremonies. (Cited in para 3-6c.(4))

**Dictionary of Occupational Titles**
(Cited in para 4-13a.)

**Manual for Courts–Martial**
Manual for Courts-Martial, U.S., 1984. (Cited in para 3-7b.)

**Uniform Code of Military Justice**
(Cited in para 3-7b.)

**DODD 2310.1**
DOD Program for Enemy Prisoners of War (EPOW) and Other Detainees. (Cited in para 1-4g.)

**DODD 5100.77**
DOD Law of War Program. (Cited in para 1-4a.(2))

**Section II**
**Related Publications**
A related publication is merely a source of additional information. The user does not have to read it to understand this regulation.

**AR 40–66**
Medical Record Administration.

**AR 40–400**
Patient Administration.

**AR 55–355**
Defense Traffic Management Regulation. (NAVSUPINST 4600.70, AFR 75-2, MCO P4600.14B, DLAR 4500.3

**AR 190–14**
Carrying of Firearms and Use of Force for Law Enforcement and Security Duties.

**AR 190–47**
The Army Corrections System

**AR 355–15**
Management Information Control System.

**AR 380–5**
Department of the Army Information Security Program.

**AR 985 series**
Army Safety Program.

**DA PAM 27–1**
Treaties Governing Land Warfare.

**FM 33–1**
Psychological Operations

**AF Handbook (AFH) 31–302**
Air Base Defense and Contingency Operations Guidance and Procedures.

**SECNAVINST 3461.3**
Program for Prisoners of War and Other Detainees.

**Section III**
**Prescribed Forms**

**DA Form 2662–R**
EPW Identity Card. (Prescribed in para 3-3a(2)(b))

**DA Form 2663–R**
Fingerprint Card. (Prescribed in para 3-3a(2)(c))

**DA Form 2664–R**
Weight Register. (Prescribed in para 3-4i(3))

**DA Form 2665–R**
Capture Card for Prisoner of War. (Prescribed in para 3-5d(5))

**DA Form 2666–R**
Prisoner of War - Notification of Address. (Prescribed in para 3-5d(4))

**DA Form 2667–R**
Prisoner of War Mail - Letter. (Prescribed in para 3-5d(1))

**DA Form 2668–R**
Prisoner of War Mail - Post Card. (Prescribed in para 3-5d(1))

**DA Form 2669–R**
Certificate of Death. (Prescribed in para 3-10e)

**DA Form 2670–R**
Mixed Medical Commission Certificate for EPW. (Prescribed in para 3-12j)

**DA Form 2671–R**
Certificate of Direct Repatriation for EPW. (Prescribed in para 3-12k)

**DA Form 2672–R**
Classification Questionnaire for Officer Retained Personnel.

**DA Form 2673–R**
Classification Questionnaire for Enlisted Retained Personnel.

**DA Form 2674–R**
Enemy Prisoner of War/Civilian Internee Strength Report.

**DA Form 2675–R**
Certificate of Work Incurred Injury or Disability. (Prescribed in para 6-6f(2))

**DA Form 2677–R**
Civilian Internee Identity Card. (Prescribed in para 6-2e)

**DA Form 2678–R**
Civilian Internee Notification of Address. Prescribed in para 6-2f)

**DA Form 2679–R**
Civilian Internee Mail. (Prescribed in para 6-8a)

**DA Form 2680–R**
Civilian Internee Post Card. (Prescribed in para 6-8a)

