# EXHIBIT 1

Opposition to Respondents' Motion to Stay

On Behalf of Petitioner,

IBRAHIM OSMAN IBRAHIM IDRIS

{{MSG016 RTF  ~~SECRET~~    Page 1

b6 -1
b7C -1

From: [redacted] (INSD) (FBI)   b6 -1
To: Caproni, Valerie E. (OGC) (FBI)   b7C -1
cc:
Subject: FW GTMO

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

Here is the second summary. One more to go.

-----Original Message-----
From: [redacted] (BS) (FBI)
Sent: Monday, August 02, 2004 10:46 AM   b6 -1
To: [redacted] (INSD) (FBI)   b7C -1
Subject: RE GTMO

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

Mr [redacted]   b6 -1
                b7C -1

As requested, here is a brief summary of what I observed at GTMO.

On a couple of occassions, I entered interview rooms to find a detainee chained hand and foot in a fetal position to the floor, with no chair, food, or water. Most times they had urinated or defacated on themselves, and had been left there for 18, 24 hours or more. On one occassion, the air conditioning had been turned down so far and the temperature was so cold in the room, that the barefooted detainee was shaking with cold. When I asked the MP's what was going on, I was told that interrogators from the day prior had ordered this treatment, and the detainee was not to be moved. On another occassion, the A/C had been turned off, making the temperature in the unventilated room probably well over 100 degrees. The detainee was almost unconcious on the floor, with a pile of hair next to him. He had apparently been literally pulling his own hair out throughout the night. On another occassion, not only was the temperature unbearably hot, but extremely loud rap music was being played in the room, and had been since the day before, with the detainee chained hand and foot in the fetal position on the tile floor.

Any questions, feel free to call or ask via email [redacted]   b2 -1
                                                              b6 -1
-----Original Message-----                                    b7C -1
From: [redacted] (INSD) (FBI)
Sent: Thursday, July 29, 2004 10:58 AM   b6 -1
To: [redacted] (BS) (FBI)                b7C -1
Subject: RE GTMO

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

DATE: 11-09-2004
CLASSIFIED BY 61579DMH/BCB/gjg 04-CV-4151
REASON: 1.4 (C)
DECLASSIFY ON: 11-09-2029

~~SECRET~~

DETAINEES-1760    1760

5053

{{MSG016 RTF    ~~SECRET~~                                           Page 2

b6 -1
b7C -1

Could you please provide a short summary of what you observed? Thanks

-----Original Message-----
From: [redacted] (BS) (FBI)      b6 -1
Sent: Monday, July 12, 2004 10:10 AM    b7C -1
To: [redacted] (INSD) (FBI)
Subject: RE: GTMO

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

                    b6 -1
Mr [redacted]         b7C -1

I am responding to your request for feedback on aggressive treatment and improper interview techniques used on detainees at GTMO. I did observe treatment that was not only aggressive, but personally very upsetting, although I can't say that this treatment was perpetrated by Bureau employees. It seemed that these techniques were being employed by the military, government contract employees and [redacted]

b1

b2 -1
b6 -1    My name is SA [redacted] Boston Division, EOD [redacted] currently assigned to Squad C-9,    (S)
b7C -1   telephone [redacted]

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

~~SECRET~~

DETAINEES-1761

1761

5054

# EXHIBIT 2

Opposition to Respondents' Motion to Stay

On Behalf of Petitioner,

IBRAHIM OSMAN IBRAHIM IDRIS

OCT 27 2004  9:24AM                  SECRET                           NO. 354   P. 2



U S Department of Justice

Federal Bureau of Investigation

Washington, D C 20535-0001

July 14, 2004

Major General Donald J. Ryder
Department of the Army
Criminal Investigation Command
6010 6th Street
Fort Belvoir, Virginia 22060-5506