**DA Form 4237–R**
Detainee Personnel Record. (Prescribed in para 3-3a(2)(b))

**DD Form 2745**
Enemy Prisoner of War (EPW) Capture Tag. (Prescribed in para 2-1b.)

**Section IV**
**Referenced Forms**

**DA Form 1132**
Prisoners Personal Property List - Personal Deposit Fund

**DD Form 551**
Record of Internment

**DD Form 629**
Receipt for Prisoner or Detained Person

**Standard Form 88**
Report of Medical Examination

**Standard Form 600**
Chronological Record of Medical Care

**DA Form 1132**
Prisoners Personal Property List-Personal Deposit Fund

**DA Form 3444**
Treatment Record

**DA Form 4137**
Receipt for Evidence/Property Custody Document

**Appendix B**
**Internment Serial Number**
The internment serial number (ISN) is a unique identification number assigned to each EPW, RP and CI taken into the custody of the U.S. Armed Forces. Throughout internment/detention, EPW/CI are identified. PWIS accountability for EPW, RP and CI by the U.S. is established when the ISN is assigned. The ISN will consist of three components, with the first two separated by a dash as follows:
  *a. First Component.* The first component will contain five characters. The first two will be the alpha-characters 'US'. The third character will be either the alpha or numeric designation for the command/theater under which the EPW, RP and CI came into the custody of the U.S. The fourth and fifth positions are alpha-characters designating the EPW, RP and CI serving power.
  *b. Second Component.* The second component is a six character numeric identifier. These numbers will be assigned consecutively to all EPW, RP and CI processed through ISN assigning organizations. The Branch PWIC will assign blocks of numbers to ISN assigning organization/elements in the supported theater.
  *c. Third Component.* The third component will consist of an acronym identifying the classification of the individual: either EPW, RP, or CI, to represent Enemy Prisoner of War, Retained Person, or Civilian Internee, respectively. Should an individual that was initially classified as an EPW later determined to be a medically or religiously qualified retained person, the classification may be changed to "RP"with the approval of the EPW command/brigade.
  *d. Example.* The first EPW processed by an ISN assigning organization in a theater designated as "9"and whose country was designated as "AB"will be assigned the following ISN: US9AB- 000001-EPW. The tenth such EPW processed by the same command will be assigned the ISN of: US9AB-000010-EPW. If the eleventh individual processed by the same command was an RP and the fifteenth a CI, their ISNs would be: US9AB-000011-RP and US9AB-000015-CI, respectively.
  *e.* EPW transferred to CONUS without having been assigned an ISN and those captured within the Continental U.S., will be processed and assigned an ISN as above, by the CONUS EPW organizations.