Re. Suspected Mistreatment of Detainees

Dear General Ryder

    I appreciate the opportunity I had to meet with you last week. As part of a follow up on our discussion on detainee treatment, I would like to alert you to three situations observed by agents of the Federal Bureau of Investigation (FBI) of highly aggressive interrogation techniques being used against detainees in Guantanamo (GTMO). I refer them to you for appropriate action

b6 -1,2
b7C -1,2

1. During late 2002, FBI Special Agent [redacted] was present in an observation room at GTMO and observed [redacted] (first name unknown) [redacted] conducting an interrogation of an unknown detainee. (SA [redacted] was present to observe the interrogation occurring in a different interrogation room.) [redacted] entered the observation room and complained that curtain movement at the observation window was distracting the detainee, although no movement of the curtain had occurred. She directed a marine to duct tape a curtain over the two-way mirror between the interrogation room and the observation room. SA [redacted] characterized this action as an attempt to prohibit those in the observation room from witnessing her interaction with the detainee. Through the surveillance camera monitor, SA [redacted] then observed [redacted] position herself between the detainee and the surveillance camera. The detainee was shackled and his hands were cuffed to his waist. SA [redacted] observed [redacted] apparently whispering in the detainee's ear, and caressing and applying lotion to his arms (this was during Ramadan when physical contact with a woman would have been particularly offensive to a Moslem male). On more than one occasion the detainee appeared to be grimacing in pain, and [redacted]'s hands appeared to be making some contact with the detainee. Although SA [redacted] could not see her hands at all times, he saw them moving towards the detainee's lap. He also observed the detainee pulling away and against the restraints. Subsequently, the marine who had previously taped the curtain and had been in the interrogation room with [redacted] during the interrogation re-entered the observation room

66F-HQ-A1234210          DETAINEES-3823          ALL INFORMATION CONTAINED
TJH:tjh (2)                                     HEREIN IS UNCLASSIFIED EXCEPT
                                                WHERE SHOWN OTHERWISE

                          SECRET                DATE: 10-27-2004
                                                CLASSIFIED BY 65179DMH/BCB/sjg 04-CV-4151
                                                REASON: 1.4 (C)
                                                DECLASSIFY ON: 10-17-2029

4622

OCT 27 2004  5:24PM                    SECRET                              NO. 05-    P. 3

General Donald J. Ryder

b6 -1,2
b7C -1,2

SA [redacted] asked what had happened to cause the detainee to grimace in pain. The marine said [redacted] had grabbed the detainee's thumbs and bent them backwards and indicated that she also grabbed his genitals. The marine also implied that her treatment of that detainee was less harsh than her treatment of others by indicating that he had seen her treatment of other detainees result in detainees curling into a fetal position on the floor and crying in pain.

b1
b6 -1,2,5
b7C -1,2,5

2. Also in October 2002, FBI Special Agent [redacted] was observing the interrogation of a detainee when [redacted] a civilian contractor, came into the observation room and asked SA [redacted] to come see something. SA [redacted] then saw an unknown bearded, long-haired detainee in another interrogation room. [redacted] SA [redacted] asked Mr. [redacted] whether the detainee had spit at the interrogators. Mr. [redacted] laughed and stated that the detainee had been chanting the Koran and would not stop. Mr. [redacted] did not answer when SA [redacted] asked [redacted]

b6 -4
b7C -4

3. In September or October of 2002 FBI agents observed that a canine was used in an aggressive manner to intimidate detainee [redacted] and, in November 2002, FBI agents observed Detainee [redacted] after he had been subjected to intense isolation for over three months. During that time period, [redacted] was totally isolated (with the exception of occasional interrogations) in a cell that was always flooded with light. By late November, the detainee was evidencing behavior consistent with extreme psychological trauma (talking to non-existent people, reporting hearing voices, crouching in a corner of the cell covered with a sheet for hours on end). It is unknown to the FBI whether such extended isolation was approved by appropriate DoD authorities.

b6 -2
b7C -2

These situations were referenced in a May 30, 2003 electronic communication (EC) from the Behavioral Analysis Unit of the FBI to FBI Headquarters. That EC attached, among other documents, a draft Memorandum for the Record dated 15 January 2003 from Capt [redacted] (USAFR), that refers to the first two events among others in a time line of events related to discussions concerning the use of aggressive interrogation techniques. Marion Bowman of the FBI's Office of General Counsel discussed the contents of those communications with Mr. Dietz, Deputy General Counsel (Intelligence) and Mr. Del'Orto, Deputy General Counsel of DoD, around the time the EC was received. Although he was assured that the general concerns expressed, and the debate between the FBI and DoD regarding the treatment of detainees was known to officials in the Pentagon, I have no record that our specific concerns regarding these three situations were communicated to DoD for appropriate action.