## Glossary

### Section II
### Abbreviations

**Secition 1**
Abbreviations

**ADP**
Automated Data Processing

**APO**
Army Post Office

**Cdr**
Commander

**CI**
Civilian Internee(s)

**COD**
Cash on Delivery

**CONUS**
Continental U.S.

**CTA**
Central Tracing Agency

**DA**
Department of the Army

**DAR**
Defense Acquisition Regulation

**DCSINT**
Deputy Chief of Staff for Intelligence

**DCSLOG**
Deputy Chief of Staff for Logistics

**DCSOPS**
Deputy Chief of Staff for Operations and Plans

**DCSPER**
Deputy Chief of Staff for Personnel

**DOD**
Department of Defense

**DRMO**
Defense Reutilization and Marketing Office

**EDCSA**
Effective Date of Change of Strength Accountability

**EPW**
Enemy Prisoner(s) of War

**FAO**
Finance and accounting officer

**FBI**
Federal Bureau of Investigation

**FORSCOM**
Forces Command

**GC**
Geneva Convention Relative to the Protection of Civilian Persons in time of War

**GPW**
Geneva Convention Relative to the Treatment of Prisoners of War

**GWS**
Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the field

**GWS SEA**
Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Ship-wrecked Members of Armed Forces at Sea

**HQDA**
Headquarters, Department of the Army

**HSC**
U.S. Army Health Services Command

**ICRC**
International Committee of the Red Cross

**ISN**
Internment Serial Number

**JCS**
Joint Chiefs of Staff

**MPMIS**
Military Police Management Information Systems

**NCO**
noncommissioned Officer

**OD**
Other Detainees

**OSD**
Office of the Secretary of Defense

**NPWIC**
National Prisoner of War Information Center

**PP**
Protected Person

**PSYOP**
Psychological Operations

**PWIC**
Prisoner of War Information Center

**RP**
Retained Personnel

**ROK**
Republic of Korea

**SJA**
Staff Judge Advocate

**TJAG**
The Judge Advocate General

**TRADOC**
U.S. Army Training and Doctrine Command

**TSG**
The Surgeon General

**TST**
Tuberculin Skin Test

**UCMJ**
Uniform Code of Military Justice

**USAFAC**
U.S. Army Finance and Accounting Center

**USFK**
U.S. Armed Forces, Korea

### Section II
### Terms

**Canteen**
A facility set up for the sale of authorized services and items of merchandise.

**Central Tracing Agency**
Centralizes tracing requests concerning all persons reported missing during the conflict. Requests are either forwarded by centralized information bureaus or submitted by families via their respective National Red Cross or Red Crescent Societies. The Central Tracing Agency (CTA) then passes them on for processing to the appropriate authorities and forwards replies to the requesters.

**Civilian Internee(s)**
A civilian who is interned during armed conflict or occupation for security reasons or for protection or because he has committed an offense against the detaining power.

**Civilian Internee Account**
Accounts established and records maintained under control of the disbursing officer. Deposit Fund Account 21X6015.

**Civilian Internee Branch Camp**
A subsidiary camp under the supervision and administration of a civilian internee camp.

**Civilian Internee Camp**
An installation established for the internment and administration of civilian internees.

**Civilian Internee Compound**
A subdivision of a CI enclosure.

**Civilian Internee Enclosure**
A subdivision of a CI camp.

**Contract Employer**
Any person, corporation, association, State or municipal government agency, and other employer (except DOD) that contracts for work to be done.

**Dependent Child Internee**
A child who on request of the interned parents, for compassionate reasons, is accommodated in a CI internment camp with the interned parents.

**Detainee**
A term used to refer to any person captured or otherwise detained by an armed force.

**Domestic Service**
Such normal household duties as preparing and serving food and the care and repair of clothing.

**Enemy Prisoner of War**
A detained person as defined in Articles 4 and 5 of the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949. In particular, one who, while engaged in combat under orders of his or her government, is captured by the armed forces of the enemy. As such, he or she is entitled to the combatant's privilege of immunity from the municipal law of the capturing state for warlike acts which do not amount to breaches of the law of armed conflict. For example, a prisoner of war may be, but is not limited to, any person belonging to one of the following categories who has fallen into the power of the enemy: a member of the armed forces, organized militia or volunteer corps; a person who accompanies the armed forces without actually being a member thereof; a member of a merchant marine or civilian aircraft crew not qualifying for more favorable treatment; or individuals who, on the approach of the enemy, spontaneously take up arms to resist invading forces.

**Enlisted EPW**
Enlisted EPW and civilian EPW entitled to be treated as enlisted EPW.

**EPW Branch Camp**
A subsidiary camp under supervision and administration of the main EPW camp.

**EPW Camp**
A camp set up by the U.S. Army for the separate internment and complete administration of EPW.

**EPW Compound**
A subdivision of an EPW enclosure.

**EPW Enclosure**
A subdivision of an EPW camp. Internment Serial Number Unique, controlled identification number assigned an EPW upon capture and entry into the Prisoner of War Information System.

**Military Nature**
Term that applies to those items or those types of construction that are used exclusively by members of the Armed Forces for operational purposes (e.g., arms, helmets). The purposes are in contrast to items or structures that may be used either by civilian

or military personnel (e.g., food, soap, buildings, public roads, or railroads).

**Military Purpose**
Activities intended primarily or exclusively for military operations as contrasted with activities intended primarily or exclusively for other purposes.

**Noncommissioned Officer EPW**
Enlisted EPW and civilian EPW entitled to be treated as a Noncommissioned Officer EPW.

**Other Detainee (OD)**
Persons in the custody of the U.S. Armed Forces who have not been classified as an EPW (article 4, GPW), RP (article 33, GPW), or CI (article 78, GC), shall be treated as EPWs until a legal status is ascertained by competent authority.