2

SECRET

DETAINEES-3824

4623

OCT 27 2004  9:25AM    SECRET                                    NO 854    P 4

General Donald J. Ryder

If I can provide any further information to you, please do not hesitate to call.

Sincerely yours,

T J. Harrington
Deputy Assistant Director
Counterterrorism Division

DETAINEES-3825

3


SECRET

4624

# EXHIBIT 3

Opposition to Respondents' Motion to Stay

On Behalf of Petitioner,

IBRAHIM OSMAN IBRAHIM IDRIS

1 of 6 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

January 1, 2005 Saturday
Late Edition - Final

**SECTION:** Section A; Column 3; National Desk; Pg. 11

**LENGTH:** 1809 words

**HEADLINE:** Fresh Details Emerge on Harsh Methods at Guantanamo

**BYLINE:** By NEIL A. LEWIS

**DATELINE:** WASHINGTON, Dec. 31

**BODY:**

Sometime after Mohamed al-Kahtani was imprisoned at Guantanamo around the beginning of 2003, military officials believed they had a prize on their hands -- someone who was perhaps intended to have been a hijacker in the Sept. 11 plot.

But his interrogation was not yielding much, so they decided in the middle of 2003 to try a new tactic. Mr. Kahtani, a Saudi, was given a tranquilizer, put in sensory deprivation garb with blackened goggles, and hustled aboard a plane that was supposedly taking him to the Middle East.

After hours in the air, the plane landed back at the United States naval base at Guantanamo Bay, Cuba, where he was not returned to the regular prison compound but put in an isolation cell in the base's brig. There, he was subjected to harsh interrogation procedures that he was encouraged to believe were being conducted by Egyptian national security operatives.

The account of Mr. Kahtani's treatment given to The New York Times recently by military intelligence officials and interrogators is the latest of several developments that have severely damaged the military's longstanding public version of how the detention and interrogation center at Guantanamo operated.

Interviews with former intelligence officers and interrogators provided new details and confirmed earlier accounts of inmates being shackled for hours and left to soil themselves while exposed to blaring music or the insistent meowing of a cat-food commercial. In addition, some may have been forcibly given enemas as punishment.

While all the detainees were threatened with harsh tactics if they did not cooperate, about one in six were eventually subjected to those procedures, one former interrogator estimated. The interrogator said that when new interrogators arrived they were told they had great flexibility in extracting information from detainees because the Geneva Conventions did not apply at the base.

Military officials have gone to great lengths to portray Guantanamo as a largely humane facility for several hundred prisoners, where the harshest sanctioned punishments consisted of isolation or taking away items like blankets, toothpaste, dessert or reading material. Maj. Gen. Geoffrey D. Miller, who was the commander of the Guantanamo operation from November 2002 to March 2004, regularly told visiting members of Congress and journalists that the approach was designed to build trust between the detainee and his questioner.

"We are detaining these enemy combatants in a humane manner," General Miller told reporters in March 2004. "Should our men or women be held in similar circumstances, I would hope they would be treated in this manner."

His successor, Brig. Gen. Jay W. Hood, told reporters in November that he was "satisfied that the detainees here have not been abused, they've not been mistreated, they've not been tortured in any way."

Journalists who were permitted to view an interview session from behind a glass wall during General Hood's tenure were shown an interrogator and detainee sharing a milkshake and fries from the base's McDonald's and appearing to chat amiably. It became apparent to reporters comparing notes in August, however, that the tableau of the interrogator and prisoner sharing a McDonald's meal was presented to at least three sets of journalists.

In addition to the account of Mr. Kahtani's treatment, the new interviews provide details and confirm some of the accounts in other recent disclosures about procedures at Guantanamo: the November report in which the International Committee of the Red Cross complained privately last summer to the United States government that the procedures at Guantanamo were "tantamount to torture"; memorandums from F.B.I. officials, most of which were released in December as part of a lawsuit brought by the American Civil Liberties Union; and another set of interviews with The Times in October in which other former Guantanamo officials described coercive and abusive techniques regularly employed there.