**Personal Effects**
Personal effects the EPW may retain include the following:
 *a.* Clothing.
 *b.* Mess equipment (knives and forks excluded).
 *c.* Badges of rank and nationality.
 *d.* Decorations.
 *e.* Identification cards or tags.
 *f.* Religious literature.
 *g.* Articles that are of a personal use or have a sentimental value to the person.
 *h.* Protective mask.

**Prisoner of War Information System**
A computer information system designed to assist military police in the field, the Branch PWIC and the National PWIC to manage enemy prisoners of war by providing automated support for the policies and procedures established by regulation.

**Prisoner of War Information Center (PWIC)**
A TOE organization established to collect information pertaining to EPW, RP and CI and to transmit such information to the National Prisoner of War Information Center.

**Protected Person**
Persons protected by the Geneva Convention who find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals.

**Retained Personnel**
Enemy personnel who come within any of

the categories below are eligible to be certified as retained personnel (RP).
 *a.* Medical personnel who are members of the medical service of their armed forces.
 *b.* Medical personnel exclusively engaged in the—
 (1) Search for, collection, transport, or treatment of, the wounded or sick.
 (2) Prevention of disease.
 (3) Staff administration of medical units and establishments exclusively.
 *c.* Chaplains attached to enemy armed forces.
 *d.* Staff of National Red Cross societies and other voluntary aid societies duly recognized and authorized by their governments. The staffs of such societies must be subject to military laws and regulations.

## Section III
**Special Abbreviations and Terms**
This section contains no entries.

# Index

This index is organized alphabetically by topic and subtopic. Topics and subtopics are identified by paragraph number.

Canteen, 3-4h
Capture, 2-1
Civilian Internee
    Authorization to Intern, 5-1b
    Definition (Glossary Section II)
    Personal effects, 6-3
    Treatment, 5-1a(1)
Complaints
    CI, 6-9
    EPW and RP, 3-16,
Correspondence
    Enemy Prisoner of War and Retained Personnel, 3-5
    Civilian Internee, 6-8

Discipline and Security
    CI, 6-10, 6-11
    EPW and RP, 3-6
Death and Burial, 3-10
    Civilian Internee, 6-14
    Burial at sea, 3-10h
Death Penalty
    Civilian Internee, 6-13g
    EPW/RP, 3-8i(1)
DOD Directive 2310.1, 1-4g

Enemy Prisoner of War
    Definition (Glossary-Section II,
    Sick and Wounded, 2-2
    Transfers, 3-11
    Questioning of Prisoners, 2-1a(1)(d)
    Evacuation of Prisoners, 2-2, 2-3,
Escape
    Preventing Escape, 3-6f(2)
Evacuation Policy, 2-3
Executive Agent, 1-4b

Flags, 3-6e
Finance
    Supplemental Pay, 4-14, 4-16

Health and Comfort Packets, 3-4h

International Committee of the Red Cross
Internee Committee, 6-4
Internment Serial Numbers (Appendix B)

Judicial proceedings
    Civilian Internees, 6-13
    EPW/RP, 3-8,

Labor (Civilian Internee,
    Authorized work, 7-3
    Unauthorized work, 7-4
    Working conditions, 7-5
    Day of rest, 7-7
Labor (EPW/RP)
    Authorized work, 4-4
    Length of work day, 4-8
    Rest Periods, 4-9
    Task system, 4-12
    Unauthorized work, 4-5

Mail
    Civilian Internee, 6-8b
    EPW/RP, 3-5
Medical
    Civilian Internee Dental Care, 6-6d(1)
    Civilian Internee Medical Care and Sanitation, 6-6

Medical Personnel, 1-5f
    Mixed Medical Commission, 3-12
Military Police, 1-4g, 6-2