The information from the various sources frequently matched, providing corroboration of the use of specific procedures, which included prolonged sleep deprivation and shackling prisoners in uncomfortable positions for many hours. One F.B.I. agent wrote his superiors that he saw such restraining techniques several times. In the most gruesome of the bureau memorandums, he recounted observing a detainee who had been shackled overnight in a hot cell, soiled himself and pulled out tufts of hair in misery.

Military officials who participated in the practices said in October that prisoners had been tormented by being chained to a low chair for hours with bright flashing lights in their eyes and audio tapes played loudly next to their ears, including songs by Lil' Kim and Rage Against the Machine and rap performances by Eminem.

In a recent interview, another former official added new details, saying that many interrogators used a different audio tape on prisoners, a mix of babies crying and the television commercial for Meow Mix in which the jingle consists of repetition of the word "meow."

The people who spoke about what they saw or whose duties made them aware of what was occurring said they had different reasons for granting interviews. Some said they objected to the methods, others said they objected to what they regarded as a chaotic and badly run system, while others offered no reason. They all declined to be identified by name, some saying they feared retaliation.

Lt. Col. Leon H. Sumpter, the spokesman for the military command at Guantanamo, said in a statement that officials would not comment on accusations about the treatment of any individual detainee including Mr. Kahtani, who was captured in Afghanistan.

"We do not discuss specific interrogation techniques nor do we identify any specific detainee," Colonel Sumpter said in a statement. "All detainees are safeguarded and are assured food, drink, clothing, shelter, health care and basic rights, all in accordance with the Geneva Convention. The U.S. does not permit, tolerate or condone torture by any of its personnel or employees."

Colonel Sumpter said that the interrogation regimen at Guantanamo had produced useful intelligence "based on trust and not out of fear or duress."

The intelligence officials who spoke with The Times said that the interrogation personnel and their assigned prisoners were divided into five groups. Four were geographically based -- one for Saudi Arabia, one for the Gulf States, another for Pakistan and Afghanistan and the last for Asia, Europe and the Americas. The fifth, termed "special projects," included Mr. Kahtani.

There was a high confidence among military intelligence officials that Mr. Kahtani was a dangerous operative of Al Qaeda. The federal commission investigating the Sept. 11 attacks concluded in its June report that he was denied entry into the United States on Aug. 4, 2001, at the Orlando airport, the same day that Mohamed Atta, the plot's ringleader, was there and most likely intended to meet him.

The officials who spoke about the detainees' treatment said, however, that very few of the other prisoners had much value. "So much of the questioning was about Afghanistan," one intelligence official said. "Most of it was dated. Information about facilitators and recruiters was useful only in style, not in facts."

The clearest indication that senior commanders at Guantanamo were aware of and supported what was occurring may be in some F.B.I. memorandums. One, dated May 10, 2003, and written by an unidentified agent, describes a sharp

exchange between bureau officials and General Miller and Maj. Gen. Michael Dunlavey, who was in charge of the intelligence operations at Guantanamo then.

"Both sides agreed that the bureau has its way of doing things and the D.O.D. has their marching orders from SecDef," the memorandum said, using abbreviations for the Department of Defense and the secretary of defense. "Although the two techniques differed drastically, both generals believed they had a job to do."

The frustration caused by Mr. Kahtani's refusal to cooperate set off a high-level review of allowable interrogation techniques, according to documents released earlier by the Pentagon. After officials at Guantanamo asked for more leeway in dealing with Mr. Kahtani, Defense Secretary Donald H. Rumsfeld in December 2002 approved a list of 16 techniques for use there in addition to the 17 methods in the Army Field Manual. He suspended those approvals the next month after some Navy lawyers complained that they were excessive and possibly illegal. But after a review, Mr. Rumsfeld issued a final policy in April 2003, approving 24 techniques, some of which needed his permission to be used.

None of the approved techniques, however, covered some of what people have now said occurred. Mr. Kahtani was, for example, forcibly given an enema, officials said, which was used because it was uncomfortable and degrading.

Pentagon spokesmen said the procedure was medically necessary because Mr. Kahtani was dehydrated after an especially difficult interrogation session. Another official, told of the use of the enema, said, however, "I bet they said he was dehydrated," adding that that was the justification whenever an enema was used as a coercive technique, as it had been on several detainees.