National Prisoner of War Information Center (NPWIC, 1-7
Naval Vessels, 2-1b

Prisoner of War Information Center, 1-8
Property, 3-9

Other Detainee (Glossary Section II)

Parcels, 3-5k
Photographing, 1-5d
Prisoner of War Information Center
    National Prisoner of War Information Center, 1-6
    Branch Prisoner of War Information Center, 1-7
Protection Policy, 1-5
Public Affairs, 1-9

Release
    Civilian Internee, 6-16
Religion, 1-5g
    Civilian Internee, 6-7
    Chaplains, 3-15b(3)
    Enemy Prisoner of War, 1-5g(2)
    Ministers, 3-15d(1)
Repatriation, 3-14)
    Sick and wounded, 3-12)
Retained Personnel, 3-15)
    Definition (Glossary Section II)
    Chaplains, 3-15b(3)
    Medical Personnel, 1-5f

Safety
    Civilian Internee, 5-2
    EPW/RP, 3-17
Saluting, 3-6d
Social, Intellectual and Religious activities, 3-4d
    Civilian Internee, 6-7
    EPW/RP, 3-4d
Spies and Saboteurs, 5-1e

Telegrams
    Civilian Internee, 6-8k
    EPW/RP, 3-5l
Tobacco, 3-4h
Transfers
    CI, 6-15
    EPW and RP, 3-11
Tribunals, 1-6
    Article 5 GPW, 1-6a

| EPW IDENTITY CARD  
For use of this form, see AR 190-8; the proponent agency is DCSPER. | DATE ISSUED | |
|---|---|---|
| (Photograph) | LAST NAME | |
| | FIRST NAME | GRADE |
| | SERVICE NUMBER | POWER SERVED |
| PLACE OF BIRTH | | DATE OF BIRTH |
| SIGNATURE OF BEARER | | |

DA FORM 2662-R, May 82          EDITION OF 1 JUL 63 IS OBSOLETE.

*(Front)*



| OTHER MARKS OF IDENTIFICATION | | LEFT INDEX / RIGHT INDEX  FINGERPRINTS | WEIGHT | COLOR OF EYES |
|---|---|---|---|---|
| | | | HEIGHT | COLOR OF HAIR |
| | | | BLOOD TYPE | RELIGION |
| | | | NOTICE | |
| | | | This card is issued to prisoners of war in the custody of the United States Army. This card must be carried at all times by the EPW to whom it is issued. | |

*Reverse of DA Form 2662-R, May 82*

*(Reverse)*

## FINGERPRINT CARD
For use of this form, see AR 190-8; the proponent agency is DCSPER.

INTERNMENT SERIAL NUMBER

LAST NAME

FIRST NAME

GRADE

POWER SERVED

NATIONALITY

SEX

AGE

HEIGHT

WEIGHT

OTHER MARKS OF IDENTIFICATION

COLOR OF EYES

COLOR OF HAIR

*LEAVE THIS SPACE BLANK*

SIGNATURE OF OFFICIAL TAKING FINGERPRINTS

CLASSIFICATION

SIGNATURE OF EPW/CIVILIAN INTERNEE

REFERENCE

| 1. RIGHT THUMB | 2. RIGHT INDEX | 3. RIGHT MIDDLE | 4. RIGHT RING | 5. RIGHT LITTLE |
|---|---|---|---|---|
| 6. LEFT THUMB | 7. LEFT INDEX | 8. LEFT MIDDLE | 9. LEFT RING | 10. LEFT LITTLE |

| LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY | LEFT THUMB | RIGHT THUMB | RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY |
|---|---|---|---|

DA FORM 2663-R, May 82

EDITION OF 1 JUL 63 IS OBSOLETE

WEIGHT REGISTER

For use of this form, see AR 190-8; the proponent agency is DCSPER.

| NAME (Last, first, MI) | | INTERNMENT SERIAL NUMBER | |
|---|---|---|---|
| DATE | WEIGHT | DATE | WEIGHT |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

DA FORM 2664-R, May 82     EDITION OF  1 JUL 63 IS OBSOLETE.