In order to carry on the charade that he was not at Guantanamo, the military arranged it so Mr. Kahtani was not visited by the Red Cross on a few of its regular visits, creating a window of several months, said a person who dealt with him at Guantanamo. Officials at the Washington office of the Red Cross, which makes periodic visits to each of the Guantanamo detainees, said they would not discuss their meetings with any prisoners as part of their agreement with the United States government.

Two interrogators confirmed several of the complaints in the Red Cross report, including the notion that interrogators were able to obtain prisoners' medical records easily, which human rights groups say could discourage inmates from seeking medical care. The interrogators also discussed another factor in the Red Cross report, the use of a Behavioral Science Consultation Team, known as Biscuit, comprising a psychologist or psychiatrist and psychiatric workers. The team was used to suggest ways to make prisoners more cooperative in interrogations.

"They were supposed to help us break them down," one said.

The same former interrogator said the Red Cross report was correct in asserting that some female interrogators used sexual taunts to harass the detainees.

It is unclear whether the Justice Department's new, broader definition of torture, posted on the department's Web site late Thursday, would have affected operations at Guantanamo.

URL: http://www.nytimes.com

LOAD-DATE: January 1, 2005

# EXHIBIT 4

Opposition to Respondents' Motion to Stay

On Behalf of Petitioner,

IBRAHIM OSMAN IBRAHIM IDRIS

15 of 46 DOCUMENTS

Copyright 2005 Associated Press
All Rights Reserved

The Associated Press

These materials may not be republished without the express written consent of The Associated Press

February 1, 2005, Tuesday, BC cycle

**SECTION:** International News

**LENGTH:** 1322 words

**HEADLINE:** AP Exclusive: Videos of riot squads at Guantanamo show prisoners being punched and stripped from the waist down

**BYLINE:** By PAISLEY DODDS, Associated Press Writer

**DATELINE:** SAN JUAN, Puerto Rico

**BODY:**
    Videotapes of riot squads subduing troublesome terror suspects at the U.S. prison camp at Guantanamo Bay show the guards punching some detainees, tying one to a gurney for questioning and forcing a dozen to strip from the waist down, according to a secret report. One squad was all-female, traumatizing some Muslim prisoners.
    Investigators from U.S. Southern Command in Miami, which oversees the camp in Cuba, wrote the report that was obtained by The Associated Press after spending a little over a week in June reviewing 20 hours of videotapes involving "Immediate Reaction Forces."
    The camp's layout prevented videotaping in all the cells where the five-person teams - also known as "Immediate Response Forces" - operated, the report said. Reviewers said they did not look at all of the available videotapes.
    Although the report cited several cases of physical force, reviewers said they found no evidence of systemic detainee abuse, according to the six-page summary dated June 19, 2004. An official familiar with the report authenticated it, speaking to AP on condition of anonymity. AP also reviewed an unclassified log of the videotape footage.
    The tapes raised questions about mistreatment and misconduct, however, said the investigators, who suggested some clips needed more scrutiny to rule out abuse. The military has cited 10 substantiated cases of abuse at Guantanamo, and announced Tuesday an extension would be granted for an investigation to interview of witnesses in the United States and abroad.
    One such clip the investigators flagged was from Feb. 17, 2004. It showed "one or more" team members punching a detainee "on an area of his body that seemingly would be inconsistent with striking a pressure point," which is a sanctioned tactic for subduing prisoners.
    In five other clips showing detainees who appeared to have been punched by team members, the investigators said: "The punching was in line with accepted law enforcement practice of striking the pressure point on the back of the thigh to temporarily distract the detainee."
    In other "questionable" cases, reviewers said a video showed a guard kneeing a detainee in the head, while another showed a team securing a detainee to a gurney for an interrogation.
    A separate clip captured a platoon leader taunting a detainee with pepper spray and repeatedly spraying him before letting the reaction team enter the cell, reviewers wrote.

Investigators also noted about a dozen cases where detainees were stripped from the waist down and taken to the "Romeo block," of the camp. No female guards were involved, they said.

Romeo block is a camp section where prisoners were often left naked for days, according to two former detainees, Britons Shafiq Rasul and Asif Iqbal, who were released last year.