AR 190–8/OPNAVINST 3461.6/AFJI 31–304/MCO 3461.1 • 1 October 1997 • R-Forms

**PRISONER OF WAR MAIL**

| IMPORTANT | TO: |
|---|---|
| This card must be completed by each prisoner immediately after being taken prisoner and each time his/her address is changed (by reason of transfer to a hospital or to another camp). This card is distinct from the special card which each prisoner is allowed to send to his/her relatives. | CENTRAL PRISONERS OF WAR AGENCY |

DA FORM 2665-R, May 82                EDITION OF 1 JUL 63 IS OBSOLETE.

*(Front)*

## CAPTURE CARD FOR PRISONER OF WAR
For use of this form, see AR 190-8; the proponent agency is DCSPER.

*WRITE LEGIBLY IN BLOCK LETTERS. DO NOT ADD ANY REMARKS*

| NAME (Last, First, MI) | | GRADE |
|---|---|---|
| SERVICE NUMBER | POWER SERVED | PLACE OF BIRTH |
| DATE OF BIRTH | FIRST NAME OF FATHER | MAIDEN NAME OF MOTHER |
| NAME, ADDRESS, AND RELATIONSHIP OF NEXT OF KIN | | DATE OF CAPTURE OR TRANSFER |

**PHYSICAL CONDITION** *(Check applicable box)*

| | GOOD HEALTH | RECOVERED | SICK | | SERIOUSLY WOUNDED |
|---|---|---|---|---|---|
| | NOT WOUNDED | CONVALESCENT | | | SLIGHTLY WOUNDED |

| FORMER ADDRESS | INTERNMENT SERIAL NO. |
|---|---|

PRESENT ADDRESS *(Name of Camp, or Hospital, and Location)*

| DATE | SIGNATURE OF PRISONER |
|---|---|

Reverse of DA Form 2665-R, May 82

*(Reverse)*

AR 190–8/OPNAVINST 3461.6/AFJI 31–304/MCO 3461.1 • 1 October 1997 • R-Forms

**PRISONER OF WAR MAIL**

DO NOT WRITE HERE

TO:

STREET

CITY

COUNTRY

PROVINCE OR DEPARTMENT

DA FORM 2666-R, May 82

EDITION OF 1 JUL 63 IS OBSOLETE.

(Front)

**PRISONER OF WAR NOTIFICATION OF ADDRESS**
For use of this form, see AR 190-8; the proponent agency is DCSPER.

LANGUAGE

POWER SERVED

*PRINT CLEARLY THE INFORMATION CALLED FOR. DO NOT ADD ANY REMARKS.*

NAME (Last, First, MI)

GRADE

INTERNMENT SERIAL NUMBER

DATE OF CAPTURE OR TRANSFER

DATE OF BIRTH

PLACE OF BIRTH

**PHYSICAL CONDITION** *(Check applicable box)*

| GOOD HEALTH | RECOVERED | SICK | SERIOUSLY WOUNDED |
| NOT WOUNDED | CONVALESCENT | | SLIGHTLY WOUNDED |

FORMER ADDRESS

PRESENT ADDRESS *(Name of Camp or Hospital, and Location)*

DATE

SIGNATURE OF PRISONER

Reverse of DA Form 2666-R, May 82

(Reverse)

SENDER:

Name (Last, first MI)
_____

Internment Serial Number
_____

Date and Place of Birth
_____

Name of Camp
_____

Country where posted
_____

*(Fold on this line)*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PRISONER OF WAR MAIL**          **LETTER**

Language _____

To _____

   Street _____

   City _____

   Country _____

   Province or Department _____

*(Fold on this line)*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DO NOT WRITE HERE**

*(Fold on this line)*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DA FORM 2667-R, May 82**          EDITION OF 1 JUL 63 IS OBSOLETE.          For use of this form, see AR 190-8,
                                                                              the proponent agency is DCSPER.