Although no female guards were videotaped in any of the stripping cases, investigators cautioned the U.S. government about using the all-female team to handle disruptive detainees, citing religious and cultural issues. Many of the prisoners are Muslim men and under strict interpretations of Islam view contact with other women other than their wives as taboo.

"Several detainees express displeasure about female MPs either escorting them, or touching them as members of an IRF team," the report says. "Because some have questioned our sensitivity to the detainees' religion and culture, we believe that talking points are appropriate to address incorporation of female soldiers into the guard force."

In one video clip of the reaction teams, the memo says, "A detainee appears to be genuinely traumatized by a female escort securing the detainee's leg irons. In another video, inexplicably an all-female IRF team forcibly extracts a detainee from his cell."

While stating that female troops have a right to serve as equals alongside their male counterparts, investigators warned the all-female team could create the perception that the gender of the squad was taken into consideration for the Muslim population.

"By forming an all-female IRF team for use with one detainee we potentially undercut our position that we do not distinguish between male and female soldiers. Clearly, the soldiers' gender did play a role in forming the all-female IRF team," the memo says.

The memo suggests that military "personnel showing the IRF videos outside of (Defense Department) channels should be prepared with talking points to refute or diminish the charge that we use women (against) the detainees' culture or religion."

The U.S. military wouldn't comment on whether there's a specific strategy involved in using an all-female response force but said female guards - who serve on mixed reaction teams as well - comprise about 20 percent of the guard force.

"As a matter of policy, we do not discuss specific Immediate Response Force composition or methods, but they are consistent with those used in the corrections profession and are always carried out with the security and safety of detainees and troopers in mind," said Lt. Col. James Marshall, a spokesman at U.S. Southern Command.

Navy Cmdr. Robert Mulac, a former spokesman at Guantanamo, reported last year that Guantanamo had surrendered 500 hours of videos to investigators. Southern Command spokesman Col. David McWilliams disputed the number on Tuesday. McWilliams said he couldn't provide a specific figure because investigations were pending and the information was classified.

Prisoners released from Guantanamo have accused the extraction teams of abuse and one former U.S. National Guardsmen received brain damage after posing undercover as a rowdy detainee and being beaten by teammates.

"The obvious problem with our armed forces is their inability to comply with international law," said Arsalan T. Iftikhar, national legal director for the Washington, D.C.-based Council on American-Islamic Relations. "Many of us thought that the Abu Ghraib scandal in Iraq was going to shake us into awakening but it seems like the things we keep learning about Guantanamo indicate there was, in fact, systematic abuse."

Joe Navarro, a former FBI interrogator who has taught questioning methods and is familiar with Guantanamo, said treating prisoners poorly makes them more stubborn and unwilling to talk.

"The military has been cavalier in their attitudes toward these individuals to the point that it has been detrimental to the overall mission," Navarro told AP.

The American Civil Liberties Union has filed a Freedom of Information Act request asking for all photographs and videotapes depicting the treatment of the detainees.

Although a court ordered the government to comply with the ACLU request and turn over documents - thousands of which the ACLU has received - the government has refused to provide videos, citing privacy concerns, said Jameel Jaffer, an ACLU attorney.

Although the extraction team actions are videotaped, interrogations with detainees aren't.

The use of female guards and interrogators has created controversy.

A former Army linguist who served at Guantanamo as an Arabic translator from December 2002 to June 2003 wrote in a draft manuscript that female interrogators tried to break Muslim detainees by sexual touching, wearing a miniskirt and thong underwear and in one case smearing a Saudi man's face with fake menstrual blood. The draft written by former Army Sgt. Erik R. Saar was obtained by AP, which reported on its contents last week.

About 545 prisoners from some 40 countries are being held at Guantanamo Bay, Cuba, most accused of links to Afghanistan's ousted Taliban regime or al-Qaida terror network.

---

EDITOR'S NOTE: Associated Press Writer Paisley Dodds is based in San Juan, Puerto Rico, and has been covering the U.S. detention mission at Guantanamo Bay, Cuba, since it began in 2002.

----

On the Net:

Joint Task Force Guantanamo: http://www.nsgtmo.navy.mil/jtfgtmo/mission.html

**GRAPHIC:** AP Graphic GUANTANAMO ABUSE

**LOAD-DATE:** February 2, 2005